**ORIGINAL**

21-CV-703

DONNELLY, J.

UNITED   STATES   DISTRICT   COURT

FOR   THE
EASTERN   DISTRICT   OF   NEW   YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  FEB 03 2021  ★

BROOKLYN OFFICE

---

LORENZO McGriff,

      Petitioner,

    -Against-

Readon, SUPERINTENDENT
Marcy  Correctional  Facility,
        Respondent.

---



RECEIVED
FEB 03 2021
PRO SE OFFICE

BRIEF   FOR PETITIONER TO BE
SUBMITTED  IN  SUPPORT  OF
WRIT  OF HABEAS  CORPUS  ON
BEHALF OF  Lorenzo McGriff,
Petitioner - Pro-Se

The Pro-Se Office
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
  225 CADMAN PLAZA EAST
BROOKLYN , NEW YORK  11201

TABLE OF CONTENT

Title                                                                    Page(s)

Brief Cover ...............................................   i
Affidavit of Service By Mail .............................   ii
Rule 30, 28 U.S.C.A. Statement ...........................   1
Preliminary Statement ....................................   2
Question Presented .......................................   3
Statement of Facts .......................................   4
The Trial- Jury Selection and Batson Challenge ..........   5-7
The People's Case ........................................   8
The Defense Case- Petitioner's Testimony ................   13
Cross- Examination .......................................   15
EMT Testimony/ Defense Attempt To call Nicole McGriff ...   17
Summations ...............................................   18
Jury Instructions, Deliberation and Verdict .............   21
Defense Motion to Set Aside Verdict- Petitioner's back-
round and Sentencing .....................................   23
GOUND: 1 / Standard of Review: Trial Court's Improper
Jury Instruction and Trial Counsel's Ineffective Assistance
During Critical stage of Proceeding ......................   27
Meeting Standard of Review ...............................   31
Standard of Review- New York's Contemporaneous Objection
Rule, CPL § 470.05 .......................................   38

Issue/ The State Court Ruling ............................   39

Standard for Determining the Adequace of Stae Ground  of

Decision .................................................   42

GROUND: 2 / Standard of Review: Weight of Evidence Element-
Based Review Legal Sufficiency Challenge .................   48
Meeting Standard of Review ...............................   50

Title                                                      Page(s)
────

GROUND: 3 / Standard of Review: Prosecutorial Misconduct/Meeting Standard of Review ................................... 59
GROUND: 4 / Standard of Review: Prosecutor's Misconduct Enterjecting Umsupported, uncharged Theory of Crime, Creating Impermissible Duplicity ................................. 68
Evidentiary Claim: ...................................... 71
GROUND: 5 / Standard of Review: The Court Erred when it Excluded as "Collateral" Petitioner's Wife's Testimony/ Meeting Standard of Review ................................... 73
Legal Standard .......................................... 78
GROUND: 6 / Standard of Review: Court's Error Denying Counsel's Batson Application/ Meeting Standard of Review . 80

Lorenzo McGriff,
               Petitoner,

                            AFFIDAVIT   OF   SERVICE BY MAIL

        -Against-

Readon, SUPERINTENDENT
Marcy Correctional Facility
                Responent.

STATE  OF  NEW  YORK)
COUNTY  OF  ONIDA  )SS.:

      I Lorenzo NcGriff, being duly sworn depose and says:
I am the Petitioner, Pro-Se, in the above-captioned action.
Following the below indicated date of notarization, I served   by
mail, 1 original and 2 copies of the annexed  Habeas Corpus Peti-
tion Upon:

                The Pro-Se Office
           UNITED   STATES   DISTRICT COURT
           EASTERN   DISTRICT   OF NEW YORK
             225 Cadman Plaza East
           Brooklyn, New York,   11201
At the Above Noted Address.

                    DAVID E. JOHNSON
               Notary Public in the State of New York
              Qualified in Oneida County 01JO6235737
sworn To Before Me on This     My Commission Expires Jan. 6, 20___  Respectfully, ect.,

2 day of May , 2020

_____
Notary Public

                   Lorenzo McGriff
                   marcy Correctional
                   Facility  Box 3600
                   Marcy, NY 13403

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF NEW YORK

---

Lorenzo McGriff.

Petitioner,


-Against-


Readon, SUPERINTENDENT
Marcy Correctional Facility

respondent.

---

## RULE 30, 28 USCA STATEMENT


1. The indictment number in the state court was 6248/2015.

2. the full names of the original parties were People of the state of New York Against Lorenzo McGriff. The parties are now Lorenzo McGriff against Readon, Superintendent Marcy Correctional facility.

3. This action was commenced in Supreme Court, Kings County.

4. It was commenced by the filing of an indictment on August 19, 2015.

1

5. This petition seeking habeas corpus relief is from a judgment convicting petitioner, after a jury trial, of second-degree assault.

6. This petition seeking relief is from a judgment of conviction rendered January 20, 2017.

7. Petitioner is requesting to proceed as a Poor-Person and for assignment of counsel, to assist with the perfection of the issues at bar present upon this petition. The appendix method is not being used.

## PRELIMINARY  STATEMENT

Petitioner Lorenzo McGriff seeks habeas Corpus relief from a January 20, 2017 judgment of the Supreme court, kings county, convicting him, after a jury trial, of second-degree assault ( P.L. 120.05[2]), an sentencing him to 7 years in prison to be followed by 5 years of post-release supervision ( **Cyrulink, J., at trial and sentence).**

The Appellate Division Second Department affirm his conviction by Decision & Oreder, dated September 18, 2019 and the New York Court of Appeal, Second-Department denied Leave on 11/27/2019 (DiFiore, Ch. J. )

Petitioner, declair that his custody is in violation of the Constitution, Laws and treayies of the United States, as the result of this conviction. 28 U.S.C. § 2254(a).

Petitioner had no co-defendants at trial. He is currently incarcerated pursuant to the judgement.

2

## QUESTION   PRESENTED

Whether the state court's invoking procedural rules in deny ing Petitioner's appeal, " contrary to, or involved an unreason- able application of clearly established federal law " or base on an unreasonable determination of facts in light of the   evidence presented in the state court proceedings ?" 28 U.S.C. §§ 2254(d)- (2006).

## STATEMENT   OF   FACTS

### Introduction

Petitioner Lorenzo McGriff, a married, middle-aged man   on his lunchtime break from his job as a peer specialist   working with the mentally ill, was walking around the block in   downtown Brooklyn when Mohammed Khalifa a stranger, elbowed him in   the collarbone. When petitioner pushed him away, Khalifa called   petitioner, an African American a " fucking nigger " and a " slave ", and threatened to " kick [his] ass ". Petitioner, retreated, but Khalifa followed him across the street and down the block.   And when petitioner, winded from trying to get away, perceived   that Khalifa had picked up a brick from a contruction site and   was swinging it at him, petitioner jabbed Khalifa five times with   a sharp instrument in an effort to make him drop his weapon.   Petitioner then fled the scene, with Khalifa still in pursuit. Khalifa was then picked up by **EMTs,** and proceeded to call   them " niggers " and " bitches ". khalifa eventually required sedation to be treated. Hospital records revealed that Khalifa tested positive for cocaine. Khalifa did not testify at trial; Petitioner , who did testify, raised a justification defense premised   on Khalifa's aggressive, abusive, and apparently drug-fueled behav - ior.

4

During jury selection, the people exercised 9 out of   11 peremptory  challenges against black members of the panel.   The court denied petitioner's objection to these strikes, ruling that he had not made a prima facie case of racial motivation.

Both at trial and during summation, the prosecutor  called petitioner a liar and embellisher, and asked, among other things, why he failed to preserve the weapon Khalifa had menaced him with The prosecutor also argued at summation that even if petitioner was initially justified in using force, he may have    " chased " Khalifa, negating his justification defense.

the jury ultimately acquitted prtitioner of    attempted first-degree assault but convicted him of second degree assault . Although the court was presented evidence that petitioner,    a family man with a full-time job, suffered from bipolar disorder - and previously undiagnosed post-traumatic stress disorder, connec ted to a debilitating injury he suffered as a child, the court im posed the maximum 7-year sentence.

## The Trial

### Jury Selection and Batson Challenge

#### Round 1

At the end of the first round of jury selection, the    pro-secutor exercised peremptory challenges against panelists  Ashley Dun and Khandija Barrow, both of whom were black (J. 121, 283).[1] During defense counsel's questioning, Dunn had indicated that she looked for consistency in witnesses and, along with Barrow,    an-swered affirmatively when asked "would you stick by what you  be-lieve in?" (J. 108, 112). Both Dunn and Barrow provided biograph-ical information, such as neighborhood and job, during the court' s

5

initial voir dire; neither was questioned by the prosecution (J.
72-73, 88- 99).

Eight jurors were seated from the first roun, three of whom
were identified as black by the prosecutor. Among the non-black
jurors seated were Sean McGuinness, who had prior theft convic-
tion; and Morley Bland, who was a crime victim, had served on
both a criminal and civil jur had volunteered previously for      a
public defender, and revealed that she experienced unpleasent in-
teraction with people on the street "[a]ll the time" (J.79, 85   -
86, 94-95, 106, 121-22, 285).

### Round 2

At the end of the second round, the prosecution struck pan-
lists Gerard Philip, Andrea Solstad, and Puline Stewart, who were
black and Tara cascone, who was white (J. 196-98, 200, 283).
Slstad, who related a story about subway harassment, earlier  had
been challenged unsuccessfully by the prosecution for cause (J.
152-53, 167, 181-84, 189-90, 198-99). Outside of providing neigh-
borhood, family, and work biographical details, neither Stewart
nor Philip spoke during questioning, except for when Philip   an-
swered defense counsel's question about the meaning of the   pre-
sumption of innocence(J. 135, 144-45, 158-59, 186). Cascone   had

---

1 Citations prefixed by "J" refer to jury-selection minutes; "H"
to minutes of the post-trial hearing held on January 17, 2017, an
"S" to sentencing minutes. Unprefixed citation refer to Volume II
of the trial minutes. All cited documents are contained in   the
Supreme Court file, except for the pre-sentence report ("PSR")
which is submitted her under separate cover.

reported being a recent victim of theft (J. 151).

Two jurors were ultimately seated from this second   round.
One was black, and both had been engaged by the prosecutor   dur-
ing questioning (J. 169-72, 202, 285-86).

### Round 3

At the end of the third and final round of jury selection ,
the prosecution struck panelists Yvonne Best, Melina Grant,   and
Marlene Laplante- all black- and panelisit Glen Mendez, who   was
identified by the defense as black (J. 275-77, 280. 284-85).   A
single white panelist, Elyse Barton, was also struck (J. 281,285)

Of the struck black panelists, Grant had been asked   only
ppeliminary biographical questions by the court, while Best   had
told the prosecutor that she would have "[n]o problem" evaluating
the case even if the complainant did not testify, and Laplante
described herself as "very emotiomal" (J. 213-15, 255, 259-60).
Panelist Mendez asked the prosecutor why the compainant would not
be present, but also agreed to follow the court's   instructions
about the complainant's absence (J. 258-60).

### Batyson Challenge

After the selection of the final alternate,       defense
counsel made a batson challenge, contending that out of 11  total
peremptory challenges, the prosecution had used 9 to strike black
panelists and only 2 to strike white panelists (J. 282-85)[2].
Defense counsel observed that neither Barrow nor Dunn, the first-
round panelists, had made "any statements during voir dire   ...
one way or the other"(J. 283). Of the second-round panelists, pane
lists Philip and Stewart "said virually nothing during voir dire"

7

although counsel acknowleged Solstad's discussion about being   a
crime victim (J. 283). With regard to the third round,   defense
counsel noted that 4 of the prosecution's 5 strikes had      been
against black panelists (J. 284-85). When the court observed that
panelist Mendez might be Hispanic rather than black, defense coun
sel disagreed, and the court did not comment further (J. 284). In
closing, defense counsel observed no apparent race-neutralreasons
for the "pattern" of strikes against black panelists other   than
Solstad, which led ultimately to a majority-Caucasian jury (J.285

In a short response, the prosecutor labeled "presumptive"
and "unfair" the allegation of a majority-Caucasian, saying  that
"we don't probably know half the race of people seated" (J. 285 -
86). He pointed to 5 seated jurors that either were black or that
he "believe[d]" were black, as well as at least one of the     al-
ternates, and commented that he had "no idea" of panelist Solstad
's ethnicity (J. 285-86). the prosecutor nevertheless represented
that he would "meet [his] burden" if the court found a      pattern
(J.286).

The court summarily denied the Batson application,    ruling
that "across the board I do not find a pattern" (J.286).

### The People's case

Shortly after 1:oo P.M. on August 11, 2015, security camera
footage showed petitioner, an AfricanAmerican man, walking   along
a street in downtown Brooklyn, followed by Mohammed Khalifa (Peo-

---

2

Dfense counsel referred to 10 peremptory callenges, contending
that panelist Nelson was deprived of a seat on the main jury, but
Nelson was not challenged until the main jury had already    been
cjosen (J. 207, 278, 280, 284).

8

ple's EX. 2 [security footage]). When petitioner crossed      the street into busy traffic, Khalifa continued to follow him (Id, at 1:07:23). Blocked by a construction site from reaching the sidewalk, petitioner resumed walking on the street itself (Id. at 1:0 7:30). Upon reaching the same construction site a few moments behind petitioner, Khalifa bent over and appeared to pick something up from the ground and wrap it in some clothing, which      swung back and forth in his hand as he continued to follow petitioner (Id. at 1:07:33-40).

A few moments later, petitioner turned around and      charged forward, causing Khalifa to back up (Id. at 1:07:37-46).      The men began to scuffle and argue. As Khalifa repeatedly approached petitioner, Petitioner both told and gesturted at khalifa to "get away" from him, and asked if Khalifa was going to "keep on saying what [Khalifa] was saying" (Janelle Toribio [eyewitness]: 4-6, 23 -24; kadesha Guy[eyewitness]: 33-34; Ashley Reyes [eyewitness] : 112-13).

Although petitioner and Khalifa eventually moved out      the frame of the security footage, a cell-phone video taken      by kadesha Guy, a passenger in a nearby car, captured petitioner and Khalifa arguing in the street, with Khalifa holding somethingthat was swining back and forth and petitioner alternately reteating and moving forward (People's Ex. 7 [cellphone footage] at.00-10). Khalifa continued to advance on petitioner (Toribio: 6-7).   Petitioner then thrusted at Khalifa three times with a sharp instrument, and someone in the car yelled "he's stabbin'him" (Guy: 35, 39-40, 60; Peoples's Ex. 7 at 12-25). A photograph extracted from the cell-phone video showed petitioner holding Khalifa's   arm in

9

his left hand and a short, sharp instrument in his right,   while Khalifa held what appeared to be an article of clothing (People's Ex. 8 [cell-phone still]).

