1    **SUPREME COURT OF THE STATE OF NEW YORK**
     **COUNTY OF KINGS : CRIMINAL TERM : PART 33**
2    ---------------------------------------------x
     **THE PEOPLE OF THE STATE OF NEW YORK**
3
                                   **Plaintiff,**
4              **-against-**

5    **LORENZO MCGRIFF,**
                                   **Defendant.**
6    ---------------------------------------------x
     **Indict. No. 6248/15**          **JURY SELECTION**
7

8                                  **320 Jay Street**
                                   **Brooklyn, New York**
9
                                   **December 14, 2016**
10

11   **B E F O R E :**

12              **HONORABLE MIRIAM CYRULNIK,**
                       **Justice, and a jury.**
13

14        **(Appearances same as previously noted.)**

15                            **VANESSA DEL VALLE**
                           **Official Court Reporter**
16
                    *    *    *    *
17

18              THE CLERK:  Calling number two from the Part

19   33 calendar, indictment 6248 of 2015, Lorenzo McGriff.

20   Case is continuing with jury selection.

21              THE COURT:  Good morning, everyone.

22              MS. BURKE:  Good morning.

23              Jamie Burke, Brooklyn Defender Services, 177

24   Livingston Street, Brooklyn, New York 11201 on behalf

25   of Mr. McGriff.

1           MR. WITTWER:  Ben Wittwer, also on behalf of

2      Mr. McGriff.

3           Good morning.

4           MR. MOTTOLA:  Office of the District

5      Attorney, Lawrence Mottola.

6           Good morning.

7           MS. D'AGOSTINO:  Stephanie D'Agostino, Office

8      of the District Attorney.

9           THE COURT:  Good morning, everyone.

10          Good morning, Mr. McGriff.  Have a seat.

11          We did before we bring in the panel, I will

12     remind them about being here promptly, we had discussed

13     excusing prospective juror number 16, Mr. Callwood.

14     Yesterday afternoon when he was up at the bench he

15     raised an issue about a prior contact and gave us,

16     essentially in my mind, confusing information about the

17     resolution of the contact.  He indicated that he spent

18     a night in jail.  That there was indicated, I believe,

19     that he took a plea and he mentioned something about

20     five years probation but had no paperwork.

21          And based upon the information that he's

22     related it's difficult for me at least to make a

23     determination as to whether he pled guilty to a felony

24     or that there was some issue that would disqualify him

25     as a potential juror.  And I think he made certain

1        other statements about his ability to reflect on his

2        ability to be fair.  And my recollection of our

3        conversation up here as all four counsels were in

4        agreement, he should be excused.  Just want to --

5                    MR. MOTTOLA:  Yes.

6                    MS. BURKE:  Yes, Your Honor.

7                    THE COURT:  All right.  So, we will seat the

8        15, number 16.  We will just keep the last gentleman to

9        the side.  He is going to be excused and send him back

10       downstairs.

11                   COURT OFFICER:  Don't put him in the box.

12                   THE COURT:  Yes.  He will be excused.

13                   COURT OFFICER:  Just tell him to go back down

14       now.

15                   THE COURT:  Yes.  Let's get the other 15.

16                   (Whereupon, there was a pause in the

17       proceedings.)

18                   COURT OFFICER:  Ready for the panel, Your

19       Honor?

20                   THE COURT:  Yes.  Thank you.

21                   COURT OFFICER:  Panel entering.

22                   (Whereupon, the prospective jury entered the

23       courtroom.)

24                   THE CLERK:  The prospective jury panel is

25       present and seated in the box.  For continuation of

1     voir dire.  Good morning.

2              THE COURT:  Both sides waive the reading of

3     that roll?

4              MR. MOTTOLA:  Yes.

5              MS. BURKE:  So waived, Your Honor.

6              THE COURT:  Thank you.

7              Good morning, everyone.

8              PROSPECTIVE JURY:  Good morning.

9              THE COURT:  Well for those of you who were

10    here on time, I thank you.  We did ask everyone to be

11    here at 9:45.  That means 9:45 outside the courtroom

12    door.  Honestly we've been waiting for you for just

13    about 45 minutes.  And your fellow jurors have been

14    waiting for, some of them for 45 minutes, waiting for

15    you to be here.

16             If you are selected for this jury you are

17    required to be here when I tell you.  This is a job.

18    This is like work, it's like school.  And you are

19    required to be here.  And if that means leaving time to

20    get upstairs in the elevator if you are asked to be

21    here at 9:30, you cannot be downstairs in the lobby at

22    9:30.

23             So as I said, this is an issue not only of

24    being respectful of your fellow jurors' time and the

25    attorneys' time and our time, but also the idea that

Case 1:21-cv-00703-AMD-LB  Document 6-3  Filed 04/15/21  Page 5 of 213 PageID #: 453

1    should we -- should you be selected, the approximate

2    conclusion date that I gave you is dependent upon us

3    being able to put in a full day's work.  If we are

4    required to wait 45 minutes or an hour for someone to

5    appear, that's going to delay the trial and that's

6    unacceptable.

7         So, I am sure this is the only time that I

8    will have to mention that.  And again for those of you

9    who were here on time, I thank you.

10        All right.  I believe yesterday I had asked

11   everybody that because this is a criminal case there

12   were police officers involved and there would be

13   testimony from police officers, as well as civilians.

14   And that in a trial a police officer is just like any

15   other witness.  I had asked if there was anyone who

16   could not treat a police officer like any other

17   witness.  There was one person, one or two indicated

18   some concerns.  I think Mr. Auerbach and Miss Hidary

19   plus Mr. Callwood.

20        Was there anyone else whom I did not get to

21   yesterday on this issue?  Okay.

22        Have any of you or any members of your family

23   ever been the victim of a crime?  Okay.

24        Miss Billingslea.

25        PROSPECTIVE JUROR:  I got my wallet stolen.

```
 1              I had it reported because my military I.D. was there.

 2         At the time they didn't have DOT numbers.  It was

 3         social.

 4                   THE COURT:  Was that here in Brooklyn?

 5                   PROSPECTIVE JUROR:  Yes.

 6                   THE COURT:  And you said it was reported?

 7                   PROSPECTIVE JUROR:  Mmm-hmm.

 8                   THE COURT:  Was anybody ever apprehended?

 9                   PROSPECTIVE JUROR:  (Indicating).

10                   THE COURT:  Just need to hear your answer.

11                   PROSPECTIVE JUROR:  No.

12                   THE COURT:  Is there anything in either in

13         the fact that this happened to you or your experience

14         with the police in reporting, anything at all that

15         would affect your ability to be fair and impartial?

16                   PROSPECTIVE JUROR:  No.

17                   THE COURT:  Thank you.

18                   Other hand.  Mr. Auerbach.

19                   PROSPECTIVE JUROR:  My wife was assaulted --

20                   THE COURT:  Sorry.  I can't hear you.

21                   PROSPECTIVE JUROR:  My wife was assaulted on

22         the street.

23                   THE COURT:  Sorry to hear that.

24                   Was she injured?

25                   PROSPECTIVE JUROR:  No.
```

1           THE COURT:  Good.

2           And was this here in Brooklyn, Mr. Auerbach?

3           PROSPECTIVE JUROR:  Yes.

4           THE COURT:  Okay.  Was it reported to the

5      police?

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  Was anybody apprehended?

8           PROSPECTIVE JUROR:  Not that we know.

9           THE COURT:  How long ago was this?

10          PROSPECTIVE JUROR:  Two years ago.

11          THE COURT:  Okay.  Is there anything in the,

12     anything in her experience, what you observed, what the

13     two of you discussed that would affect your ability to

14     be fair and impartial here?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Okay.  All right.  Thank you.

17          Other hands.  Mr. Flounoy.

18          PROSPECTIVE JUROR:  Yes.  I was mugged under

19     the Brooklyn Bridge.  And also my apartment was broken

20     into.

21          THE COURT:  Let's start with the mugging.

22          About how long ago was that?

23          PROSPECTIVE JUROR:  About nine years ago.

24          THE COURT:  Okay.  Were you injured?

25          PROSPECTIVE JUROR:  We, there were two of

1     them.  We wrestled a little bit.

2                THE COURT:  Okay.  Was it reported to the

3     police?

4                PROSPECTIVE JUROR:  Yes.

5                THE COURT:  Anybody apprehended?

6                PROSPECTIVE JUROR:  No.  I was just reporting

7     the incident about the situation.

8                THE COURT:  Okay.  And when your apartment

9     was burglarized, was anybody home at the time?

10               PROSPECTIVE JUROR:  No one was home.

11               THE COURT:  Good.

12               Was that reported?

13               PROSPECTIVE JUROR:  Yes, it was.

14               THE COURT:  Anybody apprehended in that case?

15               PROSPECTIVE JUROR:  No.

16               THE COURT:  Is there anything in either of

17    those experiences, whether it's just the fact that they

18    happened, the fact that nobody was apprehended, your

19    encounters if you will with the authorities, anything

20    that would affect your ability to be fair and impartial

21    here?

22               PROSPECTIVE JUROR:  No.  Not at all.

23               THE COURT:  Okay.  Thank you.

24               Anybody else?  Miss Jasarovic.

25               PROSPECTIVE JUROR:  Last year my boyfriend

1      was mugged in front of our apartment and he was pretty

2      hurt, but.

3              THE COURT:  Sorry to hear that.

4              Recovered fully?

5              PROSPECTIVE JUROR:  Yeah.

6              THE COURT:  Okay.

7              PROSPECTIVE JUROR:  My family and I survived

8      the Bosnian war, so we are refugees.

9              THE COURT:  So you saw quite a bit.

10             PROSPECTIVE JUROR:  Well I was a child.

11             THE COURT:  Was the -- let's talk about your

12     boyfriend for just a minutes.

13             Was that reported to the police?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Was anybody ever apprehend?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Is there anything in what you

18     observed or what he told you about the experience that

19     would affect your ability to be fair and impartial

20     here?

21             PROSPECTIVE JUROR:  No.  Would it -- no.  I

22     would be fair.

23             THE COURT:  Okay.  Is there anything about it

24     that would make it hard for you to be fair and

25     impartial here?

248

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Okay.  Anything -- how old were

3     you when you came here?

4          PROSPECTIVE JUROR:  I was four.

5          THE COURT:  You were four.

6          Anything in what you recall of your childhood

7     or what your parents might have talked about that in

8     terms of those experiences in the war that would affect

9     your ability to be fair and impartial here?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Okay.  Thank you for that.

12          Anybody else?  All right.  No hands.  Thank

13     you.

14          Have any of you or any members of your family

15     ever been arrested or convicted of a crime?  Okay.

16          Mr. Ortega.

17          PROSPECTIVE JUROR:  Mmm-hmm.  My older

18     half-brother was arrested for assault.

19          THE COURT:  Was that here in Brooklyn?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  About how long ago?

22          PROSPECTIVE JUROR:  I believe four years ago.

23     I am not sure of the date.

24          THE COURT:  And was the matter, did the

25     matter go to trial?

1        PROSPECTIVE JUROR:  I believe not.  I think

2   it was just arrested and let go.

3        THE COURT:  If you recall, were the

4   allegations made by somebody that he knew?

5        PROSPECTIVE JUROR:  I believe it was an

6   acquaintance.

7        THE COURT:  Okay.  Did you have any

8   opportunity to come and watch any of the court

9   proceedings before it was, or did it ever get to court?

10       PROSPECTIVE JUROR:  I think it didn't go to

11  court.

12       THE COURT:  Okay.  Is there anything in what

13  you know of the experience or the entire situation that

14  would affect your ability to be fair and impartial

15  here?

16       PROSPECTIVE JUROR:  No.

17       THE COURT:  Okay.  Thank you for that.

18            Anybody else?  Mr. Nelson.

19       PROSPECTIVE JUROR:  Yes.  My little cousin

20  was --

21       THE COURT:  I can't hear you.

22       PROSPECTIVE JUROR:  My little cousin was

23  charged with attempted murder.

24       THE COURT:  Your cousin?

25       PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Was that here in Brooklyn?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Okay.  About how long ago?

4          PROSPECTIVE JUROR:  This year.

5          THE COURT:  This year.

6          Is the case still pending?

7          PROSPECTIVE JUROR:  No.  It's over.

8          THE COURT:  Was it resolved?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Was there a trial?  A plea?

11         PROSPECTIVE JUROR:  It was a trial.

12         THE COURT:  It was a trial.

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Is your cousin currently

15    incarcerated?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Did you come to court to watch

18    any of the proceedings?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  You did.  Okay.

21         Was there anything in that experience what

22    you observed, anything at all, whether it was how the

23    Judge behaved, how the, what the lawyers said, the

24    defense lawyer, anything at all that would affect your

25    ability to be fair and impartial here?

1            PROSPECTIVE JUROR:  No.

2            THE COURT:  If you recall, was the person who

3     was the complaining witness someone known to your

4     cousin?  Did they know each other?

5            PROSPECTIVE JUROR:  Through basketball I

6     think.

7            THE COURT:  Okay.  All right.  Thank you for

8     that.  Anybody else?  Okay.

9            Have any of you ever served on a jury before?

10    See some hands.  Okay.  Miss Barton.

11           PROSPECTIVE JUROR:  Yep.  It was a civil

12    trial.

13           THE COURT:  Here in Brooklyn?

14           PROSPECTIVE JUROR:  It was actually

15    Manhattan.

16           THE COURT:  Oh, Manhattan.

17           PROSPECTIVE JUROR:  Mmm-hmm.

18           THE COURT:  And did the jury reach a verdict?

19           PROSPECTIVE JUROR:  They settled.

20           THE COURT:  Okay.  That does tend to happen.

21           PROSPECTIVE JUROR:  Yeah.

22           THE COURT:  Was there anything in your

23    experience as a juror there that would affect your

24    ability to be fair and impartial here?

25           PROSPECTIVE JUROR:  No.

1          THE COURT:  Okay.  Thank you.

2          Other hands I know I saw.

3          Yes, Mr. Nelson, civil, criminal, grand jury?

4          PROSPECTIVE JUROR:  Three different juries.

5  One was criminal in Manhattan.  Two were civil.

6          THE COURT:  Let's talk about the criminal

7  case first.

8          Do you remember what kind of case it was?

9          PROSPECTIVE JUROR:  Yes.  It was a murder

10  case.

11          THE COURT:  And without telling us the

12  outcome, did the jury deliberate and reach a verdict?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Was there anything in your

15  experience as a juror on this case that would affect

16  your ability to be fair and impartial here?

17          PROSPECTIVE JUROR:  No.  In fact, I thought

18  we did a good job and everything worked as planned.

19          THE COURT:  How about the civil cases?  Was

20  there a jury deliberation or did they settle?

21          PROSPECTIVE JUROR:  One, I was an alternate.

22  I never got to know how it turned out.  The other one

23  there was a resolution.

24          THE COURT:  Okay.  Anything about your

25  experiences there, perhaps frustrating you didn't get

1           to see it through to the end.

2                    PROSPECTIVE JUROR:  Yes.  That one, again,

3           that's the job of the alternate.

4                    THE COURT:  Anything that would impact your

5           ability to be fair and impartial here?

6                    PROSPECTIVE JUROR:  No.  It worked well.

7                    THE COURT:  How long ago was that criminal

8           trial, if you recall?

9                    PROSPECTIVE JUROR:  2003.

10                   THE COURT:  Yes, Mr. Mendez.

11                   PROSPECTIVE JUROR:  Criminal case.

12                   THE COURT:  Okay.  Here in Brooklyn?

13                   PROSPECTIVE JUROR:  Brooklyn, yes.

14                   THE COURT:  About how long ago?

15                   PROSPECTIVE JUROR:  Maybe about 14 years.

16                   THE COURT:  Do you remember what kind of case

17          it was?

18                   PROSPECTIVE JUROR:  Murder case.

19                   THE COURT:  Murder case.

20                   And without telling us the outcome, did the

21          jury deliberate and reach a verdict?

22                   PROSPECTIVE JUROR:  Yes.

23                   THE COURT:  Okay.  Was there anything in your

24          experience as a juror on this case that would make it

25          hard to be fair and impartial here?

                              VdV

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Okay.  Anybody else?

3          And finally, at the end of the trial I am

4     going to explain the law to you as it applies in this

5     case.  And if you are selected as a juror, then you are

6     required to follow the law as I give it to you, whether

7     you agree with it or not.

8          There anyone among you who could not do that?

9     Mr. Auerbach.

10          PROSPECTIVE JUROR:  Yeah.  If I can't make a

11     blanket promise, not nullify.

12          THE COURT:  Okay.  And that is for every kind

13     of case no matter what?

14          PROSPECTIVE JUROR:  It, like I said, I can't

15     make a blanket promise.

16          THE COURT:  Well give me an example of the

17     kind of case where that might be a consideration for

18     you.

19          PROSPECTIVE JUROR:  Like a nonviolent drug

20     offense.

21          THE COURT:  Okay.  This is not that kind of a

22     case.

23          PROSPECTIVE JUROR:  Right.

24          THE COURT:  So, since we are not talking

25     about, for example, a marijuana charge or something of

```
 1          that nature, does this make a difference in your

 2          thinking?

 3                    PROSPECTIVE JUROR:  It's, I still wouldn't, I

 4          still can't make a blanket promise.

 5                    THE COURT:  Okay.  Miss Laplante, yes.

 6                    PROSPECTIVE JUROR:  May I approach, please?

 7                    THE COURT:  Come on up, counsels.

 8                    (Whereupon, there was a discussion held at

 9          the bench on the record.)

10                    PROSPECTIVE JUROR:  Morning.

11                    THE COURT:  Morning.

12                    PROSPECTIVE JUROR:  I am sorry for my

13          lateness this morning.  My husband is blind.  Gets sick

14          last night, so I have to stay a little bit to take care

15          of.

16                    I have another situation.  Very emotional

17          person.  I can't make decision.

18                    THE COURT:  Miss Laplante, you have been

19          living in Brooklyn for over 30 years.  You work full

20          time, correct?

21                    PROSPECTIVE JUROR:  Yes.

22                    THE COURT:  No one said this is an easy

23          proposition.  No one says it's easy.  But it's

24          something that it's an obligation that we all have as

25          citizens to undertake that.
```

1              PROSPECTIVE JUROR:  I understand.

2              THE COURT:  Now, assuming that, for example,

3       we will not be working after jury selection today, we

4       won't be working for the rest of the day, will not be

5       working on Friday afternoon.  So, would that be able

6       to, with that said, you will be able to attend to your

7       husband's other needs as we go forward.  So.

8              PROSPECTIVE JUROR:  For right now my sister,

9       she has a baby-sit for three days.  The rest of the

10      days she had --

11             THE COURT:  Right.  Okay.

12             You also have two children you said.

13             PROSPECTIVE JUROR:  Yes, no, they're big.

14      They don't live in New York.  I got my, a lot on my

15      shoulders.

16             THE COURT:  So do many, many people.

17             PROSPECTIVE JUROR:  I know.  I mean I can't

18      think straight when I am nervous, so.

19             THE COURT:  Everyone's nervous when they're

20      here on jury duty.

21             PROSPECTIVE JUROR:  Not on jury duty.  I

22      don't know.  To me, yes, I am asking --

23             THE COURT:  Have a seat, please.  Thank you.

24             PROSPECTIVE JUROR:  Okay.

25             (Whereupon, the following took place on the

1    record in open court.)

2              THE COURT:  All right.  Anybody else I have

3    not spoken to about following the law?  Okay.

4              So that finishes my questions.  The attorneys

5    of course will now have an opportunity to speak with

6    you.  We will start with Mr. Mottola.

7              Reminder, counsel, it's ten minutes.

8              MR. MOTTOLA:  Yes.

9              Good morning, everyone.

10             PROSPECTIVE JURY:  Good morning.

11             MR. MOTTOLA:  You probably know what I am

12   going to ask you because I asked the first two panels

13   the same questions.

14             If during this process you have anything you

15   want to bring to my attention, just raise your hand.  I

16   will not have time to get to everybody.  I do want to

17   start with the first issue is that, again, you are not

18   going to hear from Mr. Kalifa.  Right.  The victim in

19   this case.  That was a problem for some people

20   yesterday.

21             I need to know if there are some people

22   sitting here now feel even if I meet my burden and I

23   prove Mr. McGriff's guilt beyond a reasonable doubt,

24   you could not return a guilty verdict unless you heard

25   from the victim himself.  So, I need to know that now

LORENZO MCGRIFF - JURY SELECTION

258

1          if there is anyone sitting here who feels like that.

2                    Mr. Mendez, how do you feel about that?

3                    PROSPECTIVE JUROR:  Okay.

4                    MR. MOTTOLA:  You would be okay with that?

5                    PROSPECTIVE JUROR:  My question is this.

6                    MR. MOTTOLA:  Sure.

7                    PROSPECTIVE JUROR:  Is this a case, a

8          manslaughter murder?

9                    THE COURT:  I can't hear you, sir.

10                    PROSPECTIVE JUROR:  Is this a case of

11          manslaughter?  Why he can't be here?

12                    THE COURT:  Not a manslaughter case.

13                    PROSPECTIVE JUROR:  Yes.

14                    THE COURT:  No.

15                    MR. MOTTOLA:  Right.

16                    PROSPECTIVE JUROR:  Why can't he be here?

17                    MR. MOTTOLA:  Right.  Like I said yesterday,

18          you're not going to, you may not get an answer to that

19          question, why the person's not here.

20                    THE COURT:  Let me jump in again if I can,

21          Mr. Mottola.

22                    MR. MOTTOLA:  Yes.

23                    THE COURT:  As I mentioned yesterday, the

24          People have the burden of proving the case and each

25          element of each charge beyond a reasonable doubt.

VdV

1     Beyond that, there's nothing specific about how they do

2     that.  There is no requirement that they prove their

3     case in a particular way.

4           What your function will be as jurors if you

5     are selected, is to listen to the evidence and

6     determine whether if there is evidence that you find to

7     be credible and believable.  Essentially if it's enough

8     without -- now you may not speculate about other

9     evidence.  You may not speculate about anything beyond

10    what you hear in the courtroom.

11          Again, you may hear testimony from

12    Mr. McGriff, you may not.  If he choses not to testify

13    or present witnesses for the defense, you cannot hold

14    that against him, because the burden remains, always

15    remains with the district attorney.

16          So it may, there may be a situation where you

17    do not hear the famous both sides of the story, that

18    you don't hear from the complaining witness.  You may

19    hear evidence from other witnesses, eyewitnesses,

20    depending upon how the People choose to present their

21    case.

22          Your job then would be to evaluate what you

23    do hear.  Determine if you find it credible, if you

24    find it believable.  And then essentially decide if

25    it's enough to meet that burden.

1        So can you follow that instruction?

2        PROSPECTIVE JUROR:  Yes.

3        THE COURT:  Okay.

4        MR. MOTTOLA:  Okay.  Miss Billingslea.

5        PROSPECTIVE JUROR:  I could totally.

6        MR. MOTTOLA:  Okay.  Mr. Ortega.

7        PROSPECTIVE JUROR:  I have no problem.

8        MR. MOTTOLA:  Okay.  Miss Best.

9        PROSPECTIVE JUROR:  Yeah.  No problem.

10       MR. MOTTOLA:  You would be okay with that.

11   Okay.

12       Anyone here who felt similarly to how

13   Mr. Mendez felt?  Miss Hidary.

14       PROSPECTIVE JUROR:  I would just think

15   listening to what the Judge says, then at the end I

16   would always have that little thing in my brain why

17   isn't he here.  What would he say?  What is his

18   opinion.

19       I know your job is to prove it to the best

20   you can.  Back here I am gonna go, so why isn't he

21   here?  There has to be his side.  Yesterday we had the

22   girl being attacked on the train, she was running.  She

23   said people didn't respond, but maybe they thought it

24   was her boyfriend, that's why.  We didn't have -- if I

25   am not having his opportunity to say his peace.  I

VdV

1          don't know.

2                   MR. MOTTOLA:  Right.

3                   PROSPECTIVE JUROR:  That's, you know, I

4          understand that you are gonna present all your points

5          the best that you can, but I don't know if for sure in

6          the back of my head I am going to go, well why isn't he

7          here?  What was he defending himself?  What were --

8                   MR. MOTTOLA:  Miss Barton, you were nodding.

9          You feel similarly?

10                  PROSPECTIVE JUROR:  I do.

11                  MR. MOTTOLA:  The fact this person is not

12         going to come to court, obviously that's something that

13         I have to deal with, right?  That's my job.

14                  But what I am asking you is, are you going to

15         be able to listen to whatever eyewitnesses come in and

16         the police officers and see what other evidence there

17         is, if there is a 911 caller, a video, and if you feel

18         that that is enough, right?  As if you feel that the

19         evidence that I submit to you meets the burden.

20                  I have to meet, as the Judge gives you the

21         law, could you return a verdict of guilty, or are you

22         saying you could not even if you did believe the

23         witnesses?  That's what we are trying to get to.

24                  PROSPECTIVE JUROR:  Right.  I don't know if I

25         can say it for sure.  Probably.  But, you know, I don't

1      know what the evidence that's going to come up.  I

2      can't make that statement because I have to be

3      convinced.

4              MR. MOTTOLA:  I am going to give you a hypo I

5      have seen other Judges use on jurors.

6              Say you are on the plane.  The pilot says he

7      thinks he can land the plane.  Are you going to get on

8      the plane or do you want the pilot to say I can land

9      the plane?  I need to hear from you, you can follow the

10     law, not that you think you --

11             PROSPECTIVE JUROR:  Of course I want to

12     follow the law.  My goal is to follow the law.  But at

13     the end of the day I am still human.  I still have

14     that, you know.

15             MR. MOTTOLA:  Right.  Okay.

16             Miss Barton, how do you feel about this

17     sentence?  You were nodding.  Do you feel like you

18     could listen?

19             PROSPECTIVE JUROR:  Absolutely.  Absolutely.

20             MR. MOTTOLA:  Can you be a fair juror?

21             PROSPECTIVE JUROR:  Yes.

22             MR. MOTTOLA:  Anyone else who feels

23     similarly, anybody, that it would be an issue they

24     could not deliberate fairly on this case if they don't

25     hear from Mr. Kalifa?  No one.  Everyone else is okay?

263

1    All right.

2              So just moving on briefly to the police

3    officers.  You will hear from at least one police

4    officer in this case, maybe more.

5              So, Miss Hidary, you mentioned you have a

6    bias in favor of the police.

7              PROSPECTIVE JUROR:  The police officer in my

8    eyes, the way I was brought up, he is taking an oath

9    taking care of me as a citizen, and I would put his

10   word a little bit higher than the regular person.  He

11   is not, I don't know what that guy on the street saw.