The two men were not in the frame of either video for about 20 seconds, at which point petitioner reappeared on both record-ings, running down the street (People's ex. 2 at 1:08:31-38; peo-ple's Ex. 7 at .38-42).

two witnesses and a recording of a 911 call were presented at trial tp fill that 20-second time gap. According to   Janelle Toribio, who was standing about 7 feet away, Khalifa clung   to petitioner and, after an additional struggle in which the  caree-ned into a car, both men entered an empty, under-construction storefront, where they remained for "[m]aybe a minute, not / very long" (8-9, 12-14, 24; People's EX. 4 [street photograph]).   When petitioner emerged, he pocketed a knife (which Toribio had   not previously seen) before running down the street(14-17, 27). Bleed ing from the head, Khalifa exited the storefront, screamed "I  am still alive", and ran after petitioner (14-15, 17, 28).

Ashley Reyes was focusing her attention on a potential cli-ent when she became aware of petitioner and Khalifa arguing about 8 to 15 feet away from her (109-10, 112-13, 120; Poeple's Ex. 5)[3]. They ran towards her and she moved out of the way (112,114,116). She testified that petitioner, whom she described as "profession-ally dressed" with a "vest and button up outfit" or a "suit"  al-though petitioner was actually wearing jeans and a beige shirt   - was holding a knife and "chasing after" the "yelling" Khalifa,who se head and chest were already injured (112-17, 119-20; People's

10

Ex. 10 [post-arrest photograph]). Unlike Toribio, Reyes testified that petitioner attacked Khalifa as khalifa "fell into" the store front, which was behind her and occupied, not empty (114, 116 -17 120). Petitioner, "in the suit", then "came out and ran away",and Khalifa emmerged shortly afterwards; Khalifa, yelling, tried to run in the same direction (117-22).

neither Reyes nor Toribio saw anything in Khalifa's hands during the encounter, although Toribio was initally uncertain (Toribio: 8, 16, 25, 30; Reyes: 117-18, 120-21). Guy who was near er, did not recall seeing Khalifa holding any "object" or "kinds of weapon", but thought that Khalifa was holding something- however, she was "not sure what it was" (49). Guy also recalled that as petitioner ran away, Khalifa followed him, running in the same direction a few mintues later (41, 44-45, 51).

The people also played a 911 recording for the jury. The caller said a man "chased another guy who stabbed him"' and that both men had "just ran down Schermerhorn" Kevin Hayes [NYPD technician]: 125-29; People's Ex. 11 ]911 call]).

Officer Caleb Louard arrived at the scene and was directed by a series of pointing passersby to an intersection about 6 city blocks away. There, he discovered Khalifa, who was walking but laboring and bleeding from "what appeared to be ... stab wounds" to his head, torso, and arm (Louard: 61-67, 101-06). khalifa "seemed determined to continue walking" and did not "immediately" heed Louard's direction to stop and get down, but he even-

3During Reyes's testimony, the court sustained four objection to editorializing comments in her answers (115-16, 118-19, 122).

11

tually complied and pointed south (Louard: 67-69).

Louard and another officer discovered petitioner one   block away, down on the ground behind a parked minivan. Louard  testifi ed that he had not ordered petitioner to the ground and did    not recall hearing  another officer do so (Louard: 69-72, 76, 89-90 ; People's EX. 9 [arrest footage]). According to Louard, petitioner tried to stand and did not "immediately give both of his armsupon request" to be handcuffed, but Louard was unsure about whether he had asked petitioner to show his hands (72-73, 91, 95).

Louard searched petitioner and did not find a weapon.   Pet- tioner, who was 6'1" and about 300 pounds, was uninjured (Louard: 73, 77-78).

Khalifa was taken to the hospital (Louard: 80). Medical re- cords described Khalifa as "combative", "highly uncooperative", "extremely verbally belligerent and threatening", and "severely agitated" (People's EX. 1 at 3-4, 7 [Medical Records]). They   re- counted Khalifa standing up on the stretcher and "scream[ing] out religious statements" even as he was bleeding, to the point   that he required "sedat[ion]" in order to be treated for his wounda, and was intubated to "protect staff and patient" (Id. at 3-8. 10- 11). After testing positive for cocaine, Khalifa signed    himself out against medical advice while "threaten[ing] bodily harm"    to the staff, and had to be ecorted out of the hospital by security (Id. at 2, 25, 53) never to be seen again.

## The Defense Case

### Petetioner's Testimony

Petitioner was a Brooklyn-born man in his mid-40s, married with two adult sons, who sufffered from diabetes and was a heavy smoker (159, 164, 174, 198). Petitioner, who agreed he had one prior felony conviction, testified that at the time of the incident, he worked as a forensic peer specialist at an office on Baltic Street in Brooklyn, assisting persons diagnosed with Axis 1 psychiatric disorders (159-61, 164, 167, 174, 199, 262).

Petitioner was in the midst of his daily lunchtime walk around the block when, on busy Joraelmon Street near Brooklyn Law School, he encountered Khalifa (161-63, 201). As the two men pass ed each other, Khalifa suddenly "lift[ed] his elbow up" and "jam-med it ... in[to] [petitioner's] collarbone" (162). "[S]tartled", petitioner shoved Khalifa away from him(162, 172, 202).

Khalifa "growl[ed] ... you fucking nigger" and started to "rant and rave", calling petitioner a "slave and threatening to "kick [his] ass" (162-63). When petitioner walked away, Khalifa ran up behind him and shouted, "Motherfucker. Where the fuck you going?" (163).

Accustomed to working with people suffering from mental ill ness, petitioner "notice something was off" about the"drool[ing]" Khalifa and his "erratic" body language (163, 172). Petitioner reasoned that "you encountered all kinds of things" on the street

including "sick people", so he resolved to "walk away" from  what appeared to be "more than a rational situation", hoping Khalifa would lose interest once petitioner created distance (173-74). Petitioner crossed the street, at one point running at "top speed" into heavy traffic, in an attempt to lose Khalifa, to att-ract police attention if necessary, and eventually to return  to his office (163-64, 172-75).

But Khalifa continued to follow, "yelling" and  "rant-ing" slure like "[y]ou nigger" and "[t]ake your ass back  to Africa" (163-64, 172,75, 204). Petitioner saw no police he could flag down(188). After turning the corner onto the street captured by surveillance footage, petitioner slowed because, as an  over-weight smoker, he had to "catch [his] wind"(164, 229).

Turning around, petitioner saw that Khalifa had wrapped  a brick or rock in a shirt he was carrying, and was leveraging  it to swing at petitioner (164-65, 182). believing he was in  danger of imminent attack, petitioner tried to grab Khalifa's arm,  and then jabbed Khalifa with a wire stripper tool, not a knife (165-67, 182-84, 195-96, 219). petitioner tried to aim low, in  an attempt to get Khalifa to stop, but Khalifa did not retreat  or initially drop the brick (166-67).

The two men "tussle[d]", causing Khalifa to drop the  brick and stummble into a nearby construction site, which petitionerdid not recall entering himself; believing Khalifa was no longer  a threat, petitioner then dropped the wire stripper and ran  away,

14

"adrenaline ... high," before eventually slowing to a walk (167-68, 184-85, 190). petitioner denied chasing Khalifa during the en counter(232-33).

Petitioner identified on surveillance video where Khalifa picked up the brick and whirled it at him (182-83, 270-71). In the cell phone video, petitioner also identified a "rock in the sweater" dangling from Khalifa's hands, and said that petitioner grabbed khalifa's hands "because [Khalifa] is trying ... to swing it" (187). Petitioner pointed out moments on the cell-phone video where he tried to turn around and walk away (188).

Once away from the scene, petitioner intended to take a back route to his office, but realized Khalifa was still yelling and in pursuit, although at enough of a distance that petitioner could not hear the words (167-68, 180, 189-()). Petitioner didnot want to "bring this to [his] job", so he "zigzag[ged]" in an attempt to lose Khalifa and find authorities who could help him (168, 175, 207, 253). Petitioner then heard the police behind him and testified that officer Louard ordered him to get on the ground, denying that he resisted arrest (168-69, 190-94).

### Cross-Examination

during cross-examination, the prosecutor questioned petit-ioner's story about Khalifa's wielding a brick or rock. Petit-ioner was "the only person that has come in court [and] said [Khalifa] picked up a rock, right?" and the jury would have to "rely on" petitioner's testimony and "take [his] word for that" point (226, 238). The prosecutor also asked petitioner why he "didn't stay on scene" so that he could have the police "secure the boulder so we have it at trial" (252).

15

The prosecutor also repeatedly questioned petitioner's test
imony that the tool was a wire stripper and not a knife (216, 223
and attepmted to get petitioner to admit it was a knife(255).
Petitioner sometimes corrected the prosecutor's inquies about the
"knife" (216, 223), but other times repeated "knife" in his    an-
swers (218-19, 262). The prosecutor asked petitioner why he    had
not "Kept" it so he "could have show[n] it to the police",    and
theorized that petitioner had disposed of the instrument "[b]e-
cause it ha[d] the[complainant's] blood on it" (255).    Defense
counsel's objection to this last comment was overruled    (255-56).

The prosecutor pressed petitioner about why he did not take
advantage of other purported "options" in the encounter,  for in-
stance, the prosecutor asked if "[t]he only option you are  tell-
ing everyone is to pull out the knife and stab him" (222-23, 248)
and inquired about whether petitioner had warned Khalifa    that
petitioner "had a knife" (216). The prosecuotr also asked petit-
ioner on five separate occasions why he did not call 911    (226,
251, 264), or otherwise "wait on the scene" for police to  arrive
and " have this man arrested" (248).

With regard to petitioner's conduct after the encounter,the
prosecutor asked why he did not immediately return to his office,
suggesting that rather than trying to escape Khalifa,  petitioner
was trying to lose "the police"; petitioner answered that    there
were "no police to dodge" (207). the prosecutor attacked  petit-
ioner claim that Khalifa continued to pursue him (207, 230, 257).

Finally, the prosecutor extensively questioned petitioner regarding his arrest, in part by asking him to comment on the vedio recording(257-61). Nothing the inconsistencies between petitioner's testimony about being ordered to get on the ground and Officer Louard's denial of that, the prosecoutor pressed petition er on whether Louard had "lied" in court (257-58).

Only once did the prosecutor impeach petitioner over inconsistenties with his grand jury testimony: Petitioner had told the grand jury he dropped the wire stripper on Boerum Street, but now testified he dropped it one block away on Court Street, at the scene (249-50); People's EX. 12 [map]).

### EMT Testimony

Dominique Boyd, an EMT who treated Khalifa, testified that Khalifa, was "verbally abusive and really aggressive", calling her and her black female partner "niggers and bitches", refusing to let the medical team touch him, "yelling and screaming," fighting and "assault[ing]" the team, and refusing to allow his wounds to be dressed (281-87; Defense Ex. A [EMT report]). Khalifa was "swinging his arms around, trying to get us off of him" (288). Another crew was called in order to sedate him so that he could be treated and transported (284, 287; Defense Ex. A).

### Dfense Attempts to Call Nicole McGriff

When the defense attempted to call petitioner's wife,Nicole McGriff, as a witness, the prosecutor challenged the relevance of her testimony and asked for an offer of proof (276-77). Defense counsel explained that Nicole, petitioner's wife of 25 years, would testify that petitioner carried around a wire stripper be-

17

cause one of his hobbies was repairing speakers and other equip-
ment, and argued that her testimony was necessary because        the
prosecutor "has been repeatedly calling [the tool] a knife" (277)
the prosecutor responded that this proposed testimony was "col-
lateral", bcause either a wire stripper or knife could        be a
"dangerous instrument", and alleged that "several times through-
out [petitioner] own testimony he refered to it as a knife" - al-
though the prosecutor also conceded petitioner "mostly" said"wire
stripper" on direct (278). the court excluded the testimony        as
collateral and noted an exception at defense counsel's request
(278).

## Summations

In its summation, the defense called justification        the
"main issue" in the case, emphasizing that Khalifa elbowed petit-
ioner purposefully, pursued petitioner for several blocks,        and
continued to behave aggressively and erratically even at the hos-
pital (313).

The people's summation repeated many of the themes        from
cross-examination. The prosecutor argued that despite petitioner'
s options of "feeling the situation" and resolving the despute in
another way," petitioner "choseeviólence"n(334). According to the
prosecutor, petitioner also ignored the "choice of calling 911"or
of "securing this boulder or brick" for trial (334); while later
conceding petitioner "doesn't have to call 911," the prosecutor
suggested that it showed that his story was false and that he was
not really afraid of Khalifa, who was "fleeing" from petitioner,
"[m]ake no mistake about it" (339).

18

The prosecutor encouraged the jury to find that thepeople's witnesses had testified truthfully, while petitioner had lied to them on the stand. The people's witnesses had "no bias" and "no motive to lie for either party" (338). By contrast,"eveything[petitioner] told you ... was an embellishment in some way" or " a straight up lie" (341), such as petitioner's testimony that Khalifa was "going to keep attacking me even though I stabbed him (349). Petitioner's story about Khalifa whirling a brick was "embellished," and petitioner was lying about his fear because he "needs [the jury] to believe ... he had this fear from this tiny man [who] has no weapon," as "[u]nder no view of the evidence was [Khalifa] armed" (338, 342, 360). The inconsistency between petitioner's grand jury and trial testimony aboutwhere he dropped the weapon was "nonsense" because petitioner "knows what he said in the grand jury" and"will say anything to you" (356).

With regard to the missing tool, the prosecutor argued that petitioner "didn't have an excuse" for it, asking "where's the knife? where's the knife? and telling the jury that petitioner "eventually... started calling it a knife on the witness stand" (355). Pointing to the screenshot of the cell-phone video, the prosecutor asked the jury to "[u]se your own eyes... [t]hat's not a wire stripper ... [c]lear as day that's a knife" (355). Defense counsel's objection to this last comment was sustained (355). The prosecutor suggested that petitioner was motivated by a pattern of anger and vengence. Five minutes into cross-examination petitioner was already "extremely angry" and thus was likly "ten-times angrier" when encountering Khalifa(345).

19

"No one talks to [petitioner] like that. Right? All six foot one, 300 pounds of him. He is not used to this" (338). According to the prosecutor, petitioner wanted to "teach [Khalifa] a lesson" for " walk[ing] around Brooklyn and call[ing him] those word's (343). "Here is how I solve my problems. It's with my knife" (346 "Why", the prosecutor asked, "couldn't he punch him in the face again and agin ... instead of pulling out the knife?" because"[i] f that [had] happened we wouldn't be here" (346).