12   He might have had an incident with the person two weeks

13   ago.  I don't know that.  But I know the police

14   officer, he has an obligation in his job to take care

15   of the citizens of the state.  I hold his word higher

16   than that person I don't know where he is coming from.

17             MR. MOTTOLA:  Does anyone feel -- I know,

18   Mr. Auerbach, you mentioned you feel the opposite way.

19   I just want everyone to understand the law says you

20   have to treat a police officer, like the Judge said,

21   like any other witness.

22             So, if you have one of those feelings, you

23   have to promise us that you are not going to either

24   give the police officers more credibility or you are

25   going to have some past experience weigh against these

VdV

LORENZO MCGRIFF - JURY SELECTION                    264

1        police officers because you don't know, right?  It's

2        not fair to me.  It would not be fair to Mr. McGriff

3        either.  So you need to let us know.

4                Outside of it, Mr. Auerbach and Miss Hidary,

5        does anyone else have any kind of reservation or, you

6        know, bias in favor or against police?  No one.

7                Mr. Ortega, you work in police.  You are not

8        going to let that affect your judgment?

9                PROSPECTIVE JUROR:  No.

10               MR. MOTTOLA:  You can be fair in this case?

11               PROSPECTIVE JUROR:  Yes.

12               MR. MOTTOLA:  Okay.  Just one last point,

13       everyone.

14               At the end of the case if you are picked to

15       sit on the jury, you are going to have to go in the

16       back, work together.  And you know this is a criminal

17       action, right?  There is a real possibility if I meet

18       my burden you will have to follow the law and

19       potentially return a verdict of guilty.  Okay.

20               I need your assurance now that if you are

21       picked and you believe the evidence and I meet my

22       burden, I prove guilt beyond a reasonable doubt, that

23       you can set aside any kind of sympathy or emotion you

24       have, you can return that verdict.

25               Can everyone do that?

LORENZO MCGRIFF - JURY SELECTION

265

1          PROSPECTIVE JUROR:  Yes.

2          PROSPECTIVE JUROR:  Yes.

3          MR. MOTTOLA:  Everyone can do that, yes?

4     Okay.  Thank you.

5          THE COURT:  Miss Burke.  Thank you.

6          MS. BURKE:  Good morning.

7          PROSPECTIVE JUROR:  Good morning.

8          MS. BURKE:  I know you made the promise that

9     you could return a verdict of guilty if he meets all of

10    his elements.  I need the same promise from you if he

11    doesn't meet all of his elements that you can return a

12    verdict of not guilty.

13         PROSPECTIVE JUROR:  Yes.

14         MS. BURKE:  Would you do that, Mr. Mendez?

15         PROSPECTIVE JUROR:  Sure.

16         MS. BURKE:  Would you do that,

17    Miss Billingslea?

18         PROSPECTIVE JUROR:  Yes.

19         MS. BURKE:  Mr. Ortega.

20         PROSPECTIVE JUROR:  Yes.

21         MS. BURKE:  Even if your cop friends laugh at

22    you?

23         PROSPECTIVE JUROR:  They're not my friends.

24         (Whereupon, there was laughter in the

25    courtroom.)

```
 1                    MS. BURKE:  Okay.  And Miss Best.
 2                    PROSPECTIVE JUROR:  Yes.
 3                    MS. BURKE:  Mr. Nelson --
 4                    THE COURT:  Just need to hear everybody's
 5       voice nice and loud, please.
 6                    PROSPECTIVE JUROR:  Yes.
 7                    MS. BURKE:  Miss Laplante.
 8                    PROSPECTIVE JUROR:  Yes.
 9                    MS. BURKE:  Mr. Flounoy.
10                    PROSPECTIVE JUROR:  Yes.
11                    (Whereupon, there was laughter in the
12       courtroom.)
13                    MS. BURKE:  Got to say it right.
14                    PROSPECTIVE JUROR:  You got it right.
15                    MS. BURKE:  Bear with me.  Jasarovic.
16                    THE COURT:  I have the name like Cyrulnik.
17       It's very hard.
18                    PROSPECTIVE JUROR:  It's okay.  Yes.
19                    THE COURT:  The J is like a Y.  Emphasis on
20       the Jasarovic.
21                    MS. BURKE:  Jasarovic.
22                    THE COURT:  Close.  Better.
23                    MS. BURKE:  Better.  Okay.
24                    (Whereupon, there was laughter in the
25       courtroom.)
```

1          MS. BURKE:  I like the way she says it.

2    Okay.

3          PROSPECTIVE JUROR:  Okay.  Yes.

4          MS. BURKE:  I know that you were mugged.

5          PROSPECTIVE JUROR:  My boyfriend.

6          MS. BURKE:  Your boyfriend, sorry, was

7    mugged.  And it was reported and there was no arrest.

8          The fact that there was no arrest in your

9    case, you wouldn't take that out on Mr. McGriff when

10   you are deliberating, would you?

11         PROSPECTIVE JUROR:  No.

12         MS. BURKE:  Okay.  Anybody else who had an

13   incident?

14         Mr. Flounoy, you were mugged.

15         PROSPECTIVE JUROR:  Yes.

16         MS. BURKE:  By two people.

17         PROSPECTIVE JUROR:  Kids.  Like 19, 20.

18         MS. BURKE:  And there was no arrest.

19         PROSPECTIVE JUROR:  No.

20         MS. BURKE:  The fact that that encounter with

21   you under the Brooklyn Bridge, would that have any

22   affect on your ability to sit in judgment on case?

23         PROSPECTIVE JUROR:  Not at all.  He's

24   innocent until whatever.

25         MS. BURKE:  I like those words.  Say that

LORENZO MCGRIFF - JURY SELECTION          268

1       again loud so everybody can hear.

2               PROSPECTIVE JUROR:  He is innocent until the

3       burden of proof.

4               MS. BURKE:  Has been met.

5               PROSPECTIVE JUROR:  Yes.

6               MS. BURKE:  By the District Attorney's

7       Office.

8               PROSPECTIVE JUROR:  Mmm-hmm.

9               MS. BURKE:  Everybody in agreement with that

10      statement?

11              PROSPECTIVE JUROR:  Yes.

12              MS. BURKE:  That Mr. McGriff sitting right

13      here today, tomorrow and the next day until you go into

14      that deliberation room and 12 of you say guilt beyond a

15      reasonable doubt, that until that happens he is

16      innocent, presumed innocent by each and every one of

17      you.

18              I get that promise from all of you?

19              PROSPECTIVE JUROR:  Yes.

20              PROSPECTIVE JUROR:  Yes.

21              MS. BURKE:  Okay.  So we talked about people

22      who have previously served as jurors on cases, civil

23      juries or criminal juries, right?  Anybody ever served

24      as a witness on a jury?  On a case?  Nobody's been a

25      witness.

1          Mr. Mendez, you seemed a little concerned

2     about why the complaining witness would not be here.

3     We don't know why.  You probably will never get an

4     answer to that question.  I want to make sure that the

5     fact that you don't know why that person is not here

6     isn't going to influence your ability to judge this

7     case fairly.

8          Is it going to affect your ability to judge

9     this case fairly?

10          PROSPECTIVE JUROR:  No.

11          MS. BURKE:  He said.

12          THE COURT:  Thank you.

13          MS. BURKE:  Miss Hidary, you are an

14     interesting person.  So, you say that you hold the

15     police to a higher standard.  That's just because

16     they're in uniform and they're police officers and

17     serve the City of New York?  That's the only reason?

18          PROSPECTIVE JUROR:  Yeah.

19          MS. BURKE:  So, do you hold any other

20     profession to that same standard, to a higher standard?

21          PROSPECTIVE JUROR:  You know, I am Jewish and

22     I am religious person.  And in our religion, people

23     that have that position are held to a higher standard

24     and that's the way I was brought up.

25          So, yeah, I do feel a police officer that is

1    supposed to be protecting me and have this position to

2    care for the better of the community should be held to

3    a higher standard and should be respected a little

4    more.

5            If a Judge get up says, and the Judge is

6    brought as a witness, I am going to hold her a little

7    bit higher than the next person because she knows her

8    responsibility.  And she's, she has, she should have

9    more credibility.  That's the way I feel.  That's the

10   way I was brought up.

11           MS. BURKE:  So if a rabbi came in to testify

12   and the rabbi said to you that sweater that you're

13   wearing is blue, it is not black, and you know

14   absolutely for a fact that you are wearing a black

15   sweater, you would still hold that rabbi to a higher

16   standard?

17           PROSPECTIVE JUROR:  I hold his word to a

18   higher standard.  I respect him more.  You know, those

19   things going on with the phones, is the dress gray, is

20   the dress green, right?  That whole thing that was

21   going on on social media.

22           You're right if I know it's a black shirt

23   (indicating).  But this is the way I feel with a person

24   that has, that is on this little level a little bit

25   above the regular person.  I hold them, I respect them

1    more.  Nobody's perfect.  I am sure there is a police

2    officer that's corrupt.  I am sure there is a rabbi

3    that's corrupt.  But given the generality, I hold them

4    to a higher standard.  That's basically what it is.

5           MS. BURKE:  Thank you for your honesty.

6           So let's just get on this a little bit.  If

7    there is a police officer that gets up here, say you

8    want to hold them to a higher standard because they're

9    protecting the community.  You want to give them that

10   extra bit of trust, but they get up there and blatantly

11   lie or blatantly say something that does not make sense

12   to you.  Are you going to say, well he's a police

13   officer.  I am still going to believe him.

14          Would anybody do that?  I see heads shaking

15   no.  I like hearing things.

16          PROSPECTIVE JUROR:  No.

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Two minutes, counsel.

19          MS. BURKE:  Mr. Flounoy, in your prior trial

20   experience you said everything worked out as planned.

21          Can you explain to me what you mean by that?

22          THE COURT:  I need to hear everybody's

23   answer.

24          PROSPECTIVE JUROR:  Sure.

25          I think the jury process worked well.  We

1       considered all the facts.  We, some of us disagreed in

2       the beginning, we talked to each other.  Came out 12

3       people agreeing and I thought that worked well.

4                     MS. BURKE:  Okay.

5                     PROSPECTIVE JUROR:  It was nice to see that.

6                     MS. BURKE:  Can I get an assurance from

7       everyone if you are picked to serve on this jury that

8       you will work well with the others?  You can agree to

9       disagree?

10                     PROSPECTIVE JUROR:  Yes.

11                     MS. BURKE:  You will be respectful to each

12       other?

13                     PROSPECTIVE JUROR:  Yes.

14                     MS. BURKE:  And you will vote what your heart

15       and your mind tells you to vote?

16                     PROSPECTIVE JUROR:  Yes.

17                     MS. BURKE:  Even if 11 people are against

18       you, you will still stick with your vote, even if 11

19       people are with you, you will still stick with your

20       vote?

21                     PROSPECTIVE JUROR:  Yes.

22                     MS. BURKE:  Ten people want hamburgers, two

23       people want hot dogs, you are going to still want your

24       hot dog?

25                     PROSPECTIVE JUROR:  Yes.

1          PROSPECTIVE JUROR:  No, I don't.  I don't

2     care that much.  I mean I care about his life, but if

3     ten people want a hamburger, I wanted a hot dog today,

4     you know what, tomorrow I will eat a hot dog.  That's

5     my personality.  I will not fight the mass.  I am not

6     that way.  I am going to do --

7          THE COURT:  Do you all understand somebody

8     mentioned yesterday majority rules?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  This is not one of those

11    situations.

12         PROSPECTIVE JUROR:  Right.  I understand it's

13    not a majority rules.  I have to be able to fight them.

14    I don't know.  I am that person that could dissuade ten

15    other people to believe what I believe.

16         MS. BURKE:  Okay.

17         THE COURT:  Well I just want to be clear for

18    everybody who is selected as a juror, your obligation

19    is to consider the evidence and weigh it for yourselves

20    first to evaluate it and discuss it with your fellow

21    jurors.  And that may include going back and forth to

22    discuss an issue and try to persuade someone else,

23    .    etcetera.

24         But your first obligation is to consider all

25    of the evidence for yourselves individually.

VdV

1          Do you understand that?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Okay.  Thank you.

4          MS. BURKE:  Can I get a promise from everyone

5     that you will do that, no matter what your vote is?

6     That's what you feel your vote is.  You are going to

7     stick to your vote, no matter how many people try to

8     sway you a different way?

9          PROSPECTIVE JUROR:  Yes.

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Okay.  Thank you.

12          MS. BURKE:  Thank you.

13          THE COURT:  All right, ladies and gentlemen,

14     and folks in the audience, we will have you step out

15     into the hall for just a few minutes, call you back in.

16     Please don't discuss the case amongst yourselves or

17     anyone else.  And we will see you in just a little bit.

18          Thank you.

19          (Whereupon, the prospective jury left the

20     courtroom.)

21          (Whereupon, there was a pause in the

22     proceedings.)

23          THE COURT:  All right.  Let me know when you

24     are ready.

25          (Whereupon, there was a pause in the

1          proceedings.)

2                      THE COURT:  Okay.  People ready?

3                      MR. MOTTOLA:  I am ready.  Yes.

4                      THE COURT:  Miss Burke, you ready?

5                      MS. BURKE:  Yes, Your Honor.

6                      THE COURT:  Okay.

7                      THE CLERK:  As to first two seats -- just a

8          reminder, at the end of yesterday, People used six

9          peremptory challenges, the defense, eight.

10                     MS. BURKE:  Yes.

11                     THE COURT:  All right.

12                     THE CLERK:  That's correct.

13                     As to the first two seats, People, challenges

14         for cause.

15                     MR. MOTTOLA:  None for cause.

16                     THE CLERK:  Miss Burke, challenges for cause

17         as to the first two seats?

18                     MS. BURKE:  None for cause.

19                     THE CLERK:  Okay.  People, peremptory

20         challenges as to either of those two seats?

21                     MR. MOTTOLA:  Yes.  Seat number one, Glen

22         Mendez.

23                     THE CLERK:  Is that it, Mr. Mottola?

24                     MR. MOTTOLA:  Yes.

25                     THE CLERK:  Okay.  Miss Burke, any peremptory

1     challenges as to seat number two?

2                MS. BURKE:  Number two, Your Honor.

3                THE COURT:  Number two what?

4                MS. BURKE:  Seat number two.  Sorry, Your

5     Honor.  We are challenging -- peremptory on seat number

6     two.  I apologize.

7                THE CLERK:  That's Simone Billingslea.

8                MS. BURKE:  Yes.

9                THE CLERK:  Okay.  As to seats three and

10    four, People, any challenges for cause?

11               MR. MOTTOLA:  None for cause.

12               THE CLERK:  Miss Burke, any challenges for

13    cause as to seats three or four?

14               THE COURT:  Let's go.  Seats three or four.

15               THE CLERK:  Challenges for cause.

16               MS. BURKE:  No, Your Honor.

17               THE CLERK:  People, peremptory challenges as

18    to seats three or four?

19               MR. MOTTOLA:  Seat number four, Yvonne Best.

20               THE CLERK:  Yvonne Best.

21               Miss Burke, peremptory challenge as to seat

22    number three?

23               MS. BURKE:  Seat number three, Your Honor.

24               THE CLERK:  You want to exercise your

25    challenge?

LORENZO MCGRIFF - JURY SELECTION

277

1          MS. BURKE:  Yes.

2          THE COURT:  Do me a favor.  Don't make us

3     guess, okay.

4          MS. BURKE:  I am sorry.

5          THE COURT:  Okay.

6          THE CLERK:  As to the next two seats, five

7     and six, People, challenge as to cause for either of

8     those two?

9          MR. MOTTOLA:  Seat number five for cause.

10          MS. BURKE:  Consent.

11          THE CLERK:  Consent on Hidary.

12          As to seat number six, challenge for cause,

13     Mr. Mottola?

14          MR. MOTTOLA:  No, not for cause.

15          THE CLERK:  Miss Burke.

16          MS. BURKE:  None for cause.

17          THE CLERK:  People, peremptory challenge as

18     to seat number six?

19          MR. MOTTOLA:  Yes.  Peremptory challenge.

20          THE CLERK:  As to seats seven and eight,

21     challenges for cause, People?

22          MR. MOTTOLA:  No.

23          THE CLERK:  Miss Burke, challenges for cause

24     as to seat seven or eight?

25          MS. BURKE:  No, Your Honor.

VdV

278

1           THE CLERK:  Mr. Mottola, peremptory challenge

2      as to seat seven or eight?

3           MR. MOTTOLA:  No.

4           THE CLERK:  Miss Burke, want to exercise any

5      peremptories for seat seven or eight?

6           MS. BURKE:  No peremptory challenges.

7           THE CLERK:  As to seat seven or eight.

8           MS. BURKE:  Correct.

9           THE CLERK:  Okay.  That means seat number

10     seven, Victoria Jones, will become juror number 11.

11     Seat number eight, Suncica Jasarovic, becomes juror

12     number 12.

13           Okay.  As to alternate number one, seat

14     number nine, David Auerbach.

15           MR. MOTTOLA:  For cause, yes.

16           THE CLERK:  You would?

17           MR. MOTTOLA:  Yes.  Based on he could not --

18     I mean yes, he said he could not promise he will not

19     nullify.

20           MS. BURKE:  Consent.

21           THE COURT:  Thank you.

22           THE CLERK:  As to seat number 10, People,

23     challenge for cause?

24           MR. MOTTOLA:  No.

25           THE CLERK:  Miss Burke, challenge for cause

1        as to seat number 10?

2                  MS. BURKE:  No challenge for cause.

3                  THE CLERK:  People, peremptory challenge as

4        to seat number 10?

5                  MR. MOTTOLA:  No.

6                  THE CLERK:  Miss Burke.

7                  MS. BURKE:  Yes.  We will exercise a preempt

8        for seat number 10.

9                  THE CLERK:  Okay.  As seat number 11, People,

10       challenge for cause?

11                 MR. MOTTOLA:  No.

12                 THE CLERK:  Miss Burke, challenge for cause

13       as to seat number 11?

14                 MS. BURKE:  No.

15                 THE CLERK:  People, peremptory challenge as

16       to seat number 11?

17                 MR. MOTTOLA:  No.

18                 THE CLERK:  Miss Burke, would you like to

19       exercise as peremptory challenge as to seat number 11?

20       That's Christopher Fanelli.

21                 MS. BURKE:  Exercise a peremptory, Your

22       Honor.

23                 THE CLERK:  As to seat number 12, People,

24       challenge for cause?

25                 MR. MOTTOLA:  No.

1            THE CLERK:  Miss Burke, challenge for cause

2      as to seat number 12?

3            MS. BURKE:  No.

4            THE CLERK:  People, peremptory challenge as

5      to seat number 12?

6            MR. MOTTOLA:  Yes.

7            THE CLERK:  Yes?

8            MR. MOTTOLA:  Yes.

9            THE CLERK:  As is to seat number 13, People,

10     challenge for cause?

11           MR. MOTTOLA:  No.

12           THE CLERK:  Miss Burke, challenge for cause

13     as to seat number 13?

14           MS. BURKE:  No.

15           THE CLERK:  People, peremptory challenge as

16     to seat number 13?

17           MR. MOTTOLA:  Yes.

18           THE CLERK:  As to seat number 14, People,

19     challenge for cause?

20           MR. MOTTOLA:  No.

21           THE CLERK:  Miss Burke, challenge for cause?

22           MS. BURKE:  No.

23           THE COURT:  All right.  Both sides used their

24     peremptories for that seat.

25           THE CLERK:  Correct.

1              THE COURT:  Both --

2              THE CLERK:  Seat number 14 -- you have used

3       two on the last.

4              MR. MOTTOLA:  Yes.

5              THE COURT:  And they used two.

6              THE CLERK:  Yes, they have.

7              Seat number 14, William Flounoy, junior,

8       becomes alternate juror number one.

9              And as to the final seat number 15, People,

10      challenge for cause, Elyse Barton?

11             MR. MOTTOLA:  No.

12             THE CLERK:  Miss Burke, challenge for cause?

13             MS. BURKE:  No.

14             THE CLERK:  People, peremptory challenge as

15      to seat number 15?

16             MR. MOTTOLA:  Yes.  You want to compromise on

17      someone?

18             THE CLERK:  That's the last person.

19             MR. MOTTOLA:  I know.  Compromise with

20      someone.

21             THE COURT:  See if you can agree.

22             MR. MOTTOLA:  Yes.

23             THE COURT:  Not bringing up a supplemental

24      panel for one alternate.

25             MR. MOTTOLA:  I understand.

1          MS. BURKE:  One moment.

2          (Whereupon, there was a pause in the

3     proceedings.)

4          MR. MOTTOLA:  Judge, I spoke to counsel --

5          MS. BURKE:  One moment.

6          MR. MOTTOLA:  Okay.

7          (Whereupon, there was a pause in the

8     proceedings.)

9          MR. MOTTOLA:  Yes.  So I spoke to counsel and

10    we have agreed that seat number 12, who was Shaquan

11    Nelson, would be the second alternate.

12         THE COURT:  Miss Burke, you've discussed that

13    with your client as well?

14         MS. BURKE:  Yes.

15         THE COURT:  Okay.

16         THE CLERK:  So seat number 12 will become

17    alternate number two.

18         MR. MOTTOLA:  Yes.

19         MS. BURKE:  Judge.

20         MR. WITTWER:  Your Honor, at this time I need

21    to raise a Batson challenge based on the jury

22    selection.  I have all the information in front of me

23    if Your Honor is ready.

24         Between panel one, the first jury panel, the

25    People exercised two peremptory challenges both on

1      African Americans.  The first was juror number 11,

2      Khandija Barrow.  And the second was juror --

3                 THE COURT:  Just a moment.  Hold on a second.

4                 (Whereupon, there was a pause in the

5      proceedings.)

6                 THE COURT:  Go ahead.

7                 MR. WITTWER:  Thank you.

8                 So juror number 11, Khandija Barrow, juror

9      number 12, Ashley Dunn.  Neither juror made really any

10     statements during voir dire went one way or the other.

11     Both are African Americans.

12                On the second panel the People used four

13     peremptory challenges, three of which were used on

14     African Americans.  That the African Americans that

15     they challenged were juror number six, Gerard Philip,

16     juror number 11, Andrea Solstad, and juror number 15,

17     Pauline Stewart.

18                The People also used a peremptory challenge

19     on juror number nine, Tara Cascone, who was Caucasian.

20                While Andrea Solstad, juror number 11, did

21     make a number of voir dire statements about her recent,

22     you know, crime she had been a victim of.  Juror six

23     and 15 said virtually nothing during voir dire.  Both

24     are African American.

25                The most recent panel, the third and final

1   panel, the People challenged juror number one, Glen

2   Mendez, juror number four, Yvonne Best, juror number

3   six --

4               THE COURT:  Mr. Mendez I think is Hispanic.

5          Go ahead.

6               MR. WITTWER:  Just for the record, I would

7   disagree.

8               THE COURT:  Okay.  You disagree with that.

9   Okay.

10              MR. WITTWER:  Obviously his last name

11  suggests --

12              THE COURT:  Yes.

13              MR. WITTWER:  He appeared to me to be African

14  American.  For the record, he is dark complexion.

15              THE COURT:  I see.

16              MR. WITTWER:  Juror number -- so pardon me.

17         Your Honor, juror number one, Glen Mendez,

18  juror number four, Yvonne Best, juror number six,

19  Molina Grant, juror number 12, Shaquan Nelson, who I

20  understand they will be second alternates, they

21  exercised one of his peremptory where he would have

22  been one of the main 12 jurors.

23         Juror number 13, Marlene Laplante.  That's

24  five African American jurors that the People used

25  peremptories on.  Then they used a peremptory on juror

VdV

1       number 15, Elyse Barton, who is Caucasian.

2                   In total, the People used five, six, seven,

3       eight, ten peremptory challenges on African Americans

4       and two peremptory challenges on Caucasians.

5                   And for the, for almost all of the African

6       Americans for whom the People challenged, the one

7       outliner I think being Andrea Solstad, I don't believe

8       there are racial neutral reasons that they were

9       removed.   There has clearly been a pattern during this

10      trial of the People exercising peremptory challenge on

11      African American jurors to the point now we have a jury

12      that is majority Caucasian.

13                  MR. MOTTOLA:   Just I know Your Honor hasn't

14      decided whether there is a pattern yet.  Just note that

15      is very presumptive of counsel to suggest we have a --

16      we don't probably know half the races of people seated.

17                  Moreover, I want to add in the first panel --

18      just so we are clear, juror number eight, 15 and 16 who

19      were seated are African American.   That's clear to me.

20      That is Mr. Wilson, Mr. Bennett, and Miss Brown.

21                  So that's three of the first seated jurors.

22                  Miss Solstad, I have no idea what she is, to

23      be honest.  And the answer that she gave I think

24      disqualified her from being a fair juror here.

25                  Miss Payne also an African American woman, I

1    believe, seated on this jury.  This morning -- where

2    are we?  Seven, right?  So juror number seven, also an

3    African American female woman, I believe.

4              Mr. Nelson is our second alternate.

5              Mr. Flounoy, I think it's an unfair

6    characterization to say the jury as seated is majority

7    white or Caucasian and that there was any kind of

8    pattern on my part.  So if the Court finds there is a

9    pattern I can, I will meet my burden.

10             (Whereupon, there was a pause in the

11   proceedings.)

12             THE COURT:  All right.  I've had an

13   opportunity to review the challenges that have been

14   exercised.  Actually across the board I do not find a

15   pattern.

16             MS. BURKE:  Note our objection for the

17   record, Your Honor.

18             THE COURT:  Certainly.

19             All right.  Let's bring in the panel.

20             COURT OFFICER:  Ready for the panel, Your

21   Honor?

22             THE COURT:  Yes.  Thank you.

23             COURT OFFICER:  Panel entering.

24             (Whereupon, the prospective jury entered the

25   courtroom.)

1          THE CLERK:  Okay, folks, please listen up.

2     If I call your name, you've been selected to serve as a

3     juror in this case.  Please remain seated if I call

4     your name.

5          Juror number 11, Victoria Jones, juror number

6     12, Suncica Jasarovic, alternate juror number, William

7     Flounoy, junior, and alternate juror number two,

8     Shaquan Nelson.  Those people please remain seated.

9          If I did not call your name, you are excused

10    with the thanks of the Court.  Please return to the

11    central jury room on the second floor.  Happy holidays,

12    merry Christmas to everybody.

13          PROSPECTIVE JUROR:  Thank you.

14          (Whereupon, the prospective jury left the

15    courtroom.)

16          THE CLERK:  Thank you.

17          THE COURT:  All right.  So, ladies and

18    gentlemen, you've been selected as the last group of

19    jurors in this case.  We are going to, I have another

20    matter that's going to require my attention for a good

21    part of the afternoon, so we are going to send you on

22    your way today.  And I will ask you to be back here in

23    the jury room 9:30 sharp tomorrow morning.