The prosecutor told the jury that they should view petition er's conduct after the encounter with skepticism. Petitioner's decision to leave the scene was "even more damning behavior", be- cause Khalifa was "down, prone" and petitioner was "twice hissize "(348-49). That petitioner walked "against the vehicular traffic" was "extremely suspicious" because "[h]e is going against the traffic to dodge the police" (352). Similarly, his path to where he was apprehended showed petitioner "trying to stay off the main road" (352). As he had during cross-examination, the prosecutor challenged at length petitioner's version of the events surround- ing his arrest, asking the jury, "what's Officer Louard's motive to lie ...?" (353).

> **The prosecutor concluded by exhorting the jury to convict:**
>
> [E]even if you believ that Mr. Khalifa had any kind of object or the defendant thought he had this object, once he ... breaks away and is run- ning and fleeing towards that construction site, okay, the fight is over ... he now can no longer use that knife. The man is done. He is stabbed and fleeing. He didn't do that. Because that's not what the defendant does. He was going to

20

teach Mr. Khalifa a lesson for those  nasty
things he said to him. ... He is on trial be-
cause of the choices he made that day.   The
choices of escalating a situation where   he
could have punched a man, to the situation
where he pulled out a knife. He stabbed him
again and again and again. It was not  self-
defense. It was assault (358-60).

## Jury Instructions, Deliberations, and Verdict

Two counts were submitted to the jury: attempted first-de-
gree assault and subsatantive second-degree assault, both premis-
ed on the use of a "dangerous instrument" (Indictment at 2).  The
people had earlier dismissed a substantive first-degree  assault
count, conceding that they could not make out a case for the  in-
fliction of serious physical injury(J.21).

The court gave a missing-witness instruction     regarding
Khalifa's absence from the trial (378). the court further instru-
cted that the jury "must accept the principles of law as I define
them," and that they were not "required to accept the   arguments
... made during summations", but did not tell the jury to disre-
gard statements of the law made by the parties (366, 368).

The court charged the jury on the defense of "physicalforce
" justification, explaining, in pertinent part, that petitioner's
use of force would be justified "when and to the extent that   he
reasonably believe[d] to be necessary to defend himself from what
he reasonably believe[d] to be the use or imminent use ofphysical
force" by khalifa, and did not require petitioner to wait untilhe
[wa]s struck and wounded" (384, 386- 87). The people did not  ask

21

for, and the court did not give, any instruction on the use    of deadly force.

In explaining how justification applied across the counts, the court instructed that it was "an element of each" and    then stated:

> [I]f you find that the people have failed to prove
> beyond a reasonable doubt the [petitioner] was not
> justified, the you must find him not guilty under
> counts one and two (387, 431 [recharge]).

The court omitted C.J.I. language direction the jury to acquit   a defendant of "that count and of the remaining count(s) to which that same definition of justification applies". In charging  each count, the court included justification as an additional element, but after articulating the elements of the attempted first-degree assualt count, the court segued by stating: "The second count you will consider is assault in the second degree" (389-90)(emphasis added). The verdict sheet did not mention justification, containing only a listing of both counts with boxes to check for "guilty or not guilty".

Over the course of its deliberation, which extended intothe afternoon of the next day, the jury asked to be reinstructed   on the charge , including "justification as it applies to both char-ges" (402-38; court exs. 1-6). the jury then acquitted petitioner of attempted first-degree assault but convicted him of second-degree assault (438-39).

22

## Defense Motion to Set Aside Verdict

Defense counsel moved to set aside the jury's verdict, argu
ing that petitioner should have prevailed on his justification de
fense (H. 4-5). Responding, the prosecutor said that "[a] large
part" of the people's summation was that "this incident was real-
ly two separate incidents and after the initial blows were struck
and [Khalifa] fled from [petitioner], [petitioner] pursued him"
(H. 36). The court decliend to set aside the verdict(H. 6).

## Petitioner's backround and Sentening

In addition to the Probation pre-sentencing report    and a
short memorandum by the people, the count considered a pre-senten
cing memorandum ("PSM") prepared by a Harvard-educated      trauma
specialist on behalf of petitioner. Based on interviews      with
petitioner, petitioner's family, prior case workers/mangagers,and
defense counsel, it set forth petitioner's family backround, ment
tal-heath struggles, and history of trauma, urging a lenient  ap-
proach to sentencing.

Bron in Brooklyn in 1996, petitioner was raised in aturbul-
ent household marked by his parents' unstable relationship (PSM2)
At age 15, petitioner was hit in the head with a baseball bat,
and fell into a four=month coma; his injuries were severe enough
and prospects for recovery so dim that he was nearly taken off
life support (Id). While he nevertheless recovered, he was temp-
orarily paralyzed, and his injury caused him to drop out      of
school in the tenth grade (Id.)

Although petitioner supported himself with messenger    jobs
and similar work, the injury, coma, and resultant trauma "canged"
him, leading to complex trauma symptoms such as "sudden emotional
or physical reactions", "feeling on guard", flashbacks, and feel-
ing powerless" (Id. at 2-4). These trauma symptoms were suggest-
ive of PTSD, with which he had never been previously diagnosed    -
and which, if left untreated (as here), often leads to increased
likelihood of evcounters with the criminal justice system(Id. at
2). Petitioner also suffered from symptoms of depression(Id. 4).

In 1989, petitioner was convicted of misdemeanor assault,
and in 1992, petitioner was convicted of felony manslaughter (Id.
at 3 PSR 3). He spent 17 years in prison for the felony offense,
during which he remained married to his wife, whichwhom he has   a
son; petitioner has another son from a previous relationship (De-
fense Memo. at 3). While in prison, petitioner was formally    di-
agnosed with Bipolar Disorder, for which he was medicated (Id.).
Petitioner obtained his GED while in prison (PSR 4).

In 2009, petitioner was released on parole, during which he
presented no problems and obtained an early release (PSM at 4).
He received extensive counseling and therapy, and completed    the
one-year "Howie The Harp" peer-training program, [4] whit his social
worker calling petitioner "one of [her] best clients" and a very-
good peer counselor" who "is the type that always tries to    stay
away from trouble" (Id.).

In 2012, petitioner became a peer counselor of the Mental
Health Association of New York, managing daily operations, co-
leading groups, and working with 23 clients (Id. at 4-5). He   was

24

promoted in 2014, and eventually moved to a new position as a Peer Advocate at Baltic Street AEH (Id. at 4-5). Petitioner hahad subsequent contact with the criminal justice system from his release from parole until the encounter with Khalifa (Id. at 4).

The defense memorandum described petitioner's strong family ties, noting that he was a "thoughtful and considerate individual who has a propensity to care about others who suffer from mental and physical heath problems"(Id. at 5). His family "remain supportive of him and will continue [to] encourage him despite his circumstances" (Id.).

The people sumitted their own sentencing memorandum which primarily relied upon petitioner's criminal history and the instant offense conduct- such as petitioner's "pursu[it]" of the fleeing Khalifa- to argue in favor of the maximum sentence (see Peolpe's Mem. at 1-2).

At sentencing, defense counsel reiterated many of the points from the defense memorandum, and emphasized the petitioner had been out on bail through trial and had complied with the requirements of his release (S.2-6). Counsel pointed out that during his earlier incarceration, petitioner bettered himself extensively to prepare to reenter society, completing his GED and many certificate programs while in prison and maintaining employment- focusingon persons with mental illness and contacts with the criminal justice system- once released (S. 2-4). Counsel also

---

[4]The program "tains individuals with a lived experience in the mental health system for dirct service, supervisor, and management roles within Human Services".
http:/www.communityaccess.org/our-work/educationajobreadiness/how ie-the-harp.

emphasized the unusual circumstances of the encounter, notingthat petitioner continued to assert that he was justified in defending himself from the absent Khalifa, and asked the court to     impose the lowest possible sentence (S.4-5).

Speaking on his own behalf, petitioner said:

> I have been a productive citizen. I am a taxpaying citizen .... [Prosecution] lying. He has not come into this courtroom and told one bit of truth, and I have been telling the truth. (S.8)

In response, the people stated that petitioner was a "danger to society" and not rehabilitated (S. 6-7).

Without comment, the court sentenced petitioner as a second felony offener to the statutory maximum sentence of 7 years     in prison and 5 years of post-release supervision (S. 8; H. 9).

26

GROUND : 1

> The Court Erred in Failing to Instruct Juros an
> Acquittql on the Top Count based Upon a finding
> of Justification Precluded further deliberation
> an its instructions improperly suggested that
> **Jurors were required to continue deliberation**
> and empowered to render a guilty verdict even
> if their acquittal on the top count resulted
> from a determination that petitioner had been
> Justified, trial counsel were ineffective for
> failing to make timely objections.

Standard of Review- Trial Court's Improper Jury Instructions And
Trial Counsel's Inefective Assistance During Critical Stages of
the Proceeding:

Fedral habeas court typically does not review state- law
questions determined by state court's including the propriety of
jury instructions. Estelle v. McGuire, 502 U.S. 62, 67-69 (1991).
Accordingly "[w]here an error in jury instruction is alleged, it
must be established not merely that the instruction is undesirabl
e, erroneous, or even 'universally condemned' but that it violated
some right which was guaranteed to the defendant by the Fourteeth
amendment". Davis V.Strack, 270 F. 3d 111, 123 (2d cir. 2001) (
quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)). " An impro-
per jury instruction can constitute a federal constitutional vio-
lation when the 'ailing' instruction by itself so infected the
entire trial that the resulting conviction violates due process".
Davis, id. at 123; Cupp, id. at 147". Therefore, [the] questionis
not whether the trial court gave a faulty instruction, but rather
'whether the ailing instruction' by itself so infected the entire

trial the resulting conviction violates due process".

In Davis, the Second Circit Court of Appeals set out       a
three-step analysis for determining whether a state court's refu-
sal to give a specific [] and, or proper jury instruction violat-
es federal due process. Under this analysis, a federal court   can
grant habeas relief only if it can answer the following three
questions affirmatively. First was the jury instruction  required
as a matter of New York State Law? Second, did the failure       to
give the required charge [correctly] violate due process    accord
ing to the standard set out in Cupp? Third, was the state court's
failure of such a nature that it is remediable by habeas    corpus
given the limitations prescribed by 28 U.S.C.§ 2254?

**Procedural Default:**

A petitioner's federal claims may be procedurally    barred
from habeas corpus review if they were decided at the state level
on **"independent and adequate"** state procedural grounds. Coleman v
. Thompson, 501 U.S. 722, 729-33 (1991). the procedural rule    at
issue is Adequate if it is "firmly established and reguarly follo
wed by the state in question". Garcia v. Lewis, 188 F. 3d 71,   77
(2d cir. 1999)(internal quotation marks omitted)("To be independ-
ent basis for its disposition of the case"). Harris v. Reed,   489
U.S. 255, 261-62(1989)( by "clearly and expressly stat[ing]   that
its judment rests on a state procedural bar". id. at 263(internal
quotation marks omitted). If it determine that a claim on      the
merits unless the petitioner can demonstrate both cause for    the
default and prejudice resulting therefrom, orif he can demonstrat
e inextraordinary cases, such as where a constitutional violation
results in the conviction of an individual who is actually inno-
cent. Murray v. Carrier, 477 U.S. 478, 496 (1986).

28

In actuality petitioner hereto is ACTUALLY INNOCENT of the charge of conviction, do to the trial court's IMPROPER charge to      the jury. Along with the verdict sheet, which set the stage resulting in the REPUGNANT verdict.

**Standard of Review- Ineffective Assistance of trial Counsel:**

The Supreme Court has announced a two- part test to determine if counsel's assistance was ineffective. Strickland v. Washington, 466 U.S. 668, 687 (1984).

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the six amendment". id. this performance is to be judged by an objective standard of reasonableness. 466 U.S. at 688.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to      second-guess counsel's assistance after conviction ... a fair assessment of attorney performance requires that every effort be made to eli minate the distorting effects of hindsight, to reconstruct      the circumstances of counsel's challenged conduct, and to evaluatethe conduct from counsel's perspective at the time ... [a]      court must indulge a strong presumption that counsel's conduct      falls within the wide range of reasonable professional assistance; that is   the defendant must overcome the presumption that, under      the circumstances, the challenged action "might be considered      sound trial strategy". id. at 466 U.S. 689; see Torres v. Irvin, 33 F. Supp. 2d 257, 277 (SDNY 1998).

29

Second, the defendant must show prejudice from      counsel's
performance. Stirckland, 466 U.S. at 687, "question  is    whether
there is a reasonable probability that, absent the    errors,  the
fact finder would have had a reasonable doubt respecting   guilt"
id. 466 U.S. at 695. Put, anothe was, the "defendant   must    show
that there is a reasonable probability that, but for counsel's un
professional errors, the result of the proceeding    would    have
been different". id. 466 U.S. at 694.

Petitioner's claim here is that there is no logic for trial
counsel to stand mute when the trial court charged the jury incor
rectly,  under the circumstances of the crime charged, as well as
the improper verdict sheet provided to the jury for deliberation.
This was totally prejudicial to defendant because it underminds
his cause.

In making this determination, a court hearing an ineffecti-
veness claim must consider the totality of the evidence befor the
judge or jury. Some of the factual findings willhave been unaffec
ted by the errors, and factual findings that were affected    will
have been affected in different ways. Some errors will  have  had
a pervasive effect on the inferences to be drawn from the    evi-
dence, altering the entire evidentiary picture, and some     will
have had  an isolated trivial effect. Moreover, a verdict or con-
clusion only weakly supported by the record is more likely    to
have been affected by errors than one with overwhelming    record
support. taking the due account of the effect of the errors    on
the remaining findings, a court making the prejudice inquiry must
ask if the defendant has met the burden of showing that the decis
ion reached would reasonably likely have been different absent

30

the errors. id.., 466 U.S. at 695-96.

The Supreme Court has counseled that these priciples    "do
not establish mechanical rules". id at 696. The focus of the   in-
quiry should be on the fundamental fairness of the trial       and
whether, despite the strong presumption of reliability,        the
result is unreliable because of a breakdown of the adversarial
process. id. The Supreme Court also made clear that "there is   no
reason for a court deciding an ineffective assistance claim ...to
address both components of the inquiry if the defendant makes   an
insufficient showing on one ... if it is easier to dispose of   an
ineffective claim on the ground of lack of sufficient prejudice,
which we expect will often be so, that course should be followed"
id. at 697, accord e.g., Torres, 33 F. Supp. 2d at 277.