24          Before you leave, the officer's going to take

25    you to the back and show you the room that you are

1    going to report to each morning that you're here.  She

2    will take a contact number from you in case we need to

3    reach you, especially if you're late, which I am sure

4    will not happen.  And I can give you a number you can

5    reach in the event of a problem.

6           Please allow yourself time to get upstairs

7    'cause it's busy here in the morning, and I want to be

8    able to start at 9:30.  And so, aim for getting here at

9    9 o'clock.  The absolute worse that will happen, you

10   will sit in the jury room with your fellow jurors and

11   introduce yourselves to one another.

12          And it's going to be cold tomorrow.

13   Certainly you may bring tea or coffee, something to

14   make yourselves more comfortable while you are waiting

15   and while we are working.

16          Other than that, please don't discuss the

17   case amongst yourselves or with anyone else in the

18   interim.  You may tell your employer or your family

19   members that you are a seated juror and you need, when

20   you need to be here, but beyond that, no discussion at

21   all about the case, anything having to do with the

22   case.

23          Please don't go online, do any independent

24   research about the case or anything connected with any

25   of the parties to it, including the lawyers, the Court,

1          etcetera.

2                    When you get here tomorrow, we are ready to

3          go.  You will hear some preliminary instructions from

4          me.  We will have openings from the attorneys and then

5          we will proceed with the People's case.

6                    All right.  So I thank you for your service.

7          If you grab your things, follow the officer, she is

8          going to show you the room you need to report to.

9                    All right.  We will see you bright and early

10         tomorrow morning.

11                   COURT OFFICER:  9:30, right?

12                   THE COURT:  9:30.

13                   COURT OFFICER:  Follow me, guys.

14                   (Whereupon, the jury left the courtroom.)

15                   THE COURT:  All right.  So as I said, we will

16         start at 9:30 with the Court's preliminary instructions

17         and then openings.  And have your witnesses lined up

18         and ready to go.  Okay.

19                   Bail is continued.  Thank you very much.

20         *        *        *        *        *        *        *

           **(Whereupon, the proceedings were adjourned to**

21         **December 15, 2016.)**

22         It is hereby certified that the foregoing is a true and
           accurate transcript of the proceedings.

23

24         **VANESSA DEL VALLE**
           Senior Court Reporter

25

VdV

1

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS : CRIMINAL TERM : PART 33
2    ------------------------------------X
     PEOPLE OF THE STATE OF NEW YORK    : Indictment No.
3                                       :    6248-2015
                                        :
4          - against -                  :
                                        :
5                                       : Trial
     LORENZO MCGRIFF,                   :(Volume I)
6                                       :
                   Defendant.           :
7    ------------------------------------X

8                    320 Jay Street
                     Brooklyn, New York 11201
9                    December 15, 2016

10
     B E F O R E:
11         HONORABLE MIRIAM CYRULNIK,
                Presiding Judge and a Jury.
12

13
                   A P P E A R A N C E S:
14
                   OFFICE OF ERIC GONZALEZ, ESQ.
15                 Brooklyn District Attorney
                   BY: LAWRENCE MOTTOLA, ESQ.
16                     STEPHANIE D'AGOSTINO, ESQ.
                   Assistants District Attorney
17

18                 FOR THE DEFENDANT:
                   BROOKLYN DEFENDER SERVICES
19                 177 Livingston Street
                   Brooklyn, New York
20                 BY:  JAMIE BURKE, ESQ.
                       BEN WITTWER, ESQ.
21

22

23                          Michele DeNezza, RPR
                            Senior Court Reporter
24

25

## Proceedings

1            THE COURT CLERK: Calling number seven from

2       the Part 33 calendar, 6248-2015, Lorenzo McGriff,

3       case on trial.

4            All parties are present outside of the

5       presence of the jury panel.

6            MS. BURKE: Jamie Burke, Brooklyn Defender

7       Services, 177 Livingston Street, Brooklyn, New York

8       11201 on behalf of Mr. McGriff.

9            Good morning, Your Honor.

10           MR. WITTWER: Ben Wittwer also on behalf of

11      Mr. McGriff.

12           MR. MOTTOLA: For the office of the

13      district attorney, Lawrence Mottola.

14           MS. D'AGASTINO: Stephanie D'Agastino for

15      the office of the district attorney.

16           Good morning, Your Honor.

17           THE COURT:  Good morning, Mr. McGriff.

18      All the jurors are here.

19           Anything before we start?

20           MR. MOTTOLA: I haven't drafted a

21      stipulation for the video we agreed the other day

22      would be coming in, the one surveillance video from

23      75 Livingston. If we can stipulate on the record

24      that it will be People's, I guess, 1 in evidence.

25           MS. BURKE: That's fine, but we also have

1    to deal with the medical records.

2             MR. MOTTOLA:  Right, so it's -- I had a

3    chance to review the proposed redactions by counsel.

4    It's our position that there are a couple of areas

5    where there are observations made by the medical

6    personnel and the FDNY personnel specifically stuff

7    such as where it says patient was very combative,

8    uncooperative, verbally aggressive.  Those are

9    observations made by the FDNY people and it's not --

10   that does not come in under the hearsay exception

11   since it's not for the purpose of medical treatment.

12   It's just their observation.  They would need to be

13   called to court for that.

14             MS. BURKE:  May I respond?  It is part of

15   the medical treatment.  It's because of the patient's

16   behavior that certain medical treatment was given to

17   the patient.  They had to give him Ativan and K-12 to

18   calm him down in order to suture him and to evaluate

19   the injuries when he presented himself.  So I am

20   suggesting that those observations must remain

21   because it was part of his medical treatment.

22             THE COURT:  It would seem to be germane to

23   medical treatment if he is presenting in the

24   emergency room they would have to evaluate that

25   behavior to see if there was a head injury, some

## Proceedings

1          People have stipulated to, consented to, coming in.

2     They are certified medical records.

3                    MR. MOTTOLA:  People's 1.

4                    THE COURT SERGEANT:  In evidence.

5                    MR. MOTTOLA:  The surveillance disk from

6     75 Livingston Street would be People's 2 as

7     stipulated by defense.

8                    THE COURT:  Ms. Burke?

9                    MS. BURKE:  Yes, Your Honor.

10                    THE COURT OFFICER:  Ready for the panel,

11    Your Honor?

12                    THE COURT:  Yes, thank you.

13                    THE COURT OFFICER:  Jury entering.

14                    (Jury enters courtroom.)

15                    THE COURT CLERK:  Good morning.  I know

16    you just sat down.  I have to ask you to stand up and

17    raise your right hand as a group.

18                    (Jury panel sworn.)

19                    THE COURT CLERK:  Thank you.

20                    THE COURT:  Good morning, everyone.

21                    THE JURORS:  Good morning.

22                    THE COURT:  Thank you so much for being

23    here promptly.  I hope you had at least a chance to

24    thaw out a little bit in the couple of minutes since

25    you got here.

Opening remarks by the Court

1          What I want to do now is take a few

2     minutes to explain what the procedures are that we

3     are going to follow for the rest of the trial and

4     tell you exactly what your responsibilities are going

5     to be now that you are the jurors in this case.

6          THE COURT CLERK:  The jury panel is

7     present and properly seated.

8          Each side waives the jury roll call?

9          MR. MOTTOLA:  So waived.

10          MS. BURKE:  So waived.

11          THE COURT:  Next step, after I finish

12     speaking to you, the next step is going to be an

13     opening statement by the district attorney.  The law

14     requires that the assistant district attorney stand

15     up before you and tell you what the prosecution

16     intends to prove by way of the evidence in this case.

17     After you hear the district attorney's opening

18     statement, the defense attorney may also make an

19     opening statement, tell you what the defense believes

20     the evidence will show.

21          However, the defense is under no

22     obligation to make an opening statement.  It is

23     entirely optional.

24          After you have heard the opening statement

25     or statements, the DA will begin presenting the

Opening remarks by the Court

1    People's case to you. The DA will call witnesses to

2    the stand and get a chance to question each of the

3    People's witnesses first. That's called direct

4    examination. Once the direct examination of each

5    witness is completed, then defense counsel will have

6    an opportunity to question the witness and this is

7    called cross-examination.

8           Once the district attorney is finished

9    calling People's witnesses and presenting their

10   evidence, the defendant gets a chance to call

11   witnesses and present evidence. But I will remind

12   you, again, he is under no obligation to call anyone

13   as a witness or to present any evidence. It is

14   entirely optional for him. The fact that a defendant

15   does not testify is not a fact from which any

16   negative inference to the defendant may be drawn.

17   You cannot hold it against him as I said several

18   times.

19          After you heard all of the evidence, the

20   attorneys for each side will get one more chance to

21   stand up before you to make a closing argument that's

22   called summation. After you heard the summations, I

23   will give you the specific principles of law that you

24   must apply to decide the case. I will give you the

25   case for your deliberations and then you will go on

1    to render a verdict either guilty or not guilty for

2    each charge I will list for you on a document we call

3    the verdict sheet.

4           For the most part, evidence will come from

5    testimony given by witnesses. There may be physical

6    exhibits I will allow you to see and hear and if the

7    attorneys agree on any facts which there is no

8    dispute, they'll stipulate they agree to those facts

9    and you may consider them as evidence, too.

10          Please keep in mind that the attorneys'

11   questions during the trial will not be evidence. It

12   is the answers that the witnesses give to those

13   questions that will be the evidence. So, for

14   example, if an attorney were to ask the witness do

15   you own a car and the witness says, no, you must not

16   assume that the witness owns a car simply because the

17   lawyer asked about one.

18          Now you may hear the attorneys make

19   objections during the trial. The law allows an

20   attorney to object to a question asked by the other

21   side or to an answer given by a witness. You will

22   see the attorney stand up. They'll say objection.

23   They may even give a short reason for that objection.

24   It's my job to rule on those objections. That's what

25   I will do. If I agree with the lawyer making the

Opening remarks by the Court

1       objections, I will say sustained. That means I

2       believe the question or answer is not legally proper

3       and you have to disregard it. If I disagree with the

4       attorney who makes the objection, I will say

5       overruled. That means I believe the question or

6       answer is legally proper and you may consider it. Of

7       course, please don't hold it against the lawyers if

8       they make objections I rule against because they are

9       simply doing their job.

10              Now let me go over with you your

11      responsibilities. You have been selected to decide

12      what happened in this case. You will decide whether

13      you believe what the witnesses are telling you or you

14      don't. You will decide what weight to give any of

15      the evidence and, of course, you will decide the

16      verdict. We call you the judges of the facts. My

17      job is to be the judge of the law. The attorneys

18      have to follow the law as I give it to them whether

19      they agree with it or not and so must you.

20              Now I don't have any power to tell you

21      whether to believe a witness or not believe a

22      witness. Or what weight you should give any of the

23      evidence or what the verdict should be. When I tell

24      you something is the law, you have to follow it

25      whether you agree with it or not.

Opening remarks by the Court

1           There are certain rules that you have to

2   follow because you decide the case.  The law requires

3   jurors to follow certain instructions in order to

4   assure a fair and just trial.  You have heard some of

5   these already.  First, do not converse either among

6   yourselves or with anyone else about anything related

7   to the case.  You may tell the people with whom you

8   live or your employer that you are a juror or to give

9   them information about when you need to be in court.

10  But you may not talk with them or anyone else about

11  anything related to the case.

12          Second, do not, at any time during the

13  trial, request, accept, agree to accept or discuss

14  with any person receiving or accepting any payment or

15  benefit in return for supplying any information

16  regarding the trial.

17          Third, you must promptly report directly

18  to me any incident within your knowledge involving an

19  attempt by any person to improperly influence you or

20  any member of the jury.  Should you become aware of

21  such an attempt, do not discuss it with your fellow

22  jurors, but make it known to the officer you need to

23  speak to me and they'll bring it to my attention.

24          Fourth, do not visit or view the premises

25  or place where the charged crime was allegedly

1    committed or any other premises or place that's

2    involved in the case.  And you must not use any

3    Internet maps or Google Earth or any program or app

4    or device to search for any location that's discussed

5    in the testimony.

6              Fifth, do not read, view or listen to any

7    accounts or discussions of the case reported by

8    newspapers, television, radio, the Internet or any

9    news medium.

10             Sixth, do not attempt to research any fact

11   issue or law related to this case whether it's by

12   discussing with others, by researching in the library

13   or Internet or any other means or source.  In this

14   age of instant electronic communication and research,

15   I want to emphasize in addition to not conversing

16   with anyone face to face about the case, you must not

17   communicate with anyone about the case by any other

18   means including telephone, text message, e-mail,

19   Internet chat, blogs or any social media sites such

20   as Facebook or Twitter.  You must not provide any

21   information about the case to anyone by any means

22   whatsoever, that includes posting information about

23   the case or what you're doing on the case on any

24   device or Internet site including blogs, social

25   chat-rooms, social websites or any other means.  You

1    must not Google or search for any information about

2    case, the law that applies to the case or the people

3    involved in the case including the defendant, any of

4    the witnesses, the lawyers or me.

5         Now, I want you to take a few minutes to

6    discuss and to make sure you understand why these

7    rules are so important.  The law doesn't permit

8    jurors to converse with anyone else about the case or

9    permit anyone to talk to you about the case because

10   only jurors are authorized to render a verdict.  Only

11   you folks have been found to be fair and only you

12   have promised to be fair.  No one else has been

13   qualified in that way.

14        The law also doesn't permit jurors to

15   discuss amongst themselves anything about the case

16   until I tell you to begin your deliberations.  Now,

17   we recognize it's human nature for each of you to be

18   forming certain tentative opinions about the

19   witnesses and testimony as the trial goes along and

20   there is a strong temptation to discuss those

21   opinions during the course of the trial with the

22   other jurors or with other people.  But the law does

23   not permit you to do that because the opinions you

24   may be forming during the course of the trial are

25   subject to change from time to time as the evidence

1    is presented. And in fairness, you need to hear all

2    the evidence, the summations of the lawyers and my

3    final instructions on the law before you share your

4    thoughts and opinions with the other jurors and reach

5    a final decision. So the sharing of thoughts and

6    opinions must take place only at the end of the case

7    when I say you may again your deliberations. If

8    prior to those deliberations you engage in premature

9    discussions, the concern is that you might reach a

10   premature final decision and that would not be fair.

11   And only you have promised to be fair.

12              The law also doesn't permit you to visit a

13   place that's discussed in the testimony. Because

14   first, you can't always be sure that the location is

15   in the same condition it was in on the day in

16   question. Even if it is in the same condition, once

17   you go to a place discussed in the testimony and

18   evaluate the evidence in light of what you have seen,

19   you become a witness, not a juror. And as a witness,

20   you may now have an erroneous or incorrect view of

21   the scene that neither side will know about and that

22   neither side can correct and that, of course, is not

23   fair.

24              And, finally, the law requires you not

25   read or listen to any news accounts of the case and

Opening remarks by the Court

1   you are not to attempt to research any issue or fact

2   or law related to the case because your decision must

3   be based solely on the testimony and other evidence

4   presented in this courtroom.

5       It would not be fair to the parties for

6   you to base your decision on some reporter's view or

7   opinion or on information that you acquire outside

8   the courtroom.  The rules are designed to help

9   guarantee a fair trial and, accordingly, the law sets

10  forth some serious consequences if the rules are not

11  followed.  So I trust you understand and appreciate

12  the importance of following the rules and in

13  accordance with your oath and promise I know you will

14  do that.

15      Now, a word about note taking.  You may

16  have seen trials on television or movies where they

17  show the jurors sitting in the jury box and are

18  basically taking notes while the witness is

19  testifying.  Here in New York, jurors do not take

20  notes and you are not going to be doing that in this

21  trial.  It's very difficult to listen and hear

22  everything the witness is saying and observe the

23  witnesses' demeanor and write it all down accurately.

24  We will have a court reporter who will accurately

25  take down everything that's said during the trial.

Opening remarks by Mr. Mottola

1   If, during the deliberations, at the end of the

2   trial, you do not remember what a witness said, you

3   can simply ask to have the testimony read back.

4           One other thing you need to know about

5   before we start.  This is not the only case assigned

6   to me.  I have other matters that I do have to

7   handle, but I will not ask you to wait around while I

8   am handling other matters.  In return for that,

9   again, respectfully, I will ask you to make every

10  effort to be as punctual as you can as will I and the

11  parties.  That completes my instructions to you.

12          We will move on to the next step of the

13  trial which will be the opening statement by the

14  assistant district attorney.  That will be by

15  Mr. Mottola.

16          MR. MOTTOLA:  On August 11th of 2015,

17  approximately 1:10 in the afternoon, a woman by the

18  name Jeanelle Toribio was on her way to 65 Court

19  Street to get fingerprinted to become a teacher.  At

20  that time she saw two men who she did not know having

21  a verbal dispute.  You will hear from Ms. Toribio.

22  She'll tell you she didn't think anything of it.  She

23  continued on her business until one of the men, a

24  stockier African American man wearing a kaki shirt,

25  the evidence will show that turned out to be the

Opening remarks by Mr. Mottola

1    defendant, said something along the lines of, if you

2    don't leave me alone, we are going to go -- made some

3    kind of statement to the other man who she described

4    as white or Hispanic in a green shirt.

5           Now, you are going to hear this man in the

6    green shirt, his name was Mohammed Khalifa and you

7    know he is not testifying in this case.

8           You will hear he was being antagonistic to

9    the defendant.  When the defendant turned around,

10   Ms. Toribio will tell you that they were several feet

11   apart, and that's when the defendant began now

12   walking towards the other man, Mr. Khalifa.  The

13   evidence in this case will show that at that time the

14   defendant had several choices before him.  You will

15   hear that there was space between him and Mr.

16   Khalifa, no one else around.  And the evidence will

17   show that the defendant could have chose flight.  But

18   the evidence will show he did not choose flight;

19   instead he choose fight.

20          Ms. Toribio standing on Court Street will

21   tell you the first punch thrown in this case was by

22   Mr. McGriff.  She'll tell you that the force at which

23   the defendant struck Mr. Khalifa, it was so powerful

24   it actually knocked Mr. Khalifa backwards into a car

25   that was on Court Street.

Opening remarks by Mr. Mottola

1          He struck him again.  He struck him again.
2     He struck him again.

3          It was at that point when Ms. Toribio
4     understood that the defendant wasn't punching Mr.
5     Khalifa, but he was stabbing him with a knife that he
6     held in his right hand.  She saw injuries to Mr.
7     Khalifa.  She saw blood on his torso, blood on his
8     head, blood on one of his arms.  The fight continued.
9     It wasn't just a couple of stabs to the body.  The
10    defendant continued pursuing Mr. Khalifa across the
11    street, across Court Street, the evidence will show,
12    into a building that was being renovated at the time.
13    He pursued a man that he had already stabbed at least
14    once or twice.  Pursued him with this knife and
15    continued to strike him.

16          Ms. Toribio with a front row seat saw the
17    whole thing.  She'll tell you they vanished for
18    couple of seconds.  First person to emerge from this
19    building was the defendant.  And that she saw the
20    knife, the same knife that the evidence will show he
21    used to stab the defendant -- sorry, Mr. Khalifa and
22    put it in his pocket.  She'll tell you she saw him
23    take the knife and put it in his pocket and then flee
24    towards Atlantic Avenue.

25          Shortly thereafter, Mr. Khalifa came out

Opening remarks by Mr. Mottola

1    of that location and Ms. Toribio will tell you again

2    he was covered in blood.  He was holding his head and

3    he made a statement or screamed something out and

4    started following the direction that the defendant

5    took up towards Atlantic Avenue towards Schermerhorn

6    Street.

7              That's the last Ms. Toribio saw either of

8    these two men.  She doesn't know these two men.

9    That's not where the case ends because other

10   bystanders on Court Street someone called 911.

11   Police officer Caleb Louard from 84th Precinct, he is

12   the first -- what is known as the responding officer.

13   He responded in a marked car in his uniform with his

14   partner to Court Street between Livingston and

15   Joralemon.

16             By the time he got to that location you

17   will hear from Officer Louard either the defendant or

18   Mr. Khalifa were on scene.  They had already fled.

19   Defendant doesn't wait on scene.  Mr. Khalifa

20   followed him.  Officer Louard began canvassing the

21   area.  He canvassed -- he was directed by other

22   pedestrians towards Schermerhorn more towards Clinton

23   across Atlantic Avenue, down to Dean Street

24   ultimately to Bergen approximately eight or nine

25   blocks all told.

1        Officer Louard will tell you he first

2   observed the victim Mr. Khalifa in the green shirt

3   bleeding from his head, from his torso in a green

4   shirt and that Mr. Khalifa was laboring physically

5   around the vicinity of Dean Street.  As a police

6   officer, he stopped Mr. Khalifa.  He told him stay on

7   scene, wait for the ambulance.  You will hear Mr.

8   Khalifa cooperated and ultimately he laid down and

9   waited for the ambulance.  Other officers responded.

10   They stayed with the victim.  And Officer Louard

11   continued his job, his duty, to try to find the

12   defendant.

13        Now, he will tell you on the next block,

14   Bergen, he did find the defendant and he found a man

15   fitting the exact description, a larger, stockier

16   African American, black bucket hat, kaki shirt red

17   shoes, blue jeans.  The circumstances, he found and

18   arrested the defendant, were actually captured on

19   video.  You will see that video since on that block

20   there are two schools.  Officer Louard will tell you

21   he had his gun out.  He was responding to a call of

22   an assault with a knife.  He had his firearm out as

23   he is trained to do.  When he circled around a parked

24   vehicle, he found this defendant crouched down laying

25   almost prone trying to avoid being apprehended.  At

Opening remarks by Mr. Mottola

1    that point, Officer Louard and Officer Isaacs

2    proceeded to detain the defendant.  You will see the

3    video.  You will see the defendant attempted to get

4    up.  Officers had a minor struggle putting him in

5    cuffs.  Ultimately, there was no scuffle and he was

6    arrested.

7         What you will hear is he was searched and

8    the knife was never recovered.  The knife Ms. Toribio

9    saw him put in his pocket was not on him by the time

10   he was arrested.

11        Now, you are going to hear the 911 call.

12   You are going to hear from witnesses.  You are going

13   to hear from the police officers.  You know you are

14   not going to hear from Mr. Khalifa and you all say

15   you could be fair and judge the evidence as it's

16   presented.  You will hear about his physical

17   conditions and decide the eyewitness testimony

18   through the medical records.

19        If you keep an open mind, you follow the

20   oath that you promised, I am convinced that when you

21   hear from me next week in summation, I stand before

22   you again and I argue the evidence, you will find the

23   defendant not only guilty of assault in the second

24   degree, but of other charges as well for attempting

25   to cause and successfully causing injuries to Mr.

1       Khalifa with that knife.

2               Thank you.

3               THE COURT:  You will now hear from

4       Mr. Wittwer.

5               MR. WITTWER:  There is nothing scarier

6       than someone who isn't afraid of anything.  Someone

7       who can't be reasoned with.  Someone who won't be

8       deterred, someone who has nothing to lose.  It's not

9       an uncommon experience here in the city to have an

10      uncomfortable encounter with a stranger out in the

11      street, someone looks at you funny, says something

12      that makes you uncomfortable.  Most of us in that

13      situation we walk a little faster and keep looking

14      and eventually realize you are safe then you have

15      that feeling of relief.

16              What about when that feeling never comes

17      what about, when that stranger never stops.  That's

18      the nightmare that Lorenzo McGriff lived on August

19      11, 2015.

20              You know you might look at Mr. McGriff and

21      say he is a big guy, looks like he can take care of

22      himself, some of you might be intimidated by him at

23      first glance.  Mohammed Khalifa was not intimidated.

24      The evidence in this trial will show Mohammed Khalifa

25      was determined to have a violent physical encounter

Opening remarks by Mr. Wittwer

1      with Mr. McGriff that day and that he would stop at

2      nothing to do that and that he put Mr. McGriff in a

3      situation where he had no option but to defend

4      himself.

5            You heard the prosecutor refer to Mr.

6      Khalifa as a victim a couple of times.  But the

7      evidence will show that it was Mohammed Khalifa who

8      started this confrontation that day, not Mr. McGriff.

9      It was Mohammed Khalifa who followed Mr. McGriff for

10     block after block screaming racial slurs and violent

11     threats; not Mr. McGriff.

12           It was Mohammed Khalifa who had cocaine in

13     his system that weekday afternoon; not Mr. McGriff.

14     And it was Mohammed Khalifa, ladies and gentlemen,

15     who first brandished a weapon and tried to use it;

16     not Lorenzo McGriff.

17           They didn't mention the weapon.

18           It was about one o'clock in the afternoon

19     and Mr. McGriff was on his lunch break from his job

20     as peer counsel for persons with mental illness in

21     downtown Brooklyn.  He was walking along Court and

22     turned on Joralemon heading in the direction of

23     Boerum Place.  That's where he first encountered

24     Khalifa.  Complete strangers.  He was walking one way

25     and Mr. Khalifa was walking the opposite way on the

1    sidewalk as they passed, Mr. Khalifa elbowed him.

2    Mr. McGriff turned around.  In that kind of situation

3    it can escalate or de-escalate depending how parties

4    choose to behave.  To borrow a phrase from Mr.

5    Mottola you got flight or fight.  The defendant, Mr.

6    McGriff, chose flight.  He continued to walk down

7    Joralemon towards Boerum away from this individual.

8    But Mr. Khalifa wasn't done and Mr. McGriff knew he

9    wasn't done because as he was walking towards Boerum

10   Place, he began to hear Mr. Khalifa screaming and the

11   things he was screaming are despicable and not easy

12   to hear.  But you need to hear them because they are

13   what happened.  Hey, Nigger, get back here you slave,

14   I will kill your ass, I will send you back to Africa.

15          Those are the words that Mr. McGriff is

16   hearing Mr. Khalifa scream at him in broad daylight

17   during lunch rush hour in downtown Brooklyn.  Again,

18   though, Mr. McGriff shows flight.

19          The evidence will show that he changed his

20   route.  He crossed Joralemon Street towards the

21   Borough Hall side of the street and then walked down

22   Joralemon down to Court to get away from this man,

23   but Mr. Khalifa followed him step by step screaming

24   these hideous things, screaming these threats,

25   following him all the way back down the other end of

Opening remarks by Mr. Wittwer

1    Joralemon Street.

2              Mr. McGriff, he got to Court, he crossed

3    Court Street to the other side, made a left on Court

4    Street heading south on Court Street, heading towards

5    Livingston.  Mohammed Khalifa says, get back here

6    nigger.  Then Mr. McGriff saw an opportunity.  There

7    was a steady stream of traffic coming up Court

8    Street.  Mr. McGriff actually walked into the middle

9    off traffic.  You will see it this on video.  He

10   walked into the middle to weave between cars to get

11   to the other side of the street thinking maybe I can

12   lose this guy.  You will see Mohammed Khalifa walked

13   and weaved between the same traffic with

14   Mr. McGriff's back turned.  That's when the situation

15   escalated to violence.  There was construction going

16   on on this particular block of Court Street.  You

17   will see there was some trucks there, some

18   maintenance equipment, some rubble.  Mohammed Khalifa

19   bends down and picked up a hunk of concrete, a

20   brick-like object.  For whatever reason he is

21   carrying a shirt, he is wearing a shirt, but carrying

22   some other shirt or sweater or something like that.