## Meeting Standar of Review:

A first look at trial court error is paramount to this par-
ticular claim, upon this petition which raises serious  questions
about trial counsel's assistance as a whole.

The court's instructions, considered as a whole and in con-
juction with the verdict sheet, failed to adequately convey    to
jurors that an acquittal on the top count based upon a finding of
justification precluded further deliberations and required a  not
guilty verdict as to all counts. Because there is no way to know
whether the verdict convicting petitioner of second-degree   ass-
ault occurred after a justification based acquittal on attempted
first-degree assault charge. The Appellate Court should have vaca
ted petitioner's conviction and granted him a new trial and it is

31

for this reason, the state court's denial of relief were "contrary to and involved an unreasonable application" of, clearly established federal law, as determined by the Supreme Court of the United States, among other things. U.S. Const., amends. VI, XIV.

Justification as the defense petitioner presented at trial. Such a meritorious defense under the facts and circumstances of the crime charged, rendered the use of force "entirely lawful" a not guilty verdict permised on justification requires acquittal on any count for which the same theory of justification is an element. Thus, and as set forth in the CJI pattern instruction, a court is suppose to inform the jury that a finding of justification on an initial count requires acquittal not only on "that count" but also on "the remaining count(s) to which that same definition of justification applies". CJI § 35.15(1) With the in mind the state court should have reached this issue in the interest of justice juridiction, and the failure to do so is clearly "base on an unreasonable determination of facts in light of the evidence presented in the trial court proceedings".

To this point in **People v. Tucker,**55 NY 2d 1(1981): the New York Court of Appeals stated New York's rule regarding repugnant jury verdicts, "When there is a claim that repugnant jury verdict have been rendered in response to a multiple- count indictment, a verdict as to a particular count shall be set aside only when it is inherently inconsistent when viewed in light of elements of each crime as charged to the jury ...

The critical concern is that an individual not be convicted for

a crime on which the jury has actually found that the defendant
did not commit an essential element, whether it be one element or
all, allowing such a verdict to stand is not merely  inconsistent
with justice, but is repugnant to it ...

The instructions to the jury will be examined only to determina
whether the jury, as instructed, must have reached an inherently
self-contradictory verdict. id. at 4, 6, 7 NYS at 132, 133-34,135
; Accord, e.g., People v. Trappier 87 NY 2d 55, 58 (1995)(     "A
verdict is inconsistent or repugnant ... where the defendant     is
convicted of an offense containing an essential element  that the
jury has found the defendant did not commit. In order to determin
whether the jury reached 'an inherently self- contradictory  ver-
dict a court must examine the essential elements of each count as
charged".

The theory here is that the conviction on count 2 was     re-
pugnant to-i.e., contradicted- the acquittal on count 1. In   this
light petitoner's conviction is akin to a verdict base on a   vio-
lation of double jeopardy.

Here, the trial court altered the crucial CJI language, tel
ling the jury that "if you find that the people have failed     to
prove beyond a reasonable doubt that [petitioner] was not justif-
ied, then you must find him not guilty under count one and    two"
(387, 341). This failed to convey to the jury that the same the-
ory of justification applied evenly to both counts, and if      the
jury found that the people had failed to meet their burden      on
count 1, they should stop deliberating and render a verdict     of
acquittal on count 2.

33

In fact, this omission alone constituted reversible error.   See Fabri v. United Technologies intern, inc., 387 F. 3d 109 (2d Cir. 2004): " When jury instruction of verdict sheet may lead to incon sistent verdict[] party must object before jury begin  its  deli- beration, and if timely objection is not made, failure can be ex- cused only if district court committed fundamental error, a stand ard more stringent than plain error standard applicable      to criminal appeals. Fed. Rule 52 (b), 18 U.S.C.A.,. See, Cash  v. County of Erie, 654 F. 3d 324 (2d Cir. 2011);(formulation      of special verdict questions rests in trial judge's sound discretion and will warrent reversal only if question mislead or      confuse jury, or inaccurately frame issue to be resolved).

Here, the remaining instructions exacerbated this error. Al though the court described justification as an element of    each count it failed to inform the jury that a finding of justificat- ion should end the matter. To the contrary, immediately after de- scribing count 1 the court told the jury: "The second count   you will consider is assault in the second degree" (390 [emphasis add ed]). By including lack of justification as an element of each crime, therefore, the court implied that these continued  deliber ations required reconsideration of the justification defense. See Welch v. United Parcel Service, inc., 871 F. Supp. 2d 164 (EDNY - 2012) holding(A motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a serious ly erroneous result or the verdict is a miscarriage of    justice.

34

Fed Rules Civ. Proc. Rule 59 (A)(1)(A), 28 U.S.C.A.).
Justification as element "may have led the jurors to conclude
that deliberation on each crime required reconsideration of    the
justification defense" even with acquittal on top count.      See,
Reiter v. Maxi- aids, inc., 2018 WL 557864864 (EDNY 2018)[]
("Jury verdict should be set-side only where there is such      a
complete absence of evidence supporting the verdict that the jury
's findings could only have been the results of sheer surmise and
conjecture, or ... such an overwhelming amount of evidence      in
favor of the movant that reasonable and fair minded man could not
arrive at a verdict against him"). Kosmynka v. Polaris indus.,inc
., 462 F. 3d 74, 79 (2d Cir. 2006).

the verdict form, which did not mention justification atall
failed to clarify for the jury that reassessment of justification
for each count was prohibited. Significantly, the CJI- Approved
Model Verdict Sheet for Justification cases contains printed   in-
struction telling jurors that an acquittal due to justification
comples both a cessation of deliberations and a not guilty    ver-
dict on lesser counts.See **CJI 2d MODEL VERDICT SHEET-JUSTIFICTION**

A jury verdict is supported by sufficient evidence,      the
court must determine whether there is any valid line of reasoning
amd permissible inference which could lead a rational personer to
the conclusion reached by the jury on the basis of the    evidence
at trial and as a matter of law satisfied the proof and burdenre-
quirements for every element of the crime charged. If that     is
satisfied, then the verdict will be upheld by the intermediate
appellate courton that review basis.

In the present situation, under the circumstances for which
the verdict were rendered, violated petitioner's fifth amendment
right against "double jeopardy" because as justification was   an
element of both counts. Acquittal on top count required acuittal
on remaining counts, where elements of crime charged were     the
same. "Federal double jeopardy rule, which states that   jeopardy
attaches after jury is sworn and empaneled"[].

In Cash, 654 F. 3d 324 (2d Cir. 2011), there was a special
verdict sheet issue as well. See Stephenson v. Doe, 332 F.3d   68
(2d Cir. 2003)( A reviewing court usually does not consider    an
issue not passed upon below, however, the court of Appeals recog-
nizes an exception to this rule, and may grant judgment as     a
matter of law was made, if necessary to prevent manifest injust-
ice.

The state court refuse to reach the issue in the interest
of justice, despite the compelling evidence supporting     petit=
ioner's justification defense and the impossibility of determin-
ing whether the trial court's error led the jury to reach     an
improper verdict.

This court should grant habeas corpus relief for    among

other reasons, a new trial is warranted for defense     counsel's
failure to object to the improper charge and verdict sheet    in a
timely manner. Strickland, 466 U.S. at 687-88.

        Trial counsel acknowledge her error only untimely,     after
discharge of the jury (H. 3,4,5,6). This error during the     most
critical stage of the proceeding, not only deprived      petitioner
of effective assistance of counsel, but a fair trial, See, U.S v.
Cronic, 466 U.S. 648 (1984).

        Ineffective assistance of counsel when trial lawyer    while
moving to dismiss for legal insufficiency, failed to specify    an
argument that would have prevailed on appeal. Cooper v. Fitz- har
ris, 586 F.2d  1325 (1978)( the sixth amendment requires that per
sons accused of crime be afforded reasonable competent         and
effective representation, where claim of ineffective     assistance
is founded upon specific acts and omissions of defense counsel at
trial, accused must establish that counsel's errors prejudiced de
fense and representation afforded prisoner satisfied the       sixth
amendment). Mitchell v. U.S., 259 F. 2d 787 (1958)([] "effective
assistance of counsel does not mean successful assistance,     and
does not relate to the quality of the decisions he makes in    the
normal course of a criminal case, except that, if his conduct  is
so incompetent as to deprive defendant of a trial in any      real
sense, defendant must have another trial, or rather more     accu-
rately is still entitled to a trial, and defendant cannot     bring
about a judicial hearing on and determination of trial competence
of defense counsel by making allegations which, either on     their

                              37

face or after initial testing for verity fail to indicate a lack of skill so great that defendant in realistic fact had not a fair trial".

The state court should have reached the issue in the interest of justice given the compelling evidence supporting petitioner's claims of trial court's error, failing to instruct the jurors properly concerning the elements of the crime charged,      and trial counsel's failure to object in a timely manner which      was extremely prejudicial. This default attributing to petitioner being denied a fair trial .

The state court's denial of these claims on Appeal      were, "contrary to, and involved an unreasonable application" of clearly established federal law as determined by the Supreme  Court of the United States, also resulted in a decision that was based  on an unreasonable determination of facts, in light of the evidence presented in the state court proceedings, makes clear as well the decision was an abuse of discretion.

**Standard of Review -New York's contemporaneous Objection    Rule, CPL § 470.05**

The state court's decision denying relief upon Appeal     of conviction, fall's outside the scope of the "Adequate and Indepen dent state ground doctrine", under the circumstances for which it was involked.

**Meeting Standar5d of Review-**

The state court misapplied, New York's "Contemporaneous" ob jection rule, in rejecting petitioner's claims on direct appeal. See Garcia v. Lewis, 188 F. 3d at 77-79; Hathorn, 457 U.S. at 263

Issue:

> Trial Court erred in its duty to adequately instruct   the
> jury with respect to the elements of the crime charged   to
> be considered during deliberation.

> Trial Counsel's failure to timely object to the     errors
> which occurred during this most critial stage of the  pro-
> ceeding, rendered her assistance incompeteently ineffect-
> ive, both errors amounting to a denial of a fair trial
> 5th, 6th, 14th amendment  rights guaranteed by the    U.S.
> Constitution.

The State Court Ruling in pertinent part:

"THE DEFENDANT CHALLENGE TO THE COURT"S INSTRUCTION WAS NOT
PRESERVED FOR OUR REVIEW, AND WE DECLINE TO REACH THE ISSUE    IN
THE EXERCISE OF OUR INTEREST OF JUSTICE JURISDICTION(cf. CPL 470.
05[6][a];

' IN FULFILLING OUR RESPONSIBILITY TO CONDUCT AN INDEPEN =
DENT REVIEW OF THE WEIGHT OF EVIDENCE(CPL470.15[5], WE NEVERTHE-
LESS ACCORD GREAT DEFERENCE TO THE JURY's OPPORTUNITY TO     VIEW
WITNESSES, HEAR TESTIMONY, AND OBSERVE DEMEANOR. UPON REVIEWING
THE RECORD HERE, WE ARE SATISFIED THAT THE JURY'S VERDICT REJECT-
ING DEFENDANT'S JUSTIFICATION DEFENSE AND FINDING HIM GUILTY  WAS
NOT AGAINST THE WEIGHT OF EVIDENCE';

[]' THE DEFENDANT FAILED TO MAKE A Prima Facie SHOWING THAT
THE PROSECUTION EXERCISED IT'S PEREMPTOR CHALLENGES IN A DISCRIM_
INATORY MANNER:

' THE DEFENDANT'S REMAINING CONTENTIONS ARE WITHOUT MERIT''.'

State Courts Are Not Required To Use Particular language:

State Courts are Not required to Use Particular Language:

In larrea v. Bennett, 2002 WL 1173564, this court noted;

"We encourage state courts to express plainly, in  every

decision potentially subject to federal review, the ground   upon

which their judgment rest, but we will not impose on state courts

39

the responsibility for using particular language in every case in which a state prisoner presents a federal claim- every state appeal, every deial of state collateral review- in order that federal courts might not be bothered with reviewing state law and the record in the case. Coleman v. Thompson, 501 U.S. at 739. Furthermore, unlike the situation where the state court holds that claims were either unpreserved or without merit, whic the Second Circuit has found to be too ambiguous to preclude habeas review, See e.g., Tankleff v. Senkowski, 135 F. 3d 235, 247 (2d Cir. 1998); Reid v. Senkowski, 961 F. 2d 235, 247 (2d Cir. 1998).

Here, the distinguishing factor between Larrea, and the petition before the court today is, in Larrea the court "explicitly" stated that it found his claim to be unpreserved, and the fact that the first Department also stated the conclusion it would reach "w]ere we to review" the claim does not change the result. see, e.g., Fama v. Commissioner of Correctional Service , 235 F. 3d 804, 810-11 & n. 4 (2d Cir. 2000).

"Where a State Court says that a claim is not preserved fo Appall ate review and then ruled 'in any event' on the merits, such a claim is not preserved'", See, e.g., Garcia v. Lewis, 188 F 3d at 77-82 ("There is no question that the Appllate Division's explicit invocation of procedural bar constitutes an 'independant' state ground". [].

**Was The State Court's Procedural ground "Adequate" In The Present Case?**

40

Under New York Law, in order to preserve for     Appellate review petitioner's claim the the jury charge was     erroneous, trial counsel was required to object to charge at trial. See, CPL § 470.05(2); People v.  Autry, 75 N.Y. 2d 836, 839 (1990); People v. Jackson, 76 N.Y. 2d 908, 909 (1990); People v. Cadoretter,  56 N.Y. 2d 1007, 1009(1982); people v. Mallory, 258 A.D. 2d 343 (1st Dept.) appeal. denied (1999); People v. Charleston, 56 N.Y.     2d 886, 887-88 (1982), See, also, e.g., Lugo v. Kuhlmann, 68 F. Supp 2d 347, 372-73 (SDNY 1999). (Patterson, DJ & Peck, MJ); Liner  v. Keane, 95 Civ. 2738, 1996 WL 33990al *7 (SDNY 1996)( Wood, DJ  & Peck, MJ).

The question, however, is not whether New York "generall" applies the **Contemporaneous** objection rule, but whether the  rule was applied **"Evenhandedly"** to all claims similar to petitioner here claims ? See, e.g., Hathorn v. Lovorn, 457 U.S. 255, 262-63 (1982) holding:

"our decisions, however, stress that a state     procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed .... state courts may not avoid    deciding federal issues by invoking procedural rules that they do      not apply evenhandedly to similar claims".