23   He placed the brick into the garment and he begins to

24   swing it like a sling.

25              Mr. McGriff turned around at that point

1    and he saw this violent stranger created his own

2    weapon and I would suggest to you flight was no

3    longer an option.  He had to defend himself, protect

4    himself.

5            The evidence will show that's what he did.

6    And that after he subdued the individual momentarily

7    he continued to flee him and he had good reason to.

8            Ladies and gentlemen, Mr. Mottola told you

9    both of these individuals ended up six blocks from

10   where this happened.  After Mr. McGriff defends

11   himself, he begins to go down Court and Mohammed

12   Khalifa is following him still; still screaming

13   threats, still screaming remarks that suggest racial

14   hatred while he is bleeding.

15           Eventually, the police come and they

16   apprehend both of these individuals.  I will suggest

17   to you, ladies and gentlemen, Mr. McGriff was

18   cooperative.  He got down on the ground.  When police

19   had their guns drawn, he cooperated with their

20   commands, allowed himself to be arrested.  Meanwhile

21   Mohammed Khalifa assaulted the medical personnel on

22   scene to treat him the evidence will show.  They had

23   to sedate him because he was being physically and

24   verbally aggressive with EMTs.  When they end up

25   taking him to the hospital, he is physically and

1    verbally aggressive with the people there rendering

2    aid.

3             They end up testing -- his urine tests

4    positive for cocaine.  The next day, he is not in the

5    hospital 24 hours, he signs himself out against

6    doctors' orders, threatens the staff.  They don't let

7    him and he leaves and is escorted off the premises by

8    security.

9             Now, you heard a lot about Mohammed

10   Khalifa and you probably have a lot of questions

11   about him.  I don't know how many of those questions

12   are going to be answered at this trial because he is

13   not testifying.  I want to make it clear to you,

14   ladies and gentlemen, it has nothing to do with

15   injuries.

16             MR. MOTTOLA:  Objection.

17             THE COURT:  Sustained.

18             MR. WITNER:  You are not going to know

19   the reason Mr. Khalifa is not testifying.  It's an

20   important question.  It's a question you ought to

21   think about because the Government can't meet it's

22   burden of proof beyond a reasonable doubt without

23   calling the alleged victim in this case.  And the way

24   they are going to try to do that is they are going to

25   show you pieces of what happened.  They are going to

1    have witnesses to some of what happened.

2            They are going to show video of some of

3    what happened. They are going to call Jeanelle

4    Toribio. She is going to be a much more pleasant

5    witness to listen to than Mohammed Khalifa. But she

6    doesn't know what happened. The only witness you are

7    going to hear from what happened and will tell you

8    accurately is Lorenzo McGriff.

9            He will recount images and sounds and

10   feelings that are ingrained to his memory the rest of

11   his life. What I am just asking you, ladies and

12   gentlemen to do now is what you all swore you would

13   do is keep an open mind. Remember Mr. McGriff is

14   presumed to be innocent.

15           Remember the burden of proof is on the

16   prosecution to show that their story is what happened

17   beyond any doubt, to show that Mr. McGriff's actions

18   that day were not justified by law beyond any doubt.

19           And at the end of this trial Ms. Burke and

20   I will ask you to do simple justice for Mr. McGriff.

21                Thank you.

22                (Continued in volume two, page one.)

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS : CRIMINAL TERM : PART 33
2    ------------------------------------X
     PEOPLE OF THE STATE OF NEW YORK    : Indictment No.
3                                       :  6248-2015
                                        :
4              - against -             :
                                        :
5                                       : Trial
     LORENZO MCGRIFF,                   :  (Volume II)
6                                       :
                    Defendant.          :
7    ------------------------------------X

8                         320 Jay Street
                          Brooklyn, New York 11201
9                         December 15, 2016

10
     B E F O R E:
11      HONORABLE MIRIAM CYRULNIK,
                          Presiding Judge and a Jury.
12

13
                    A P P E A R A N C E S:
14
                    OFFICE OF ERIC GONZALEZ, ESQ.
15                  Brooklyn District Attorney
                    BY: Lawrence Mottola, Esq.
16                      Stephanie D'Agostino, Esq.
                    Assistants District Attorney
17

18                  FOR THE DEFENDANT:
                    Brooklyn Defender Services
19                  177 Livingston Street
                    Brooklyn, New York
20                  BY:  Jamie Burke, Esq.
                        Ben Wittwer, Esq.
21

22
                            Michele DeNezza, RPR
23                          Senior Court Reporter

24

25

J. Toribio - People - direct

1           MR. MOTTOLA:  People call Jeanelle

2     Toribio.

3           THE COURT OFFICER:  Ready for the witness?

4           THE COURT:  Yes.

5           THE COURT OFFICER:  Witness entering.

6           (Witness enters courtroom.)

7           THE COURT OFFICER:  Remain standing face

8     the clerk.

9  J E A N E L L E   T O R I B I O ,  a witness called by and

10 on behalf of the People, having first been duly sworn,

11 testifies as follows:

12          THE COURT CLERK:  Please state your name

13     for the record and spell your name.

14          THE WITNESS: My name is Jeanelle Toribio,

15     J-e-a-n-e-l-l-e, T-o-r-i-b-i-o .

16          THE COURT:  Spell your first name again.

17          THE WITNESS: J-e-a-n-e-l-l-e.

18          THE COURT:  Approach for just a moment.

19          (Whereupon, there is a discussion held off

20     the record at the bench between the assistants

21     district attorney, defense counsels and the Court.)

22          THE COURT:  Ms. Toribio, can I have that

23     paper, please?

24          THE WITNESS:  (Handing.)

25          THE COURT:  Mr. Mottola, whenever you are

J. Toribio - People - direct

1       ready.

2   DIRECT EXAMINATION BY

3   MR. MOTTOLA:

4       Q   Good morning, Ms. Toribio.

5       A   Good morning.

6       Q   How old are you?

7       A   36.

8       Q   Are you currently employed?

9       A   Yes, I am.

10      Q   Where do you work?

11      A   Department of Education.

12      Q   How long have you worked there?

13      A   I have worked there two years now.

14      Q   I want to direct your attention to August 11th

15  of 2015.  Approximately one o'clock in the afternoon.

16  Where were you at that time?

17      A   I was going to 65 Court Street to get

18  fingerprints for my job and I was walking towards 65 Court

19  Street.

20      Q   Is that here in Brooklyn?

21      A   Downtown Brooklyn, yes.

22      Q   What was the weather like that day if you

23  remember?

24      A   It was sunny, warm.

25      Q   Were you with anyone else?

J. Toribio - People - direct

1          A      No, I was by myself.

2          Q      Which direction were you coming from?

3          A      I was coming from -- I don't really know.  I

4     was coming from Livingston walking towards Court Street.  I

5     don't know.

6          Q      So as you were walking towards 65 Court Street,

7     what, if anything, happened at that time?

8          A      As I was walking to the building, I was

9     crossing the street and then I noticed that there was

10    construction on the street.  So there was a lot of things

11    on the street.  So I started to cross and then I noticed

12    there were two men in the street arguing.  And so I noticed

13    them because they were -- they were -- they looked like

14    they were arguing, about to fight.

15         Q      Did you know either of these two men?

16         A      No.

17         Q      And could you describe the two men to the best

18    of your ability to the jury?

19         A      One man was tall, he looked black.  Should I

20    say what he was wearing?

21         Q      If you remember.

22         A      Black hat, he was wearing a black hat, blue

23    jeans, possibly tan polo shirt that was maybe light brown.

24              The other man was skinny, long black hair with a

25    green shirt.

5

J. Toribio - People - direct

1      Q      Okay.

2             When you first observed these two men, how close

3      were you to them?

4      A      I was maybe a couple of feet away from them.

5      Very, very -- not in close proximity, but maybe like four

6      feet or something like that.

7      Q      Well, were you in the street?

8      A      I was still -- I didn't cross yet.

9      Q      So you were on one of the sidewalks?

10     A      Yeah, I was still on the same side that I was

11     going to cross then, that's when I noticed them and I had

12     stopped.

13     Q      Were you on the same side of Court Street as

14     65?

15     A      No, I was across the street from it.

16     Q      Let me finish the question, for the reporter.

17            You were opposite from 65; is that fair?

18     A      Yes.

19     Q      And where were the two men?

20     A      In the middle of the street.

21     Q      Could you tell how close they were to each

22     other when you heard the arguing?

23     A      They were very close to each other.

24     Q      And what were these men doing?

25     A      Well, the man with the green shirt seemed like

J. Toribio - People - direct

1    he kept on approaching him and the other man was trying to

2    get away from him saying, get away from me.

3        Q     So you could actually hear what was being said?

4        A     I did hear him say, you know, get away from me.

5        Q     That's the larger man?

6        A     The larger man.

7        Q     What happened after you heard that man say get

8    away from me?

9        A     So, it was like they, the other man would not

10   get away from him.  He was very close to him.  So he was

11   just like, well, okay, you don't -- you are going to keep

12   on saying what you are saying or you are going to keep on?

13   Okay.  And then he got mad.

14       Q     So we are clear.  Again, this was the larger

15   man saying these things?

16       A     Yeah.

17       Q     Or the other man?

18       A     The larger man.

19       Q     So it's something along the lines of, you are

20   going to keep saying these things?

21                 MR. WITTWER:  Objection.

22                 THE COURT:  Sustained.

23       Q     Was the larger man at that point facing the man

24   in the green?

25                 MR. Wittwer:  Objection.

J. Toribio - People - direct

1          A     I can't remember.

2                THE COURT:  Ma'am, when you hear

3          objection, that means you have to wait for me to tell

4          you whether you can or can't answer.

5                Don't lead.

6          Q     Which direction was the larger man looking when

7     he made that statement if you remember?

8          A     I don't remember.

9          Q     So what happened after that?

10         A     Then after that, then he hit the other man.

11         Q     So, we need to be very specific.

12         A     The larger man hit the man with the green

13    shirt.

14         Q     Do you recall how he hit him?

15         A     No, no.

16         Q     Did he kick him, punch him?

17         A     Oh, he punched him.  Yes, he punched him.

18         Q     How close were the men at this point?

19         A     Very close.  On top of each other.

20         Q     Before the man in the green was punched had you

21    seen him take any kind of physical action towards the

22    larger man?

23         A     No.

24         Q     What was the man in the green doing before he

25    got punched, if you remember?

1        A      He just kept on going towards him, just kept

2   on, you know, he wouldn't give him any sort of space.  He

3   just kept on going towards him.

4        Q      Did you see him with any kind of weapon or

5   object?

6        A      No.

7        Q      Did you see him doing anything?

8              MR. WITTWER:  Objection.

9              THE COURT:  Overruled.

10       Q      Did you see him doing anything at all with his

11  hands that you can remember?

12             MR. WITTWER:  Objection.

13             THE COURT:  Overruled.

14       A      I don't remember.

15       Q      So after the larger man, he punches the man in

16  the green, what happened after that?

17       A      So, they were -- so he was -- he couldn't hit

18  him back, the other man was just overpowering him.  So I

19  think he was just like you said, was he doing anything with

20  his hands, he was holding onto him to him like as he was

21  hitting him then they fell into the car, a car that was

22  right next to that, they were right next to, then the

23  mirror broke off, fell off.

24       Q      I want to back up.

25             When the man in the green was punched the first

J. Toribio - People - direct

1    time, are the two men still in the street?

2                    MR. WITTWER:  Objection.

3                    THE COURT:  Overruled.  Try not to lead.

4        But he has to clarify.  We have a lot of "hes".

5        A    Yes, they were still in the street.

6        Q    Now you said he was holding on to the --

7        A    The man with the green shirt.

8        Q    So if you can clarify who was doing what for

9    the jury.

10       A    Yes, the man with the green shirt was holding

11   on to the man with the black hat.

12       Q    While the man in the green shirt is holding on,

13   what, if anything, was the other man doing?

14       A    I don't remember.  I remember there was the one

15   hit and then I don't remember after that.

16       Q    You just testified that they ended up going

17   somewhere.

18                   In which direction did these two men go during

19   the fight?

20       A    When they fell into the car, they ended up on

21   the other side of the street, which is the 65 Court Street,

22   and then fell into a building that was under construction

23   or a storefront that was under construction.

24                   MR. MOTTOLA:  I would ask there are four

25       eight and a half by 11 color photos I would like to

J. Toribio - People - voir dire by Mr. Wittwer

1        show the witness and mark them 3, 4, 5 and 6 for

2        identification.

3                    THE COURT:  All right.

4                    THE COURT OFFICER:  Okay.  They are

5        marked.

6        Q      Ms. Toribio, look at those four photos.  Do you

7   recognize the location in each of those four photos?

8        A      Yes.

9        Q      And which block is pictured in those four

10  photos?

11       A      65 Court Street.

12       Q      Are those photos fair and accurate

13  representations what the street looked like on August 11 of

14  2015?

15       A      Yes.

16                    MR. MOTTOLA:  Your Honor, I would ask that

17       People's 3, 4, 5 and 6 for identification be entered

18       and received as 3, 4, 5 and 6 in evidence.

19                    MS. BURKE:  One moment, Your Honor.

20                    MR. WITTWER:  I would ask for a brief

21       opportunity to voir dire the witness on the

22       photographs.

23                    THE COURT:  Okay.

24  VOIR DIRE EXAMINATION BY

25  MR. WITTWER:

J. Toribio - People - voir dire by Mr. Wittwer

1      Q      Good morning, Ms. Toribio.

2      A      Good morning.

3      Q      The photographs in front of you you testified a

4  moment ago they are a fair and accurate depiction what it

5  looked like in the area of 65 Court Street?

6      A      Yes.

7      Q      But the set up of the street in those

8  photographs is not the same as it was on August 11, 2015,

9  is it?

10      A      Why would it be different?

11      Q      Wasn't there a significant amount of

12  construction going on in the street on the 11th you

13  testified about?

14      A      Yes, there was.

15      Q      Is there construction going on in any of those

16  photographs?

17      A      No, I don't see it, no.

18      Q      And the construction that was going on back on

19  August 11th of last year, obstructed the view in portions

20  of the street, correct?

21      A      I don't think that it --

22              THE COURT:  I am going to sustain that.

23      Q      The street itself was obstructed by

24  construction equipment on August 11th, correct?

25              MR. MOTTOLA:  Objection.

J. Toribio - People - direct

1              THE COURT:  Sustained.

2              MR. WITTWER:  Nothing further.  Thank you,

3         Your Honor.

4              THE COURT:  Any objection?

5              MR. WITTWER:  No objection.

6              THE COURT:  Thank you.  We will mark it 3

7         through 6 inclusive in evidence.

8              THE COURT OFFICER:  So marked.

9    DIRECT EXAMINATION BY

10   MR. MOTTOLA:

11        Q    So, Ms. Toribio, I am going to ask you to look

12   at the photos.  Can you show us on the photos --

13             THE COURT:  Do you want to use the

14        overhead projector?

15             MR. MOTTOLA:  Yes, please.

16        Q    In the meantime, so, you testified that the men

17   ended up crossing Court Street, correct?

18        A    Yes.

19        Q    Where did they go?

20        A    They fell into the store that was under

21   construction, that was empty.

22        Q    So, if you can look through those photos

23   People's 3 through 6, do you see the area they were, they

24   crossed into, in any of those photos?

25        A    I do, I do.

13

J. Toribio - People - direct

1      Q      If you can turn the photo around and let us

2  know which photo it is?

3                  THE COURT:  People's 4.

4      Q      If I can have People's 4.

5                  So, Ms. Toribio, looking at this photo --

6                  THE COURT:  Is that People's 4?

7      Q      -- People's 4 in evidence, looking at People's

8  4 in evidence, does this view, are we facing 65 Court

9  Street or is it behind us?

10     A      We are facing it.

11     Q      Can you indicate where 65 Court Street would

12  be?

13     A      (Indicating.)

14     Q      To the upper right corner of the photo, this

15  gray and black building?

16     A      Yes.

17     Q      Can you indicate if possible on the photo where

18  you saw the two men fighting before they crossed the

19  street?

20     A      Before (indicating.)

21     Q      Indicating to the left next to the first

22  vehicle between the writing on the pavement.

23                  After the two men crossed, the street into the

24  storefront, can you indicate where they went?

25     A      They went into here.

J. Toribio - People - direct

1        Q      So that's the third, the third storefront from
2    the left of 65 Court?

3        A      Yes.

4        Q      Once they went inside that location, how long
5    were they there?

6        A      Maybe a minute, not very long.

7        Q      And where were you at this time?

8        A      I was still outside, still in the street.

9        Q      You were still in the street.

10              How close would you say you were to that
11   location that we have just shown in People's 4?

12       A      I mean I was across the street.

13       Q      Was anything blocking your view?

14       A      No.

15       Q      You said approximately a minute these men were
16   inside?

17       A      Uh-huh, yes.

18       Q      What happened after that minute passed?

19       A      They fell into the store and they, from that
20   fight that they had had, and then they were in there. I
21   didn't see what was happening when they were in there and
22   then when they came outside, then, well, the first one, the
23   first man with the black hat came outside.  He came outside
24   then he had a knife.  And he put it in his pocket then he
25   started to run and then the other man with the green shirt

1    came out.  He had blood on his head and he was holding his

2    head and he was screaming, I am still alive, and then he

3    ran after him in the same direction.

4         Q    So, you're still across from 65 Court Street

5    when you saw the men come out of the building?

6         A    Yes.

7                   MR. WITTWER:   Objection.  Continued

8         leading.

9                   THE COURT:  Sustained.

10        Q    Had you seen the knife prior to the time the

11   man came out of the building?

12        A    No.

13        Q    That was the first time you seen the knife?

14        A    Yes.

15        Q    Did you see any injuries to this larger man?

16        A    No.

17        Q    Did you notice any blood on him?

18        A    No.

19        Q    You testified that they were fighting, and

20   that's how they ended up in this building?

21        A    Yes.

22        Q    Can you describe the fight for us?  What did

23   you see?

24        A    What I saw was when he -- when the man with the

25   black hat hit him, basically the other man was -- with the

1   green shirt was just holding on to him, you know, I guess

2   not to fall, but just still be there and then -- then

3   that's when they fell on to the car and then they broke the

4   mirror and then some other momentum got into the store they

5   fell into the store.  I don't remember exactly what they

6   were doing or how they were fighting.

7        Q    So during this whole time, did you see the man

8   in the green shirt with any weapon?

9        A    No.

10                  MR. WITTWER:   Objection.

11                  THE COURT:   Overruled.

12        Q    Did you see him with any object?

13        A    No.

14        Q    Did you see him with anything at all in his

15   hands?

16        A    No.

17        Q    Did you see him strike the larger man at all?

18                  MR. WITTWER:   Objection.

19                  THE COURT:   Overruled.

20        A    No.

21        Q    What direction did the larger man, in which

22   direction did the larger man go when he left from that

23   storefront, do you remember?

24        A    North, maybe north.  So it was passed 65 Court

25   Street.

1       Q       And was he walking?

2       A       Running.

3       Q       He was running.

4               What did the man in the green shirt do?

5       A       He ran after him.

6       Q       Is that the last time that you had seen either

7       of those two men that day?

8       A       Yes.

9       Q       So after the two men left Court Street what did

10      you do?

11      A       I went into the building I was going into, 65

12      Court Street.

13              MR. MOTTOLA:   Thank you, Ms. Toribio.  I

14      have no further questions.

15      CROSS-EXAMINATION BY

16      MR. WITTWER:

17      Q       Good morning, again, Ms. Toribio, prior to

18      August 11, 2015, you had never seen Mr. Lorenzo McGriff?

19      A       No.

20      Q       You had never seen Mohammed Khalifa either?

21      A       No.

22              THE COURT:   Keep your voice up a lit bit.

23      Q       You don't know either of these two men?

24      A       No.

25      Q       The first time you had ever seen either of

J. Toribio - People - cross/Mr. Wittwer

1   these two men was when you were walking on to Court Street?

2        A    Yes.

3        Q    You didn't know their names at the time?

4        A    No.

5        Q    There was a man in the Polo shirt?

6        A    Yes.

7        Q    And you now know that's Mr. McGriff?

8        A    Yes.

9        Q    And there was the man in the green shirt?

10       A    Yes.

11       Q    And you know his name was Mohammed Khalifa?

12       A    Yes.

13       Q    You don't know what went on between Mr. McGriff

14  and Mr. Khalifa before you got to Court Street?

15       A    No.

16       Q    You didn't see Mr. Khalifa elbow Mr. McGriff on

17  Joralemon Street?

18       A    No.

19       Q    You didn't see Mr. Khalifa follow Mr. McGriff

20  down Joralemon Street?

21       A    No.

22       Q    You didn't see Mr. Khalifa follow Mr. McGriff

23  down Court Street?

24       A    He was following him.

25       Q    By the time you saw Mr. Khalifa and Mr. McGriff

1    they were midway down Court Street?

2         A      No.

3         Q      So you can only testify what you saw that day?

4         A      Yes.

5         Q      In fact, it was clear to you from what you did

6    see that this was an incident that began sometime before

7    you got there?

8                       MR. MOTTOLA:  Objection.

9                       THE COURT:  Sustained.

10        A      I didn't know.

11                      THE COURT:  There is going to be no sound

12             effects from anybody in the courtroom period.  Please

13             continue.

14                      MR. WITTWER:  One moment Your Honor.  May

15             I approach?

16                      THE COURT:  Sure.

17                      (Whereupon, there is a discussion held off

18             the record at the bench between the assistants

19             district attorney, defense counsels and the Court.)

20        Q      Ms. Toribio, at the time you saw this argument

21   you were able to ascertain that it was a continuation of

22   something that started previously, correct?

23        A      No, I didn't know, I didn't know what was

24   happening.

25        Q      Ms. Toribio, did you testify about this

J. Toribio - People - cross/Mr. Wittwer

1    proceeding at a previous date?

2        A    Yes.

3        Q    And it was last year, correct?

4        A    Yes.

5        Q    It was shortly after everything that you saw

6    and you are describing today?

7        A    Yes.

8        Q    So the events of what happened on August 11th

9    were fresh in your memory at the time you previously

10   testified?

11       A    Yes.

12       Q    And you were being you were under oath at the

13   time you previously testified?

14       A    Yes.

15       Q    And you were being as accurate as possible at

16   the time you testified?

17       A    Yes.

18       Q    Isn't it true that you were asked on that prior

19   date:  And the man in green was antagonizing the other guy.

20   Could you tell what they are saying?

21            And you responded:  Some sort of arguing that

22   that happened before I saw them.

23            Isn't that what you testified to?

24       A    Some sort of arguing that happened before I saw

25   them.

J. Toribio - People - cross/Mr. Wittwer

1      Q      Isn't that what you testified to previously?

2      A      I would not know if they were arguing before I

3   saw them.  I don't know what was happening.

4      Q      But you knew when you testified about this

5   proceeding last year, didn't you?

6      A      I don't know if my words were not -- are being

7   misconstrued, but I -- the only thing I know is what I saw

8   and only thing I heard is what I heard.  When I saw them, I

9   don't know what was happening before I saw them.

10     Q      Is there anything that would refresh your

11  recollection about what you testified to previously?

12     A      Like what?

13     Q      Like if you were able to read a transcript of

14  your testimony from a prior hearing, would that help you

15  remember today what you said back then?

16     A      Sure.

17            MR. WITTWER:  May I approach the witness?

18            (Handing to the court officer.)

19            THE COURT:  Counsel, can you direct her to

20       a line number you are inquiring about?

21            MR. WITTWER:  Should I approach?

22            THE COURT:  Do it from where you are.

23     Q      I am referring to lines 21 through 24 on page

24  18.

25     A      I see it.

J. Toribio - People - cross/Mr. Wittwer

1    Q    So, these are actually the notes that you were
2    referring to immediately before your testimony today,
3    correct?

4    A    Uh-huh.

5    Q    You had them up on the witness stand with you
6    before you began testifying?

7                MR. MOTTOLA:  Objection.

8                THE COURT:  Sustained.

9    Q    It's true you testified last year there was
10   some sort of arguing that happened before you saw them,
11   correct?

12   A    That is true, according to this, yes.

13   Q    Thank you. Let's talk about what you did that
14   day.

15        You were on Court Street between Joralemon and
16   Livingston, correct?

17   A    Yes.

18   Q    They were doing construction on the street at
19   the time?

20   A    Yes.

21   Q    And you were in the process of crossing the
22   street?

23   A    Yes.

24   Q    And it was initially out of the corner of your
25   right eye that you saw these two men on the street?

1        A     Yes.

2        Q     And you could hear that Mr. McGriff was telling

3   the other man, get away from me?

4        A     Yes.

5        Q     But the other man, Mr. Khalifa, kept going back

6   to Mr. McGriff?

7        A     Yes.

8        Q     And this happened a couple of times that you

9   saw?

10       A     Yes.

11       Q     And this was before you saw any physical action

12   by either man?

13       A     Yes.

14       Q     Mr. Khalifa kept coming very close to Mr.

15   McGriff?

16       A     Yes.

17       Q     And you don't know what the source of the

18   argument was?

19       A     No.

20       Q     You couldn't hear most of what was being said?

21       A     No.

22       Q     You heard Mr. Khalifa yelling at Mr. McGriff?

23       A     I heard them arguing.

24       Q     Did you hear Mr. Khalifa call Mr. McGriff a

25   nigger?

1        A    No.

2        Q    You heard Mr. McGriff say oh, you going to say

3    it again?

4        A    Yes, I did hear that.

5        Q    You did not hear what Mr. Khalifa said that

6    triggered that reaction?

7        A    No.

8        Q    Mr. Khalifa was holding something while this

9    was going on, wasn't he?

10       A    I don't remember that.

11       Q    You testified that you were about four feet

12    away from these men as this was going on, correct?

13       A    Approximately.

14       Q    So, I don't have a ruler in the courtroom, so

15    just let me know. I have no idea if this was four feet.

16    Is this how close you were when you were watching this?

17       A    No.  Maybe, yeah, maybe there.

18       Q    So from about where you are sitting in the

19    witness stand to where I am standing is how far away you

20    were from the altercation that you witnessed?

21             THE COURT:  For the record, would you say

22        you are at the front edge of the court reporter's

23        area? Seven feet, four inches.