Petitioner, here contends that this exactly what took place on his direct appeal, because as his appeal was pending     before the state court several cases were revesed on this very     issue See, e.g., People v. Breckenridge, 162 A.D. 3d 425(1st Dept. 2018

41

People v. Marcucci, 158 A.D. 3d 434 (1st Dept. 2018); Velez, 132-134.

It was argued on petitioner's direct appeal relying on the ruling in Velez:
"In so doing, the First Department has noted the confusion created when, as here, a trial court not only fails to give a stop-deliberation charge, but also indicates that jurors should consider lesser counts in the alternative or irrespective of the disposition of others. Id. at 131 A.D. 3d 132-134". Also People v. Castro, 131 A.D. 2d 771, 773 (2d Dept.1987; People v. Feuer,11 A.D. 3d 633, 634-35 (2d Dept. 2004). This makes clear that the Appellate Division in this case use of the state procedural ground was MISAPPLIED.

In garcia v. Lewis, 188 F.3d 79 States:
( Although " New York's Contemporaneous objection rule is not rendered 'inadequate' on account of novelty or sporadic application ... [petitioner] does not object to New York's contemporaneous objection rule generally, but rather contends that the rile was misapplied in his case particularly".
Garcia is the leading Second Circuit case on this issue, worthy of quoting at length.

**Standard for Determining The Adequacy of State Ground of Decision**

The Supreme Court repeatedly has held that " The question of when and how defaults in compliance with state procedural rules can preclude ... consideration of a federal question is itself a federal question".

"State Courts may not iavoid deciding a federal issue by invoking procedural rules that do not apply evenhandedly to similar claims". Accordingly, a procedural bar will be deemed

"Adequate" only if it is based on a rule that is "firmly established and regularly followed" by the state in question. When a federal court- finds that the rule is inadequate under this test the rule should not operate to bar federal review. Nontheless, the principle of comity that drive the doctrine counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion "lightly or without clear support in state law".

The responsibility to ensure that the state rule is "Adequate" obligates this court to examine the basis for and application of state law. In making that determination, however, some degree of deference is required. The Supreme Court has suggested that in determining the adequacy of a state procedural bar that precludes consideration of a federal claim, this court's inquire whether there was a "fair or substantial basis" in state law for the default. To this end, when "there can be no pretence that the [state] court adopted its view in order to evade a constitutional issue, and the case has been decided upon grounds that have no relation to any federal question, this court accepts the decision whether right or wrong". In line with cases, this court deferred to findings of procedural default as long as they are supported by a "fair or substantial basis" in law.

### Was There A "fair or Substantial Basis" In State Law For The Procedural Bar ?

here, the Appellate Division applied New York's codified Contemporaneous Objection Rule, which preserves for review only

43

those questions of law as to which "a protest ... was registered,
by the party claiming error, at any subsequent time when        the
court had opportunity of effectively changing the same".     N.Y.
CPL § 470.05.

In the present situation trial counsel ultimately        sought
to remedy her error, during the trial court proceeding. Initially
counsel moved for a court order of trial dismissel on the    basis
of "inconsistantverdict" among a number of other issues. However,
prior to counsel's complete objection  the court interjected    in
correction. Stating: "counsel you mean motion setting aside    the
verdict under CPL 330.30?" Where upon, the court outright denied
the motion in all respects. (H. 3,4,5,6).

The New York court of Appeals has explained that this   rule
"require[s], at the very least, that any matter which a      party
wishes the Appellate Court to  decide have been brought to     the
attention of the trial court at a time and in a way that gave the
latter the opportunity to remedy the problem and thereby     avert
reversible error". As another New York court has explained     "a
question of law will be considered preserved for Appellate     re-
view when it is interjected at the fact-finding level in      such
a manner and at such a time as to fairly apprise the court     and
the opposing party of the nature and scope of the matter contest-
ed".

The Supreme Court has recognized that Contemporaneous obj-
ection rule of this kind serve a legitimate state interest.

This court too have recognized the propriety of such rules,

44

noting that "[i]f a state appellate court refuses to review   the
merits of a criminal defendant's claim of constitutional error be
cause of his failure to comply with .... a 'contemporaneous objec
tion' rule, a federal court generally may not consider the merits
of the constitutional claim on habeas corpus review". As a result
this court have observed and deferred to New York's   consistent
application of its contemporaneous objection rule.   Accordingly,
New York's contemporaneous objection rule is not rendered "inade-
quate" on account of novelty or sporadic application, as sometime
is the case. The evidence presented on this petitiondemonstrates
this is not the case at hand.

In the Garcia, case he does not object to New York's contemporan-
eous objection rule generally, but rather contends that the   rule
was Misapplied in his case in particular. Contending this demon-
strates that New York does not apply its rule "evenhandedly     to
all similar claims" with in the meaning of Hathron, 457 U.S.    at
263, Garcia, 188 F. 3d at 77-79 (citation omitted).

        The contemporaneous objection rule also is intertwined with
the Appellate Division's discretionary power. New York Law   pro-
vides the Appellate Division with the discretionary power to rule
on forfeited claim "in the interest of justice". CPL §§ 470.15(3)
(c), 470.15 (6)(a), in four other reported decisions, the Appell-
ate Division was asked to review an unpreserved objection   to an
Allen charge similar to the offending charge given in Garcia. And
in all four cases the Appellate Division reversed the convictions
in the "interest of justice"

45

People v. travis oo, 237 A.D. 2d 646, 647-48 (3d Dept. 1997); People v. Arce, 215 A.D. 2d 277, 278 (1st Dept. 1997); Appeal denied 91 N.Y. 2d 835 (1997); People v. Jones, 216 A.D. 2d 324, 325 (2d Dept. 1995); People v. Allan, 192 A.D. 2d 433(2d Dpet. 1993).

Accordingly, petitioner in the present case ascertive claim here, as was on direct appeal, trial counsel's failure to object to trial court's erroneous justification charge. Did not constitute an "Adequate" state ground for denying relief, because the Appellate Division failed to apply the contemporaneous objection rule "evenhandedly to all similar claims". See, e.g., Wedre v. Lefevre, 988 F. 2d 334, 339-40 (2d Cir. 1993)("we are not convinced that simply because New York Law allows some disrection to be exercised in granting of extentions that a dismissal on the basis of untimeliness does not constitute an adequate procedural bar. Adequacy only requires application of the rule evenhandedly to all 'similar claims'. Procedural bar found to be adequate because cases in which New York courts had granted a discretionary exception were factually distinguishable"). McLaurin v. Kelly, No 94-CV- 1560, 1998 WL 146282 at *6 (NDNY mar. 27, 1998)( Pooler,DJ (the Appellate Division's "application of the contemporaneous objection rule was thus **Atypical** because New York often allows claims like petitioner's to be raised for the first time on appeal ... consequently, its finding of procedural default does not bar federal habeas review of petitioner's claim") Gagne v. Coughlin, 995 F. Supp. 268, 275-77 (EDNY 1996)( Analyzing whether discretionary New York procedural bar was applied consistently enough to satisfy adequacy standard), Aff'd. 129 F. 3d 254(2d Cir 1997).

46

Wherefore, this court should reach the issue here in thein-terest of justice given the compelling evidence supporting petit-ioner's contentions that, the state court's decision denying re-lief upon appealof conviction, fell outside the standard of the "Adequate' and 'independent' state ground doctrune", of New York's Contemporaneous Objection rule. See Stephenson, id.

Alternatively, a new trial is warranted due to defense counsel's failure to object in a timely manner, to the improper jury charge and verdict sheet issue. Strickland, 466 U.S. at 687-88.

GROUND:    2

> The People Failed to Disprove Justification Beyond a
> Reasonable Doubt, and the Verdict was therefore
> against the Weight of the crediable Evidence.

Standard of Review- Weight of Evidence Element- Based   Review
Legal Sufficiency challenge:

Under AEDPA petitioner has the burden to demonstrate   that
the state court's decision rejecting his claim is "contrary   to,
and a unreasonable application" of clearly established federal
law, as determine by the Supreme Court of the United States,   or
that it was based on unreasonable determination of facts   in
light of the evidence presented in the state court proceeding.

AEDPA also, place new constraint on power of federal habeas
court, to grant state prisoners application for Writ of   habeas
Corpus, with respect to claims adjudicated on merits in   state
court, limiting issuance of  writ to circumstances in which   one
of the two conditions is satisfied, 28 U.S.C. § 2254.

A federal habeas corpus court must consider not   whether
there was any evidence to support a state court conviction,   but
whether there was sufficient evidence to justify a rational trier
of facts to find guilt beyond a reasonable doubt. See, In re Win-
ship, 397 U.S. 358, Id. at 2786- 2792 (1970).

(a) As an essential of due process guaranteed by   the
Fifth and Fourteenth Amendments that no person shall be made   to
suffer the onus of a criminal conviction except upon   sufficient
proof- defined as **"Every Element"** of the offense. Id. at   2786-
2788.

48

(b) The critical inquiry on review of the  sufficiency
of the evidence to support a criminal conviction must be     not
simply to determine whether the record evidence could  reasonably
support a finding of guilt beyond a reasonable doubt. The rele  -
vant question is whether after viewing the evidence in      most
favorable light to the prosecution, any rational trier of  facts
could have found the essential elements of the crime  beyond   a
reasonable doubt.

The Thompson "no evidence" rule is simply inadequate     to
protect against **Misapplication** of Constitutional standard of rea-
sonable doubt. See, Thompson  v.   City of Louisville, 362 U.S.199
(1960). Id. at 2788-2790.

(c) in challenge to a state conviction brought   under
28 **U.S.C.** § **2254,** which requires a federal court to entertain   a
state prisoner's claim that he is being held in "custody" in vio-
lation of the "constitution, or law or Treaties of the     United
States", the applicant is entitled to habeas corpus relief if  it
is found that upon the evidence adduced at the trial no  rational
trier of fact could have found proof of guilt beyond a reasonable
doubt. Id. at 2790-2792. Where state provided for an appeal     to
state supreme court and on that appeal considers question raised
under federal constitution, proceeding in state supreme     court
must conform to procedural due process. Cole v. State of Ark.,333
U.S. 196.

**Meeting Standard of Review:**

To being with the state court abused its       discretionary power on appeal of revie to make specific finding to deny relief The decision rejecting the claims on direct appeal were "contrary to, and a unreasonable", application of clearly established federal law, as determined by the Supreme Court of the United States and it was based on unreasonable determination of facts in light of the evidence presented at trial.

Petitioner, a peer counselor in Brooklyn, was in the middle of his usual lunchtime walk around the block when he was assaulted without provocation by Khalifa a violent and disturbed       man under the influence of cocaine. In broad daylight, Khalffa follow ed petitioner threatening to "kick [his] ass" and calling petitioner a "nigger" and "slave". Survellance footage captured       the complainant picking up something from a construction site       just moments before petitioner winded and concern that Khalifa       was about to attack him with a brick wrapped in a shirt,       confronted khalifa in self-defense. Once petitioner thought Khalifa       no longer posed a threat, he escaped with khalifa in continued pursuit and screaming "I am still alive" resumed to pursue       petitioner for another 6-7 blocks.

the people's video evidence showed, among other       things Khalifa following petitioner and appearing to hold something weighted in his hands. The medical evidence conveyed Khalifa's cocaine intoxication and combative irrational, and racially       charged behavior. Together, this evidence overwhelmingly supported petitioner's testimony and, by extention, his justification defense.

50

Significantly, the people failed to produce their undeniably disturbed and unhinged complainant for trial.      Instead, the people seized minor inconsistences to argue that petitioner's act ions against the aggressive Khalifa were unreasonable. But      the people fell far short of their burden, and many of their argument were legally irrelevant under the justification instruction act - ually given to the jury. Thus, the people failed to disprove just ification beyond a reasonable doubt, and the verdict was therefor against the weight of the credible evidence. Jackson v. Virginia, 433 U.S. 307, 315 (1979). U.S. Const., Amends. V, XIV.

A justification defense becomes an extra element that      the poeple must disprove beyond a reasonable doubt P.L. §§ 25.00(1), 35.00; Matter of Y.K., 87 N.Y. 2d 430, 433 (1996). Physical force against another is justified when a person "reasonably    believes such to be necessary to defend himself" against "the use or imminent use of unlawful phsical force by other person". P.L. § 35.15 (1).

Petitioner, testified that while walking khalifa unprovocked, elbowed him in the collarbone as they were passing on      the street, called petitioner a "nigger" and "slave", and Threatened to "kick [his] ass" - and be came more agitated as      petitioner tried toretreat,(162-63). this encounter established that khalifa was the initial aggressor, capable of violence and spoiling    for a fight. Right from the first, khalifa both physicslly    attacked petitioner and threaten him, while using charged racial slurs.

51

Not only did the people not dispute the initial encounter, their evidence supported petitioner's testimony. khalifa's medical records, introduced by the people, showed he was high on cocaine during the entire encounter and, at the hospital, behaved in such an alarmingly irrational and abusive manner that he could not be treated without sedation. He also called the EMT team "nigger bitches" (287; Peo. EX. 1[Medical Records]). In other words, khalifa was precisely who petitioner said he was.

Continuing, petitioner testified that he attempted to retreat and lose Khalifa, but that he persisted in following him [petitioner] across the street and around the corner, even cutting into busy traffic to get away (163-64, 172-75, 204). This testimony was amply corroborated by people's Exhibit 2, the survellance footage, which shows Khalifa follow [petitioner] despite ample opportunities to go the other direction (Peo.'s Ex. 2 at 1:07:23-30).

petitioner testified that the encounter escalated when, winded he turned around and realized khalifa had picked up something from the nearby construction site, had wrapped it in some cloth - ing, and was menacing him with it (164-65, 183). And again, the people's evidence corroborates petitioner's testimony. The surveillance footage shows Khalifa bending over and picking something up before wrapping it in the clothing he was carrying; it then "pendulums" back and forth as he continues to approach petitioner (people's Ex. 2 at 10:07:33-40). The other visual evidence, such as the cell-phone video and still image, both show Khalifa holding clothing that sags in his grip(people's Ex. 7 [cell-phone - video] at .00-10; people's Ex. 8 [cell-phone still image]).