24       Q    Seven feet four inches away, that's how far

25    away you were from these two men?

J. Toribio - People - cross/Mr. Wittwer

1      A      Approximately.

2      Q      From this distance, you have no recollection of

3    Mohammed Khalifa holding anything in either of his hands?

4      A      I didn't see him have anything in his hands.

5      Q      You mentioned earlier that Mr. Khalifa was

6    antagonizing Mr. McGriff?

7      A      Yes.

8      Q      He would get close to Mr. McGriff and

9    Mr. McGriff would try to get him away?

10     A      Yes.

11     Q      And Mr. McGriff would try to get him away, that

12   didn't involve punching him or doing anything else?

13     A      No.

14     Q      And actually Mr. McGriff was making a motion at

15   the man that sort of, to you, meant get away?

16     A      Yes.

17     Q      Could you demonstrate the motion for the jury?

18     A      It was kind of like to scare him away, you

19   know, like get away from me, get away from me.  Like that.

20     Q      But it didn't work?

21     A      No.

22            THE COURT:  Make a record of what you

23         observed.

24            MR. WITTWER:  Let the record reflect that

25         the witness is using both of her arms and sort of

26

1        thrusting them forward in a repeated motion to

2        describe what Mr. Khalifa was doing on that day. Your

3        Honor, I would like to refer to the exhibit

4        Mr. Mottola published. People's 4.  I need some help

5        with the technological aspect?

6                THE COURT:  Should be on.  See your hand

7        is there.

8                MR. WITTWER:  Dim the lights, please.

9        August 11th this is not exactly what the street

10       looked like?

11       A     No, there was construction.

12       Q     And the construction was on the right-hand side

13       of the street, correct?

14       A     It was in the middle.  Yes, yes.

15               THE COURT:  Can you use the pointer?

16       Q     If I can, to depict where the construction was

17       occurring?

18       A     Alongside here, no alongside here I think.

19       Q     It was on the left side?

20       A     Yeah, I think it was on this side.

21               THE COURT:  On the left side.  I believe

22       it was.  So there was a lot of things on the street.

23               MR. WITTWER:  Let the record reflect the

24       witness is indicating the left side of the

25       photograph.

1        Q    Now what sort of things were in the street?

2        A    Like boulders and yellow big cones not the

3    small ones, the ones that are more rectangular.

4        Q    Were there construction vehicles as well?

5        A    I don't remember.

6        Q    But you remember the boulders and you remember

7    the cones?

8        A    Yes.

9        Q    This argument that was going on between these

10   two men was happening in that same area of the street,

11   correct?

12       A    Yeah, more so in the middle.

13       Q    Sort of the middle of Court Street not far from

14   where the construction on the left was occurring?

15       A    Yeah.

16       Q    Thank you.  You can put the lights back on.

17            Now, Ms. Toribio, you testified that after there

18   was this sort of pattern of Mr. McGriff trying to get Mr.

19   Khalifa away and him coming back that they tumbled into a

20   storefront?

21       A    Uh-huh, yes.

22       Q    You didn't see what happened after that point?

23       A    While they were in the store, no.

24       Q    You did not see anyone stab anyone?

25       A    No.

1      Q      But you did note that when you saw them when
2   they came out Mr. Khalifa was bleeding?
3      A      Yes.
4      Q      And Mr. McGriff was walking north on Court
5   Street away from the situation?
6      A      Running.
7      Q      He was running?
8      A      Yes.
9      Q      And Mr. Khalifa ran after him?
10     A      Yes.
11     Q      In the same direction?
12     A      Yes.
13     Q      Maybe to continuing the fight?
14            MR. MOTTOLA:  Objection.
15            THE COURT:  Sustained.
16     Q      Ms. Toribio you testified that as Mr. Khalifa
17   was running after Mr. McGriff he was yelling something?
18     A      Oh, he said I am still alive when he came out.
19   He said, I am still alive.  I am still alive.  That's what
20   he said then he started running.
21     Q      I don't mean to cut you off.  He was yelling
22   that in the direction of Mr. McGriff?
23     A      No, it's when he first came out of the store
24   and he was holding his head and he said I am still alive.
25   I am still alive.  Then he started to run.

1          Q      After Mr. McGriff?

2          A      Yeah.

3                        MR. WITTWER:   Nothing further, Judge.

4                        THE COURT:  Redirect?

5     REDIRECT EXAMINATION BY

6     MR. MOTTOLA:

7          Q      Can I approach for distance, Your Honor?

8                        THE COURT:  Sure.

9          Q      So I am clear, again you are about seven feet

10    from the two men, correct?

11         A      Possible, yeah, approximately, yes.

12         Q      When you are this distance, was there anything

13    at all blocking your view?

14         A      No.

15         Q      Was there any construction machinery blocking

16    your view?

17         A      No.

18         Q      Were both men in this location where I am

19    standing now?

20         A      Yes.

21         Q      And what was happening when they were seven

22    feet from you?

23         A      They were -- there was a fight.

24                        MR. WITTWER:   Objection.

25                        THE COURT:  Overruled.

J. Toribio - People - redirect

1       A       The man with the black hat had hit him, hit the

2   man with the green shirt and the man with the green shirt

3   was holding on to him.  They fell into the car.

4       Q       And from that distance, were you able to see

5   any weapons at all in the man in the green shirt's hand?

6                       MR. WITTWER:   Objection.  He is going

7               over same testimony from direct examination.

8                       THE COURT:   Objection is overruled.  If I

9               need the reason.  I will ask.

10      A       No, I did not.

11                      MR. MOTTOLA:   Thank you, Ms. Toribio.  I

12              have nothing further.

13                      THE COURT:   Recross?

14                      MR. WITTWER:   No, Your Honor.

15                      THE COURT: Ms. Toribio, you may step down.

16              Thank you very much.

17                      All right, ladies and gentlemen.  We are

18              going to take a couple of minutes.  I will send you

19              back to the jury room.  Use the facilities.  Do not

20              discuss the case among yourselves.  We will bring you

21              out in a few minutes and continue.  Thank you very

22              much.

23                      THE COURT OFFICER:   Follow me, guys.

24                      (Jury exits courtroom.)

25                      THE COURT:   All right.  Use the facilities

Proceedings

1    if you need to.  If you want to use the opportunity
2    to test the system.
3              MR. MOTTOLA:  I want the court to know the
4    witness that we were seeking to obtain from the
5    witness order, we have her.  I have not spoken to her
6    yet.  Can I have ten minutes to speak to her?
7              THE COURT:  Yeah.
8              MR. MOTTOLA:  Thank you.
9              THE COURT: So brief second call.  See if
10   there is anybody out there.
11             (Whereupon, other cases were called and
12   this case was recalled as follows:)
13             THE COURT:  Recalling the case on trial.
14             THE COURT CLERK:  Lorenzo McGriff.
15             THE COURT:  All appearances are as
16   previously noted.
17             THE COURT CLERK:  The jury is not present.
18             THE COURT:  You have an application?
19             MR. MOTTOLA:  I move to vacate the
20   material witness order for Kadesha Guy.
21             THE COURT:  Order is vacated.  Is that
22   somebody's witness?
23             MR. MOTTOLA:  That's a detective
24   investigator.
25             THE COURT OFFICER:  Ready for the jury,

Proceedings

1              Your Honor?

2                        THE COURT:  Yes.  Thank you very much.

3                        THE COURT OFFICER:  Jury entering.

4                        (Jury enters courtroom.)

5                        THE COURT CLERK:  The jury panel is

6              present and properly seated.  Each side waive the

7              jury roll call?

8                        MR. MOTTOLA:  So waived.

9                        MS. BURKE:  So waived.

10                        THE COURT:  Hello, again.  Make yourself

11              comfortable.

12                        Mr. Mottola, whenever you are ready.

13                        MR. MOTTOLA:  People call Kadesha Guy.

14                        THE COURT OFFICER:  Ready for the witness,

15              Your Honor?

16                        THE COURT:  Yes.  Thank you.

17                        THE COURT OFFICER:  Witness entering.

18                        (Witness enters courtroom.)

19                        THE COURT OFFICER:  Good morning.  Step

20              up.  Remain standing.  Face the clerk.

21                        THE COURT CLERK:  Raise your right hand.

22      K A D E S H A   G U Y ,  a witness called by and on behalf

23      of the People, having first been duly sworn, testifies as

24      follows:  Be seated.  Get comfortable.

25                        State your name for the record and spell

K. Guy - People - direct

1          your name.

2                    THE WITNESS: Kadesha Guy, K-a-d-e-s-h-a

3          G-u-y.

4                    THE COURT CLERK:  G-u-y?

5                    THE WITNESS:  Yes.  G-u-y.  Last name is

6          G-u-y.

7     DIRECT EXAMINATION BY

8     MR. MOTTOLA:

9          Q     Good morning, Ms. Guy?

10         A     Good morning.

11         Q     How old are you?

12         A     23.

13         Q     And are you currently working?

14         A     Yes.

15         Q     Where do you work?

16         A     Amazon.

17         Q     I want to direct your attention to August 11,

18    2015 at approximately 1:10 in the afternoon.

19         A     Okay.

20         Q     Where were you at that time?

21         A     Court Street, downtown Brooklyn.

22         Q     Do you remember the cross street?

23         A     No.

24         Q     Could you describe the section of Court Street

25    you were on?

K. Guy - People - direct

1    A    By building 65, Department of Education.

2    Q    That's in Brooklyn, right?

3    A    Yes.

4    Q    Were you in a vehicle or on foot?

5    A    Vehicle.

6    Q    Were you driving or a passenger?

7    A    Driver.

8    Q    Were other people with you in that vehicle?

9    A    Yes.

10   Q    How many other people?

11   A    Two.

12   Q    At ten after 1:00 on that date, while you were
13   driving, what, if anything, happened?

14   A    I was driving down Court Street and I seen two
15   guys scuffling.

16   Q    These two guys, had you ever seen these two
17   guys before?

18   A    No.

19   Q    Could you describe the two men?

20   A    Like a Hispanic guy probably like five
21   something, and African American.

22   Q    So, when you say they were scuffling, what
23   exactly did you see?

24   A    Like basically like walking towards the car,
25   like pushing each other a little bit.

1    Q    Is that part of Court Street, is it one or two

2    lanes, do you know?

3         A    One lane.

4         Q    So you were going in which direction?

5         A    Going towards Atlantic.

6         Q    Where were these two men in relation to your

7    car?

8         A    Like directly kind of in front of it.

9         Q    How close would you say you were to these two

10   men?

11        A    Probably not even like a feet away.

12        Q    What happened after they were scuffling near

13   your car?

14        A    They banged my car.  I told them to watch out

15   for my car.

16        Q    Could you describe what, if anything, the

17   African American man was doing?

18        A    He stabbed the other guy in like his abdomen

19   area.

20        Q    Did you see how many times?

21        A    I am not sure the amount.  I know he stabbed

22   him probably like three times or more.

23        Q    Now, at that point, did you know the name of

24   the African American man?

25        A    No.

K. Guy - People - direct

1       Q      Did you later learn what his name was?

2       A      Yes.

3       Q      What was his name?

4       A      McGriff.

5       Q      I am going to ask you to look around court

6    right now.  If you see Mr. McGriff in court, please point

7    to him and identify him?

8       A      (Pointing.)

9       Q      Can you describe what he is wearing?

10      A      Right now he is wearing a green sweater.

11             MR. MOTTOLA:  Your Honor, indicating the

12      defendant for the record.

13             THE COURT:  Yes.

14      Q      I am going to ask the witness be shown a CD

15   which has been premarked People's 7 for identification.

16      A      Okay.

17      Q      Ms. Guy, do you recognize that CD?

18      A      Yes.

19      Q      How do you recognize it?

20      A      I saw a video.

21      Q      Did you have a chance to watch what is on that

22   CD?

23      A      Yes.

24      Q      When did you do that?

25      A      Earlier than today, a little bit earlier than

1    today.

2         Q    What is on that CD?

3         A    It's actually a video of the stabbing and is

4    the little bang on my car.

5         Q    Did you record the video?

6         A    No.  Somebody else did.

7         Q    Where was that person?

8         A    In the back seat right behind me?

9         Q    Does the video, the recording on that disk,

10   does it fairly and accurately depict what you saw happening

11   on Court Street at around 1:10 in the afternoon on August

12   11, 2015?

13        A    Yes.

14        Q    At this time, I would ask that the video

15   premarked People's 7 be entered and received as People's 7

16   in evidence.

17                   MS. BURKE:   May I voir dire.

18                   THE COURT:   Sure.

19   VOIR DIRE EXAMINATION BY

20   MS. BURKE:

21        Q    Good morning, Ms. Guy.

22        A    Good morning.

23        Q    The video that you saw earlier, you didn't take

24   that video right, you didn't tape it?

25        A    No.

K. Guy - People - voir dire/Ms. Burke

1          Q      You didn't -- did you give it to the district

2    attorney's office?

3          A      Actually, they --

4          Q      It's a yes or no question.  Did you give it to

5    the district attorney's office?

6          A      No.

7          Q      Did you review it prior to seeing it earlier

8    today?

9          A      Yes.

10         Q      When was that?

11         A      That was after it happened.

12         Q      You reviewed the video?

13         A      Uh-huh.

14         Q      The video that you reviewed, it's the same

15   length as the video you reviewed today?

16         A      Yes.

17         Q      And who took the video?

18         A      A friend of mine's.

19         Q      Who is this friend?

20         A      Her name is Ashley.

21         Q      Did Ashley use her phone or your phone?

22         A      My phone.

23         Q      How did it get to the district attorney's

24   office?

25                      MR. MOTTOLA:   Objection.

1              THE COURT:  Sustained.  If I say

2       sustained, you don't have to answer.

3              MS. BURKE:  Nothing further, Your Honor.

4              THE COURT:  Okay. Any objection?

5              MS. BURKE:  No.

6              THE COURT:  Thank you.  People's -- that

7       will be marked People's 7 in evidence.

8              THE COURT OFFICER:  So marked.

9              MR. MOTTOLA:  If I can please have it.

10   DIRECT EXAMINATION BY

11   MR. MOTTOLA:

12              MR. MOTTOLA: With the Court's permission,

13       I would like to play it.  Officer, if you can dim the

14       lights.

15       Q    So, Ms. Guy, I am going to play the video, once

16   then I am going to ask you to describe what we are seeing

17   after it's done.  Okay?

18                   (Video played.)

19       Q    If you can turn the lights on.

20              So, Ms. Guy, did you hear audio as part of that

21   video?

22       A    Yes.

23       Q    Whose voice was that?

24       A    That was my voice and my little sister's voice

25   and my friend's.

K. Guy - People - voir dire/Ms. Burke

1      Q      What is depicted in the video, was that from
2   where you were seated?

3      A      Yes -- no.

4      Q      So the person who took that video --

5      A      -- is behind me.

6      Q      Were they behind the driver's seat or passenger
7   seat?

8      A      Driver seat.

9      Q      Before that incident that's recorded, can you
10  tell the jury what was happening between these two men
11  before the phone was turned on?

12      A      They looked like they were just having -- I
13  don't know if it was like disagreeing or something, but one
14  guy looked like he was about to push the other guy.  And
15  they looked like they was going to fight until the other
16  guy got stabbed.

17      Q      When you say one guy pushed the other guy?

18      A      Uh-huh.

19      Q      Which guy pushed which guy?

20      A      The African American man.

21      Q      Was the pusher?

22      A      Yes.

23      Q      Okay.  Did you ever see any objects or any kind
24  of weapons in the man in the green shirt's hands?

25      A      No.

41

K. Guy - People - voir dire/Ms. Burke

1    Q    Did you see the man in the green shirt strike
2    the African American man at all?

3              MS. BURKE:  Objection, Judge.

4              THE COURT:  Don't lead.

5    Q    Did you see -- what, if anything, did you see
6    the man in the green shirt do?

7    A    I seen him hold his head.

8    Q    When was that?

9    A    That was after the stabbing.

10   Q    Did you notice anything about his physical
11   condition after the stabbing?

12   A    Yeah, his head looked like it was bleeding a
13   little bit.

14   Q    Did you notice blood anywhere else?

15   A    No.

16             MR. MOTTOLA:  Your Honor, I am going to
17        ask the witness be shown an eight and a half by 11
18        color photo marked People's eight for identification.

19             THE COURT:  Counsel, you saw it?

20             MS. BURKE:  Yes, Your Honor.

21   Q    Ms. Guy, do you recognize that photograph?

22   A    Yes.

23   Q    What is it a photo of?

24   A    Of the stabbing.

25   Q    Did you take that photo?

K. Guy - People - voir dire/Ms. Burke

1        A     No, it's actually a clip from the video.

2        Q     Does that photo fairly and accurately depict

3     part of what we witnessed in the video?

4        A     Yes.

5        Q     That's from August 11, 2015?

6        A     Yes.

7              MR. MOTTOLA:  Your Honor, I would ask that

8         what's been premarked People's 8 be entered and

9         received as People's 8 in evidence.

10             MS. BURKE:  Quick voir dire.

11    VOIR DIRE EXAMINATION BY

12    MS. BURKE:

13       Q     This isn't a photo that you took, correct?

14       A     No, it's from video.

15       Q     How do you know it's from a video?

16       A     Because I like screen shot it from the phone.

17       Q     Did you send it to the DA's office?

18             MR. MOTTOLA:  Objection.

19             THE COURT:  Sustained.

20       Q     What did you do with it after you snapshot it?

21       A     It was just in my phone.

22             MS. BURKE:  Nothing further, Your Honor.

23             THE COURT:  No objection?  It will be

24        marked People's 8 in evidence.

25             THE COURT OFFICER:  So marked.

                    K. Guy - People - direct

 1   DIRECT EXAMINATION BY

 2   MR. MOTTOLA:

 3                MR. MOTTOLA:  If I can have People's 8,

 4        please.

 5                THE COURT OFFICER:  (Handing.)

 6                MR. MOTTOLA:  I am going to publish

 7        People's8 for the jury.

 8        Q     Ms. Guy, I am going to ask you, just looking at

 9   this photo, that's People's 8?

10                THE COURT:  Counsel, if you need to move

11        so you can see it, that's fine.

12        Q     Can you tell the jury what you see in Mr.

13   McGriff's hand?

14        A     Knife.

15        Q     Is that what you saw on August 11, 2015?

16        A     Yes.

17        Q     The person in the green shirt on the left, did

18   you ever know that person's name?

19        A     No.

20        Q     Is that the person that you saw the defendant

21   stab?

22        A     Yes.

23        Q     You can put the lights on, I guess.  Sorry.

24   Ms. Guy, after the stabbing, what happened after that?

25        A     The cops later met me by Atlantic Mall and

1    picked me up.

2         Q    So, we just watched the video that's People's 7

3    in evidence.

4         A    Uh-huh.

5         Q    So after that video, after you were done

6    recording that video --

7                   MS. BURKE:  Objection.

8                   THE COURT:  Sustained.

9         Q    After the video concludes, what was the next

10   thing that you did?

11        A    I pulled over.

12        Q    What happened after that?

13        A    My friend called the cops.

14        Q    Did you see where Mr. McGriff went, in which

15   direction?

16        A    I just seen them run up the block and he made a

17   right turn.  I am not sure.  I don't remember what block it

18   was though.

19        Q    Could you describe how he was going in that

20   direction?

21        A    Kind of running.

22        Q    The man in the green shirt, did you see him

23   again?

24        A    When -- after he got stabbed, he was also like

25   running in that direction, but that was couple of minutes

1    later.

2         Q    It was a couple of minutes?

3         A    Probably like a minute or two.

4         Q    What happened after that?

5         A    They basically was -- he was running down the

6    block I guess to go find him.

7                   MS. BURKE:  Objection.

8                   THE COURT:  Sustained.

9         Q    What did you do next?

10        A    I went trying to go back home.

11        Q    Did there come a time he later that day where

12   you saw the defendant again?

13        A    Yes.

14        Q    And how soon after the stabbing was that?

15        A    Probably like 15 minutes.

16        Q    And when you saw him, did you identify him to

17   the police?

18        A    Yes.

19        Q    What did you tell the police happened?

20                  MS. BURKE:  Objection.

21                  THE COURT:  Approach.

22                  (Whereupon, there is a discussion held off

23        the record at the bench between the assistants

24        district attorney, defense counsels and the Court.)

25        Q    When you saw him later that day, what did you

K. Guy - People - cross/Ms. Burke

1    -- I will withdraw that question, Your Honor.

2                 MR. MOTTOLA:  I have nothing further,

3         Ms. Guy.  Thank you.

4                 THE COURT:  Ms. Burke?

5    CROSS-EXAMINATION BY

6    MS. BURKE:

7         Q    Ms. Guy, how did you get to court today?

8                 MR. MOTTOLA:  Objection.

9                 THE COURT:  Overruled.

10        A    Somebody came and get me.

11        Q    Who came and got you?

12        A    Two detectives.

13        Q    Was that because you didn't want to come?

14        A    No.

15        Q    Why didn't you come on your own?

16        A    Before I didn't come because I was busy.  I

17   work night shift.

18        Q    I want to bring your attention back to August

19   11, 2015.  You were riding in the car with two friends,

20   correct?

21        A    My little sister and a friend.

22        Q    What is your sister's name?

23        A    Brittany.

24        Q    And Ashley is the friend?

25        A    Yes.

K. Guy - People - cross/Ms. Burke

1    Q    Did you have music playing in the car?

2    A    Yes.

3    Q    Windows up or down?

4    A    Down.

5    Q    It was hot out that day?

6    A    Yeah.

7    Q    But you did have music playing?

8    A    Yes.

9    Q    Could you hear each other talking in the car

10   above the music?

11   A    Yes.

12   Q    When you first noticed the man you identified

13   as Mr. McGriff, where was he standing?

14   A    He was standing in the middle of the street.

15   Q    In the middle of Court Street?

16   A    Yes.

17   Q    How far away was Mr. Khalifa, the man you

18   described as a Hispanic man?

19   A    Almost a foot away from my car.

20   Q    How far was he away from Mr. McGriff?

21   A    Probably couple of inches.

22   Q    Couple of inches.  So you heard them talking?

23   A    No.

24   Q    They are a foot away from your car.  You didn't

25   hear them talking?

48

1    A    No.

2    Q    You said that they were arguing?

3    A    I said it looked like they was arguing.

4    Q    So, you saw them having a conversation?

5    A    Yeah, more like a disagreement.

6    Q    But you don't know what they were saying to

7    each other?

8    A    Nope.

9    Q    Did you hear the Hispanic man call Mr. McGriff

10   a nigger?

11   A    No.

12   Q    Did you hear the Hispanic man call Mr. McGriff

13   a slave?

14   A    No.

15   Q    Did you hear the Hispanic man tell Mr. McGriff

16   go back to Africa?

17   A    No.

18   Q    Did you hear Mr. McGriff tell the man to get

19   away from him?

20   A    No.

21   Q    Did you hear Mr. McGriff tell him to leave him

22   alone?

23   A    No.

24   Q    But you are a foot away from them, correct?

25   A    Yes.

K. Guy - People - cross/Ms. Burke

1      Q      And your car windows are down?

2      A      Yes.

3      Q      You said that at some point you saw them

4      scuffling, right?

5      A      Yes.

6      Q      At the time you saw them scuffling, isn't it

7      true that Mr. Khalifa, the Hispanic man had something in

8      his hand?

9      A      Yes, but I am not sure what it was.

10     Q      But you did you see something in his hand?

11     A      Yes.

12     Q      At the time you noticed the two of them

13     scuffling, you were talking about what was happening in

14     front of you with the people in the car, correct?

15     A      Yes.

16     Q      And as matter of fact, you said to somebody in

17     the car, he should kick his ass, correct?

18     A      No.

19     Q      You didn't say kick his ass in the car?

20     A      I didn't say that.

21     Q      Did somebody in the car say kick his ass?

22     A      Yes.

23     Q      Who was that?

24     A      Ashley.

25     Q      Do you know why Ashley said that?

1              MR. MOTTOLA:  Objection.

2              THE COURT:  Sustained.

3        Q    Do you know who Ashley was referring to when

4   she said kick his ass?

5              MR. MOTTOLA:  Objection.

6              THE COURT:  Sustained.

7        Q    This statement, kick his ass, was made right

8   before the two of them started fighting; is that correct?

9        A    Yes.

10       Q    They were walking towards your car --

11       A    Yes.

12       Q    -- at the time.

13             As matter of fact, they banged on your car?

14       A    Yes.

15       Q    You stated that Mr. McGriff stabbed the other

16   guy in the abdomen?

17       A    In the stomach, yes.

18       Q    Did you see him stab him in the face?

19       A    No.

20       Q    Were they always in your view during the time

21   of the scuffle?

22       A    No.

23       Q    Did there come a time when they were out of

24   your view?

25       A    Yes.

K. Guy - People - cross/Ms. Burke

1      Q      When was that?

2      A      That's like when I was driving past them.

3      Q      Did you see them go into any other building?

4      A      No.

5      Q      When you drove past them, were they still on

6   the street?

7      A      Yes.

8      Q      And the next time you saw them again were they

9   still on the street?

10     A      Yes.

11     Q      Approximately how much time had elapsed between

12  the time that you saw them bump into your car and the time

13  that you saw them again on the street?

14     A      Probably two minutes after.

15     Q      You said that the man in the green shirt was

16  running after Mr. McGriff; is that correct?

17     A      Yes.

18     Q      Was he yelling?

19     A      I am not sure.

20     Q      Did you hear him say anything?

21     A      No.

22     Q      Approximately how far did you see him run after

23  Mr. McGriff, how far in distance?

24     A      He wasn't too far from him.  He was probably

25  like two feet away, probably three.

K. Guy - People - cross/Ms. Burke

1      Q      Running after Mr. McGriff?

2      A      Yes, after he was running.

3      Q      Mr. McGriff turned the corner to the right you

4    stated?

5      A      Yes.

6      Q      Did the man in the green shirt turn the corner

7    to the right as well?

8      A      No, he actually stopped on the corner.

9      Q      At any time did you see him go to the right?

10     A      No.

11     Q      When the man was on the corner, the man in the

12   green shirt was on the corner, where were you in your

13   vehicle?

14     A      I was like kind of in front of T-Mobile.  I

15   actually pulled over.

16     Q      That was on the corner of Livingston and Court

17   Street?

18     A      Yes, you can say that.

19     Q      Is that the corner that Mr. McGriff turned?

20     A      I think so.  I am not 100 percent sure.

21     Q      The man in the green shirt, he was on that

22   corner as well?

23     A      Yes.

24     Q      Do you at any time render aid to the man on the

25   corner?

1      A     No.

2      Q     How long did you stay pulled over on that
3   corner?

4      A     Probably five minutes.

5      Q     And the man in the green shirt, did he stay on
6   that corner that five minutes?

7      A     Yes, he was actually with four other people.

8      Q     Is your testimony that the man in the green
9   shirt was with four other people on the corner of Court
10  Street and Livingston Street?