52

Here, the people did challenge petitioner's story by elici-
ing statements that Khalifa did not have a weapon, but the      eye-
witness testimony relied upon simply cannot be squared with     the
visual evidence to the contrary. Both Toribio and Reyes testified
that Khalifa held nothing in his hands Toribio:(8, 16, 25, 30     ;
Reyes:(117-18, 120-21), which is flatly contradicted by the  cell
phone and surveillance- camera evidence. Guy, who was        closer,
testified more accurately, remembering that Khalifa was      holding
something but "not sure what it was"(49). the people's  witnesses
were simply wrong, and the visual evidence is consistent        with
petitioner's explanation that Khalifa wrapped a brick or     debris
in an article of clothing that he held.[5]

Petitioner testified that, in the scuffle that followed,  he
jabbed Khalifa a few times with a wire stripper, aiming low  try-
ing to disarm him and ran away once he thought Khalifa could    no
longer harm him (165-67, 182-85,190, 195-96, 219). The cell-phone
video and still image supported petitioner's testimony, and the
audio visual evidence as a whole showed that the entier   scuffle
lasted less than 20 seconds. Moreover, nothing in Guy's        or
Toribio's recounting disputed petitioner's testimony or the clear
timeline established by the videos. While both witnesses   thought
that petitioner used a "knife", they were far enough away so that
the difference between tool might not have been clear, and  wit-

---

[5]
Even assuming there was no brick, petitioner had already     been
physically attacked, threatened, and pursued by the cocaine-fuel
ed Khalifa. Thus, petitioner's belief that some kind of  physical
assault was imminent, and his use of physical force in self-defen
se, would still have been reasonable.

ness Toribio in particlar testified to the chaotic and confusing struggle between the two men.

While the people extensively relied on Reyes' suggestion that petitioner"chased" khalifa during the scuffle, none of the other witnesses recounted anything similar. Indeed, the 911 caller said that Khalifa chased petitioner(people's Ex. 11). Moreover Reyes was facing away from the scene, admitted she was not paying close attention, was wrong about several other details encounter- such as her insistence that petitioner was wearing a suit- and frequently editorialized duringher time on the stand (112-14, 118, 120, 122). In short, to the extent that the fleeting mention of a "chase" was even legally significant, it was not credibly supported by the broader record.

Finall, petitioner testified that Khalifa contiued to pursue him as petitioner zigzagged to avoid leading the deranged man back to his office (167-68, 180, 189-90, 207, 253). Yet, again, the people's evidence supported petitioner. Officer Louard testiied that both men were found near each other, about 6 or 7 blocks away from the scene(61-72, 101-06; people's Ex. 12 [Map]). Far from trying to dodge police, petitioner testified that he hoped to encounter them on route back- which included Atlantic Avenue - who would notice that Khalifa kept chasing him and render aid(175 ). And all of the people's eyewitnesses agreed Khalifa took off in the same general direction as petitioner, although they varied on the specifics.

54

Bearing in mind that it was the people's burden to disprove petitioner's justification defense beyond a reasonable doubt, the people managed instead only minor ambiguity about irrelevant particulars. Here, Khalifa, whom the people failed to produce for trial was a violent and deranged man petitioner described, and was also under the influence of cocaine. From the moment he encountered petitioner, Khalifa was both physically aggressive and actively threatening- more than enough to render him the aggressor under the law, especially given that petitioner was in poor health(174).

The people could not seriously dispute that Khalifa was filmed picking something up from the construction site, or that he had created a threatening hostile, and intimidating environment even before picking up the brick.

Further, to the extent that petitioner "chased" khalifa and the evidence overwhelmingly shows he did not- a brief pursuit does not defeat justification.

The relevant inquiry in the state court should have been, not whether Khalifa was retreating but whether petitioner reasonably believed that he posed an imminent threat. The people did not convincingly argue that in the heat of the moment, and in light of Khalifa's post-encounter conduct, such a belief would been unreasonable.

Given the extensive evidence showing the reasonableness of petitioner's response in the face of a dangerous and disturbed man, the people advanced a variety of legally dubious arguments that likely confused the jury's analysis of justification.

55

For one, the people repeatedly suggested that    petitioner had some responsibility to "feel" or take advantage of other more peaceable options (216-223). This is simply not so. A "physical force" justification defense has no requirement of a duty to retreat. Only deadly force justification requires retreat but    that charge was neither requested nor given. See P.L. § 35.15(1)-(2)  ; CJI 35.15(2). The people are bound to disprove the charge actually given, petitioner's failure to "choose" continueous    retreat cannot defeat his defense.

For another, and relatedly, the people suggested    petitioner's use of force was excessive. Given the facts presented at trial, the winded and otherwise poor health petitioner would  have been justified in using deadly force when confronted with    a clearly deranged individual menacing him with a brick. But again, only physical- force justification was charged here.

In the face of so  much evidence that petitioner was justified in his actions, the jury's guilty verdict could therefore be explained by the prosecutor's misleading suggestions that  petitioner had a duty to retreat or to otherwise prove that the    use of the wire stripper was proportionate to the perceived    threat. This is especially so tandem with the prosecutor's repeated  suggestions, amounting misconduct, that petitioner had a duty    to preserve Khalifa's weapon and that petitioner was generally    a dangerous and vengeful man. See (Grounds 1, 3).

the state court's denial was incorrect as unreasonable  for not finding that petitioner's rights were violated, do to    the verdict being against the weight of the evidence.

which totally affected the outcome of the trial. This    violation
hinged on Pre-Se prejudice, Vivar v. Senkowski, 335 F. Supp    2d
344 (EDNY 2004) ( Petition granted in part, denied in part)    "[]
arguing that his conviction for criminal possession of a    weapon
in the second degree. Violated due process of law as    guaranteed
by 14th amend., because the state failed to prove every    element
of the offense". Jackson v. Virginia, 433 U.S. 307 (1979)    "pre-
sumes as well that a total want of evidence to support a    charge
will conclude the case in favor of the accused". U.S.C.A.    Const.
Ament. 14th., Bruton v. U.S., 391 U.S. 123 (1968) "a defenant    is
entitled to a fair trial but not a perfect one, there are    some
context in which risk that jury will not, or cannot follow    in-
structions is so great and consequences of failure so vital    to
defendant in criminal cause that parctical and human    limitations
of jury system cannot be ignored"; Deutch v. U.S., 367 U.S.    456
(1961) "Prosecution has burden of establishing guilt solely    on
basis of evidence produced in court and under circumstances    as-
suring an accused all safe-guards of a fair procedure,    including
presumption of his innocence".

        In James v. Moore, 2008 WL 5188145 (Dec. 10, 2008),    Place
emphsasis on the phrases "contrary to" and "unreasonable applica-
tion" hav[ing] independent meanings; a federal habeas court    may
issue the writ under the contrary to clause if the state    court
applies a rule different from the law set forth in ... [Supreme
Court] cases, or if it decides a case differently than we    have
done on a set of materially indistinuishable facts. The court may
grant relief under the " Unreasonable application" clause if    the

state court correctly- identifies the governing legal    priciple
from .... [Supreme Court's] decisions but unreasonably applies it
to the facts of a particular case. The focus on the latter    in-
quiry is whether the state court's application of clearly  estab-
lished federal law is objectively unreasonable ... and a  unrea-
sonable application is different from an incorrect one.
See, langston v. Smith, 630 F. 3d 318 (2d Cir. 2011) " reasonable
jury would not have convicted petitioner of felony assault    and
federal habeas relief was warranted".

In conclusion here for the reasons stated above, this    court
should grant habeas relief, and conclude that petitioner's indict
ment is dimissed and order his immediate release from    state
custody.

58

GROUND: 3

> The Prosecutor Committed Misconduct During Cross-Exami
> nation and Summation, by Vouching for his Witnesses
> While calling Petitioner a liar shifting the burden of
> Proof, making inflammatory Comments, Testifying    and
> Misstating record evidence and Impling that Petitioner
> was a Dangerous and Vengeful person- all while    also
> misstateing the Applicable Law.

## Standard of Review- Prosecutorial Misconduct:

In determining whether a petitioner is entitled to a writ
of habeas corpus, a federal court must apply the standard of  re-
view provided in 28 U.S.C. § 2254, as amended by AEDPA,    which
provides in relevant part:

> "If the federal claim was not adjudicated on    the
> merits 'AEDPA' deference is not required, and conlus-
> ion of law are reviewed 'de novo'". Dolphy v. Mantello
> 552 F. 3d 236, 238 (2d Cir. 2009)( quoting Spears  v.
> Greiner, 459 F. 3d 200, 203(2d Cir. 2006).

Foot Note: Ground(s) 4 and 5 are addressed under the    same
standard of review as noted above.

## Meeting Standard of Review:

Through a combative cross-examination and heated summation,
the prosecutor did more than just argue that petitioner's justi-
fication defense was not worthy of belief. The prosecutor shifted
the burden of proof to petitioner, pressed him to testify    that
certain prosecution witnesses were lying, acted as an unsworn wit
ness, vouched for the prosecution's witnesses while denigrating
petitioner, and in summation- described petitioner as having   a
violent and vengeful character.

Thought, the prosecutor's comments also gave the jury an erron-
ous view of the relevant law, which was not cured by the     jury
charge. This misconduct denied petitioner a fair trial and     de-
prived him of dur process. See U.S. Cont., Amands. V, XIV; Darden
v. Wainwright, 477 U.S. 168, 181 (1986); Moore v. Morton, 255  F.
3d 95, 119-20 (3d Cir. 2001).

Moor, ruling that "habeas relief was appropriate when prosecutor
made improper race-based comments and trial judge's      curative
instructions to the jury were not adequate to ensure a       fair
trial"' and listing in footnotes 15 and 16 cases where habeas re-
lief was granted or denied for improper [] comments.

    First, the prosecutor repeatedly shifted the burden      of
proof to petitioner by suggesting, among other things, that peti-
tioner had the responsibility to preserve evidence, to  remain at
the scene, or to otherwise explain why he had not "warned"
Khalifa or made a more peaceable choice. For instance, the prose-
cutor suggested that it was petitioner's burden to produce  wit-
nesses to corroborate his story about the brick, by asking    him
why he was "the only person that has come in court" to testify
about it( Tr. 226, 252, 255, 264-65, 341), and that petitioner
had the duty to call 911 or to otherwise warn Khalifa about   the
wire stripper(Tr. 216-17, 350). "Given the choice of calling  911
... he didn't do so"' the prosecutor said, and "[t]hat's      why
[petitioner] is in this chair" (Tr. 334). The prosecutor     also
suggested that it was petitioner's responsibility to "wait on the
scene" for police to arrive and "have this man arrested"(Tr.248),

and to justify why petitioner emerged from the fracas   uninjured
(Tr. 236). These comments served to shift the burden to petition-
er to provide affirmative proof of justification and lack      of
intent, and also impermissibly referred to his pre-arrest slience
See, Robinson v. Graham, 671 F. Supp. 2d 338 (NDNY 2009) "[i]t is
not enough that the prosecutor's remarks were undesirable or even
universally condemned. The relevant question is whether the prose
cutor's comments'so infect [] the trial with unfairness as      to
make the resulting conviction a denial of due process'"; Darden v
Wainwright, 699 F.2d at 1036.

     Second, the prosecutor vouched for the people's witnesses
while calling petitioner a liar. Donnelly v. Dechristoforo,    416
U.S. 637 (1974) " Moreover, the apporpriate standard of     review
for such a claim on writ of habeas corpus is 'the narrow one    of
due process, and not the broad exercise of supervisory power".Id.
at 642; United States v. Young, 470 U.S. 1, 11 (1985) "remarks of
the prosecutor in summation do not amount to a denial of due pro-
cess UNLESS they constitute 'egregious misconduct'". Referring to
witnesses Guy and Reyes and Toribio the prosecutor said all     had
testified under oath and remarked, "I submit that they told     you
exactly what they saw. They have no basis here... no motive     to
lie" (Tr. 335, 338). The prosecutor's improper vouching shifting
the burden to petitioner, suggesting it was his obligation      to
present the jury with a reason to disbelieve the various witness-
es. Petitioner's testimony, by contrast, was "nonsense"   because
"[he] will say anything to you"; should not be believed    because
"[n]one of that happened" and the only personsaying to the contra
ry is "the interested [petitioner]", and "everything" he said was

"an embellishment" or "a straight up lie" (Tr. 341, 356-57). See,
Garofolo v. Coomb, 804 F. 2d 201, 206 (2d Cir. 1986). These   ex-
hortations were plainly improper.

        Relatedly, the prosecutor also engaged in misconduct,  both
innately and through additional burden shifting, by pressing pet-
itioner to say that Officer Louard "lied" about the arrest(Tr.257
-58). The prosecutor then repeated this characterization on sum-
mation, asking the jury, "what's officer Louard's motive to   lie
...?" (Tr.353). But it is "improper for a prosecutor to force   a
defendant on cross-examination to characterize the prosecution
witnesses as liars". Miranda v. Bennett, 322 F. 3d 171,180 (2d
Cir.2003) Id. at 180.

        In deciding whether a defendant has suffered prejudice   of
due process proportions as a result of prosecutorial  misconduct,
court have considered (1) the severity of the misconduct; (2)the
measure adopted to cure the misconduct; (3) and the certainty  of
conviction absent the improper statements. See, Floyd v. Meachum,
907 F. 2d 201, 206 (2d Cir. 1990).

        the prosecutor also testified to the jury. Without   record
support, the prosecutor told the jury that petitioner "came    up
with the idea" to throw away the wire stripper "because people
are following me" (Tr. 356). The prosecutor assured the jury that
during the scffle, Khalifa was "fleeing" from petitioner, "[m]ake
no mistake about it" (Tr. 339), and that the instrument seen   in
the cell-phone still picture was "a knife". "Clear as day" (355).
With regard to the path petitioner took following the incident,
the prosecutor was inappropriately acting as an UNSWORN witness.

People v. Paperno, 54 N.Y. 2d 294, 300-01(1981) "Unsworn witness rule generally stands for proposition that prosecutor may    not interject his own credibility into the trial, rule is violated when prosecutor, by cross-examination suggests existence of facts not in evidence". See, e.g., Mitchell v. Artus, No. 07 Civ.   4688 LTS AJP, 2008 WL 2262606 at * 22 (SDNY June 2, 2008). "Like other claims of prosecutorial misconduct, a violation of the 'unsworn witness' rule results in a constitutional error 'only when    the prosecutorial remarks were so prejudicial that they rendered   the trial in question Fundamentally Unfair'". See, Garofolo v. Coomb, 804 F. 2d 201, 206 (2d Cir. 1986).