11     A     Yes, they was actually running after him.

12     Q     When you say four people were running after
13  him, does that mean he had stopped or he was moving?

14     A     Who?

15     Q     You just testified that four people were
16  running after him?

17     A     With him, the guy with the green shirt, they
18  was running after McGriff.

19     Q     So did the man in the green shirt stop or did
20  he continue?

21     A     He stopped at the corner after he was trying to
22  chase him down.

23     Q     Did he stay on the corner?

24     A     Yes.

25     Q     You said he stayed on the corner for five

1      minutes?

2           A     Yes.

3           Q     You said you stayed on the corner for five

4      minutes?

5           A     Yes.

6           Q     You didn't see the man in the green shirt turn

7      up Livingston Street and chase after Mr. McGriff?

8           A     I think he started chasing, but I was pulling

9      off.

10          Q     My question was:  Did you see him do it?

11          A     No.

12                     MS. BURKE:  One moment, Your Honor.

13                     THE COURT:   Sure.

14                     (Pause.)

15          Q     So your testimony today is that you pulled over

16     and stayed on the corner of Court and Livingston Street for

17     five minutes, right?

18          A     Yes.

19          Q     And you recall testifying in the grand jury on

20     or about August 13th of 2015?

21          A     I am not sure of the date but yes.

22          Q     Couple of days after this incident happened,

23     correct?

24          A     Yes.

25          Q     And Mr. Mottola was there, the DA, the

K. Guy - People - cross/Ms. Burke

1    assistant DA here?

2         A    Yes.

3         Q    And you took an oath to tell the truth?

4         A    Yes.

5         Q    And raised your hand and swore to tell the

6    truth?

7         A    Yes.

8         Q    And you recalled the events at that time

9    because it was closer in time to the incident, correct?

10        A    Yes.

11        Q    So your memory was clear then?

12        A    My memory is still kind of clear.

13        Q    You were, at that time, you were asked the

14   following question and you gave the following answer:  Line

15   22, page nine:  So after you observed the punching and

16   striking with the knife --

17                  "ANSWER:  Yes.

18                  "QUESTION:  -- what did you do next?

19                  "ANSWER:  I was driving to get off Court

20        Street and drove up to get away from everything."

21                  Do you recall giving that answer?

22        A    Yes.

23        Q    At that time, you didn't testify that you

24   waited five minutes on the corner, correct?

25        A    Yes, I actually pulled over after I was driving

1    up to get off Court Street.

2        Q    At that time, you did not testify that you

3    waited on the corner five minutes, did you?

4        A    No.

5        Q    During that testimony you also stated that the

6    Hispanic guy had pushed Mr. McGriff, right?

7        A    I don't remember.

8        Q    Is there something that would refresh your

9    recollection like your grand jury testimony?

10       A    Yeah.

11       Q    You did review it before you came in to testify

12   today, right?

13       A    Kind of.

14       Q    I was going to -- one moment.

15            (Pause.)

16            MS. BURKE:  Officer?

17       Q    I would ask you to look at page nine and read

18   the first quarter of the page and when you are done could

19   you look at me?

20       A    Huh?

21            THE COURT:  Use that to refresh your

22       recollection.  Read it.  When you are done reading

23       that part, you can look back up at Ms. Burke.

24            THE WITNESS:  Okay.

25       Q    Ms. Guy, does that refresh your recollection?

K. Guy - People - redirect

1          A    Yes.

2          Q    Is it true that the Hispanic looking guy was

3     pushing Mr. McGriff?

4          A    Yes.

5                    MS. BURKE:  Nothing further.

6                    THE COURT:  Redirect?

7     REDIRECT EXAMINATION BY

8     MR. MOTTOLA:

9          Q    Can the same document be given to Ms. Guy that

10    she used to refresh remember recollection?

11               You testified just now the man in the green

12    pushed Mr. McGriff?

13         A    Yes.

14         Q    Had Mr. McGriff done anything to the man in the

15    green first?

16         A    Yeah, he pushed him.

17         Q    So who pushed who first?

18         A    McGriff pushed the Hispanic guy first.

19         Q    Thank you.

20               You also testified on cross that you saw

21    something.  You weren't sure what was in the man in the

22    green's hand, correct?

23         A    Yes.

24         Q    So we played the video that's People's 7.  So

25    before that video, since we don't have what you saw before

1    the video, you need to tell us.  So I am going to ask you

2    when you first are on Court Street in your car, how far

3    were you from the defendant and the man in the green before

4    you started filming?

5                        MS. BURKE:  Objection.

6          Q    Before someone started filming?

7                        THE COURT:  Overruled.

8          A    Almost like a foot away.

9          Q    So the first time you notice the defendant and

10   the other man is when you are about a foot away?

11         A    Yeah.

12         Q    And the man in the green specifically, did you

13   see -- did you see him doing anything with his hands?

14         A    No.

15         Q    Like during the fight?

16         A    No.

17         Q    What did you see him doing?  What, if anything?

18         A    Just like he was just trying to back up.

19         Q    Did you see him whirling anything above his

20   head?

21                        MS. BURKE:  Objection.

22                        THE COURT:  Overruled.

23         A    No.

24                        MR. MOTTOLA:  No further questions.  Thank

25         you.

1              THE COURT:  Recross?

2              MS. BURKE:  No recross, Your Honor.

3              THE COURT:  Thank you very much, Ms. Guy.

4     Thank you.  You may step down.

5              MR. MOTTOLA:  People call Police Officer

6     Caleb Louard.

7              THE COURT OFFICER:  Ready for the witness,

8     Your Honor?

9              THE COURT:  Yes, thank you.

10             (Witness enters courtroom.)

11             THE COURT CLERK:  Officer please raise

12    your right hand.

13    P. O.  C A L E B   L O U A R D ,  a witness called by and

14    on behalf of the People, having first been duly sworn,

15    testifies as follows:

16             THE COURT CLERK:  Please be seated.  State

17        your name for the record.  Watch the chair is on

18        wheels.  Once you are settled state and spell your

19        name. And give us your shield number and command.

20             THE WITNESS: First name first?  Police

21        Officer Caleb, C-a-l-e-b, Louard, L-o-u-a-r-d.

22        Shield number 2304, 84th Precinct, New York City

23        Police Department.

24    DIRECT EXAMINATION BY

25    MR. MOTTOLA:

P. O. Louard - People - direct

1       Q      Good afternoon, Officer.

2       A      Good afternoon.

3       Q      By whom are you currently employed?

4       A      New York City Police Department.

5       Q      In what capacity?

6       A      Police officer.

7       Q      How long have you been a member of NYPD?

8       A      Over 15 years.

9       Q      Which precinct are you currently assigned to?

10      A      84th Precinct.

11      Q      And how long have you been in the 84th

12  Precinct?

13      A      Over four years.

14      Q      I want to direct your attention to August 11,

15  2015.  Were you working that day?

16      A      Yes, I was.

17      Q      What hours were you working?

18      A      7:05 a.m. to 3:40 p.m.

19      Q      What was your assignment that day?

20      A      Patrol.

21      Q      What sector were you patrolling?

22      A      What we call sector Adam which was -- would

23  cover roughly Brooklyn Heights area.

24      Q      Were you assigned to a patrol car that day or

25  were you on foot?

P. O. Louard - People - direct

1          A      Patrol car.

2          Q      Were you the driver that day or recorder?

3          A      I was the driver if I remember, yeah.

4          Q      I want to direct your attention to

5     approximately 1:10 in the afternoon on August 11th.

6          A      Okay.

7          Q      Where were you at that time?

8          A      On Cadman Plaza West in Brooklyn Heights.

9          Q      That's in Kings County?

10         A      Yes, in Kings County.

11         Q      What, if anything, happened while you were in

12    the vicinity of Cadman Plaza West?

13         A      We received a radio call a few minutes after

14    that time.

15         Q      And what type of call did you receive?

16         A      Assault in progress.

17         Q      Did you get a location?

18         A      Yes, we did.

19         Q      What was the location?

20         A      It was Court Street and Livingston Street.

21         Q      Did you get a description of any of the

22    parties?

23         A      Yes, I did.

24         Q      What was the description?

25         A      The description of a victim and a perpetrator.

1      Q      Right.  So a physical description?

2      A      Yes.

3      Q      What was the physical description that you

4   received?

5      A      I received a description of victim as being a

6   male, possibly Hispanic wearing a green shirt and that's

7   all I can remember at this time.  Male Hispanic probably

8   wearing a green shirt.

9      Q      Did you get a description of the other

10  individual?

11     A      I got a description of a perpetrator, male

12  black wearing a tan shirt, blue jeans and red and white

13  sneakers.

14     Q      When you received this call, what, if anything,

15  did you do?

16     A      We responded to the location.

17     Q      And how quickly would you say it took you or

18  rather how quickly did you get to Court and Livingston

19  Street?

20     A      From the time the transmission came over the

21  radio we were in close proximity.  So approximately one

22  minute or so.

23     Q      And when you arrived at Court and Livingston

24  Street, did you find anyone fitting either of the

25  descriptions?

P. O. Louard - People - direct

1        A     No.

2        Q     What did you do at that time?

3        A     Well, at that time, we began to -- myself and

4    my partner, we began to look up and down the street for

5    anyone fitting either description.  We didn't see anyone.

6                MS. BURKE:  Objection to the "we" Your

7          Honor.

8                THE COURT:  Sustained.  Officer, speak to

9          what you did, you saw, et cetera.  Opposed to "we"

10         did.

11               THE WITNESS:  Okay.  Understandable.

12       Q     So after you couldn't find anyone fitting the

13   description at Court and Livingston Street, what did you do

14   next?

15       A     Well, at that time there was passersby that

16   started -- several people were pointing in a certain

17   direction which was -- what direction is that?  Southbound

18   on Court Street towards Livingston Street.  Sorry toward

19   Schermerhorn Street.

20       Q     What did you do after that?

21       A     So I continued in the direction that people

22   were pointing.  And once I got to the that corner, then I

23   -- there were more people actually pointing in the

24   direction down Schermerhorn Street which was westbound on

25   Schermerhorn Street towards Clinton.  So I went -- would

1    you like me to continue?

2        Q    Yes.  Continue.

3        A    I continued along the path that people were

4    pointing to.  Once I reached Clinton Street on Schermerhorn

5    Street, they were pointing southbound on Clinton Street

6    which is against the flow of traffic.  So I actually

7    continued against the flow of traffic with my lights and

8    sirens on in that direction toward Atlantic Avenue.

9        Q    I will stop you there.  So we are clear.

10           So you went from Court and Livingston towards

11   Schermerhorn Street.  You then went towards Clinton from

12   Schermerhorn Street?

13       A    Yes.

14       Q    Then you went up towards Atlantic Avenue?

15       A    Yes.

16       Q    How many blocks have you gone so far

17   approximately if you remember?

18       A    Approximately three or four blocks.

19       Q    While you were going up those three or four

20   blocks, had you found anyone yet?

21       A    No.

22       Q    Who fit either description?

23       A    No, I haven't.

24       Q    So, now, continue.  Now you are at Atlantic

25   Avenue.  What happened next?

P. O. Louard - People - direct

1    A    Once we reached Atlantic Avenue, I just

2  continued crossing Atlantic Avenue which direction is

3  southbound.  And I believe when I reached -- I believe the

4  next street was I believe it was Amity Street, it might

5  have been.  And then we were -- there was someone on that

6  corner also pointing back eastbound on Amity Street.  So I

7  went up that street back to Court Street which -- on the

8  other side of Atlantic.  I continued.  I continued toward

9  -- up Amity Street.  It actually turns into -- I believe

10  it's Dean Street.  That's going back eastbound.

11          I continued up Dean Street.  And once I got

12  close to Boerum Place, that's when I located the victim who

13  I got as a description as a victim.

14    Q    So, the person that you now found in the

15  vicinity of Dean and Boerum?

16    A    Yes.

17    Q    Did you know who that person was at that time,

18  did you know his name?

19    A    No, I didn't know his name.

20    Q    Did you later learn his name?

21    A    Yes.

22    Q    What was his name?

23    A    Can I refer to my notes?

24          THE COURT:  What are you looking at?

25          THE WITNESS: I am going to look at the

66

P. O. Louard - People - direct

1        complaint report, police complaint report.

2                    THE COURT:  You are going to use that to

3             refresh your recollection?

4                    THE WITNESS: To refresh my recollection,

5             Your Honor.

6                    THE COURT:  When you are done, you can

7             look back at Mr. Mottola.  Of course, don't read from

8             that when you answer the question.

9                    THE WITNESS:  Yes, ma'am. Yes, I am ready

10            Your Honor.

11       Q      Did you later learn what that person's name?

12       A      Yes.

13       Q      What was that?

14       A      Mohammed Khalifa.

15       Q      What, if anything, did you observe about Mr.

16   Khalif's appearance?

17       A      When I first observed him, I observed he fit

18   the description of what was given over the radio and he was

19   bleeding profusely.  As I approached him, as I got closer

20   to him, I noticed that he was bleeding from multiple stab

21   wounds, what appeared to be to me multiple stab wounds.

22       Q      When you say bleeding profusely, where was he

23   bleeding from?

24       A      Mostly -- most of the blood was coming from his

25   head.  And that's where most of it was coming from.  But he

P. O. Louard - People - direct

1   was -- I also observed a couple of stab wounds on his head
2   and some to his torso, his body. I believe it might have
3   been his back. And one stab wound to his arm.
4        Q    How was -- how would you describe how Mr.
5   Khalifa was acting when you first found him?
6        A    He was walking but he was laboring. He seemed
7   to be breathing heavy.
8        Q    Did he say anything to you? Sorry, withdrawn.
9            Outside of what you describe as laboring, how
10  else would you describe how he was on the scene?
11       A    What do you mean?
12       Q    Was he calm, was he --
13                MS. BURKE:  Objection, Your Honor.
14                THE COURT:  Overruled.
15       A    He wasn't -- he wasn't erratic or anything. He
16  seemed calm, he seemed determined to continue walking.
17       Q    And what did you do when you found him in this
18  condition?
19       A    Well, I kept telling him to stop. And you know
20  to get down because he appeared to have lost so much blood.
21                MS. BURKE:  Objection, Your Honor.
22                THE COURT:  Sustained.
23       Q    What did you tell him to do?
24       A    I told him to get down.
25       Q    Did he comply?

1     A    Not immediately, no.

2     Q    Did he ultimately get down?

3     A    He did.  Once he turned, he made a right from

4 Dean on to Boerum Place and he eventually did, did get

5 down.

6     Q    Did you stay with Mr. Khalifa at that time?

7     A    No, I didn't.

8     Q    Was anyone else -- were any other police

9 officers on scene by that point?

10     A    Yes, there were numerous police officers on the

11 scene.

12     Q    What about EMS?

13     A    EMS was close behind us.  Yes, they were on the

14 scene also.

15     Q    You say you didn't stay with Mr. Khalifa?

16     A    No, my partner at the time did.

17     Q    Where did you go?

18     A    Well, myself and another officer, he went in

19 the direction that he pointed.

20     Q    Which direction was that?

21     A    Which would be southbound on Boerum Place

22 toward Bergen Street.

23     Q    How far is Bergen Street from where you were on

24 Dean Street?

25     A    One block.

1        Q       Where did you go next?

2        A       I went to Bergen Street.  And when I reached

3   Bergen Street, there was another passerby who pointed to

4   the other side of the street, opposite from where I was on.

5        Q       As you were heading towards Bergen Street, what

6   is the last thing you remember Mr. Khalifa doing before you

7   headed up to Bergen Street?

8        A       Before I headed up to Bergen Street, I left him

9   with my partner and EMS.  He collapsed down onto his knees.

10                  MS. BURKE:  Objection, Your Honor.

11                  THE COURT:  Sustained.

12       Q       When you left Mr. Khalifa, was he standing or

13  was he on the ground?

14       A       No, he went to his knees.  He got down on the

15  ground.  He was on his knees.

16       Q       The ambulance was there at that point?

17       A       Yes.

18       Q       That was the last time you saw him before you

19  went to Bergen Street?

20                  MS. BURKE:  Objection, Your Honor.

21                  THE COURT:  Overruled.

22       A       Yes, that was.

23       Q       What happened once you got to Bergen Street?

24       A       Once I got to Bergen Street, a passerby pointed

25  across the street from the -- I was on the north side of

P. O. Louard - People - direct

1   Bergen Street at Boerum Place.  She pointed to the south

2   side of the street.

3          Q     Now, you said you were with another officer?

4          A     Yes.

5          Q     Who was that other officer?

6          A     Police Officer Isaacs.

7          Q     Were you and Officer Isaacs both in uniform?

8          A     Yes.

9          Q     Did you have your firearm out?

10         A     After she pointed I did.

11         Q     So, someone points, then you pull out your

12   firearm?

13         A     Yes.

14         Q     Why did you take out your firearm at that

15   point?

16               MS. BURKE:  Objection.

17               THE COURT:  Overruled.

18         A     Where the lady pointed was -- there was a

19   minivan there.  I didn't see anyone.  So I felt that the

20   suspect may have been behind the minivan.

21         Q     Could you see behind that minivan at all?

22         A     No, I couldn't see anyone behind the minivan.

23         Q     What did you do after your firearm was out?

24         A     I went over to the minivan, went around the

25   rear of the minivan, and I found who fit the description of

71

P. O. Louard - People - direct

1    the perpetrator.

2        Q    The person that you saw behind the minivan, did

3    you know who they were at that time?  Did you know their

4    name at that time?

5        A    Not at that time, no.

6        Q    Did you later learn that person's name?

7        A    Yes, I did.

8        Q    What was that person's name?

9        A    Can I refer to my notes?

10            THE COURT:  Yes.  Let us know what you are

11       looking at.

12            THE WITNESS: The arrest report, in order

13       to recollect my memory.

14            THE COURT:  Refresh your memory.  Use that

15       report and let us know when you are finished doing

16       that.  When you answer you will not be reading from

17       any documents.

18            THE WITNESS: I am ready.

19       Q    What was that person's name?

20       A    Yes, Mr. Lorenzo McGriff.

21       Q    I am going to ask you now if you look around

22    court, if you see Mr. McGriff in court, could you please

23    point to him and identify him?

24       A    Yes, I do.  Mr. McGriff is the gentleman

25    sitting in the olive drab green sweater and glasses on.

1            MR. MOTTOLA:  Indicating the defendant for

2       the record.

3            THE COURT:  Yes, thank you.

4       Q    When you first observed the defendant behind

5  this minivan, what position was he in?

6       A    He was down on the ground near the bottom of

7  the minivan.

8       Q    You found him he was down on the ground

9  already?

10      A    Yes.

11      Q    Had you said anything to him prior to that?

12      A    No, I hadn't seen him prior to coming around

13  the minivan.

14      Q    Did you order him down on the ground at that

15  point?

16            MS. BURKE:  Objection, Your Honor.

17            THE COURT:  Overruled.

18      A    No, sir.  He was already down.

19      Q    Once you came around and saw the defendant,

20  what happened next?

21      A    Well, he attempted to get up and both Officer

22  Isaacs and I pushed him back down and attempted to place

23  him under arrest.

24      Q    When you say you attempted to place him under

25  arrest, what, if anything, was the defendant doing?

### P. O. Louard - People - direct

1       A       Well, he didn't immediately give both of his
2    arms upon request to be handcuffed.

3       Q       Ultimately he was handcuffed?

4       A       Yes.

5       Q       Were you the arresting officer in this case?

6       A       Yes, I was.

7       Q       Did you notice any injuries to Mr. McGriff at
8    all throughout your interaction with him that day?

9       A       No.

10      Q       Officer, I am going to ask this witness be
11   shown what's premarked People's 9 for identification.  It's
12   a CD.

13              Officer Louard, do you recognize what's been
14   premarked as People's 9?

15      A       Yes.

16      Q       What do you recognize it to be?

17      A       This is a CD of the arrest that occurred on the
18   day in question.

19      Q       How do you know that's a video of the arrest?

20      A       Because I initialled and dated this very video.

21      Q       Did you watch that video?

22      A       Yes, I did.

23      Q       When did you watch it?

24      A       I watched it on December 12th and I watched it
25   again this morning.

74

P. O. Louard - People - direct

1    Q    Does that video fairly and accurately depict
2    the arrest of the defendant on August 11, 2015?
3    A    Yes, it does.
4         MR. MOTTOLA:  Your Honor, at this time I
5    ask what was premarked People's 9 be entered and
6    received as People's 9 in evidence.
7         MS. BURKE:  No objection.
8         THE COURT:  People's 9 in evidence.
9         THE COURT OFFICER:  So marked.
10   Q    Do you know where this video is from, at which
11   location?
12   A    Location, it's on Bergen Street.  I can't
13   remember the exact address on Bergen Street.  Near the
14   intersection of Boerum Place.
15   Q    Officer Louard, I am going to direct your
16   attention to the screen. Officer Louard, I am going to ask
17   you to kind of describe what the video is showing to the
18   jury.
19   A    Describe it now?
20   Q    Yes.
21   A    All right.  White minivan, and that's the
22   defendant, Mr. McGriff, got down to the ground.  That's my
23   leg.  The first person you seen come around, that's Officer
24   Isaac who is the first officer to push him back down as he
25   tried to get up.  And that's -- there is a third officer I

1    am not sure who that is at that time.  And we are

2    handcuffing, attempting to handcuff the defendant.

3        Q    I am going to stop the video.  It's at 1:28.  I

4    am going to back it up to the beginning to play it one more

5    time.  I made the screen larger.

6        A    Again, that's the white minivan that I spoke of

7    earlier.  That's the defendant, Mr. McGriff, behind the

8    minivan.  That's me coming around the minivan.  That's

9    Officer Isaac.  He tries to get up, pushes him back down

10   and we are handcuffing the defendant at this time.  Give me

11   one second.

12       Q    So I paused the video at 1:27 and 28 seconds.

13            I am going to direct your attention to the top,

14   the top left of the white minivan.  Can you describe what's

15   next to the white minivan top left, what would be the

16   passenger side like up here in this direction?

17       A    That appears to be myself approaching the

18   minivan.

19       Q    So at that point, you're on the passenger side

20   of the white minivan, correct?

21       A    Yes.

22       Q    Can you see or were you able to see anyone at

23   all behind that white minivan at this point?

24       A    Not at that point, no.

25       Q    Had you given any verbal commands at all to

P. O. Louard - People - direct

1    anyone behind that minivan?

2         A    No, sir. I didn't see anyone.  And I didn't

3    give any verbal commands to anyone at that point.

4         Q    Now, it's now 1:27 32 seconds.  So five seconds

5    passed officer.  Where are you in this video clip?

6              THE COURT:  Have him use the laser

7         pointer.

8         A    These are my legs here.  This is a tree.  So

9    that's where I am.

10        Q    Is that the first time you saw --

11             THE COURT:  Indicating?

12        Q    Indicating the set of legs that's closest to

13   the tree closer to Mr. McGriff?

14             THE COURT:  Indicating the very top of the

15        screen just to the right of the midway point.

16        Q    Is this the first time that you saw Mr. McGriff

17   that day?

18             MS. BURKE:  Objection.

19             THE COURT:  Sustained.

20        A    Yes, yes, it was.

21             THE COURT:  So when you hear me say

22        sustained it means you don't answer.

23             That answer is stricken.  The jury is to

24        disregard that.

25             MR. MOTTOLA:  You can turn the light on.

P. O. Louard - People - direct

1      Q      So after Mr. McGriff was in cuffs, what
2      happened next?

3      A      Another set of officers performed a show up.

4      Q      No, don't.

5             THE COURT:   Again, that's stricken.   The
6             jury is to disregard the last statement.

7      Q      Where did you process Mr. McGriff?

8      A      84th Precinct stationhouse.

9      Q      Before you transported him to the 84th
10     Precinct, did you search his person?

11     A      Yes, I did.

12     Q      Did you search him on scene?

13     A      Yes, I did.

14     Q      Did you ever recover a knife from his person?

15     A      No, I did not.

16     Q      Did you recover a cell phone?

17     A      Yes, he had a cell phone on him.

18     Q      What was done with that cell phone after the
19     arrest?

20     A      It was given to Mr. McGriff's wife.

21     Q      Now, when you went back to the police precinct,
22     you processed Mr. McGriff's arrest?

23     A      Yes.

24     Q      As part of that processing, do you take what is
25     known as pedigree information.

78

1       A       Yes, I do.

2       Q       Did Mr. McGriff give you his height and weight?

3       A       Yes.

4       Q       Can you tell the jury what the height and

5       weight he gave you that day was?

6       A       Yes.

7               THE WITNESS: Your Honor, I need to refer

8               to my arrest report.

9               THE COURT: You can use it to refresh your

10              recollection. You are not to read from the document.

11      A       I am done. Yes, six-foot-one 295 pounds is the

12      height and weight that I got on that day.

13      Q       Did you take any photographs at the precinct

14      that day?

15      A       Yes, I did.

16      Q       What did you take a photograph of?

17      A       I took a full body photograph of Mr. McGriff as

18      well as mugshots.

19              MR. MOTTOLA: Your Honor, I am going to

20              ask the witness be approached with an eight and a

21              half by 11 color photo shown to counsel marked as

22              People's 10 for identification.

23              THE COURT: Give me one second.

24              (Pause.)

25              THE COURT: Sorry.

P. O. Louard - People - direct

1      Q      Do you recognize People's 10 for

2   identification?

3      A      Yes, I do.

4      Q      How do you recognize it?

5      A      It's a photo that I took in the holding cell

6   arrest processing area of the precinct.

7      Q      Did you take that photograph the day you

8   arrested Mr. McGriff?

9      A      Yes, I did.

10     Q      Is that photo a fair and accurate

11  representation of what Mr. McGriff was wearing the day you

12  arrested him?

13     A      Yes, it is.

14            MR. MOTTOLA:  Your Honor, at this point I

15       would ask what was premarked People's 10 for

16       identification be entered and received as People's 10

17       in evidence.

18            MS. BURKE:  Other than an objection to

19       relevance, I have no objection to it coming in.

20            THE COURT:  Objection as to relevance is

21       overruled.  People's 10 in evidence.

22     Q      Did you have any other interaction with Mr.

23  Khalifa after you arrested Mr. McGriff?

24     A      I did not, no.

25     Q      Do you know if he went to the hospital?

1        A     Yes, he was transported to the hospital.

2        Q     Do you know which hospital?

3        A     I have to look at my notes to find that.

4               THE WITNESS: Your Honor, may I?

5               THE COURT:  Again, what are you looking

6        at?

7               THE WITNESS: I am looking to see if I can

8        recollect my memory with the aided report worksheet.