Perhaps most troubling was the prosecutor's repeated sugges tion that petitioner was generally a violent, dangerous, and vengeful man. The prosecutor told the jury that petitioner "[a]ll six foot one 300 pounds of him" was "not used to this" kind    of disrespect(Tr. 338). And was instead an "angry" (Tr. 215, 345)per son inflicting pain on "tiny" Khalifa (Tr.342)- to "teach" him  a "lesson", because petitioner was the kind of person who "solve[d] [his] problems" with his "knife" Tr. 343, 346, 359). In closing pitch to the jury, the prosecutor returned to this theme: petitioner did not back down because "that's not what this defendant does", and he "chased" Khalifa to "finish the job" (Tr. 359). The prosecutor's improper comments served to "convey to the jury, by insinuation, suggestion or speculation,the impression that    the petitioner is guilty of other crimes not in issue at the trial" or was otherwise of bad character. Gonzalez v. Sullivan, 934 F 2d 419, 424 (2d Cir. 1991); United States v. Young, 470 U.S. 1, 11 (1985)

"Remarks of the prosecution in summation do not amount to    a
denial of due process umless they constitute ' egregious    miscon-
duct'". United States v. Shareef, 190 F. 3d 71, 78 (2d Cir. 1999)
also see, Lisenba v. California, 314 U.S. 219, 236 (19410;  Bent-
ley v. Scully, 41 F 3d 818, 824 (2d Cir. 1994) "Suffered    actual
prejudice because the prosecutor's comments during [cross-examin-
ation and, or] summation had a substantial and injurious    effect
or influence in determining the jury's verdict". United States v.
Thomas, 377 F. 3d 232, 245 (2d Cir. 2004).

The Supreme Court has long recognized that "[i]t is unpro-
fessional conduct  for the prosecutor to express his or her  per-
sonal belief or opinion as to the truth or falsity of any  testi-
mony or evidence or guilt of the defendant". See, Young, id.   at
1, 8 (quoting ABA Standard for Criminal Justice 3-5. 8(b)(2d. ed.
1980); Accord United States v. Nersesian, 824 F. 2d 1294,    1328
(2d Cir. 1987). However, a reviewing court "must evaluate     the
challenged remarks in the context of the trial as a whole,   for
the government is allowed to respond to argument that impugns its
integrity or the integrity of its case" United States v. Rivera,
22 F. 3d 430, 438 (2d Cir. 1994). In Donnelly, The  Supreme Court
found that a prosecutor's remark: While unambiguously   improper,
was merely trial error, and that the "distinction between    odin-
nary trial error of a prosecutor and that sort of egregious mis-
conduct" that "amount[s] to denial of constitutional due process"
must be maintained. Id. at 416 U.S. 647-48. Unlike in Gonzal, any
impropriety regarding the statements here by the prosecutor    in

64

summation were not sever enough to equate with the "eregious con-
duct" refered to in Donnelly, and any potential threat to petit-
ioner's constitutional rights was effectively neutralized by  the
instructions of the trial judge. See, e.g., United States    v.
Rivera, 971 F. 2d 876, 885 (2d Cir. 1992) (Finding that the trial
court's instructions cured any prejudice arising from     prosecu-
torial error). As the Second Circuit has noted "[o]ften, the  ex-
istence of substantial prejudice turns upon the strength of   the
government's case:  if proof ofguilt is strong, then the prejud-
ice effect of the comments tends to be deem insubstantial,    if
proof of guilt is weak, then improper statements are more   likely
to result in reversal". United States v. Modica, 663 F.2d    1173,
1181 (2d Cir. 1981);Also Bentley, at 41 F. 3d 818, 824.

Finally, the prosecutor misstated the law pertaining to
petitioner's justification defense by claiming that petitioner
had a duty to retreat, and that "punching" would have been accep-
table while using an instrument was not (Tr. 223, 334, 346, 360),
"a prosecutor's remarks, even if improper and beyond the    bounds
of fair advocacy, will not warrant habeas relief'unless the    re-
mark caused the petitioner substantial prejudice'". Bradley    v.
Meachum, 918 F. 2d 338,343 (2d Cir. 1990). First, the prosecutor
assertion the "we wouldn't be here" if petitioner had punched the
complanaint (Tr. 346) is both erroneous, in the sense that     it
could still at a minimum be charged as third-degree assault, P.L.
§ 120.00(1), and misleading, in that the prosecutor's    arguments
against justification would apply equally had petitioner   punched

65

the complainant. Second, petitioner had no duty to retreat  under the charged physical-force justification, but the jury would  not have been aware that a lack of such duty is one of the key diffe- rences between physical-force and deadly-force justification.

Both individually and cumulatively, the prosecutor's impro- per comments, in tandem with a sarcastic and inflammatory tone  , deprived petitioner of due process and a fair trial. See, Umited States v. Young, 470 U.S. 1 (1985); United States v. Robinson  , 485 U.S. 25 (1988).

This pervasive misconduct cannot be deemed harmless.  Chap- man v. California, 386 U.S. 18, 23 (1967). As set forth in here, the prosecution failed to present the complanaint for trial  and did not even attempt to challenge petitioner's testimony that he was repeatedly and violently menacing petitioner. And by vouching for witnesses, denigrating petitioner and otherwise straying out- side of the boundaries of the factual record, the prosecutor en- courage the jury to disbeliev petitioner's otherwise logical and credible recollection of the events and todisregard the  many instances where the evidence corroborated his testimony- such  as the video and medical evidence showing that Khalifa pursuit  of petitioner, or the EMT who confirmed KHalifa's irrational, racist and violent behavior.

Moreover, the prosecutor's incorrect statement of  legal principles was particularly damaging where the prosecutor assail- ed petitioner for failing to take actions that were of no  legal consequence to justification. The jury was not told to disregared the legal arguments of counsel, and the instructions given could not"cure" the prosecutor's misstatements because they did  not

66

affirmatively inform the jury that those disputed elements,   particularly the duty to retreat and the difference between a punch and stab, were irrelevant. The prosecutor therefore USRPED   the court's function of instructing the jury on the law. See,   Darden v. Wainwright, 477 U.S. 168 (1986).

Defense Counsel objected to several of the prosecutor's com ments such as attempt to shift the burden to petitioner regarding the production of Khalifa's weapon for trial(Tr. 252) and   the similar need to keep the wire stripper (Tr. 255), preserving them for review. To the extent that this court deem, this argument ab ove rest on points not preserved in the trial court, the argument should be reached in the interest of justice. See, e.g.,   Jhonson v. Bellnier, 2010 WL 7100915 (EDNY November 8, 2010).

Here the state court upon appeal rule this matter to   be without "merit, or not preserved", for review. This denial   falls well outside the standard of "Adequate and Independent"   state ground doctrine. The Supreme Court repeatedly has held:[]   State Courts may not avoid deciding a federal issue by invoking proce- dural rules that do not apply 'Evenhandedly'". [] When a federal court finds that the rule is inadeqate under this test the   rule should not operate to bar federal review.

Alternatively, because there is no apparent reason why de- fense counsel would not object and request curative instructions or a mistrial, this court should find that counsel was constitu- tionally ineffective for failing to do so. U.S. Const. Amend. VI; Strickland v. Washinton, 466 U.S. 668, 687-88 (1984).

For the above reasons, this court should grant habeas   re- lief vacate petitioner's conviction and remand for a new trial.

GROUND 4

                The Prosecutor's Two-Incidents Theory Transformed  the
                Single Count of Assault into Two Separate          Counts,
                Creting impermissible Duplicity and rendering            it
                Impossible to determine Whether the Jury was       Unanim-
ous in its Verdict.

Standard of Review- Prosecutor's Misconduct Enterjecting Unsuppor
ted/ uncharged Theory of Crime, Creating Impermissible Duplicity:

        The federal standard of review upon this ground is          the
same as the one noted for ground #3.

        The prosecutor's theory of the case asked the jury to treat
the single assault charge as two separate counts- based on     when
Khalifa allegedly "fled" - and to reconsider justification       for
each. In an error similar to the one committed by the court      in
ground #2, above, this violated the well- established prohibition
against **Duplicitious** counts. Because it is therefore  impossible
to tell if the jury was unanimous in its verdict, petitioner  was
deprived of his rights to due process and a fair trial.          U.S.
Const., Amends. V, XIV.

        Each count of an indictment "may charge one offense only ".
CPL § 200.30(1). The prohibition on duplicitous counts      "further
not only the function of notice to a defendant and of     assurance
against **DOUBLE JEOPARDY,** but also ensures the reliability of   the
unanimous verdict". A facially vaild count can become duplicitous
if the "evidence presented at trial makes plain that      multiple
criminal acts occurred during the time period, rendering          it
nearly impossible to determine the particular act upon which   the
jury reached its verdict".

                                68

Under New York Law "[e]ach count of an indictment     may
charge one offense only". N.Y. Crim. Proc. Law § 200.30(1).  See,
Schwatz v. Connel, No. 05 Civ. 10305 (RPP) 2006 WL 3549660,     at
*8 (SDNY Dec. 6, 2006) Gray v. Artuz, 931 F. Supp. 1048, 1051(SD-
NY 1996), " a count of an indictment is duplicitous under NY Law
if it charges more than one offense".

Here, the indictment charged a single count of assault, and
a single charge of attempted assault based on different intended
outcome, arising out of Khalifa's confrontation with petitioner-
doing so was appropriate, because a single assualt charge    ordi-
narily covers an uninterrupted course of conduct, not each   sepa-
rate attack. United States v. Aracri, 968 F. 2d 1512,1518 (2d Cir
1992).

The prosecutor seized on Reyes stray comment about       a
"chase" to split the single incident in two, and ask the     jury
to reconsider the use of force for each even though no  charge to
that effect was requested or given. The prosecutor's argument was
that the initial encounter, in which petitioner stabbed Khalifa ,
was interrupted by his flight, and petitioner's decision .    to
"finish the job" marked a second, dicrete incident of assualt for
which the jury needed to reassess justification- even if the jury
believed petitioner was justified as to the first part of the en-
counter (Trial Record 358-59).

the prohibition against duplicitous indictments serve   the
following policy considerations interms of clarity:

Avoiding the uncertainty of whether a general verdict    of
guilty conceals a finding of guilty as to one crime and a finding
of not guilty as to another, avoiding the risk that the     jurors

may not have been unanimous as to any one of the crimes charged ,
assuring the defendant adequate notice, providing the basis   for
appropriate sentencing, and protecting against double jeopardy in
a subsequent prosecution.

The prosecutor's theory created a duplicitous assualt count
allowing the jury to treat the single confrontation as two   se-
parate incidents. It is thus impossible to tell whether the jurys
verdict was unanimous. Some of the jury could have thought   peti-
tioner was not justified at all, while the rest of the jury could
have thought petitioner was justified as to the "initial" encoun-
ter but not the subsequent confrontation after Khalifa's alleged
flight. "constitutional provisions respectively relating        to
tenure and compensation of judges and providing for presentment
or indictment of grand jury drawn from the people and the     pro-
visions for trial by jury, are safeguards designed to      protect
defendants against oppressive government practices". U.S.      v.
Gallo, 394 F. Supp. 310 (D. Conn. 1975), one purpose of a require
ment that an individual be indicted by grand jury is to      place
between the prosecutor and accused an indpendent body, which can
evaluate the evidence and determine if the charge is based upon
reason.

Although the court did partly charge that      justification
equaled a not- guilty verdict, but see ground #2 above, the court
never told the jury to disregard the prosecutor's      erroneous
statement of the law, which the jury could easily have reconciled
with the court's instruction: "if you find petitioner    justified
for both purported uses of force, he is not guilty. And     unlike

cases like People v. Kaid, where the prosecution's theory  simply offered the jury alternative means (not requiring unanimity), the theory here asked the jury to decide on what were now two different justification elements. See, Kaid, 43 A.D. 3d at 1082-83 (no duplicity when theory split means rather than elements).

## Evidentiary Claims:

For habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he  must show that the error was so prevasive as to have denied him  a fundamentally fair trial. United States v. Agurs, 427 U.S.  97 (1976) Id. at 108. The standard is "whether the erroneously  admitted evidence, viewed objectively in light of entire record before the jury was sufficiently material to provide the basis  for conviction or to remove a reasonable doubt that would have  existed on the record without it. It must have been 'crucial, cruitical, hightly significant'". Collins v. Scully, 755 F. 2d 16,  19 (2d Cir. 1985)( quoting Netties v. Wainwright, 677 F. 2d 410, 414 -15 (5th Cir. 1982). This test applies post- AEDPA. See, Wade  v. Mantello, 333 F. 3d 51, 59 (2d Cir. 2003); Velilla v.  Senkwoski, 20-CV- 6458 2003 WL 23198791 at *9 (EDNY Oct. 30, 2003). U.S.  v. Acquest Development, LLc, 932 F. Supp. 2d 453 (WDNY 2013)(  very purpose of fifth amendment requirement that a man be indicted  by grand jury is to limit his jeopardy to offenses charged by  a group of his fellow citizens acting independently of either prosecuting attorney or judge).

71

In sum, the count of conviction was rendered **Duplicitous** by the prosecutor's split trial theory. This court should vacat petitioner's conviction by way of habeas relief, in the interest of justice authority and remand for a new trial. Alternatively, a new trial is warranted by counsel's failure to object to the duplicitous charge. Strickland, 466 U.S. at 687-88.

GROUND :   5

> The Court Erred When it Excluded as "Collateral"   Pet-
> itioner's Wife's Testimony That He Carried a Wire   St-
> ripper and not a Knife, When it would have Corroborated
> a Key Element of His Testimony and Rehabilitated   His
> Credibility, both of which directly related to His Just
> ification Defense.

Standard of Review- The Court Erred When it Excluded as   "colla-
teral" Petitioner's Wife's Testimony:

The federal Standard of review upon this ground is the same
as the one noted for ground(s) #3 and #4.

Meeting Standard of Review:

Both in their case-in-chief and during petitioner's cross -
examination, the people advanced the theory that petitioner   had
stabbed Khalifa with a knife, a weapon, rather than with a   wire
stripper, a tool. In short, the people argued that petitioner was
lying when he denied using a knife as part of the defense   case
counsel sought to rehabilitate petitioner and corroborate   his
testimony by calling his wife, Nicole McGriff, to speak   about
petitioner's repair hobby and his habit of carrying around a wire
stripper, but the trial court erroneously bared her   testimony
as collateral. This incorrect exclusion deprived petitioner   of
his Constitutional right to present a defense, to due process,
and to a fair trial. U.S. Const., Amends. VI, XIV; See, Cran   v.
Kentucky, 476 U.S. 683, 690 (1986); Also see C.P.L § 60.15(1).

73

As defense counsel set forth, Nicole's testimony was being offered to corroborate petitioner's story and if necessary, to rehabilitate his credibility. The people case in chife had inclueded extensive testimony about the alleged "knife" (Toribio : Tr. 14-15; Guy: 43; Reyes: 114-15, 117) and people's Exhibit 8 showed petitioner with a sharp instrument in his hand. When petitioner testified that it was actually a wire stripper (Tr. 165 , 167) the prosecutor attempted to undermine this testimony on cross-examination, aggressively and sometimes sarcastically questioning petitioner's truthfulness(Tr. 219-20, 223, 255), and stating that the jury would "have to rely on" petitioner's testimony because of lack of corroborating evidence (Tr. 220). The knife was one of the key points on which the prosecution attempted to impeach petitioner's credibility. In fact, in summation , the prosecutor not only emphasized the identity of the "knife" in stead of "wire stripper" (Tr. 355).