9        Q     Officer, which document would refresh your

10   recollection?

11       A     The aided report worksheet.

12              MR. MOTTOLA:  If I can hand up the report

13       to the officer.

14              THE COURT:  Yes.

15              THE WITNESS: My memory is refreshed, Your

16       Honor.

17       Q     Which hospital?

18       A     Yes, he was transported to Methodist Hospital

19   in Brooklyn.

20              MR. MOTTOLA:  Thank you, Officer Louard.

21       I have no further questions.

22              THE COURT:  Counsel, approach for a

23       second.

24              (Whereupon, there is a discussion held off

25       the record at the bench between the assistant

P. O. Louard - People - direct

1       district attorney, defense counsel and the Court.

2                   THE COURT:  All right, Officer Louard.  I

3       am going to have you step down.  We are going to have

4       you back at 2:15 sharp outside of the courtroom.  In

5       the interim, please don't discuss your testimony with

6       anyone.  We will see you back at 2:15.

7                   Thank you.

8                   So, ladies and gentlemen, I have a few

9       other matters that I have to attend to this morning.

10                  You can see there are a number of lawyers

11      and people in the audience.  I am not going to have

12      you wait around while I do that.  I am going to send

13      you out a little bit early for lunch if you can brave

14      the cold weather.

15                  Be back in the jury room 2:15 and

16      continue.  In the interim please don't discuss the

17      case among yourselves.  I will see you promptly 2:15.

18      Thank you for your attention.

19                      (Jury exits courtroom.)

20                  THE COURT:  Second call for you at 2:15.

21                      (Lunch recess taken.)

22                      (Afternoon session.)

23                  THE COURT CLERK: Recalling the case on

24      trial, Lorenzo McGriff, all parties are present

25      outside the presence of the jury.

P. O. Louard - People - direct

1      THE COURT:  You want to see if the officer

2    is outside?

3      MR. MOTTOLA:  He is here.  If you want to

4    bring the overhead down.

5      THE COURT:  For the record Officer Louard

6    has been recalled to the stand.  The jury is not yet

7    present.

8      THE COURT OFFICER:  Ready for the jury,

9    Your Honor?

10      THE COURT:  Yes, thank you.

11      THE COURT OFFICER:  Jury entering.

12      (Jury enters courtroom.)

13      THE COURT CLERK:  Jury panel is present

14    and properly seated.  Each side waive the jury roll

15    call?

16      MR. MOTTOLA:  So waived.

17      MS. BURKE:  So waived.

18      THE COURT CLERK:  Officer, I remind you

19    you are still under oath.

20      THE COURT:  Good afternoon.  Those of you

21    with coats on must have gone outside.  Was it bad?

22    Make yourself comfortable.  Warm yourselves up a

23    little bit.

24      Ms. Burke whenever you are ready.

25    CROSS-EXAMINATION BY

1    MS. BURKE:

2        Q    Good afternoon, Officer.

3        A    Good afternoon.

4        Q    Is your testimony that Mr. Khalifa was not

5    acting erratic.  That's your testimony today?

6        A    Not in front of me, no, he wasn't, no.

7        Q    You had an opportunity to observe him for quite

8    some time, correct?

9        A    From the time I seen him to the time I left

10   him.

11       Q    How much time was that?

12       A    Maybe a minute or two.

13       Q    When you first approached Mr. Khalifa you told

14   him to get on the ground, correct?

15       A    Yes.

16       Q    He didn't comply, did he?

17       A    No.

18       Q    You told him repeatedly to get on the ground,

19   correct?

20       A    Yes.

21       Q    More than once?

22       A    More than once, yes.

23       Q    More than twice?

24       A    More than twice.

25       Q    More than three times?

1        A      Possibly.

2        Q      He didn't comply, did he?

3        A      No, not immediately.

4        Q      Matter of fact, he continued to walk, right?

5        A      Yes.

6        Q      Against your command, correct?

7        A      Yes.

8        Q      Because you had told him to stop, right?

9        A      Yes.

10       Q      But he continued to walk?

11       A      Yes.

12       Q      And he was screaming things at that time,

13  wasn't he?  It's a yes or no question.

14       A      I don't recall if he was screaming something at

15  that time.

16       Q      So the entire minute, one to two minutes, you

17  observed him, it's your testimony that you don't recall if

18  he was screaming?

19       A      Well, not at the time when I first contacted

20  him.  He did yell something right before he went down to

21  the ground.

22       Q      And it's your testimony earlier today that he

23  collapsed.  That was your statement, correct?

24       A      Yes, I believe that was stricken, but yes.

25       Q      Is it your testimony now that he collapsed?

P. O. Louard - People - cross/Ms. Burke

1          A     I could describe it as such, yes.

2          Q     In your prior testimony, you didn't describe it

3     as such, correct?

4          A     Are you referring to earlier today?

5          Q     In any of your prior testimony, you didn't

6     describe it as him collapsing, correct?

7          A     I would have to read the minutes probably.  I

8     don't recall if I said that word.

9          Q     You testified three times in this matter; isn't

10    that correct, Officer?

11         A     Including this time?

12         Q     Yes.

13         A     Sounds right.

14         Q     You testified in the grand jury, correct?

15         A     Yes, I did.

16         Q     That was August of last year?

17         A     Yes.

18         Q     You testified at a hearing, correct?

19         A     Yes, I did.

20         Q     That was sometime this year, correct?

21         A     Yes.

22         Q     And you testified today, correct?

23         A     Yes, I did.

24         Q     Today is the first time that you ever said that

25    Mr. Khalifa collapsed, correct?

1      A      Like I said, I would have to read the minutes.

2      Q      Is there something that would refresh your

3  recollection?

4      A      If you have the minutes of that testimony.

5              MS. BURKE:  May I approach the witness?

6              THE COURT:  Let Mr. Mottola know what you

7      are looking at.

8      Q      I am handing you two items.  One is packaged

9  with a clip and the other are several pieces of loose

10  paper.

11              Officer, I direct your attention to page 28 of

12  the loose papers if that would help?

13      A      Okay.

14      Q      I direct your attention specifically to line

15  18.

16      A      Yes.

17      Q      You had an opportunity to review it?

18      A      Yes.

19      Q      Does it refresh your recollection?

20      A      Yes.

21      Q      Around do you recall ever stating that Mr.

22  Khalifa collapsed in your prior testimony?

23      A      No, I didn't say that then.

24      Q      Would you like to review your hearing testimony

25  to see if you ever said it then?

1        A      Sure.

2                 MS. BURKE: May I get the item back?

3                 THE COURT:  If you can point to a specific

4        page or pages and lines?

5        Q      Officer, I direct your attention to page nine

6        of your hearing minutes.  I would like you to review that.

7        Page nine, and half of page ten, please.

8        A      I reviewed it.

9        Q      In that testimony, do you at any time state

10       that Mr. Khalifa collapsed?

11       A      No, I didn't say that in the same words no.

12       Q      You also stated earlier that Mr. Khalifa was

13       not acting erratic; is that correct?

14       A      Correct.

15       Q      Was he acting belligerent?

16       A      I don't recall him being belligerent with me,

17       no.

18       Q      Do you recall him being agitated?

19       A      Can you elaborate, please?

20       Q      Was he being combative with you?

21       A      No.

22       Q      I wanted to bring your attention to after you

23       had encountered Mr. Khalifa, you left to look for

24       Mr. McGriff, correct?

25       A      Yes.

1      Q      It was around the corner from where you left

2    Mr. Khalifa, right?

3      A      Yes.

4      Q      And you and your partner and other police

5    officers went to look for Mr. McGriff, correct?

6      A      Myself and another officer, yes.

7      Q      Was it only two officers or more than two?

8      A      I left Mr. Khalifa with one other officer that

9    was directly with me.  There were many officers near the

10   scene.

11     Q      By the time you came up on Mr. McGriff, there

12   were at least four officers there, correct?

13     A      I didn't count how many officers were there.

14     Q      To your recollection, do you recall how many

15   were there?

16     A      I can't say how many, but more than the two of

17   us.

18     Q      And at what point did you draw your weapon?

19     A      At the point when I started to cross the street

20   toward the minivan that was seen in the video.

21     Q      Drawing your attention to this video, you

22   approached the minivan from behind, correct?

23     A      Yes.

24     Q      And you were on the passenger side behind the

25   van?

1      A      Yes.

2      Q      You and several other officers, correct?

3      A      Yes.

4      Q      And it was your testimony earlier that you

5  didn't see Mr. McGriff at that time?

6      A      Correct.

7      Q      But you had your gun drawn?

8      A      Yes.

9      Q      Didn't you yell for someone to get down?

10     A      Excuse me?

11     Q      Didn't you yell for someone to get down?

12     A      No.

13     Q      So you have your weapons drawn, but you don't

14  say get down.  You are not making any commands?

15     A      I didn't see anyone to make any commands to.

16     Q      You didn't say stop?

17     A      At which point in time?

18     Q      As soon as you had your weapon out?

19     A      No.

20     Q      As you were walking up to the van, did you say

21  stop?

22     A      No.

23     Q      As you were coming across the street towards

24  the van, did you yell stop?

25     A      I don't believe so, no.

1    Q    Did you hear any of your fellow officers yell

2    stop?

3    A    I don't recall hearing anyone yell stop.

4    Q    Did you hear any of your fellow officers say

5    get down, get down?

6    A    I don't recall hearing anyone say that.

7    Q    So it's your testimony that two, three or four

8    New York City police officers with guns drawn approached

9    the area by the van and no one said anything?

10   A    I didn't say that no one said anything.  You

11   asked me if I said something specifically as in stop.  I

12   didn't say those words.

13   Q    What specifically did you say?

14   A    I would have said:  Show me your hands.

15   Q    What did the other officers say?

16   A    I can't recall.  I can't testify what other

17   officers said.

18   Q    Why can't you?

19   A    Because I don't recall what any other officer

20   said.

21   Q    So you don't know if any other officer said,

22   get down?

23   A    No, I don't know.

24   Q    You don't know if any other officer said stop?

25   A    No, I don't know.

1       Q      But you only know that you said show me your

2    hands?

3       A      Correct.

4       Q      At what point in time did you say show me your

5    hands?

6       A      Upon the site of Mr. McGriff.

7               MS. BURKE:  Your Honor, permission to play

8          the video?

9               THE COURT:  Sure.

10              (Video plays.)

11      Q      Officer, can you turn the lights please.

12              Do you see Mr. McGriff at any time you're on the

13   other side of the white van correct?

14      A      Yes.  I didn't see him at that point until now.

15      Q      When you say until now, is that after you had

16   passed the back of the van?

17      A      Yes.

18      Q      Approximately how much time would you say

19   elapsed between the time Mr. McGriff was on the ground and

20   the time that you came around the van, matter of seconds?

21      A      Can you repeat that question, please.

22      Q      Approximately how much time would you say had

23   elapsed between the time that you came around the van and

24   the time that Mr. McGriff was on the ground?

25      A      That he was first on the ground?

1       Q       Yes.

2       A       As I came around the van, he was already on the

3    ground.  I couldn't tell you how long he was on the ground

4    for because I didn't see him before I came around the van.

5    I can't tell you how much time would have elapsed.

6       Q       I am going to try to reverse this. The video

7    says 1:27 and 25 seconds, correct?

8       A       Yes.

9       Q       Looking at the video, at 1:27 and 31 seconds,

10   you come on to the screen correct?

11      A       Yes.

12      Q       So it's a matter of six seconds between the

13   time you say you came and saw Mr. McGriff on the ground and

14   you approached him, correct?

15      A       You are saying the time I would have first seen

16   him on the ground and approached him is how many seconds?

17      Q       Six seconds?

18      A       Six seconds?

19      Q       That is the question.

20      A       You would have to rewind that.

21                      (Video playing.)

22      Q       I will start the video at 1:27 and 22 seconds.

23   I think I am going to start the video.  23 seconds, he's

24   not on the ground yet, 26, 27 seconds he is on the ground.

25   At that time, 31 seconds, the officers are there, correct?

1          A     Right.

2          Q     So, I was mistaken.  It was a matter of four

3     seconds, correct?

4          A     According to the video, yes.

5          Q     Can we have the lights, please?

6                And you said that Mr. McGriff was resisting you;

7     is that correct?

8          A     Yes.

9          Q     You said that's because he did not hand you his

10    arms immediately?

11         A     Not only did he not hand us the arms, but in

12    attempting to get one of his arms behind him, he resisted

13    by tensing his arm.

14         Q     And that's visible on this video we just

15    viewed?

16         A     I am not sure.  I would have to look at it.

17         Q     Let's look at it again.

18                    MS. BURKE:  Sorry, Your Honor.

19                    THE COURT:  No problem.

20         A     Mind if use the laser pointer if I need to?

21         Q     I don't mind.  Can we get the lights, Officer.

22                    (Video playing.)

23         Q     He is on the ground.  You got your knee in his

24    back --

25                    THE COURT:  The witness is going to

P. O. Louard - People - cross/Ms. Burke

1          testify or the video plays.  If you want to ask the

2          witness what's happening, that's fine.

3          Q     I am going to back it up so I can ask a

4    question frame by frame if I need to.

5          So at 1:27 31  seconds, what are you doing?

6          A     I was still telling him to show me his hands at

7    the time you stated.

8          Q     Have you made physical contact with him?

9          A     Not at that time, no.  Officer Isaac was first

10   to make physical contact.

11         Q     Are you standing next to him?

12         A     Yes, now at this point, now, I am close to him.

13         Q     Can you show with the laser pointer where you

14   are standing?

15         A     I can't really see it.  May be if you rewind a

16   little bit so I can see. Okay.

17         Q     I paused it at 1:27 33 seconds.  Are you in

18   this frame at all?

19         A     Yes.

20         Q     Can you point with the laser pointer and show

21   where you are?

22         A     I believe this is me here.

23              MS. BURKE:  Your Honor, pointing to sort

24         of the middle top portion of the frame, looks to be

25         two legs spread apart, next to two legs which seem to

1              be in a walking position.

2              Q    I am going to stop it here 1:27 36 seconds.

3       Are you in this frame?

4              A    Yes.

5              Q    Using the pointer laser pointer, can you point

6       where you are in this frame?

7              A    (Pointing.)  That's me.

8              Q    Pointing to top middle portion of the frame?

9                   THE COURT:  With one leg bent.

10             Q    With one leg bent.  At this time were you

11      telling Mr. McGriff to show his hands?

12             A    I believe at that time, I would have holstered

13      my weapon and I am going to assist Officer Isaac in

14      grabbing his hands.

15             Q    My question was:  At this time did you show

16      Mr. McGriff, did you ask Mr. McGriff to show his hands?

17             A    Before that.

18             Q    So you didn't say it at this time?

19             A    Before that.

20             Q    So you didn't say it at this time?

21             A    No, not at that time.

22             Q    I am continuing with the video.  I am stopping

23      at 1:27 38 seconds.  Can you show with the laser pointer

24      where you are in this video?

25             A    No, I can't really see where I am.

1        Q      Are you having physical contact with

2    Mr. McGriff at this time?

3        A      I believe so.

4        Q      And you would say that a matter of maybe four

5    seconds elapsed; is that correct?

6        A      From when?

7        Q      From the last two frames?

8        A      Maybe four or five seconds.

9        Q      Do you know at this time if Mr. McGriff had

10   been cuffed?

11       A      No, he has not.

12       Q      How can you tell that from this video if you

13   can't see where you are?

14       A      My recollection of the incident and I believe

15   this is his right arm here, Mr. McGriff's right arm.

16       Q      You believe.  But you don't know for certain?

17       A      No, I would like to -- have to see it playing.

18       Q      Continuing to play the video.  Stopping at 1:27

19   and 41 seconds.

20              Do you know where you are in the video now,

21   Officer?

22       A      No.

23       Q      And at this point can you tell if Mr. McGriff

24   had been cuffed?

25       A      I can't tell from the video, no.

P. O. Louard - People - cross/Ms. Burke

1      Q     Continuing to play the video.

2            Officer, did you see if an officer stepped away

3      from the video?

4      A     I see that officer, yes.

5      Q     Do you know where you were in this video?

6      A     I still can't see where I am in the video

7      definitively.

8      Q     But Mr. McGriff is still on the ground,

9      correct?

10     A     Yes.

11     Q     Continuing to play the video.

12           At this point in time, can you see where you are

13     in the video?

14                 THE COURT:  Identify the time.

15     Q     1:27 50  seconds.

16           Can you see where you are in the video?

17     A     No, I can't.

18     Q     You would agree with me, Mr. McGriff is not

19     prone on the ground at this point?

20     A     Excuse me?

21     Q     Would agree with me Mr. McGriff is not prone on

22     the ground at this point?

23     A     No, I cannot agree with you.

24     Q     Can you see Mr. McGriff on the ground?

25     A     I see him on the ground here, yes.

1    Q    Continuing to play.

2         Stopping the video at 1:27 57  seconds.  Can you

3    point out to the jury where you are in this portion of the

4    video?

5    A    No, I cannot.

6    Q    Can you tell the jury where Mr. McGriff is at

7    this point in time?

8    A    Mr. McGriff would be right here.

9    Q    Are you indicating that he is on the cement

10   ground at this time?

11   A    Yes.

12   Q    Approximately how many officers are standing

13   around you and Mr. McGriff?

14   A    I can't tell from this video, but it's -- I

15   would say more than three, probably more than four.

16   Q    More than four?

17   A    Looks like it's more than four.

18   Q    May I have the lights, please?

19        To your memory, how long did it take to cuff

20   Mr. McGriff?

21   A    At the time, I wasn't counting how long it was

22   taking to cuff him.

23        But if I could see a point where I know he is

24   cuffed in the video, then I would answer.

25   Q    Would you like to go through the video again?

P. O. Louard - People - cross/Ms. Burke

1        A     No, if you could continue.

2        Q     At this point in the video, is it your

3    testimony you don't know if he was cuffed?

4        A     I don't know for sure, no.

5        Q     Did you use your own cuffs or someone else's

6    cuffs to cuff Mr. McGriff?

7        A     I don't recall if I lent my cuffs to assist,

8    but Officer Isaac started to cuff first.  So he would have

9    used his handcuffs.  I may have lent my cuffs to assist.  I

10   am not sure.

11       Q     During this encounter, other than saying, show

12   me your hands, did you have any other conversation with

13   Mr. McGriff?

14       A     None that I recall.

15       Q     Do you recall saying anything to him as he was

16   on the ground?

17       A     None that I recall.

18       Q     Did you arrest him for resisting arrest?

19                   MR. MOTTOLA:  Objection.

20                   THE COURT:  Overruled.

21                   THE WITNESS: I would have to, Your Honor,

22           review my arrest report.

23                   THE COURT:  Okay.  Go ahead.

24                   THE WITNESS: To recollect from memory. My

25           memory is refreshed.

P. O. Louard - People - cross/Ms. Burke

1           THE COURT:  You can answer.

2      A    No, I didn't charge him resisting arrest.

3      Q    You stated that you gave Mr. McGriff's cell

4  phone to his wife, correct?

5      A    Yes.

6      Q    Do you know if it was working?

7      A    I can't recall if it was working or not.

8      Q    Between the time you got your radio run about

9  the assault in progress and the time that you apprehended

10 Mr. McGriff, how much time had elapsed?

11     A    I don't know exactly how much time.

12     Q    Can you approximate?

13          THE WITNESS: Your Honor, may I look in my

14     memo book copies?

15          THE COURT:  Yes.

16          THE WITNESS: To recollect my memory.

17          THE COURT:  If it will help refresh your

18     recollection, of course.

19     A    My memory is refreshed.  I would say

20 approximately 12 to 15 minutes.

21     Q    And the first time that you got the radio run,

22 you said it took a minute to get to the corner of

23 Livingston and Court Street; is that correct?

24     A    Approximately, as I recall.

25     Q    When you got to the corner of Livingston and

1    Court Street, did you see a man with a green sweater or

2    shirt on?

3         A    No.

4         Q    Did you see Kadesha Guy there?

5         A    No.

6         Q    After you left Livingston and Court, which

7    direction did you go?

8         A    I proceeded southbound on Court Street and I

9    stopped at Schermerhorn Street.

10         Q    So I am clear, you're in your squad car,

11    correct?

12         A    Yes.

13         Q    Marked squad car?

14         A    Yes.

15         Q    You are driving or recording?

16         A    Driving.

17         Q    You're driving.  You stop at Livingston and

18    Court Street, correct?

19         A    Yes, initially, yeah.

20         Q    How long did you stay at Livingston and Court

21    Street?

22         A    Not long, approximately a minute or two.

23         Q    A minute or two.

24              During that one to two minutes, you did not see

25    Mr. Khalifa, correct?

P. O. Louard - People - cross/Ms. Burke

1       A       No.

2       Q       Didn't see a man in a green shirt, correct?

3       A       No.

4       Q       You didn't see Kadesha Guy, correct?

5       A       No, I didn't.

6       Q       You proceed down Court Street at that time
7    towards Schermerhorn Street?

8       A       Yes.

9       Q       After you got to Schermerhorn and Court Street,
10   which direction did you drive?

11      A       West on Schermerhorn Street.

12      Q       Which is towards which block, which name
13   street?

14      A       Repeat that.

15      Q       Which name street did you go towards?

16      A       Clinton Street.

17      Q       So that means you took a right on Schermerhorn
18   Street?

19      A       Yes.

20      Q       How long, how far, did you travel on
21   Schermerhorn Street going towards Clinton?

22      A       The length of the block, that's the next street
23   over.

24      Q       You traveled one block?

25      A       Yes.

P. O. Louard - People - cross/Ms. Burke

1       Q       During that one block, did you encounter Mr.

2   Khalifa?

3       A       No.

4       Q       Did you encounter Mr. McGriff?

5       A       No.

6       Q       After you got to the corner of Clinton and

7   Schermerhorn Street, which direction did you drive?

8       A       Southbound on Clinton Street.

9       Q       Would that be a left on Clinton Street?

10      A       Yes.

11      Q       When you turned left on Clinton Street, did you

12  see Mr. Khalifa?

13      A       No.

14      Q       Did you see Mr. McGriff?

15      A       No.

16      Q       How far did you travel on Clinton Street?

17      A       I traveled until I reached Amity Street.

18      Q       Is that past Atlantic Avenue?

19      A       Yes.

20      Q       Is that past Dean Street?

21      A       No, Dean stops at Court Street.  So it would be

22  -- if it was a continuous street, it would be Amity Street.

23      Q       Approximately three blocks would you say?

24      A       Yes.

25      Q       During those three blocks, did you see Mr.

1    Khalifa?

2         A    No.

3         Q    And you didn't see Mr. McGriff, correct?

4         A    No, I did not.

5         Q    After you got to Amity, what did you do?

6         A    I made a left on Amity which is going back

7    eastbound.

8         Q    And on Amity, after you made the left, did you

9    see Mr. Khalifa?

10        A    No.

11        Q    Did you see Mr. McGriff?

12        A    No, I did not.

13        Q    Did you travel the full block on Amity?

14        A    I traveled to Court Street.

15        Q    What was the cross street?

16        A    Amity to Court Street.

17        Q    Amity back to Court Street?

18        A    Yes.

19        Q    On the corner of Court and Amity, did you

20   encounter Mr. Khalifa?

21        A    No.

22        Q    Did you encounter Mr. McGriff?

23        A    No, I did not.

24        Q    Did you turn at that time?

25        A    Yes, I made a quick left the wrong way on Court

P. O. Louard - People - cross/Ms. Burke

1    Street which would be northbound.

2         Q    So you came back northbound on Court Street.

3    Were your lights on?

4         A    Yes.

5         Q    Siren?

6         A    Yes.

7         Q    When you came up Court between Amity and what

8    block?

9         A    Well, I made a quick left and a right onto

10   Dean.  The street staggers. (Indicating.)

11        Q    Indicating an L or upsidedown sideways Z.

12             So you are on Dean Street.  Are you going the

13   right way on Dean Street?

14        A    Yes.

15        Q    Not against traffic, correct?

16        A    No.

17        Q    Are your lights still on?

18        A    Yes.

19        Q    Are your sirens still on?

20        A    Yes, they are.

21        Q    On Dean Street, that's where you encounter Mr.

22   Khalifa?

23        A    Yes, I did.

24        Q    Was he close to the corner or in the middle of

25   the block?

P. O. Louard - People - cross/Ms. Burke

1      A     He was closer to Boerum Place which is the next

2   street up eastbound.

3      Q     So further up the block?

4      A     Yes.

5      Q     And at the time that you saw him, he had on

6   this green shirt?

7      A     Yes, he did.

8      Q     Was he carrying anything else with him?

9      A     No, I didn't observe him carrying anything

10  else.

11     Q     Did you observe him with a second shirt or

12  sweater?

13     A     Not that I recall.

14     Q     And it was at that time that you told him to

15  get on the ground, correct?

16     A     Yes.

17     Q     But he didn't do it?

18     A     No, he did not.

19     Q     You told him several times repeatedly to get

20  down on the ground, correct?

21     A     Yes, I did.

22     Q     Eventually he did get down on the ground,

23  correct?

24     A     Yes, he did.

25     Q     And you left him there?

1          A     Yes.

2          Q     Because the ambulance had come?

3          A     They were following the same route we were

4     following so they were there, also.

5          Q     So the ambulance was there prior to you leaving

6     Mr. Khalifa?

7          A     Yes.

8          Q     Did you observe him go into the ambulance?

9          A     No, I did not.

10         Q     That's because you were looking for

11    Mr. McGriff?

12         A     Yes.

13                    MS. BURKE:  One moment Your Honor.

14                    (Pause.)

15                    MS. BURKE: Nothing further, Your Honor.

16                    MR. MOTTOLA:  I have no redirect, no.

17                    THE COURT:  Officer, you may step down.

18    Thank you very much.

19                    MS. BURKE:  They are mine, Your Honor.

20                    THE COURT:  Only take what you brought

21    with you.  Thank you very much.

22                    MR. MOTTOLA:  People call Ashley Reyes.

23                    THE COURT OFFICER:  Ready for the witness,

24    Your Honor?

25                    THE COURT:  Yes, thank you.

A. Reyes - People - direct

1          THE COURT OFFICER:  Witness entering.

2                (Witness enters courtroom.)

3          THE COURT CLERK:  Face me and raise your

4      right hand.

5   A S H L E Y   R E Y E S ,  a witness called by and on

6   behalf of the People, having first been duly sworn,

7   testifies as follows:

8          THE COURT CLERK: Please be seated.  Get

9      yourself comfortable.  Watch the chair.  It's on

10     wheels.

11         Keep your voice up. State your name and

12     spell your name for the record.

13         THE WITNESS: Ashley Reyes, A-s-h-l-e-y

14     R-e-y-e-s.

15         THE COURT:  Mr. Mottola when you are

16     ready.