Nicole's testimony would have provided the corroboration alluded to as lacking by the prosecution. Her testimony about her husband's habit of carrying a wire stripper for the purpose of repair hobby wpuld have been directly relevant to both the intent and justification elements of the charged offense, also, while there is nothing inherently illegal about carrying a knife, commone sense suggests that a jury would perceive the disput differently if petitioner were deploying a hobbyist's tool in a frantic attempt to defend himself.

74

Furthermore, the jury's assessment of petitioner's truthful-
ness is central to the justification defense, and petitioner test
ified that he used a wire stripper, not a knife- a fact clearly
not "collateral" in the people's view, especially as the people
argued on summation that it undermined his credibility.   Because
petitioner's credibility was central question in assessing    his
justification defense, it simply could not be collateral.    See,
Jamison v. Auburn Correctional Facility, 2015 WL 8770079 (EDNY 20
15). ( the trial court excluded petitioner's wife's testimony re-
garding their sexual relationship on the ground that it was    ir-
relevant. The Appellate Division did not specifically    discuss
petitioner's claim that the exclusion of character evidence    was
improper). This determination is entitled to AEDPA deference.
Watson, 640 F. 3d at 508 n.7; Jimenez, 458 F. 3d at 146.See, also
Wade v. mantello, 333 F. 3d 51, 57 (2d Cir. 2003). In this    vein
"where constitutional rights directly affecting the ascertainment
of guilt are implicated the hearsay rule may not be    applied
mechanistically to defeat the ends of justice". Chambers,    410
U.S. at 302 (1973); Hawkins v. Costello, 460 F. 3d 238 (2d Cir .
2006). Only errors of federal constittuional law are cognizable
on habeas review. Crispino v. Allard, 378 F. Supp. 2d 393,    408-
(SDNY 2005) (" [i]t is well established that the mere fact that a
state court made evidentiary errors, without more,does not pro-
vide a basis for habeas relief")( Citing Estelle, 502 U.S. at 72)

The court's failure to allow Nicole to testify    clearly
harmed the defense. Chapman, 386 U.S. at 23.

75

It allowed the prosecutor to suggest, both directly and implicit-
ly, that petitioner was engaged in an unsupported fabrication-
that he would "say anything" to the jury to appear sympathetic,
and that the failure to produce the tool at trial amounted     to
deception (Tr. 356). Moreover, despite arguing that Nicole's test
imony was "collateral" during the colloquy with the court,     the
prosecution eagerly returned to attacking petitioner's credibili-
ty regarding the tool in closing: " If it was really this     wire
stripper, right, that he wants you to believe, wouldn't he     have
kept it ?" (Tr. 355). With credibility and corroboration directly
bearing on the elements of justification and intent, the exclus-
ion of this witness cannot be harmless.

The question here is [w]hether the ailing instruction     of
the state court to exclude Nicole's testimony by itself, so     in-
fected the entire trial that the resulting conviction violates
due procss ? Cupp v. Naughten, 414 U.S. 141, 147 (1973); also see
Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Donnelly v. Dechis-
toforo, 416 U.S. 637, 643 (1974). In Cupp,it was held: "an impro-
per jury instruction can constitute a federal constitutional vio-
lation when the ailing instruction by itself so infected the en-
tire trial that the resulting conviction violates due process".Id
at 123 (2d Cir. 2001).

This issue was preserved when defense counsel proposed cal-
ling Nicole and in response the people's demand, explained     the
scope of her testimony regarding petitioner's hobbies and     the
need to correct the prosecutor's implication that petitioner     was
lying and had used a knife (Tr. 277-78).

In Deluca  v. Lord, 858 F. Supp. 1330 (SDNY 1994) " Respondents contend that petitioner anbandoned her request to    present the proposed expert testimony because she did not request      a ruling from justice Tonetti at trial. Therefore, they argue,   she is procedurally barred from raising this claim in her habeas peti tion". the magistrate judge rejected this argument, finding  that justice Tonetti had put an end to this issue in his ruling at the § 440 hearing. Although admitting that his decision may     have been off the record, justice Tonetti stated that " my recollection is that ... the court made a ruling denying counsel's application to call that witness and that it was preserved for      the record". This court accepted magistrate judge Robert's recommendation that the respondents assertion of proceduraldefault     be rejected. [] even if erroneous, evidentiary ruling by state court " do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus". Taylor v. Curry, 708 F. 2d 886, 891 (2d Cir. 1983). A defendant is entitled to habeas relief only when she/ [h]e can show    that the  error was so prejudicial as to amount to a denial of    due process or that it was tantamount to the denial of a fundamentally fair trial". Id at 891 (emphasis in original; citations omitted). "It is the materiality of the excluded evidence to      the presentation of the defense that determines whether a    defendant has been deprived of a fundamentally fair trial". Rosario    v. Kuhlman, 839 F. 2d 918, 925 (2d Cir. 1988) (Citing Taylor    v. Curry). Erroneously excluded evidence is material and constitut - ional error has been committed " if the omitted evidence  creates

77

a reasonable doubt that did not otherwise exist". Rosario, 839 F.
2d at 925 (quoting United States v. Agurs, 427 U.S. 97, 112-13
(1976).

### Legal Standard:

Noble v. Kelly, 89 F. Supp. 2d 443 (SDNY 2000). The Sixth
amendment to federal constitution guatanteed every criminal defen
dant "the right ... to have compulsory process for obtaining wit-
nesses in his favor ..." U.S. Const., Amend. VI. Although      some
have suggested that the compulsory process clause only guarantees
the power to subpoena witnesses, See, Taylor v. Illinois, 484 U.S
400, 407-08, nn. 10-12 (1988). The Supreme Court of the      United
States has consistently held that, such a right would be meaning-
less unless it were also interpreted as a right to present those
witnesses at trial. See, Michigan v. lucas, 500 U.S. 145, 149(19-
91); taylor, 484 U.S. at 407-08 ("Our cases establish at a mini-
mum, that criminal defendants have ... the right to put      before
a jury evidence that might influence the determination of guilt")
(Citing Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987).      The
right to present exculpatory testimony is central to concept    of
an adversary system. Taylor, 484 U.S. at 408-09 (Citing      United
States v. Nixon, 418 U.S. 683, 709 (1974)), and is "a fundamental
element of due process of law", id. at 409 (Citing Washington v.
Texas, 388 U.S. 14, 19 (1967)). See also Chambers v. Mississippi,
410 U.S. 284, 302 (1973)(" few rights are more fundamental    than
that of an accused to present witnesses in his own defense").  Of
course, the accused's right to present witnesses in his      defense
is not without limits. For example a court may limit the    present
ation of evi...

ation of evidence if it is concerned about "harassment, prejudice, confusion of the iusse, the witness' safety, or interrogation that is repetitive or marginally relevant". Delaware v.     Van-Arsdall, 475 U.S. 673, 674 (1986). Similarly, it is consistent with compulsory process clause for the state to enact discovery or evidentiary rules that limit a defendant's opportunities     to prevent favorable testimony. Lucas, 500 U.S. at 149, 151( rape shied statute); Rock v. Arkansas, 483 U.S. 44, 55-56 (1987) (Citing Chambers, 410 U.S. at 295). Alibi - notice staties, such    as the one at issue here, have been reviewed by the court on     two occasions and found to be constitutional each time. See Wardius v Oregon, 412 U.S. 470, 474 (1973) (describing a similar statute as "a salutary development which, by increasing the evidence available to both parties, enhances the fairness of the adversary system").

If the court deems any aspect of the issue unpreserved, it is respectfully requested that the court reach it in the interest of justice or, alternatively, rule that trial counsel was ineffective for failing to appropriately object. Strickland, 466 U.S. at 687-88. For the reasons set forth above, this court should  grant habeas corpus relief, vacate petitioner's conviction on the     law and remand for a new trial.

GROUND : 6

> The Court's Step-One denial of Defense Counsel's Bat-
> son Application, which alleged that the Prosecution
> disproportionately Struck Black Jurors with no    appa-
> rant basis for most of the challenges- thus    meeting
> the defense's burden of Showing Prima Facie discrimi-
> nation- was Error.

Standard of Review- Court's Error Denying Defense Counsel's  Bat-
son Application:

As AEDPA provides in pertinant part:

In habeas proceedings " a determination of factual issues
made by state court shall be presumed to be correct. The    appli-
cant shall have the burden of rebutting the presumption of corect
ness by clear and convincing evidence". 28 U.S.C. § 2254(e)(1).
Also, AEDPA placed new constraint on power of federal      habeas
court to grant state prisoners application for writ of      habeas
corpus with respect to claims adjudicated on merits in      state
court, limiting issuance of writ to circumstances in which one of
the two conditions is satisfied.

**Meetin Standard of Review:**

The prosecution used 9 of 11 peremptory challenges      to
strike black panelists. When the defense challenged this extreme-
ly high and apparently arbitrray deployment of strikes, the pro-
secutor's only response was that the seated jury was purportedly
not "majority" white. On this record, the defense's    challenge
more than made out a Prima Facie case of racially based    peremp-

80

tory challenges, and the trial court's summary decision to   con-
trary was error. U.S. Const. Amend., XIV; Batson v. Kentucky, 476
U.S. 79, 98 (1986).

The use of peremptory challenges to purposefully exclude
persons of a particular race violate the federal constitution.

The three- step Batson assesses whether the prosecution has
exercised peremptory challenges on the basis of race: 1) a prima
facie showing of race- based strikes, 2) opposing party's articu-
lation of race- neutral rationale, and 3) determination of whe-
ther the proffered reason was pretextual. Id. at 571 (Citing Bat-
son, 476 U.S. at 96- 98.

This case implicates the first of batson's three steps:   A
prima facie case. the prima facie burden is not onerous as " a
defendant satisfies the requirments of Batson's first step    by
producing evidence sufficient to permit the trial judge to   draw
inference that discrimination has occurred". Johnson v.     Cali-
fornia, 545 U.S. 162, 170 (2005). Relevant factors include  nume-
rical arguments , whether seated panelists shared similar chara-
teristics or answers with the excluded panelists, and whether the
defendant shares a group identity with the excluded jurors. Bat-
son, 476 U.S. at 96- 97.

Here, defense counsel's challenge combined numerical infor-
mation with qualitative assessments of those struck. Defense coun
sel argued that 9 0f 11 peremptories used by the prosecution ser-
ved to eliminate black prospective jurors (J. 285). A Batson chal
lenge brought via habeas petition must defeat the "presumption of
correctness" afforded to the trial court's first- hand observat-
ion of the  events in voir dire. Galarza v. Keane, 252 F. 3d  630
635 (2d Cir. 2001) "[i]t is one thing to conclude that a  pattern

81

of strikes is prima facie evidence of unreasonable application of Batson", See Sorto v. Herbert, 497 F. 3d 163, 174 (2d Cir. 2007).

Counsel did not rely on a numbers argument alone,   turning to the fact that the prosecutor struck at least 4 of the panelist for no apparent reason, as those panelist had said "virtually not hing " (J. 283). Defense counsel contrasted this to panelist So-lstad, who had discussed her status as a crime victim (J. 283).

Outside of Solstad, the challenged black panelists from the first two rounds- Barrow, Dunn, Philip, and Stewart- gave   minor biographical details and answered innocuous questions about "con-sistency", but were otherwise silent (J. 72- 73, 88- 99, 108, 112 The third- round challenges meanwhile, included panelists   like Grant who had answered only biographical questions, and   those like Best who answered questions in a manner favorable to   the prosecution (J. 213- 15, 259- 60 ). Far from providing grist   for the prosecution, those removed were largely the people who   said nothing at all. And yet the prosecution agreed to seat,   among others, a person who had worked for a public defender and exper-ienced unpleasant street harassment- neither of whom was   black (J. 79, 86, 94- 95, 106, 111, 121 ).

Ignoring defense counsel's qualitative arguments, the   pro-secutor responded to the numeracy argument by pointing to   black jurors whom he had allowed to be seated. However, "[t]he   mere inclusion of some members of defendant's ethnic group will   not defeat an otherwise meritorious [Batson] motion". Because   the

habeas petitioner bears the burden of demonstriating a violation
of constitutional rights if a deficiency in the record make    it
impossible to ascertain the existence of discriminatory  conduct,
the petitioner's claims must be rejected. Id at 172- 73.        The
number of strikes in this case provided an ample statistical base
line, distingushing this fact pattern from cases where the number
of strikes were too small to be statistically significant.

      The Second Circuit also has observed that while the burden
of showing a prima facie case is not onerous, it safeguards "the
traditional confidentiality of lawyer's reason for      peremptory
strikes unless good reason is adduced to invade it ..." id.at 170
(Citing Miller- El v. Dretke, 545 U.S. 231 (2005).

Because the law forbids "the exclusion of even a single juror  on
racial grounds". Rosario v. Ercole, 582 F. Supp. 2d 541 (SDNY 20=
08), "state trial court unreasonably applied federallaw in ruling
that Rosario failed to establish a prima facie case under  batson
claim". It thus matters little that the prosecution did        not
strike all of the black members of panel. Moreover, as petitioner
is a black man removing black people from the jury         directly
affected the "cognizable group" of which he is a part.

      In short, the disproportionate number of challenges       to
black panelist combined with the lack of obvious on-the-record
reasons for challenging them, more than met petitioner's step-one
burden. The trial court's summary ruling that there was no "pat-
tern" was thus incorrect and without any clear grounding in the
record.

The Second Circuit often has noted the perils of using a snapshot in tome amid an incomplete voir dire when reviewing a Batson objection raised in a habeas petition to ascertain the existence of a prima facie case, "[t]he discharge of this burden may entail a review of prosecutorial strikes over the span of selection process". Sorto, 497 F. 3d at 170. this is because in part, "[t]he need to examine statistical disparties may commend a wait-and-see approach", and because "an early Batson challenge--- limits that state court's ability to properly assess a prima facie case". Id.

Petitioner's Batson claim was preserved via a timely challenge and the trial court's ruling. This Batson argument presented by defense counsel at jury selection. But to the extent this court deems any aspect of the issue unpreserved and necessary for disposition favorable to petitioner, it is respectfully requested that this court reach it in the interest of justice or, rule that trial counsel was ineffective as grounds for granting habeas relief. Strickland, 466 U.S. at 687-88.