17         Keep your voice up so they can hear you in

18     the empty back row.

19  DIRECT EXAMINATION BY

20  MR. MOTTOLA:

21     Q    Good afternoon, Ms. Reyes.  How old are you?

22     A    27.

23     Q    Are you currently employed?

24     A    Yes, I am.

25     Q    I want to direct your attention to August 11,

A. Reyes - People - direct

 1    2015.

 2          A     Okay.

 3          Q     Were you employed on that date?

 4          A     Yes, I was.

 5          Q     What was your job that day?

 6          A     I was an independent contractor.

 7          Q     For which company?

 8          A     For Verizon.

 9          Q     So I want to direct your attention to

10    approximately ten after 1:00 in the afternoon on August 11,

11    2015.

12                Where were you at that time?

13          A     I was on the street in front of -- in between

14    Soul Cycle and a candy store called Sugar.

15          Q     When you say you were on the street, do you

16    know the name of the street you were on?

17          A     It was Court Street.

18          Q     Is that here in Brooklyn?

19          A     Yes.

20          Q     Were you with anyone else?

21          A     I was with a co-worker at the time and another

22    person I was speaking to on the street, but that I did not

23    know.

24          Q     When you say you were on the street, were you

25    on the street or on the sidewalk?

A. Reyes - People - direct

1       A     On the sidewalk in between those two stores.

2                 MR. MOTTOLA: Officer, if I can have what's

3       in evidence, People's 3, 4, 5, 6 those photos.

4       Q     Ms. Reyes, next to you there is a laser

5       pointer.  I am going to publish -- this is People's 5.

6                 THE COURT:  Hold it in your hand and press

7       the red button and you can see the dot.

8                 This is which photo?

9                 MR. MOTTOLA: People's 5.  Officer, if you

10      can hit the light, please.  Thank you.

11      Q     Ms. Reyes, looking at this street here, if

12      possible, can you indicate where you were standing on the

13      street with the laser pointer?

14      A     So I was behind this police truck here in this

15      area.

16      Q     So indicating it's the third doorway from the

17      bigger gray building on the right?

18      A     Yes, not too far from the Department of

19      Education on the corner.

20      Q     At that time, what type of location was that?

21      A     At the time, it was -- it wasn't a business yet

22      there was construction there.  So the nearest store that I

23      was next to was the Soul Cycle.

24      Q     If you can again just please indicate?

25      A     Right here. (Indicating.)

A. **Reyes** - People - direct

1       Q      So you are standing in this location.  Are you
2    in front of the doorway?

3       A      About five feet from it.

4       Q      So were you closer to the street?

5              MS. BURKE:  Objection, Your Honor.

6              THE COURT:  Overruled.  When you hear
7       someone say objection, you have to wait until I say
8       you can answer.

9       A      So I was not directly by the door, but not by
10   the street.  So in between.

11             MR. MOTTOLA:  You can put the lights on,
12      Officer.  Thank you.

13      Q      So while you were standing at that location,
14   what, if anything, happened?

15      A      Sorry say again.

16      Q      What, if anything, happened while you were
17   standing where you indicated?

18      A      You mean like what happened or what if
19   anything?

20      Q      You were working, right?

21      A      Yeah, exactly.  I was working.

22      Q      Who were you working with?

23      A      My co-worker.  And like I said, I was having a
24   friendly conversation with a potential client on the
25   street.

A. Reyes - People - direct

1        Q        While you are having that conversation.

2        A        While I was having that conversation, I noticed

3    that two people were running towards me and it caught my

4    reaction to what was happening.

5        Q        The two people that were running towards you,

6    which direction were they coming from?

7        A        From my left hand side.

8        Q        So can you use the photo?

9        A        So if my back was towards here, towards this

10   door directly, it was my left hand side, meaning coming

11   from -- towards the location of the Department of Education

12   on the corner.

13       Q        Indicating again the same location you pointed

14   to earlier.  That's where you were standing and the two men

15   came from?

16       A        From this direction, correct.

17       Q        Were you facing the street at this time?

18       A        Yes, I was.

19       Q        And what, if anything, did you notice about

20   these two men?

21       A        Prior to the incident happening, they were just

22   yelling on the street.

23       Q        Could you tell which of these two men were

24   doing the yelling?

25       A        Yes, the gentleman in the green shirt was

1    yelling.

2         Q    Could you describe these two men, what they
3    looked like?

4         A    Yes.  The one gentleman was wearing a green
5    shirt and the other gentleman was like professionally
6    dressed, vest and button up outfit with a hat on.

7         Q    To the best of your ability could you describe
8    what you believe to be the race of these two men?

9         A    The gentleman in the green shirt was Caucasian
10   and the gentleman in the button up suit was African
11   American.

12        Q    What did you observe these two men doing after
13   you heard the yelling?

14        A    After the yelling, they seemed to be down the
15   street towards the Department of Education which is when I
16   noticed them coming towards me again.  So when I noticed
17   the commotion, I immediately tried to move myself out of
18   the way.

19        Q    When you first noticed this commotion, how
20   close were you to these two men?

21        A    Definitely within walking distance, maybe 15
22   feet or so.

23        Q    Was there anything on the street that was
24   blocking your view of the two men?

25        A    No.

A. Reyes - People - direct

1      Q      What happened after that?

2      A      It was when I noticed that two people were

3  running towards me that I decided to move slightly out of

4  the way in front of the store that was with the

5  construction.  I then noticed that the one gentleman was

6  chasing the other gentleman and there was a knife in his

7  hand.  That's when the one person fell into the

8  construction site of the store.

9             At that point the other gentleman was already

10  stabbing him at that point and you could see there was

11  blood coming out.

12      Q      Which gentleman was chasing which other

13  gentleman?

14      A      So it was the gentleman in the suit and --

15  chasing the person in the green shirt.

16      Q      So the record is clear the race of the person

17  who was chasing?

18      A      African American chasing the Caucasian man.

19      Q      How close did they get to you?

20      A      At that point they were about five feet from

21  me.

22      Q      Was there anything blocking your view of these

23  two men?

24      A      No.

25      Q      At which point did you see this knife that you

A. Reyes - People - direct

1    mentioned?

2         A    When they were directly next to me.

3         Q    Did you notice anything about the man in green

4    about his physical condition at that point?

5         A    He seemed to be homeless.

6              MS. BURKE:  Objection, Your Honor.

7              THE COURT:  Sustained.

8         Q    I will narrow it.

9              Did you notice any injuries or anything like

10   that?

11        A    Prior?

12        Q    When they were within five feet of you?

13        A    Yes.

14        Q    What type of injuries did you observe?

15        A    A head injury and body injury.  You could see

16   there was blood.

17        Q    When you say body injury, where was the body

18   injury?

19        A    It looked like it was somewhere around the

20   chest area.

21        Q    The man in the green shirt -- withdrawn.

22             You testified someone fell into the construction

23   area.  Could you elaborate on that?

24        A    Because there was an open door and the

25   gentleman in the green shirt was running away, he ran into

A. Reyes - People - direct

1     this door and he fell into the door where the construction

2     site was. So he was running away from the situation.

3          Q     So after the man in the green shirt ran inside,

4     how close was he to you?

5          A     At that point maybe ten feet because now he was

6     inside.

7          Q     Could you see inside this construction site?

8          A     Not from where I was.

9          Q     Could you tell if there were other people

10    inside the construction site?

11         A     Yes.

12         Q     What did you observe next?

13         A     At that time, after he fell into the open door

14    with the store, that was the gentleman in the green.  The

15    other gentleman in the suit had gotten up and ran away.  At

16    that point, the construction men had come out directly

17    after the guy had fell in the green shirt to see what was

18    going on.

19                    MS. BURKE:  Objection.

20                    THE COURT:  Sustained.

21         Q     We are going to break it down.  Okay?

22         A     Uh-huh.

23         Q     The man in the green shirt goes into the

24    construction site.

25         A     Yes.

A. Reyes - People - direct

1      Q      What happens immediately after that?

2      A      The gentleman in the suit came out and ran

3   away.

4      Q      Did you see, prior to that, did you see the

5   African American gentleman do anything with the knife?

6                MS. BURKE:  Objection.  Asked and

7        answered.

8                THE COURT:  Overruled.

9      A      Nothing other than using the knife to stab the

10  gentleman in the green.

11     Q      How many times did you see the man with the

12  knife stab the man in the green?

13     A      Three.

14     Q      Do you recall where the man in the green was

15  stabbed?

16     A      Yes.

17     Q      Where?

18     A      In the head and chest.

19     Q      Do you recall at any time seeing the man in the

20  green holding any kind of weapon?

21     A      No.

22                MS. BURKE:  Objection.

23                THE COURT:  Overruled.

24     Q      Do you recall the man in the green holding any

25  object like a brick or rock?

A. Reyes - People - direct

1      A      No.

2      Q      Do you recall the man in the green at any time

3  striking the man with the knife to your memory?

4      A      No.

5      Q      Which direction did the man with the knife run?

6      A      Towards my left which was towards, again, the

7  direction of Department of Ed.

8      Q      Where were you standing when he came out of the

9  construction site?

10      A      Still on the same place on the street in

11  between the street in front of that store.

12      Q      What did the man with the knife do when he came

13  out of the construction site?

14      A      He just ran towards the direction away from

15  where I was.

16      Q      Did you see what happened to the man in green

17  after that?

18      A      He got up and tried to find help at that time.

19      Q      By saying he tried to find help, what, if

20  anything, did he observe?

21      A      He was just yelling because he was just kind of

22  holding where he had gotten injured.  And was just trying

23  to run in that same direction to see if he could find

24  someone to help him.

25              MS. BURKE:  Objection.

A. Reyes - People - cross/Ms. Burke

1        THE COURT:  Sustained, jury.  That last

2    comment is stricken and the jury is instructed to

3    disregard it.

4        Q    Did you actually see the man in green walk in

5    any direction?

6        A    Yes.

7             MS. BURKE:  Objection.

8             THE COURT:  Overruled.

9        Q    In which direction did that man go?

10       A    The same direction which was to the left of me.

11       Q    Did you have any other interaction with either

12   of those two men after that incident?

13       A    No.

14       Q    Did you know either of those two men prior to

15   that day?

16       A    No.

17            MR. MOTTOLA:  Thank you, Ms. Reyes.  I

18       have no further questions.

19            THE COURT:  Ms. Burke?

20   CROSS-EXAMINATION BY

21   MS. BURKE:

22       Q    You testified there was a bunch of yelling

23   prior to you seeing the encounter between the two men; is

24   that correct?

25       A    Yes.

1        Q    Did you hear what was being said?

2        A    No, I did not.

3        Q    Do you know who was yelling?

4        A    Yes, I do.

5        Q    Who was yelling?

6        A    The gentleman in the green shirt.

7        Q    Do you know if he was yelling at the

8    professionally dressed gentleman?

9        A    No.

10       Q    But you didn't hear what he was yelling?

11       A    No.

12       Q    And how close to you were they when you first

13   heard the man in the green shirt yelling?

14       A    I would say maybe eight to ten feet.

15       Q    When you heard the yelling, were you focused

16   only on what was happening between the two men?

17       A    No, I was also focused on speaking to the

18   person in front of me.

19       Q    You say that the black man had a knife and you

20   saw him stab the man in the green shirt three times?

21       A    Correct.

22       Q    Did you see if the man in the green shirt had

23   anything at all in his hand?

24       A    No, he only had clothing on himself.  It was

25   just only -- he had nothing in his hands.

1      Q      Nothing at all?

2      A      Nothing.

3      Q      You said they fell into a construction site at

4    a store, that's correct?

5      A      Yes.

6      Q      How long were they in there?

7      A      Ten, 15 seconds.

8      Q      When you saw the black man with the knife, did

9    you run?

10     A      No.

11     Q      Did you call 911?

12     A      No.

13     Q      Did you scream?

14     A      No.

15     Q      After the black man came out of the store, you

16   say he ran toward 65 Court Street, correct?

17     A      Yes, from what I know, that's from my

18   knowledge, that's the direction of Department of Education,

19   as a landmark.

20     Q      And the man in the green shirt went after him,

21   correct?

22     A      Correct.

23     Q      He was running as well?

24     A      No.

25     Q      Not running at all?

A. Reyes - People - cross/Ms. Burke

1      A      No --

2      Q      Yes or no?

3      A      No.

4      Q      So, when the man in the green shirt emerged

5    from the store, did you hear him say anything?

6      A      No.

7      Q      Was he yelling?

8      A      Yes.

9      Q      But you didn't hear what he said?

10     A      No.

11     Q      You said you were about --

12     A      Five feet from him.

13     Q      Five feet away, but you didn't hear what he

14   said?

15     A      It wasn't anything specific.  It was just

16   groans of pain.

17                 MS. BURKE:  Objection, Your Honor?

18                 THE COURT:  Sustained.

19                 MS. BURKE:  Move to strike.

20                 THE COURT:  Jury is to disregard that.

21   Ms. Reyes, you can only testify what you saw, you

22   heard.  You cannot say what you think somebody else

23   was doing or feeling, et cetera.  Okay?

24                 THE WITNESS:  Sure.

25     Q      The man in the green shirt, you say he walked

A. Reyes - People - cross/Ms. Burke

1  up Court Street?

2       A     Yes.

3       Q     Did you see him stop at all?

4       A     No.

5       Q     He just continued to walk up Court Street?

6       A     Yes.

7       Q     When did you lose sight of him?

8       A     Just as soon as he was out of my sight, I

9  didn't see him again.

10      Q     When did you lose sight of him?

11      A     After I guess the building.  You can't see

12  around the building.  So, I lost sight of him as soon as he

13  reached the corner of that street.

14      Q     Did he stop at the corner?

15      A     I think.  Let me see, he did not stop at the

16  corner.

17      Q     He continued to go?

18      A     Yes.

19            MS. BURKE:  Nothing further.  One moment

20       Your Honor.

21            (Pause.)

22            MS. BURKE:  Nothing further.

23            THE COURT:  Any redirect?

24            MR. MOTTOLA:  No, Your Honor.

25            THE COURT:  Ms. Reyes, you may step down.

124

A. Reyes - People - cross/Ms. Burke

1        Thank you very much.

2                    MR. MOTTOLA:  Can we approach?

3                    THE COURT:  Come on up.

4                    (Whereupon, there is a discussion held off

5        the record at the bench between the assistants

6        district attorney, defense counsels and the Court.)

7                    THE COURT:  All right, ladies and

8        gentlemen, we are going to take a five minute or so

9        recess, let you stretch your legs, use the facilities

10       if you need to.  All of us can do that.

11                   Please don't discuss the case among

12       yourselves.  See you back in just a little bit.

13       Thank you very much.

14                   (Jury exits courtroom.)

15                   (Recess taken.)

16                   (Jury enters courtroom.)

17                   THE COURT CLERK:  Jury panel is present

18       and properly seated. Both sides waive the jury roll

19       call?

20                   MR. MOTTOLA:  So waived.

21                   MS. BURKE:  So waived.

22                   THE COURT:  Mr. Mottola?

23                   MR. MOTTOLA:  People call Kevin Haynes.

24                   THE COURT OFFICER:  Witness entering.

25                   (Witness enters courtroom.)

K. Haynes - People - direct

1          THE COURT CLERK:  Face me.  Raise your

2      right hand.

3  K E V I N   H A Y N E S , a witness called by and on

4  behalf of the People, having first been duly sworn,

5  testifies as follows:

6          THE COURT CLERK:  Please be seated.  Watch

7      that chair.  It's on wheels.

8          State your name for the record and spell

9      your name.

10          THE WITNESS: K-e-v-i-n,  H-a-y-n-e-s.

11  DIRECT EXAMINATION BY

12  MR. MOTTOLA:

13      Q    Good afternoon, Mr. Haynes.

14      A    Good afternoon.

15      Q    By whom are you currently employed?

16      A    Police Department, New York City Police

17  Department.

18      Q    How long have you been a member of NYPD?

19      A    21 years.

20      Q    In what capacity do you work for NYPD?

21      A    Tape and records technician.

22      Q    Are you a police officer?

23      A    No, I am not.

24      Q    What is your official command?

25      A    Communications Division and that division we

K. Haynes - People - direct

1    create tapes and audio for the department.

2         Q    How long have you worked in the communication

3    division of the NYPD?

4         A    21 years.

5         Q    What is your job description now?  What do you

6    do?

7         A    Okay, subpoenas come in, you know, basic to my

8    department.  And we have to create audio for transmission

9    from 911 calls and transmission that, you know, units have

10   with the dispatchers for different agencies on a regular

11   basis.  That would be my duty at this time.

12        Q    Are all 911 calls in the City of New York

13   recorded by the NYPD?

14        A    Yes.

15        Q    Do you know how they are recorded?

16        A    It's through a digital wave file.

17        Q    Did your office receive a subpoena from my

18   office, the Kings County District Attorney's Office,

19   regarding a 911 call that was made some time in the

20   afternoon of August 11, 2015 in relation to an incident

21   near Court Street and Livingston Street?

22        A    Yes, that is correct.

23        Q    Pursuant to that request, was a search made by

24   someone in your office?

25        A    Yes.

K. Haynes - People - direct

1        Q        Did that person pursuant to that subpoena make

2   and prepare a tape from that search from the master tape?

3        A        Yes.

4                  MR. MOTTOLA:  Your Honor, I would ask the

5            witness be shown this disk and it be marked People's

6            11 for identification.

7                  THE COURT:  Okay.

8        Q        Mr. Haynes, look at that disk.  Do you

9   recognize that disk?

10       A        Yes.

11       Q        How do you recognize it?

12       A        Because a little while ago, I listened to it

13  and I signed it.  So I am very aware of that tape.

14       Q        Now, was the recording on that tape, was it

15  made from the New York City Police Department, the master

16  tape?

17       A        That is correct, yes.

18       Q        And does that CD contain the entirety of one

19  specific 911 call which was made regarding Court and

20  Livingston Street approximately 1:00 p.m. on August 11,

21  2015?

22       A        That is correct, yes.

23       Q        Was People's 11 for identification, that disk,

24  was it prepared in the ordinary course of business of the

25  communication division of the NYPD?

1          A      Yes.

2          Q      Is it in the regular course of business of the

3    NYPD to keep, maintain and produce the master tape?

4          A      Yes.

5          Q      And is it also the regular course of business

6    of the NYPD to keep, maintain and produce duplicate tapes?

7          A      Yes, that's by request for subpoenas.

8          Q      Are you, in your official capacity, are you a

9    custodian of the master tape?

10         A      That is correct, because the master tape is

11   basically kept by the police department.  So that is

12   correct.

13         Q      The recording that's on Number 11 for

14   identification, the copy, is that an exact copy of that

15   specific 911 call from the master tape?

16         A      Yes, yes, it is.

17                MR. MOTTOLA:  I would ask what was marked

18         People's 11 for identification be entered and

19         received as People's 11 in evidence.

20                MR. WITTWER:  I am objecting based on it

21         violates my client's Sixth Amendment right to

22         confront witnesses against him.

23                THE COURT:  That objection is overruled.

24         It will be marked People's 11 in evidence.

25                THE COURT OFFICER:  So marked.

K. Haynes - People - cross/Mr. Wittwer

1        MR. MOTTOLA:  I will play it.

2            (Recording played.)

3        MR. MOTTOLA:  Thank you, Mr. Haynes.  I

4    have no further questions.

5            THE COURT:  Cross?

6   CROSS-EXAMINATION BY

7   MR. WITTWER:

8        Q     Good afternoon, Mr. Haynes.

9        A     Good afternoon, sir.

10       Q     In your employment at the NYPD, you're trained

11  in protocols that 911 operators use when they receive calls

12  to 911 correct?

13       A     Yes.

14       Q     And you are familiar with the sorts of

15  information the 911 operator attempts to elicit from a

16  caller in the course of their duties in taking and

17  recording the call?

18       A     That is correct.

19       Q     One of the things that a 911 operator attempts

20  to do when they receive a call is determine the identity of

21  the person who is calling, correct?

22       A     What do you mean?

23           MR. MOTTOLA:  Objection.

24           THE COURT:  Are you or are you not

25      objecting?

1              MR. MOTTOLA:  I am.

2              THE COURT:  I can't hear you when you are

3         sitting.

4              MR. MOTTOLA:  Sorry.  Objection.

5              THE COURT:  Sustained.

6         Q    It's important when you receive a 911 call to

7    know the identity of the caller?

8         A    Why is that?

9         Q    I am asking questions for you to answer.  So if

10   you can answer.

11        A    The whole reason when you receive a 911 call,

12   the whole significance of taking information from the

13   caller, you are trying to get the most pertinent

14   information from the caller so they can receive help as

15   soon as possible.

16              THE COURT:  I will ask you to respond to

17         counsel's questions and then if the DA has questions

18         he wants to ask after, he will do that.

19              MR. WITTWER: Thank you, Your Honor.

20        Q    So Mr. Haynes pertinent information could

21   include, who are you, couldn't it?

22        A    What is your name?  I am trying to understand

23   what you are saying.  What do you mean?  What do you mean

24   when you are asking this question.

25        Q    Again, Mr. Haynes, I am going to ask you

131
K. Haynes - People - cross/Mr. Wittwer

1    questions.  You can answer them?

2         A     I am trying to answer them.  I am not

3    understanding per se how you are trying to come across to

4    me.  That's why I am asking you that.

5         Q     When a person calls 911 --

6         A     The first thing you ask --

7              THE COURT:  Mr. Haynes, please let counsel

8         finish his questions.

9              THE WITNESS: Not a problem.  I am trying

10        to answer.

11        Q     I am going to ask a question and pause and give

12   you an opportunity to answer?

13        A     Not a problem.

14        Q     When a person calls 911, the dispatcher

15   attempts to obtain the identity of that person don't they?

16        A     Okay.  For starters, the dispatcher does not

17   answer the phone, 911 operator answers the phone.

18   Dispatchers communicate with police officers.  Let me

19   explain that to you.

20        Q     I am not asking you that, but I will rephrase

21   my question.  Thank you.

22             When a person calls 911, the operator who

23   answers the phone --

24        A     Exactly.

25        Q     -- should attempt to identify who is calling,

1   correct?

2       A       When the first time the 911 operator receives a

3   call, the first thing they are trying to identify is where

4   is the emergency along the line.

5       Q       Respectfully, I am not asking about the

6   priority which information is obtained.  I am asking about

7   whether a 911 operator should at some point find out --

8       A       At some particular time that can be asked, but

9   that's not -- that really isn't important quite honestly.

10      Q       So it's your professional opinion that when

11  someone calls 911 it is not important to find out who that

12  person is?

13      A       That's not what I am saying.  What I am saying

14  to you the most important thing --

15              THE COURT:  Mr. Haynes just a moment,

16          please.  Approach, Counsel.

17              (Whereupon, there is a discussion held off

18          the record at the bench between the assistants

19          district attorney, defense counsels and the Court.)

20      Q       Mr. Haynes, if a person calls 911, the operator

21  attempts to locate and then send assistance to their

22  location, correct?

23      A       Yeah, that's correct.

24      Q       And it's important to know who that person is

25  and why they are calling correct?

Proceedings

1        MR. MOTTOLA:  Objection.

2        THE COURT:  Sustained.

3        MR. WITTWER:  Nothing further.

4        MR. MOTTOLA:  No redirect.

5        THE COURT:  Mr. Haynes, thank you very

6    much.  You may step down.

7        MR. MOTTOLA:  Can I approach?

8        THE COURT:  Sure.  Come up, counsel.

9        (Whereupon, there is a discussion held off

10   the record at the bench between the assistants

11   district attorney, defense counsels and the Court.)

12        THE COURT:  All right, ladies and

13   gentlemen.  Thank you for your patience.  I have

14   another matter that I need to attend to where the

15   attorneys are coming in a little bit later.

16        As I indicated, I am not going to have you

17   sit around and wait while I address the other cases.

18   So I will send you on your way for tonight.  I will

19   ask you to be back tomorrow morning, 9:30 sharp in

20   the jury room to continue.  I will remind you there

21   were some prospective jurors who asked about having

22   Friday afternoon off.  I don't recall if any of you

23   were asking that question, but I did represent that

24   we would work half a day tomorrow and to the extent

25   that everyone has relied on that statement that I

Proceedings

1    made the other day, I will honor that.  So we will

2    work half a day tomorrow until one o'clock, and

3    adjourn for further proceedings Monday.

4              Bring tea.  I heard it's going to be

5    colder tomorrow than today.  In the interim, don't

6    discuss the case, no independent research, nothing at

7    all about the case.

8              Thank you so much for your continued

9    patience and your attention.  I will see you tomorrow

10   morning.  Thank you very much.

11             (Jury exits courtroom.)

12             THE COURT:  So people had asked for an

13   opportunity to make a decision about resting tomorrow

14   morning, et cetera.

15             MR. MOTTOLA:  Yes.

16             THE COURT:  Then we will have further

17   proceedings depending what happens.  Again, working

18   half a day tomorrow and then depending upon whether

19   you are calling witnesses how long those witnesses

20   take, et cetera, we will work out scheduling for

21   summations and the precharge conference.

22             MS. BURKE:  For clarification, the medical

23   records have been stipulated to and a video have been

24   stipulated to.  We can use them at any time during

25   our case in chief?  I want to make sure.

Proceedings

1      MR. MOTTOLA:  Regarding the medical

2   records, the Court I think gave some clarity no one

3   is going to read from them.

4      THE COURT:  What do you mean no one is

5   going to read from them?

6      MR. MOTTOLA:  The medical records are in

7   evidence.  I was under the impression the witnesses

8   weren't going to testify from them.

9      If Ms. Burke intends to point things out

10   in summation that's --

11      THE COURT:  I don't know what the

12   witnesses are going to be asked, et cetera.  I am

13   assuming we are talking about perhaps the EMT.  I

14   don't know what is going to be asked of whom.  I will

15   have to rule on it.  I think the only question that

16   came up informally was whether at a minimum civilian

17   witnesses, whether eyewitnesses were going to be

18   asked about whether, what they observed was

19   consistent with what was in the medical records and

20   we sort of cleared up that wasn't going to happen.

21      Beyond that, I don't believe I made any

22   specific ruling, any kind of blanket ruling certainly

23   and depending what is asked whom when, you know --

24      MS. BURKE:  The specific question is

25   because they are in evidence, Counsel can read from

**Proceedings**

1       the minutes at any time to the jury.

2                   THE COURT:   Yeah.

3                   Bail is continued.  Thank you very much.

4       See you 9:30 tomorrow.

5                   (Trial adjourned to December 16, 2016.)

6

7       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

8       This is to certify that the foregoing is a true and

9       accurate transcript of the stenographic minutes taken

10      within.

11

12

13

14      _____

15          MICHELE DENEZZA, RPR

16          Senior Court Reporter

17

18

19

20

21

22

23

24

25