1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS - CRIMINAL TERM - PART 33
2   ------------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
3
                                    Plaintiff,
4           -against-

5   LORENZO MCGRIFF,
                                    Defendant.
6   ------------------------------------------------X
    Indictment # 6248/15            TRIAL
7
                                320 Jay Street
8                               Brooklyn, New York 11201

9                               December 16, 2016

10  B E F O R E:

11              HONORABLE MIRIAM CYRULNIK,
                        Justice, and jury.
12
    A P P E A R A N C E S:
13

14          OFFICE OF ERIC GONZALEZ, ESQ.
            ACTING DISTRICT ATTORNEY - KINGS COUNTY
15              350 Jay Street
                Brooklyn, New York 11201
16          BY: LAWRENCE MOTTOLA, ESQ.
                STEPHANIE D'AGOSTINO, ESQ.
17              Assistant District Attorneys
                For the People
18

19          BROOKLYN DEFENDER SERVICES
                177 Livingston Street
20              Brooklyn, New York 11201
            BY: JAMIE BURKE, ESQ.
21              BEN WITTWER, ESQ.
                For the Defendant
22

23

24
                    VANESSA DEL VALLE
25                  Senior Court Reporter


                    VdV

1          THE CLERK:  Calling number six from the Part

2     33 calendar, indictment 6248 of 2015, Lorenzo McGriff,

3     the case continued on trial.  The parties are present

4     but the jury is not present in the courtroom.

5          THE COURT:  Good morning.

6          MR. WITTWER:  Good morning.

7          MS. BURKE:  Good morning, Your Honor.

8          THE COURT:  All appearances as previously

9     noted.

10          Okay.  When we left yesterday I think the

11     People were going to evaluate whether they were going

12     to be resting.  I assume you are.

13          MR. MOTTOLA:  Yes, I am.

14          THE COURT:  All right.  Since we have some

15     time, I am not sure how many jurors are here just as of

16     now, let's address the issue we started to address

17     yesterday afternoon.

18          MR. WITTWER:  Sure.

19          THE COURT:  Which was the, I guess --

20          MS. BURKE:  Medical records.

21          THE COURT:  Yes.  The proposed use of the

22     medical records.

23          Let me just, Mr. Wittwer, or Miss Burke, if

24     you could start us off by putting on the record what

25     you would like to do with them or what you would like

139

1 to use them for it's, that would be helpful.

2  MR. WITTWER:  Thank you, Your Honor.

3  What we are proposing to do is open our case

4 in chief by reading several excerpts from the medical

5 records, with no witness on the stand, which are

6 already in evidence.

7  I have timed this and it will take

8 approximately two minutes and 20 seconds.

9  THE COURT:  Well the time is irrelevant.  The

10 length of time is irrelevant.

11  MR. WITTWER:  Just so the Court knows it

12 won't take a substantial amount of time, judicial

13 economy purposes.  I would put each page on the

14 prompter as I read to ensure the reading was accurate.

15 That I wasn't redacting any information, omitting any

16 words.

17  It's well settled that a certified business

18 record, once it's marked as an evidence and offered in

19 evidence, can be shown or read to the jury at any time.

20 There is no requirement that a witness be on the stand.

21 There is no requirement that it occur within summation.

22  The People were allowed to put their case in

23 chief on in any way that they chose and, in fact, they

24 moved these records into evidence outside the presence

25 of the jury, so the jury's not even aware that these

LORENZO MCGRIFF - TRIAL

140

1    records are in evidence.  If we are not allowed to

2    proceed in this way, they won't be aware of that fact

3    until summation, you know, which is generally seen as

4    argument and not evidence.

5            THE COURT:  Well they haven't been, they

6    haven't rested yet.  In theory that could be resolved

7    and should be resolved by the assistant making an

8    appropriate record.

9            Go ahead.

10            MR. WITTWER:  That's true, Your Honor.

11            THE COURT:  Okay.

12            MR. WITTWER:  Nonetheless, we've discussed

13    our strategy in terms of, you know, putting on the best

14    possible defense for our client, ensuring he has access

15    to a fair trial.  We would like to open our case by

16    referring briefly again for a couple of minutes to

17    information that is in evidence, that has not been

18    heard by the jury.

19            I would be willing to preview the entirety of

20    what I am going to say so the Court knows exactly, you

21    know, that I am going to sign most promptly this is

22    People's Exhibit A, previously moved into evidence,

23    page three, paragraph so on, so forth.  And that's what

24    we intend to do.

25            I think if the People are objecting, it's

1    incumbent on them to have a basis why we can't do it.

2    I can't believe such a basis exists.  This is

3    colloquial --

4           THE COURT:  This is what?

5           MR. WITTWER:  Colloquial.

6           Two months ago in October I did a jury trial

7    where the People read the medical records to the jury

8    with no witness.  There was no issue at that time.

9           THE COURT:  Well.

10          MR. WITTWER:  I am just saying --

11          THE COURT:  I am not interested in People

12    versus other Judges do it.

13          MR. WITTWER:  Sure.

14          THE COURT:  Or People versus we should be

15    entitled to.  There is either authority for it or there

16    isn't.

17          MR. WITTWER:  Well I think the authority for

18    it is simply the fact it's in evidence, and it should

19    be shown or read to the jury.  I don't think there is

20    any authority to suggest that there is a limitation in

21    our ability to reference.

22          THE COURT:  Do you have a case that, do you

23    have some appellate case that --

24          MR. WITTWER:  Again, Your Honor, I don't

25    think this has been addressed.  I don't think it's a

1    controversial thing.  I did read several treatises.

2              THE COURT:  What's the name of the treatise

3    you are reading from?

4              MR. WITTWER:  Now is trial techniques by

5    Thomas A. Mauet.  His case, I will quote it now --

6              THE COURT:  Is that the case that it cites

7    civil practice?  Civil trials?

8              MS. BURKE:  I don't know that -- sorry, Jamie

9    Burke.  I don't believe that there is a distinction,

10   Your Honor.

11             THE COURT:  Mmm-hmm.

12             MS. BURKE:  It does not say there is a

13   distinction.

14             MR. WITTWER:  It indicates the section I am

15   reading from is the business records section.  It

16   indicates, once moved into evidence and labeled with an

17   exhibit, they can be read from to the jury.

18             THE COURT:  Okay.

19             MS. BURKE:  It does cite to federal rules as

20   part of the beginning of that chapter.

21             THE COURT:  Well we -- okay.  Go ahead.  I am

22   sorry.

23             MS. BURKE:  But it doesn't state that it's

24   impermissible to do it in state court.

25             THE COURT:  Now let me ask you a question,

1    Mr. Wittwer.

2            MR. WITTWER:  Yes.

3            THE COURT:  Then I will hear from the People.

4            Actually you know what, let me hear from the

5    People first.

6            MR. MOTTOLA:  Judge, I will defer to your

7    judgment and your ruling in this.  Either way, I want

8    to be clear ahead of time so I know what I can do with

9    the medical records.

10           If the defendant does testify and there's

11   relevant testimony about the number of stab wounds or

12   something like that, if I could put the medical records

13   which are in evidence in the overhead and read from

14   them to confront the witness just about stuff like

15   that.  Nothing else.  I wouldn't ask to read from them,

16   but if the Court permits it, I would not be foreclosed

17   from doing that.

18           MR. WITTWER:  I would just note, Your Honor,

19   of course it would be reciprocal.  Of course the People

20   would be permitted to do so, the same.

21           THE COURT:  Of course.  Listen, there is, to

22   me, a qualitative difference between using the records

23   that are in evidence to either cross examine to

24   impeach, to use them in that way.  But to, they are in

25   evidence already and they will be given to the jury.

1    When you sum up, you can read from them at

2    length, but then we get into a situation where when you

3    say, quote, there is no witness on the stand, you're

4    reading from these.  And yes, you say you are going to

5    put it on the prompter just, quote, to make sure that

6    there is no inaccuracies.  But then we get into a

7    situation where we have things outside the record; your

8    intonation in the way you are reading them.

9         Again, it's your reading of them in that

10   sense is not evidence.  They are in evidence, can be

11   looked at.  And on summation you can argue them.  You

12   can read from them until the cows come home.

13        MR. WITTWER:  Right.

14        THE COURT:  And reading from them there, in

15   whatever way you, whatever use you choose to make of

16   them is argument.  That's the evidence.  Not through

17   reading them.

18        MR. WITTWER:  I think the point about the

19   intonation is something that the People could object if

20   the intonation was inappropriate --

21        MS. BURKE:  Or Your Honor --

22        THE COURT:  Listen.  This was asked to

23   clarify beforehand.  So, these are all issues that are

24   of concern.

25        MS. BURKE:  Well, Your Honor, if the Court is

LORENZO MCGRIFF - TRIAL

145

1    concerned about the intonation or the way the words are

2    said, the court reporter could always read the record

3    if they're in evidence.

4            THE COURT:  That's what -- listen.  That's

5    what happens in the course of readback.  That's why

6    there is case law that says the Judge should not

7    participate in readback.  For the very same reason that

8    it should be just that person.

9            I don't think it is -- as I said, they are in

10   evidence.  You can use them to impeach, you can,

11   etcetera, as you choose.  And on argument, on summation

12   you can argue anything and everything that you need to

13   about it.

14           MS. BURKE:  Your Honor, if I may, if the

15   Court is denying our application to read the excerpts

16   from the medical records prior to any witness getting

17   on the stand, and the Court has denied us the

18   opportunity to cross examine witnesses in reference to

19   what's in the medical records and what they observed on

20   that day, and of course Mr. McGriff can testify to what

21   happened on that day, but not what happened in the

22   hospital or in the ambulance.  It effectively is

23   precluding us from putting in any evidence about the

24   missing witness that isn't here, because the only

25   evidence that we have about this particular witness is

1    going to be Mr. McGriff's testimony.

2              THE COURT:  Right.

3              MS. BURKE:  And the other people that were

4    able to observe him are the medical staff and

5    personnel.  The three witnesses that were put on,

6    eyewitnesses that were put on by the People basically

7    said we saw this encounter.  We don't know what

8    happened.  We don't know this person's character.  We

9    don't know what was going on.

10             THE COURT:  Okay.

11             MS. BURKE:  But the medical records

12   absolutely speak to what was happening.

13             THE COURT:  After.  After.  I mean this

14   when -- that yes, I said you could not.  Your request

15   at the time was to ask if you could ask civilian

16   eyewitnesses if the victim, the purported victim's

17   behavior was consistent with what's in the medical

18   records and I said no.

19             First of all, they would have no basis for

20   evaluating it.  They're not experts, they're not --

21   they were simply eyewitnesses to be cross examined,

22   etcetera.  So, it's frankly for the same reason that

23   your client could not testify about what happened in

24   the hospital.  He wasn't there.  He didn't see it.

25             Correct?

LORENZO MCGRIFF - TRIAL

147

1        MS. BURKE:  Yes.

2        THE COURT:  Okay.  So, as I said, the People

3    should put in front of the jury that there was an, a

4    stipulation agreeing to the admission of these medical

5    records, etcetera.

6        Your client, I'm sure, I don't know what he

7    is going to testify to, but I am assuming that there

8    will be evidence presented by him that relates to

9    Mr. Khalifa's behavior towards him, his continuing

10   behavior towards him, etcetera.  I don't want to

11   presume what it's going to be, but from the questions

12   that I heard, the openings, I assume that will be part

13   of it.

14       So, I don't, other than looking to, you know,

15   if you want to call a witness, I believe you subpoena

16   the EMT, but if you want, you know, if you want to

17   subpoena the doctor who wrote these to ask him about it

18   to do whatever is one thing.

19       But asking your client and just reading these

20   to the jury as part of your, you know, and not... we

21   come back to the same point that I said before.

22   They're already are in evidence.  And so you can use

23   them to argue on summation and use that in your

24   argument to support the testimony and to impeach the

25   testimony and to, you know, address the issues.

VdV

1          MR. WITTWER:  Your Honor, I would just point

2     out the medical records are voluminous.  There are

3     about 150 pages and the jurors aren't permitted to take

4     notes.  So, you know, to say in the summation on page

5     three it says this, on page 56 it says this, it would

6     be difficult for the jurors to go back and review that.

7          THE COURT:  Mr. Wittwer, you can, and it's

8     happened on many trials, make copies of those pages.

9     Highlight whatever you want.  Put them on the projector

10    while you are summing up.  Have an opportunity to have

11    them read along with you while you read it to them.

12         MR. WITTWER:  Yes, Your Honor.  That's true.

13         THE COURT:  Okay.

14         MR. WITTWER:  We would like to read from

15    business records which are in evidence during our case

16    in chief.  I believe it's, this is permissible.  I

17    believe that not allowing us to do so implicates

18    Mr. McGriff's constitutional right to due process and a

19    fair trial.  I want to make that record.

20         THE COURT:  Okay.

21         MR. WITTWER:  I don't believe any reason that

22    this would not be allowed has been cited other than the

23    potential intonation issue, which I think is something

24    that has to be raised only if that becomes an issue.

25         THE COURT:  Okay.  Thank you.  All right.

```
 1                    (Whereupon, there was a pause in the

 2          proceedings.)

 3                    THE COURT:  We have everybody here?

 4                    COURT OFFICER:  Everybody's here.  Yeah.

 5                    THE COURT:  Great.

 6                    COURT OFFICER:  You want them?

 7                    THE COURT:  Yes.

 8                    (Whereupon, there was a pause in the

 9          proceedings.)

10                    COURT OFFICER:  Ready for the jury, Your

11          Honor?

12                    THE COURT:  Yes.  Thank you.

13                    COURT OFFICER:  Jury entering.

14                    (Whereupon, the jury entered the courtroom.)

15                    THE CLERK:  Okay.  Good morning.

16                    The jury panel is present and properly

17          seated.

18                    Does each side waive the jury roll call?

19                    MR. MOTTOLA:  So waived.

20                    MS. BURKE:  So waived.

21                    THE CLERK:  Thank you.

22                    THE COURT:  Good morning, everyone.

23                    THE JURY:  Good morning.

24                    THE COURT:  All right.  I expect to see

25          little icicles dripping while you are sitting there.
```

1      In the meantime, make yourselves comfortable.

2                 Mr. Mottola.

3                 MR. MOTTOLA:  Yes, Your Honor.

4                 At this time the People do not have any

5      additional witnesses in this case.

6                 Just for the record, I would add that counsel

7      and I agreed outside of the presence of the jury to two

8      separate stipulations as to evidence.  The first being

9      People's 1 in evidence is a certified copy of medical

10     records for Mr. Mohammed Khalifa from Methodist

11     Hospital.  Date of admission was August 11, 2015.  And

12     his discharge date was August 12 of 2015.

13                In addition, there was a second stipulation

14     as to surveillance video recovered from 75 Livingston

15     Street from approximately between 1 and 1:15 p.m. here

16     on Court Street between Livingston and Joralemon

17     Street.  That's People's 2 in evidence.

18                With those two stipulations, Your Honor, the

19     People do rest at this time.

20                THE COURT:  Okay.  All right.  Thank you.

21                All right, ladies and gentlemen, the People

22     have rested.  I am going to send you back to the jury

23     room for just a few minutes so I can address an issue

24     of law with the lawyers.  Please don't speculate about

25     what that might be.

1              Don't discuss the case amongst yourselves,

2     and we will bring you back in a few minutes.  Thank

3     you.

4              COURT OFFICER:  Follow me.

5              (Whereupon, the jury left the courtroom.)

6              THE COURT:  Miss Burke, motions.

7              MS. BURKE:  Actually Mr. Wittwer's going to

8     make it.  He is going to contact our investigator to

9     see if we got the EMS person.

10              Can you just give me one second?

11              THE COURT:  Yes.

12              (Whereupon, there was a pause in the

13     proceedings.)

14              MR. WITTWER:  Okay, Your Honor.  So I

15     understand --

16              THE COURT:  People rested.  Yes.

17              MR. WITTWER:  They did.  Thank you.

18              So we are moving pursuant to CPL 290, sub 6,

19     10, for trial orders of dismissal first on the counts

20     of attempt assault one, Penal Law 110/120, subsection

21     10, subsection 1.  The People need to make out an

22     intent on Mr. McGriff's part to cause serious physical

23     injury to the complainant.  Which has been defined as

24     substantial risk of death, serious or protracted

25     disfigurement, protracted impairment of health or

1     protracted loss or impairment of the function of a

2     bodily organ.

3            The People, I think, concede that that did

4     not occur in this case. So the question is what

5     evidence can, was elicited in their case in chief that

6     would go towards an intent on Mr. McGriff's part, you

7     know, to attempt to commit that crime.

8            We have no statements from Mr. McGriff

9     whatsoever that have been testified to that would

10     suggest that that was his intention, which is one thing

11     that we would look for.

12            We have actions from Mr. McGriff both before

13     and after the stabbing that indicate an intention to

14     get away from the individual. And I think critically

15     there is no intervening factor that prevents him from

16     completing, essentially.

17            If the People are arguing that he was

18     attempting to cause serious physical injury, it begs

19     the question of why the injury wasn't caused. Police

20     didn't intervene. You know, some third party, he

21     wasn't repelled. He stabbed him a limited number of

22     times, somewhere between three and five. And then left

23     the situation.

24            We know that even after Mr. McGriff -- after

25     this act was committed Mr. McGriff had other

LORENZO MCGRIFF - TRIAL

153

1    opportunities to continue to try to cause injury to

2    Mr. Khalifa, because Mr. Khalifa followed him at least

3    for some period of time.  And we also know Mr. McGriff

4    had significant opportunities prior to cause injury to

5    Mr. Khalifa.

6              So, we have a situation where, you know,

7    intent means his conscious objective or purpose must

8    have been formed not just to stab Mr. Khalifa, not even

9    just to harm Mr. Khalifa, but to seriously injure him

10   as defined by statute.

11             Given that he was not injured in that way,

12   that Mr. McGriff did not say or do anything to suggest

13   that he intended to injury him in that way, and that

14   Mr. McGriff had the opportunity perhaps to injure him

15   in that way and did not do so, it would seem to me like

16   the People have not shown that Mr. McGriff's

17   objective --

18             THE COURT:  Let me interrupt you.

19             Are these potential witnesses?

20             MR. WITTWER:  No, Your Honor.  They're just

21   Brooklyn Defender staff.  Will not be testifying at

22   trial.

23             THE COURT:  Okay.  Sorry.

24             MR. WITTWER:  As I was saying, serious

25   physical injury was not caused.  There's been no

1    evidence Mr. McGriff's objective was to cause serious

2    physical injury.  And Mr. McGriff had the opportunity

3    on several occasions to cause serious physical injury

4    and did not do so.

5            And I think Your Honor even remarked, you

6    know, at the start of the case, you know, why are they

7    going forward on attempt if they can't make out the

8    serious physical injury?

9            I know that Mr. Mottola's argument will be

10   it's a stabbing, but there is no law to support the

11   idea that a stabbing in itself means that we have an

12   attempt assault one situation or serious physical

13   injury is being met.

14           As we can see from the facts of this case, it

15   is very possible to stab someone or stab them more than

16   once without causing that level of injury.

17           I think taking all of the testimony we heard,

18   there's an indication that Mr. McGriff intended to stab

19   Mr. Khalifa, but not an indication that he attempted to

20   injure him in a serious fashion.  And, in fact,

21   indications that he was, whether or not he was

22   justified in doing what he did, that his intention was

23   to get away from Mr. Khalifa.

24           I would also in terms of the other count,

25   Your Honor, Penal Law 120.05, assault two, I would just

1    argue that the People have not made out impairment of

2    physical condition or substantial pain.

3          The case I will point, People V. Chiddic, 29

4    AD3rd, 382, which is a 2007 Court of Appeals case.

5    Gives examples of the types of evidence that you would

6    elicit to show physical injury.  The victim's

7    subjective description of what he felt in terms of

8    pain, we don't have that because the victim didn't

9    testify.  An objective account of the injury about the

10   degree of pain the victim experienced.  I don't think

11   we have that either.  And that the victim sought

12   medical treatment.

13         Not sure he received it.  I believe the

14   evidence in this trial not that he sought medical

15   treatment at all.  In fact, he made no attempt to seek

16   it.

17         I would ask the Court to dismiss that count.

18         MR. MOTTOLA:  In regards to the attempted

19   assault in the first degree charge, Your Honor, I

20   believe the intent element is made out very clearly by

21   the testimony of the three civilian eyewitnesses, as

22   well as the video evidence which is before the jury.

23         Specifically I will direct the Court to the

24   last civilian who testified, Miss Reyes, she was across

25   the street after the initial two stabbings by the

1    defendant to Mr. Khalifa took place in the street.  Her

2    testimony clearly shows Mr. Khalifa fled and was being

3    chased by the defendant, who still had the knife, and

4    he proceeded to stab him three additional times, for a

5    total of at least five stab wounds.

6              That's also partially corroborated by the

7    medical records.  I would submit to the Court that

8    stabbing another human being five times in the head and

9    in the stomach, the intention is established by the

10   actions of the defendant, that he was trying to cause

11   serious physical injury, whether or not he succeeded.

12             The fact that he failed is the reason why we

13   dismissed the B felony and he is only facing a C felony

14   at this time.

15             Regarding the impairment of condition, that

16   injury for the assault two charge, all three civilian

17   witnesses plus the police officer observed stab wounds,

18   bleeding to Mr. Khalifa.

19             Officer Louard had the lengthiest contact

20   with the victim.  He found him on Dean Street and he

21   interacted with him for about a minute, he testified.

22   He observed stab wounds to his torso, to his arm, to

23   his face.  He described Mr. Khalifa as laboring,

24   bleeding heavily.  And he actually told him to get

25   down, and he was then placed in EMS.  That's the last

LORENZO MCGRIFF - TRIAL

157

1           Officer Louard saw of the victim.

2                   But I think his testimony very clearly

3           establishes physical injury, and the People

4           respectfully request the Court to allow the jury to be

5           the final determiner in this case.

6                   THE COURT:  All right.  Thank you.

7                   The defense motion for a trial order of

8           dismissal as to each count is denied.

9                   MS. BURKE:  The defense wishes to proceed,

10          Your Honor.

11                  THE COURT:  Okay.  Let's line them up.  Thank

12          you.

13                  (Whereupon, there was a pause in the

14          proceedings.)

15                  COURT OFFICER:  You ready for the panel, Your

16          Honor?

17                  MS. BURKE:  One second.

18                  (Whereupon, there was a pause in the

19          proceedings.)

20                  MS. BURKE:  Yes.

21                  THE COURT:  Yes?  Okay.

22                  COURT OFFICER:  Ready?

23                  THE COURT:  Yes.  Thank you.

24                  COURT OFFICER:  Jury entering.

25                  (Whereupon, the jury entered the courtroom.)

VdV

1           THE CLERK:  Okay.  The jury panel is once

2      again present and properly seated.

3           Does each side waive the jury roll call?

4           MS. BURKE:  So waived.

5           MR. MOTTOLA:  So waived.

6           THE COURT:  Thank you very much.

7           Miss Burke.

8           MS. BURKE:  Your Honor, at this time the

9      defense would call Lorenzo McGriff to the stand.

10          THE COURT:  Okay.

11          COURT OFFICER:  Step up.  Remain standing.

12          THE CLERK:  Sir, please face me and raise

13      your right hand.

14          **L O R E N Z O        M C G R I F F**,

15     called as a witness, having been first duly sworn by the

16     clerk of the court, was examined and testified as follows:

17          THE WITNESS:  Yes.

18          THE CLERK:  Okay.  Please be seated.  Make

19      yourself comfortable.

20          State your name for the record.

21          THE WITNESS:  Lorenzo McGriff.

22          THE CLERK:  Spell your name also.

23          THE WITNESS:  L-O-R-E-N-Z-O, M-C-G-R-I-F-F.

24          THE CLERK:  Thank you.

25

1    DIRECT EXAMINATION

2    BY MS. BURKE:

3         Q    Good morning, Mr. McGriff.

4         A    Good morning, Miss Burke.

5         Q    How are you feeling?

6         A    I am all right.

7         Q    Introduce yourself to the jury, Mr. McGriff.

8         A    How you doing?  My name is Lorenzo McGriff.

9              THE COURT:  Just ask you to keep your voice

10   up a little louder.

11        A    Yes.  I am Lorenzo McGriff, 47 years old, born and

12   raised in Brooklyn.

13        Q    Are you married, Mr. McGriff?

14        A    Yes.  25 years.

15        Q    Have any children?

16        A    Two sons.

17        Q    Okay.

18        A    24, 28.

19        Q    I am going to direct your attention to August 11,

20   2015.  You remember that day?

21        A    Yes.

22        Q    Let's start with your morning on August 11, 2015.

23        A    Okay.

24        Q    What time do you get up?

25        A    I get up at 5:30.

1    Q    Why do you get up at 5:30 on this day?

2    A    Well it's my regular schedule getting up.

3         Um, at this particular time my wife, she works in

4    Harlem, I used to work in the Bronx but I had got a job in

5    Brooklyn.  So, I would drive my wife to work, park my car in

6    the garage because my wife can't walk that well.  So I would

7    drive her to work, park my car in the garage, get on the

8    train to come back to Brooklyn.  There is no parking down

9    here anyway.  I work on Baltic Street.

10   Q    Where did you work?

11   A    I worked in a non for profit agency called Baltic

12   Street AHE, Inc.

13   Q    And what is Baltic Street AHE, Inc.?

14   A    It is a program which assists individuals with

15   Access One, navigate life in of itself.  It's, I'm a

16   counselor that assists people who are diagnosed with Access

17   One to perform daily tasks like, you know, finding housing,

18   you know, some can work.  You know, they may need to apply

19   for benefits or health insurance.

20        You know, I help them with these things that they

21   can't seem to get connected to.

22   Q    Okay.  And what is Access One, if you know?

23   A    That is a mental illness.

24   Q    And how long did you work at this agency?

25   A    Well this agency I had been working there for about

VdV

1    eight months.

2         Q    And what was your title?

3         A    Forensic peer specialist.

4         Q    So on August 11, what time did you arrive at work?

5         A    I got there about 9 o'clock.

6         Q    What did you do once you got there?

7         A    I had breakfast, sat at my desk, you know, checked

8    in with my group 'cause we work as a group.  It's five of

9    us.  We a team.  We each have case loads where, you know,

10   some might need assistance with one.  We discuss what's

11   going on for the day.

12        Q    And did you do this on August 11, 2015?

13        A    Yes.  Yes.

14        Q    Did there come a time when you left work on

15   August 11?

16        A    Yes.  About a quarter to 1 I had left for lunch.

17        Q    Okay.  Is that your usual lunchtime?

18        A    Well actually we was running a little over this

19   day, so I normally leave between 12 and 12:30 but, you know,

20   we ran over a little bit.  So it was about a quarter to 1

21   when I started walking up Court Street.

22        Q    What, if anything, happened as you walk up Court

23   Street on August 11, 2015?

24        A    Well, you know, nothing particularly until I

25   reached Joralemon.

1    Now this is a walk that I take every day.  Um, you

2    know, I don't get much exercise.  I don't, I haven't been

3    exercising much lately.  What I do, my lunch break walk the

4    perimeter of Court Street and Boerum, from Baltic Street up

5    to Joralemon, back down Boerum to Baltic Street.  That's my,

6    you know, my little daily exercise in between work.

7    On this particular day when I reached Joralemon

8    Street, this is a street that is heavy with pedestrian

9    traffic.  So, you know, a typical brush, bump and things

10    like that is common, so you know, like I said, I navigate

11    the street every day.

12    But when I came, encounter with Mr. Khalifa, this

13    wasn't a bump, he struck me.  Um, he walked past me.  When

14    we passed each other, he lift his elbow up (indicating) and

15    jammed it here in my collarbone (indicating).

16    MS. BURKE:  For the record, Mr. McGriff is

17    indicating his right elbow held about shoulder length

18    high and indicating a back towards thrusting motion

19    (indicating).

20    A    Yes.

21    So when that occurred, you know, it startled me so

22    I shoved him (indicating).  And when I shoved him, you know,

23    it was just to create the space, you know, to see what was

24    happening here.  Um, you know, he stand his ground.  He had

25    this growl on his face like a madmen.  That's the best I

MCGRIFF - DIRECT EXAMINATION - BURKE

163

1    could describe it.  He said, you fucking nigger.

2         So instantly dealing with people with mental

3    illness, instantly I noticed something was off, okay.  He

4    started on with the rant and rave.  You're a slave, this and

5    that.  Nigga, I kick your ass.  Where you think you are

6    going?

7         I turned around.  I continued walking down

8    Joralemon towards Boerum.  When I get just about to the law

9    school where the little -- if any of you know where the

10   newsstand is by that law school --

11   Q    Would that be Brooklyn Law School?

12   A    Yes, Brooklyn Law School.

13        He ran up behind me, you know.  Mother fucker.

14   Where the fuck you going?  And I look behind him.  I said,

15   yo, get out of here.  But he kept ranting and raving.

16        I mean his body language was, it was just erratic.

17   So I crossed Joralemon onto the Borough Hall side where the

18   plaza is.

19        So now, he runs across the street.  I quicken my

20   pace.  I walking down this side, headed back towards Court.

21   He yelling, ranting and raving.  You nigger.  You this and

22   that.  Take your black ass to Africa.  This and that.  You

23   slave.

24        I gather that he saw my badge on the neck where the

25   slave situation came in.

VdV

1        As the traffic, if you know anything about

2    Joralemon, the traffic is pretty heavy on the street at

3    times.  So as he follows me, yelling, ranting, wow, blowing

4    my lunch hour.  I am late already.  So my intentions was to

5    head back to my office.  But he's on my trail, so okay.  I

6    am walking.  I quicken my pace.

7        As the traffic start pulling up Joralemon I see two

8    buses coming.  Before the buses could get to me, I literally

9    dash in the street and get across because he can't get

10   across now.  Because that traffic is coming up the,

11   Joralemon, those cars not stopping for any pedestrian coming

12   while that light is green.

13       So, what was I thinking when I took, I mean when I

14   got on the other side of this bus I took off running at a

15   top speed.  Running.  Dodging people on Joralemon.  But when

16   I turned the corner on Court I had to catch my wind because,

17   you know, I am a big guy but I am a heavy smoker and I

18   couldn't breathe.  I was (indicating), so I slowed my pace

19   and my walking, but I got the jump on this guy.  He cannot

20   get across the street.  So I'm figuring if once I blend as I

21   cross the street, things going on, I blend into the traffic,

22   he wouldn't see me, he will go on about his business.

23       No.  As I am walking trying to gather myself, you

24   nigga, he coming.  So, as I turn around to look at him he's

25   coming, he stopped, pick up a brick, wrap it in his shirt.

VdV

1    At this point I had to turn around, stand my

2    ground.  I cannot run any further.  I was depleted with

3    energy.  Now I have to confront him because if I keep my

4    back to him he is going to strike me.  There is no question

5    in my mind that he is going to strike me with this brick.

6    Some debris picked up from a construction site.

7    So at this point I turned around and confronted

8    him.  He continued.  He wasn't running from me.  He was

9    trying to get his foot so he can -- in that videotape show

10   you, he didn't turn and back and run.  Had he done that I

11   would have gone the other way.  He was backing up like this

12   (indicating) trying to get leverage to swing the rock.

13           MS. BURKE:  Your Honor, for the record

14   Mr. McGriff is rolling his arm, turning his arm around,

15   his right arm in a circular fashion.

16           THE COURT:  Mmm-hmm.

17   A    You understand what I am saying?

18   So now it's like now I got to stop him from

19   swinging and hitting me with this boulder that he picked up

20   from this construction site.  So, at this point I had my

21   instrument, which is a wire shredder, it isn't actually a

22   knife, it's a wire stripper.  It's an instrument that you

23   use to strip wire.  So, this is what I had only to defend

24   myself against him because he's wheeling and swinging.

25   So I am trying to grab his arm but he's not, you

1    know what I mean?  It's just totally erratic.  He is all

2    over.  He's swinging this thing.

3         I am like, yo, what's good with you?  And I keep

4    telling him get out of here, but it isn't until he picked

5    the brick up wrapped in that shirt we came into a full head

6    collision.  It wasn't until that moment.

7    Q    So after you had your -- what did you do with your

8    instrument?

9    A    I dropped it right there.

10   Q    Prior to dropping it what did you do with it when

11   you encounter with Mr. --

12        THE COURT:  Just keep your voices up because

13        the fax is working.

14        THE WITNESS:  Yes.

15   A    While, when I was trying to prevent him from

16   swinging the thing, he kept jousting, I prod with the

17   instrument.  Boom, I hit him.  And I was aiming low to let

18   him know, what are you doing?  Stop.  But he wouldn't.  He

19   just kept (indicating).

20        So, this is where, you know, we in the mix of the

21   confrontation at this point.

22   Q    Did you strike him with the instrument?

23   A    Yes, I did.

24   Q    Do you know approximately how many times you did?

25   A    About three or four times.  I am sure.

1       Q       Do you know where you struck him?

2       A       I was actually land, aiming for the lower

3    extremities so not to cause fatal damage, but the instrument

4    was about four inches big (indicating) because it wasn't

5    actually a knife, it was a tool that you use for shredding

6    wire.

7       Q       So after your encounter with Mr. Khalifa what did

8    you do?

9       A       Once I, once I knew he had the brick out his hand,

10   once he dropped the brick and that's when he fell into the

11   construction to that building, 'cause I am actually trying

12   to get him to go backwards because he is not going

13   backwards, he is actually coming forward with the rock in

14   the, then I am trying to get him to go backwards.

15          So once he fell off his feet into the building and

16   released the rock, I turned around and I left.

17      Q       Where did you go?

18      A       I ran down Court Street towards Livingston.

19          Now, once I turned on Livingston I, because it's so

20   much pedestrian traffic I am going to the back route to my

21   office because my office is on Baltic Street between Clinton

22   and Court.  So I figure boom, I'll lose him and he'll -- no.

23   He came running around the corner.  You nigga.

24          At this point I see him he is bleeding.  But I keep

25   moving.  At this point I am not afraid that he is going to

MCGRIFF - DIRECT EXAMINATION - BURKE

168

1    injure me because he don't have the brick in his hand, he is

2    just yelling at this point.  As was prior to him picking up

3    the brick.

4          There was no eminent threat of danger until he

5    picked up the brick from the on start when this occurred and

6    he went off in his erratic state, I walked away.  I

7    continued to walk away.  I started to run.  I don't know

8    what this man is thinking at this point.  You know, why you

9    following me?  It's not that serious.

10   Q    Did there come a time when you were stopped?

11        (Whereupon, there was a pause in the

12   proceedings.)

13   A    By?

14   Q    You said you continued to walk towards your office.

15        Did you make it to your office?

16   A    No, I didn't.  Um, he kept following me so, you

17   know, I am doing this, the zigzag.  I ran this way.  I keep

18   moving.  I keep moving.  He is behind me yelling.  You know,

19   I am keep moving, keep moving, keep moving.

20        Then when I got to, um, Boerum and Bergen I could

21   hear the police behind me.  I could hear all the motion on

22   Boerum, 'cause I had already turned the corner on Bergen.

23        As I hear, you know, the walkie talkies, I turned

24   around, I am on the sidewalk as they showed on the video, I

25   am on the sidewalk.  That officer that testified, he was

1    standing on Boerum and Bergen.  I was on Bergen closest to

2    Court Street.  This man pulled his gun out from across the

3    street, get on the floor (indicating).  That's when I start

4    doing this behind the truck (indicating).  He came.

5        And when you look at the tape you will see, he said

6    he didn't see me.  You could see his feet in that video

7    before you come on this side.  Because he was yelling from

8    that corner, get on the floor.  Get on the floor.  That's

9    why you see me behind the truck getting down.  Never did I

10   resist him.

11       When they told me to get on the floor, I got on the

12   floor.  They handcuff, pick me up, they stood me there for a

13   minute.  It was the young lady I guess they see drove by the

14   car, they stood me, handcuff me, put my hat on my head.  A

15   police car drove by.  Boom.  Then they took me, put me in

16   the car and took me to the precinct.

17   Q    Okay.  I am going to show you some videos.

18   A    Mmm-hmm.

19   Q    And I'd like you to explain your story as I show

20   you the video.

21            MS. BURKE:  Can I have number 2 in evidence?

22            (Whereupon, there was a pause in the

23   proceedings.)

24            MS. BURKE:  One moment, Your Honor.

25            THE COURT:  Sure.

170

1              (Whereupon, there was a pause in the

2        proceedings.)

3              (Whereupon, a videotape was played.)

4              MS. BURKE:  Officer, may I have the lights,

5        please?

6              (Whereupon, the videotape was stopped.)

7    Q    Okay.  Mr. McGriff.

8    A    Yes.

9    Q    Do you recognize the scene that's on the screen?

10   A    Yes, I do.

11   Q    What do you --

12             THE COURT:  Counsel, can you just identify

13       the time for the record?

14             MS. BURKE:  13:07:02.

15             THE COURT:  Thank you.

16             MS. BURKE:  1:07 p.m. and 2 seconds.

17             THE COURT:  Thank you.

18   Q    Do you recognize that scene?

19   A    Yes, I do.

20   Q    Can you describe to the jury what this scene is?

21   A    Um, it's a construction site that's on Court Street

22   that was going on that day.  This is across.  This is in

23   front of 65 Court Street.

24   Q    Between what two blocks is this, Mr. McGriff?

25   A    Between Livingston sand Joralemon.

VdV

1    Q    At approximately -- at this time where were you?

2    A    Well I don't see me in this frame, so I must be

3    still on Joralemon.

4    Q    And using the clicker that's in front of you.

5            THE COURT:  The red button.

6            THE WITNESS:  Mmm-hmm (indicating).

7            THE COURT:  There you go.

8    Q    Can you indicate to the jury where Joralemon Street

9    is in this frame?

10   A    Joralemon Street is back here (indicating), back

11   down here at the end of the block back this way.

12           MS. BURKE:  Indicating the left hand --

13           THE COURT:  The upper left-hand corner.

14           MS. BURKE:  Yeah.

15   A    Actually it's the right, it's not --

16           THE COURT:  No.  Just talking at the upper

17       left-hand corner of the picture.

18           THE WITNESS:  Sorry.

19   Q    Prior to this time, it's 13:07 and 2 seconds, you

20   say that you were on Joralemon Street, had you encountered

21   Mr. Khalifa by this time?

22   A    Uh, I couldn't say if, you know, you said the time.

23   This is the actual time of the day?

24   Q    Yes.

25   A    1:13.  It's possible that we are on Joralemon at

this point, because I left my office about a quarter to 1
and it takes about 10, 15 minutes to get to Court Street.  I
mean Joralemon I mean.

Q    And on Joralemon Street approximately where did you
first encounter Mr. Khalifa?

A    Excuse me.  We encountered each other right past
the little newsstand that's by the Brooklyn Law School on
Joralemon, right next to 210 Joralemon.  It's a newsstand
there.  And it was at this we crossing right there, passing
each other is when he struck me.

Q    When he struck you, what were you feeling at that
time?

A    Well it startled me initially, so, you know, in a
reaction to what had just taken place I pushed him like, you
know, hey, what's going on (indicating).

But when I pushed him to create the space, he
jumped back and he, I mean he just had this awful look on
his face.  I mean it's his mouth was something going on in
there.  And he, you know, like a drool like (indicating).
I'm like, okay.  Something is wrong here.  Okay.

At this point he's yelling, screaming obscenities.
I turned --

Q    I need you to tell the jury exactly what he was
yelling.

A    You nigger.  You slave.

VdV

1          At that point I just turned and walked away because

2     I understood that there was something more than a rational

3     situation here.

4          Q    Okay.  When you walked away, what was your thought

5     process at that time?

6          A    You know, these sick people on the street, you

7     know, you encounter all kinds of things.  So it was just,

8     mine was walk away, all right.  Whatever.  I just turned and

9     walked away.

10         Q    What were you feeling?  Were you afraid?  Were you

11    unafraid?

12         A    Not at this particular time.  I had no real

13    concerns about my safety at that time, because it hadn't

14    escalated yet.

15         Q    And after you walked away at that point, you say

16    that you had crossed the street.  What made you cross the

17    street?

18         A    Because he ran up on back of me.  Now I am getting

19    concerned because he ran up on me, in a threatening manner.

20    Where the fuck you going and da, da, da, da.

21              Again I, you know, ignoring the situation and I

22    crossed onto the Brooklyn Borough Hall side.

23         Q    I need to slow you down one second, Mr. McGriff.

24              You said he said where the fuck are you going, and

25    you said and da, da, da, da.

1    Could you explain to the jury what you mean by

2    that?

3    A    Oh, okay.  Being he said where the fuck are you

4    going, nigger?  You should take your ass back to Africa.

5    He's just rambling.  So, you know, I continued to walk.

6    That was my only focus at that point was to create distance

7    between me and him.

8    Q    Why did you want to create distance?

9    A    Number of reasons.  First he messed with my lunch

10   break.  I ain't ate all day.  I am diabetic.  Secondly, I

11   got to get back to my office.  It's like a half a mile down

12   Court Street, you know, so I am thinking about all my

13   responsibilities.  I am at work.  I got to go pick my wife

14   up.  You know, it's just like, you know, the trouble.  Boom.

15   Let's get away.

16   And I thought by me, you know, actually retreating

17   from him that he would take that as a -- oh, you know, brush

18   it off, but he didn't.  He just was totally persistent in

19   pursuing me.

20   Q    After you had crossed the street to the other side

21   of Joralemon Street --

22   A    Mmm-hmm.

23   Q    -- you said you were on the Borough Hall side?

24   A    Yes.

25   Q    You said you changed direction.

1        A    Yes.

2        Q    Can you tell me --

3        A    Yes, I see.

4        Q    -- if you see yourself?

5        A    I see me walking slow.

6        Q    I am going to stop it.  I want you to point out to

7    the jury where you are.

8        A    Right.

9        Q    I am going to try to stop it.

10            (Whereupon, the videotape was stopped.)

11       Q    Can you point with the clicker?

12       A    (Indicating) okay.

13       Q    Where are you?

14       A    I'm right here (indicating).

15       Q    Okay.  I am going to back up the video because I

16   want you to use the clicker to tell me when you see yourself

17   emerge on this film.

18       A    Right.

19            (Whereupon, a videotape was played.)

20       A    You got to understand, this is not real time

21   because this, this was actually just simultaneously

22   happening.  It's, this is not real time.  So you have to

23   understand that is happening live fashion.

24       Q    Okay.  I am forwarding the video at 1:07 and 25

25   seconds.

1          Do you see yourself on the video?

2     A    Not -- yes.  Yes.  There I go coming across the

3     street.

4     Q    Use the clicker.

5     A    Oh, my God, there.

6     Q    The laser.

7     A    Right.  Actually oh, come on, man.  What is this

8     thing?

9          (Indicating) I first come into the frame right here

10    at the top of the pay loader because I had to slow down my

11    pace because I came up Joralemon so fast, once I turned

12    Court Street and got like in the middle of the block, I

13    really couldn't breathe so I slowed my pace.

14         (Whereupon, the videotape was stopped.)

15    A    To a walk.  And that's when Mr. Khalifa came

16    around.  Yelling.  But, you know, I am walking trying to get

17    my breath.

18         By the time I stop, turned around, see what he is

19    doing, this man has picked up a brick from this construction

20    site.

21         (Whereupon, a videotape was played.)

22    A    In the real time.

23         (Whereupon, the videotape was stopped.)

24    A    It's like he's coming, right?  I didn't stop

25    walking.  He is coming, boom.  And he, all in the same

1    motion he is just coming with, I am like, yo, what are you

2    doing --

3         Q    Mr. McGriff.

4         A    Yes.

5         Q    I would like to make a record.

6              MS. BURKE:  Mr. McGriff is again rolling,

7         turning his right arm in a circular fashion.

8         Q    Now I want you to look at the video.  Please keep

9    the clicker in hand.

10        A    Mmm-hmm.

11        Q    Do you see Mr. Khalifa in this video?

12        A    Yes, I see him.  I believe that's him right there

13   coming up behind me (indicating).

14        Q    Okay.

15             THE COURT:  Indicating to the side of the --

16             THE WITNESS:  Pay loader.  Right in front of

17        the pay loader.

18             THE COURT:  Counsel.

19             MS. BURKE:  Yes.  Indicating to sort of the

20        side of the pay loader in the left quarter of the

21        photo -- upper quarter of the photograph right in front

22        of the construction pile.

23             THE COURT:  Okay.

24        Q    I am going to go through this video very slowly,

25   Mr. McGriff.

1       A     Mmm-hmm.

2       Q     I want you to indicate for the jury where you say

3    you saw Mr. Khalifa pick up the brick.

4       A     Now as you may know, this may well be him behind

5    me.  I don't realize he is behind me until I get up here.

6    He reached down in this pile and pick up that brick.

7               (Whereupon, a videotape was played.)

8       A     (Indicating).

9       Q     Indicating --

10      A     That's me (indicating).

11      Q     And what are you doing at this time?

12      A     I am walking at this point.  I had stopped running

13   because I had run out of oxygen.  I couldn't run anymore.

14   Right.  That's (indicating), I see I am walking.  He --

15      Q     What is your intention to, at this time?

16      A     It's to hit Livingston and go to, uh, what's that

17   street?  Clinton.  To go to Clinton and walk down Clinton

18   back to my office.

19      Q     At any time that you see Mr. Khalifa in the video I

20   want you to stop me.

21      A     Right.  Right.  Now here he come (indicating).  He

22   is --

23               MS. BURKE:  Indicating the left upper quarter

24         of the frame near the construction site, near the

25         backhoe.

A    Now as you look at this video you will see I was in this frame at least a minute or two before him, because I did not, I had lost him on Joralemon. He was stuck on the sidewalk with the traffic.

Q    Okay. Mr. McGriff, I'd like you to indicate to the jury where you saw this, Mr. Khalifa picked up the brick.

A    Mmm-hmm. Really he don't start yelling until he get about right close to mother fucker, where you going? Nigga. Da, da, da, da. Nigger and so forth.

He reached right here. When he get right here he pick up some debris. I mean this boulder from this pile of rocks right here that he was, Mr. Khalifa (indicating). He stops, picks up some debris from this place and that's when I, yo, what you doing?

MR. MOTTOLA: Can you make a record?

MS. BURKE: Okay.

Q    Mr. McGriff, I am going to ask you --

(Whereupon, the videotape was stopped.)

Q    -- I am stopping the frame at 13:07:42.

Do you see yourself and Mr. Khalifa?

A    Yes. Right here (indicating).

MS. BURKE: Indicating the --

THE COURT: Behind the orange piece of equipment.

MS. BURKE: Behind the orange piece of

182

1    equipment, upper half the frame next to the red truck.

2    Q    At this time what had happened?

3    A    Mr. Khalifa, he got the rock, he wrapped it in his

4    shirt.  He is coming.  He is yelling nigger, whatever,

5    whatever, and I come, I turn around and I confront him with

6    it now.

7    At this point I can no longer run, there is no more

8    run in me to get away from him.  I did not believe at that

9    time I could withdraw from this man in complete safety

10   without him hitting me with that rock.

11   Q    I am going to continue the video at 13:07:42.

12   (Whereupon, a videotape was played.)

13   A    See as he backing up you could see him wailing it.

14   He is not running.  He's trying to position himself to swing

15   the rock.

16   MR. MOTTOLA:  Objection.

17   THE COURT:  Sustained.

18   (Whereupon, the videotape was stopped.)

19   Q    What did you believe was happening at that time?

20   A    That he was positioning his self to swing the rock,

21   not running.

22   Q    I am going to back it up.

23   (Whereupon, a videotape was played.)

24   A    So now we wrestling right here because see, see his

25   hand (indicating), he is trying to whirl the rock.  We -- I

VdV

1    am trying to prevent him from that.

2                 (Whereupon, the videotape was stopped.)

3         Q    Mr. McGriff, can you indicate where you see him, as

4    you say, whirl the rock?

5         A    Right here in front of this cement mixer

6    (indicating), that's me and him.  So now trying to back him

7    up, he backing up -- see, if you look at this picture, he is

8    whirling the sweater in his hand (indicating).

9         Q    As he is whirling the sweater in his hand at that

10   moment, how did you feel?

11        A    In total danger.

12        Q    And why is that?

13        A    Because this man was approaching me rapidly with

14   this weapon.  And like I told you before, I could not, I

15   did -- I could not get away from him.  With my back turned

16   to him he would have surely struck me with that weapon.

17        Q    I am going to continue the video.

18                 (Whereupon, a videotape was played.)

19        Q    At this point at 13:07:53, can you tell the jury

20   what's happening?

21        A    We in a full-fledged tussle right here

22   (indicating).

23        Q    When you say --

24        A    I am trying to stop him from swinging the rock.

25        Q    Okay.  When you say full-fledged tussle, can you

                              VdV

1    explain to the jury what do you mean?

2         A    We're in a encounter.  He's trying to swing.  I am

3    (indicating), you dig what I am saying?  I am trying to get

4    him to back up off of me (indicating).  And not swing the

5    rock.  Because he's doing this (indicating).  He is not

6    running, he is backing up.

7              MS. BURKE:  Indicating for the record

8         Mr. McGriff is again swinging his right arm in a

9         circular motion.

10             (Whereupon, the videotape was stopped.)

11        Q    I am going to continue the video at 13:08 and 1

12   second.

13             (Whereupon, a videotape was played.)

14        Q    Can you tell the jury what is happening at this

15   time?

16        A    Well I don't see either one of us --

17        Q    Not what you see, but what was happening.  Even

18   though it's not on the video.

19        A    Oh, right.  We are in a full-fledged tussle, that's

20   what I am saying.  I don't see what's going on at this video

21   at the particular time.  So this not here.

22             As you can see, the people in the street, we are in

23   a full-fledged tussle.  He is not running, he is fighting.

24   And he is trying to strike me with this rock.  Is my idea

25   was to get him off of his feet, he couldn't swing the rock.

1      Q     I am going to stop the video now.

2            (Whereupon, the videotape was stopped.)

3      Q     And back it up to 13:08:35 seconds.  Sorry, 31

4      seconds.

5            (Whereupon, a videotape was played.)

6      Q     Can you indicate to the jury when you see yourself

7      in this video?

8      A     Yes.  I am running away now.

9            Now at this point he has fallen.  He has fallen off

10     his feet.  I see the shirt release from his hand.  I turn

11     around and I leave.

12           (Whereupon, the videotape was stopped.)

13     Q     Where did you run to?

14     A     To Livingston.

15           MS. BURKE:  Can we have the lights, please?

16           One moment, Your Honor.

17           (Whereupon, there was a pause in the

18     proceedings.)

19           MS. BURKE:  Can I have People's Number 7 in

20     evidence, please.

21           Bear with me one moment, Your Honor, please.

22           THE COURT:  Just give me a second as well.

23           (Whereupon, there was a pause in the

24     proceedings.)

25           MS. BURKE:  Ready when the Court is.

VdV

186

1          THE COURT:  Yes.  Thank you.

2      Q    Mr. McGriff, I want to direct your attention, the

3  video that Miss Guy said was taken in her car.

4      A    Mmm-hmm.

5          MS. BURKE:  I'd ask that the, have the

6      lights, officer.

7              (Whereupon, a videotape was played.)

8              (Whereupon, the videotape was stopped.)

9      Q    Now can you tell the jury where you are in this

10 blurry frame?

11     A    Yeah.  I really can't tell if that's me or not

12 (indicating).

13     Q    Going to try to play it for you while the video is

14 playing.

15          Can you narrate to the jury what was happening as

16 you saw it?

17              (Whereupon, a videotape was played.)

18     A    At this point where we video, this is after we stop

19 running and I turned around to confront him.

20              (Whereupon, the videotape was stopped.)

21     A    So he's threatening with the rock that he is going

22 to swing it with all of the derogatory remarks, and all the

23 while I am telling him, yo, get out of here.  Get out of

24 here.  But he is still threatening with the rock in his

25 shirt.

1              (Whereupon, a videotape was played.)

2       A     See, that's a rock in the sweater in his hands.  I

3    grabbed his hands because he is trying to get his hand free

4    to swing it.  That is, that's material you see in his hand,

5    that is a --

6              (Whereupon, the videotape was stopped.)

7       A     -- a sweater with a rock, a brick he picked up from

8    that construction site and wrapped it in.  That's when I was

9    trying to stop him from swinging it.

10             (Whereupon, a videotape was played.)

11      Q     I can't stop this video and keep it clear, but I am

12   going to try to do that so you can explain to the jury where

13   you see the brick in his hand.

14      A     See?  See the sweater?  See the thing in his hands

15   right there, dangling from his hands?  I keep trying to grab

16   his hands.  You saw the quick glimpse.  He keeps swinging.

17      Q     I need you to use the laser pointer.

18      A     Yes.

19      Q     I am going to go back to the video.  Point --

20      A     See here, right here, look right here.  You see

21   that material in his hand, right?  (Indicating)

22             MS. BURKE:  Your Honor, at this time --

23      A     That's a rock.

24             MS. BURKE:  I am sorry, you can't stop this

25   in mid frame, but indicating the middle of the video

VdV

1          pointing to the man with the green shirt on.

2          A    Now this recording is, this is after the run --

3          Q    At this point were you trying to walk away,

4     Mr. McGriff?

5          A    Yes.  I told him several times to get away.

6     (Indicating) but as you see, this material that he got in

7     his hand right here, that has a brick wrapped in it.

8                    MS. BURKE:  One moment.

9          Q    When you see -- you say you tried to walk away.

10          I want to play the video one more time.

11          Can you indicate and tell me to stop when you see

12     yourself trying to walk away from the video.

13                    (Whereupon, a videotape was played.)

14          A    Right here, getting ready to turn around.  Yo, get

15     out of here.  He threatens, with what?  You dig what I am

16     saying?  He coming again with the brick.

17                    (Whereupon, the videotape was stopped.)

18                    MS. BURKE:  May I have the lights, officer?

19          Q    At the time that you turned to walk away and you

20     say that Mr. Khalifa continued to pursue you, why didn't you

21     call the police?

22          A    There was none and he was heavily attacking me.

23     So, I, my first instinct was to get away from him because of

24     the erratic state he was in.  My only concern was to create

25     distance between us because he was definitely posing eminent

1    threat to me.

2        Q    Was there anything else you could have done in

3    order to protect yourself?

4             MR. MOTTOLA:  Objection.

5             THE COURT:  Sustained.

6        Q    Did you think of any other ways you could protect

7    yourself?

8        A    I could run.

9             MR. MOTTOLA:  Objection.

10       Q    Why didn't you call for help on the street?

11       A    There was no need to call for help.  Everybody

12   would see what was going on, so if somebody was going to

13   help, they would have intervened.

14            MS. BURKE:  Could I have People's 9 in

15       evidence?

16       Q    As I am preparing this video I'd like you to take

17   the jury on your route prior to you being arrested.

18            You initially said that you went down Court Street

19   towards Livingston Street.

20       A    Right.

21       Q    What did you do once you got to Livingston?

22       A    I went to Livingston, I went down Clinton, and he

23   caught up to me at this time.  He's --

24       Q    Who is he?

25       A    Mr. Khalifa.  He has caught up to me at this time,

1    by the time I get to Clinton, but I keep moving.  He no

2    longer has the brick.  I just keep moving.  There is no need

3    to turn around because he is not posing that eminent threat

4    anymore, so I keep moving.  He is still yelling.  I am

5    walking, walking.  What is he saying?  I am not, you know,

6    if it's still the same, turn out this and that.  He is just

7    yelling.  My emotions, my running adrenaline is high.  My

8    only concern is to get away from him.

9        I go down Atlantic, he is still following.  I get

10   to Atlantic 'cause I am trying to remember how did I get on

11   Boerum.  I just kept walking that way down Atlantic and I

12   turned and I was on Boerum, so I guess Atlantic and

13   Boerum -- I turned and Boerum, still behind me, yelling da,

14   da, da, da.  By the --

15   Q    I am sorry, Mr. McGriff, you said he is still

16   behind you yelling.  What was he saying?

17   A    Yelling, that's what I am saying.  It's inaudible

18   to me right now.  He is just yelling.  At a high voice he is

19   just yelling.  I am just moving.

20       When I get to Bergen and I make the turn and cross

21   the street I could hear the police, you know, radio da, da.

22   I hear the commotion.  I turn around.  When I turn around,

23   the officer that was here yesterday was standing on this

24   corner, on this corner across the street, freeze, get on the

25   ground (indicating).

1        You could see I went like this, I got down

2    (indicating).  Him and his boys come running this way, some

3    running that way.  Boom.  They got on top of me, handcuff.

4    There was no resistance.  Grabbed my hand, put it behind my

5    back, that was it.  They stand me up, put my hat on my head

6    and the police car came by.

7        Q    The instrument that you used to confront

8    Mr. Khalifa, what could you do with that?

9        A    I dropped it.  Like I told you, I dropped it on

10   Court Street.

11       Q    Why did you drop it?

12       A    Because he no longer had the brick.

13            MS. BURKE:  Your Honor, I am just trying to

14       wait for the video to cue up.  For some reason this

15       particular one takes an awfully long time.

16            (Whereupon, there was a pause in the

17       proceedings.)

18       Q    So, Mr. McGriff, starting with your first encounter

19   with Mr. Khalifa on the corn -- on Joralemon near Brooklyn

20   Law School until your arrest on Bergen Street, approximately

21   how many blocks would you say that Mr. Khalifa followed you?

22       A    At least nine.

23       Q    I am showing you the video of Bergen Street that

24   was entered into by the People.

25            MS. BURKE:  I am sorry, Your Honor, trying to

VdV

1      read the time, 1:27:34.

2                 (Whereupon, a videotape was played.)

3                 MS. BURKE:  Thank you.

4      Q    I am going to back it up a little.

5      A    See.  (Indicating) that's officer so and so right

6      there.

7      Q    One moment, Mr. McGriff.

8      A    See those feet there?

9      Q    One moment, Mr. McGriff.

10                (Whereupon, there was a pause in the

11     proceedings.)

12     Q    Indicate to the jury what is happening here.

13     A    Right here I turned.  I heard the police coming.

14     Boom.  When he come up on this corner here (indicating) he

15     yells and say get down.

16     Q    What are you doing?

17     A    Getting down.

18     Q    What happened further?

19     A    See?  Say again.

20     Q    What happened further?

21     A    Boom.  Now him and his boys, they start coming

22     around.  Boom.  They take me, they put my hand behind my

23     back and cuff me.  They pick me up after that.

24                (Whereupon, the videotape was stopped.)

25     Q    Prior to you getting on the ground do you recall --

MCGRIFF - DIRECT EXAMINATION - BURKE

193

1    lights, please -- do you recall where Mr. Khalifa was?

2        A    No.  He was still around the corner.  I could hear

3    him yelling.  I could still hear him yelling.  He was still

4    on Boerum.

5        Q    And you could still hear him yelling on Bergen?

6        A    Yes, from around the corner, but now in

7    conjunctions with his yelling, I hear the commotion of the

8    police.  And they trampling around.  I could hear it's many

9    of them.

10       Q    Did the officer that testified yesterday, did he

11   say anything to you as he approached you?

12       A    Let me see your hands.  Let me see your hands.

13       Q    Did he say anything else?

14       A    Not that I can recall right now.

15       Q    Do you know which officer commanded you to get

16   down?

17       A    Him.  He told me to get down from across the

18   street.

19       Q    At what point in this video did you see the

20   officers?

21            MS. BURKE:  Going to rewind it briefly.

22            (Whereupon, a videotape was played.)

23            MS. BURKE:  I am going to rewind it back to

24   1:27:16 seconds.

25       A    Now that's me coming up on the sidewalk

1    (indicating).  He says freeze.  I turn around.  He says

2    freeze.

3        Q    At 1:27 and 20 seconds.

4        A    Get down.  You look right through here between the

5    crack of here, you can see his feet --

6        Q    Indicating between the white vehicle and the maroon

7    van.

8        A    He is yelling at me from across the street.  Get

9    down.

10            (Whereupon, the videotape was stopped.)

11       Q    Is anything being said to you at this time?

12            Continuing the video.

13            (Whereupon, a videotape was played.)

14       A    Other than just get down, show me your hands or

15   whatever, now he come 'cause he is inching up the side.  He

16   said show me your hands.  Show me your hands.  But that's

17   him.  That's the officer that testified yesterday

18   (indicating).

19            (Whereupon, the videotape was stopped.)

20       A    Those are his feet.

21       Q    Okay.  Indicating --

22       A    And the officer that's right here on my back

23   (indicating), he was in this court yesterday.

24            MS. BURKE:  Indicating for the record a pair

25       of legs standing in the middle of the sidewalk

VdV

1     approximately two feet from Mr. McGriff who is laying

2     on the ground.

3         Q   Mr. McGriff, I'd like to show you People's Number

4     8.

5             MS. BURKE:  Yeah.  Could it be shown to the

6     witness, please.

7         Q   You recognize that photo, Mr. McGriff?

8         A   Yes, I do.

9         Q   Is that on August 11, 2015?

10        A   Yep.  Yes.

11        Q   And is there an item in your hands?

12        A   Yes.

13        Q   What is that item?

14        A   That is a wire stripper.

15        Q   What do you do with that wire stripper?

16        A   I use it to prepare, fix headphones.  Things like

17    that.  You know, uh, or any electronical, you know, I may

18    have a short in a cord, something like that.  I use it to

19    skin the wire.

20        Q   Okay.  Would you refer to that as a knife?

21            MR. MOTTOLA:  Objection.

22            THE COURT:  Sustained.

23        Q   What do you call it, that instrument?

24        A   A wire stripper.

25        Q   Can you show that photo to the jury?

1        A     (Indicating).

2        Q     Show them the wire stripper in your hand.

3        A     (Indicating).

4              MS. BURKE:  Indicating middle of the photo,

5        almost center of the photo.

6        Q     And what hand is this wire stripper?

7        A     My right hand.

8        Q     Is that the instrument that you used to confront

9    Mr. Khalifa?

10       A     Yes.

11       Q     Why did you use that particular instrument?

12       A     Because it was my only option to defend myself.

13             MS. BURKE:  Nothing further.

14             THE COURT:  Okay.  All right, Mr. McGriff,

15       you may step down.

16             (Whereupon, the witness was excused from the

17       stand.)

18             THE COURT:  All right, ladies and gentlemen,

19       I am going to send you back into the jury room for a

20       few minutes.  Stretch your legs, use the facilities.

21       Please don't discuss the case amongst yourselves.  We

22       will bring you back out in a few minutes.  Thank you

23       very much.

24             (Whereupon, the jury left the courtroom.)

25             THE COURT:  Second call on the trial.  Thank

VdV

1      you.

2                  (Whereupon, there was a break in the

3           proceedings and then resumed shortly thereafter.)

4                  (Whereupon, other business was conducted and

5           then the case continued.)

6                  THE CLERK:  Recalling the case on trial of

7           Lorenzo McGriff.  All parties are as before, outside

8           the presence of the jury.

9

10                 THE COURT:  All right, Mr. McGriff, why don't

11          you come on back up.  Thank you.

12                 L O R E N Z O       M C G R I F F,

13     recalled as a witness, having been previously sworn by the

14     clerk of the Court, resumed the witness stand and testified

15     further as follows:

16                 COURT OFFICER:  Line them up?

17                 THE COURT:  Line them up.  Yes.

18                 COURT OFFICER:  You ready for the jury, Your

19          Honor?

20                 THE COURT:  Yes.  Thank you.

21                 COURT OFFICER:  Jury entering.

22                 (Whereupon, the jury entered the courtroom.)

23                 THE CLERK:  Okay.  The jury panel is present

24          and properly seated.

25                 Does each side waive the jury roll call?

1          MR. MOTTOLA:  So waived.

2          MS. BURKE:  So waived.

3          THE CLERK:  Thank you.

4          THE COURT:  All right, Mr. McGriff, just a

5     reminder you are still under oath, sir.

6          MR. MOTTOLA:  Yes.  Thank you, Your Honor.

7          THE COURT:  Mr. Mottola.

8          MR. MOTTOLA:  If I could have the evidence,

9     please, all of it.

10          COURT OFFICER:  All of it?

11          MR. MOTTOLA:  Well not the medical records,

12     but the three videos and the photos that are in

13     evidence.

14     CROSS EXAMINATION

15     BY MR. MOTTOLA:

16     Q    Good morning, Mr. McGriff.

17     A    Good morning.

18          MR. MOTTOLA:  Thank you.

19          COURT OFFICER:  Mmm-hmm.

20     Q    So, you take a walk around Brooklyn Heights pretty

21     much every day when you work, right?

22     A    Yes.

23     Q    You are very familiar with all of the streets?

24     A    Uh, yeah, I know the streets.

25     Q    Well you work at, off Baltic Street, right?

1       A    Yes.  On Baltic.

2       Q    Between Court and Clinton?

3       A    Yes.

4       Q    On August 11 of 2015 you went on your lunch break,

5  right?  Which direction did you go?

6       A    Up Court Street towards Joralemon.

7       Q    Okay.  Then eventually you hit Joralemon Street,

8  right, and then you circled back down towards Court and

9  that's when you encounter Mr. Khalifa, right?

10      A    No.

11      Q    No.  You encountered Mr. Khalifa when?

12      A    On Joralemon.

13      Q    Okay.  And so those surrounding streets, you are

14  familiar with the area, correct?

15      A    Yes.

16      Q    Joralemon, Court, Bergen, Baltic, all those

17  streets?

18      A    Mmm-hmm.

19           MR. MOTTOLA:  Your Honor, I just want to

20      approach the witness with an 8 and a half by 14 color

21      photo.  I have shown to counsel.  Ask it be marked

22      People's 12 for identification.

23      Q    So, Mr. McGriff, is that, do you see what we are

24  looking at there in People's 12 for identification?

25      A    Mmm-hmm.

1       Q    Is that document -- can you tell the jury what it

2   is?

3       A    It's a map.

4       Q    Okay.  What neighborhood is it a map of?

5       A    Cobble Hill I guess.

6       Q    Okay.

7       A    Downtown Brooklyn.

8       Q    Does that map show, is it a fair and accurate

9   representation of the street layout where this incident took

10  place on August 11, 2015?

11      A    Yeah.

12      Q    Okay.  It shows Court and Joralemon Street, right?

13      A    Yes.

14      Q    It shows Bergen Street, right?

15           (Whereupon, there was a pause in the

16  proceedings.)

17      Q    Towards the bottom, sir?

18      A    Oh, okay.  Yeah.  I see it.

19      Q    Okay.

20           MR. MOTTOLA:  Your Honor, at this time I

21  would just ask that what was marked People's 12 for

22  identification be entered into evidence as People's 12

23  in evidence, noting it's not to scale.

24           MS. BURKE:  No objection, Your Honor.

25           THE COURT:  Thank you.  People's 12 in

VdV

1          evidence.

2                    COURT OFFICER: So marked.

3                    THE COURT: Thank you.

4                    MR. MOTTOLA: Could I please have it? Okay.

5          Thank you.

6          Q    All right. So, Mr. McGriff, I am going to publish

7     this map. We are going to go through street by street where

8     you were when you first met Mr. Khalifa, okay?

9                    THE COURT: You want the light on or off?

10                   MR. MOTTOLA: You can turn it off if it's

11         easier for the witness.

12         Q    Okay. Where did you first encounter Mr. Khalifa?

13                   (Whereupon, there was a pause in the

14         proceedings.)

15         Q    Well --

16         A    Yeah. I can't really --

17         Q    Correct me if I'm wrong, but on direct you

18    testified, I believe, that you were on Joralemon Street

19    right by Brooklyn Law School?

20         A    Yes. Yes.

21         Q    That's when you are walking in the direction of

22    Court Street?

23         A    No. Boerum.

24         Q    Towards Boerum. Okay.

25                   You first bump into Mr. Khalifa at that time,

                              VdV

1     right?

2          A    Right.

3          Q    Okay.  So he elbows you?

4          A    Mmm-hmm.

5          Q    And then you pushed him back, right?

6          A    Right.

7          Q    Okay.  And he starts yelling these nasty things at

8     you?

9          A    Right.

10         Q    Were there a lot of people on the street at that

11    time?

12         A    Yes.

13         Q    Okay.  Did you notice if anyone else stopped to

14    look at you and Mr. Khalifa?

15         A    No.

16         Q    And he is screaming, right?

17         A    Yes.

18         Q    And he is yelling at, like, slave, all these other

19    horrible words, right?

20         A    Right.

21         Q    But you are not sure if anyone else was looking?

22         A    I am sure they were.

23         Q    Well did you see them?

24         A    No, I didn't --

25         Q    You carry on towards Boerum, right?

1          A    Right.

2          Q    Okay.  Then where did you go?

3          A    I crossed onto the Brooklyn Borough Hall side as he

4     kept yelling.

5          Q    Okay.  Eventually you hit Joralemon Street,

6     correct?

7          A    I am on Joralemon.

8          Q    Oh, eventually you hit Joralemon and Court?

9          A    Right.  Walking back towards Court.

10         Q    Right.

11              The video we showed off of the one video that you

12    spoke about this morning actually shows Court and Joralemon

13    Street?

14         A    No.  Closer to Livingston, that's what it shows.

15         Q    Okay.  Can you see Joralemon Street in that video?

16         A    No.

17         Q    Okay.

18         A    You can see -- you can't see -- what you see, can

19    you see -- no, you can't see Joralemon.  All you can see is

20    the building that's on the corner of Joralemon.

21         Q    You get to Court Street --

22         A    Right.

23         Q    -- and Joralemon, and you turn onto Court Street,

24    right?

25         A    At what point?

VdV

1      Q      After you crossed Joralemon.

2             (Whereupon, there was a pause in the

3      proceedings.)

4      A      What is your question? I am not understanding.  I

5      am not following.

6      Q      I am just asking the direction you went, sir.

7      A      Coming from my office I walked up Court Street,

8      turned on Joralemon.  Me and the guy got into the encounter.

9      We da, da, da.  I crossed over onto the Borough Hall side on

10     Joralemon, continued walking back towards Court, then I went

11     down Court Street.

12     Q      Okay.  So, we're going to get back to the incident,

13     to the actual stabbing later, but I am just trying to get

14     your direction now.

15     A      I just told you.

16     Q      Okay.  Now after you stabbed Mr. Khalifa four, five

17     times you end up leaving the location, right?  You didn't

18     wait on Court and Livingston?

19     A      After our encounter, no, I didn't.

20     Q      Right, you didn't.  You went several blocks?

21     A      Right.

22     Q      Nine blocks you said?

23     A      Something like this.

24     Q      I want to go through the blocks you went through

25     after you stabbed Mr. Khalifa, okay?  So the first --

Case 1:21-cv-00703-AMD-LB  Document 6-4  Filed 04/15/21  Page 67 of 135 PageID #: 728

1          A    After I defended myself against Mr. Khalifa.

2     That's more like it.

3          Q    Okay.  Sure.

4               Which blocks did you go through after you stabbed

5     Mr. Khalifa?

6          A    Like I said, down Livingston to Clinton, from

7     Clinton to Atlantic, from Atlantic to Boerum, from Boerum to

8     Bergen.

9          Q    Okay.

10              MR. MOTTOLA:  So, with the Court's

11         permission, can I draw on People's 12?

12              MS. BURKE:  Objection, Your Honor.

13              MR. MOTTOLA:  We can do it.  We can have him

14         do it.

15              THE COURT:  You can have him do it.

16              MR. MOTTOLA:  Okay.  You can put the lights

17         on, officer.  Do you have a -- I will give him this.

18         Do you have a marker?  Okay.

19         Q    Starting from Court and Joralemon Street, which is

20    indicated on this map, just please take the marker, trace --

21              THE COURT:  You have one?

22              COURT OFFICER:  I gave him one.

23         Q    -- give the location of the route you took from

24    when you left Court and Livingston and were arrested by

25    Officer Louard.

1        A     (Indicating) it started over here.  I walked here,

2    down here, down here, and I went to Atlantic.  From Atlantic

3    to Boerum, to Boerum.  I went there.

4        Q     Are you finished, sir?

5        A     Mmm-hmm.

6        Q     Okay.  So I am going to publish People's 12 again.

7    All right.

8              So this black line with the marker, this was drawn

9    by you just now, right?

10       A     Just now.

11       Q     Now you work, to be clear, you work on Baltic?

12       A     On Baltic.

13       Q     Right between Court and Clinton, right?

14       A     That's right.

15       Q     Okay.  So, after you encountered Mr. Khalifa and

16   you started to leave the location, you first go up Court

17   Street, right?

18       A     Mmm-hmm.

19       Q     You go down Livingston Street, right?

20       A     Mmm-hmm.

21       Q     Then you go back towards Atlantic Avenue, right?

22       A     Down Clinton.

23       Q     So you were on Court headed towards Clinton?

24       A     Right.

25       Q     You could have gone straight down Court Street to

1      get to your job?

2            A    Yes, I could have.

3            Q    You could have gone down straight Clinton Street to

4      get to your job?

5            A    Right.

6            Q    But you didn't do that?

7            A    Right.  I was trying to lose him.

8            Q    You were trying to lose him?

9            A    Right.

10           Q    Not the police?

11           A    Mr. Khalifa.

12           Q    You were trying to lose Mr. Khalifa?

13           A    Right.  He was pursuing me.

14           Q    The man stabbed five times?

15           A    Pursuing me, vigorously, behind me.

16           Q    Vigorously behind you?

17           A    Mmm-hmm.

18           Q    You were not trying to dodge the police, right?

19           A    No.  There was no police to dodge.  No police was

20     in the area.

21           Q    Okay.

22           A    Because if there was, I would have went to them.

23           Q    Well let's be clear.  You didn't wait at Court and

24     Livingston, did you?

25           A    No, because a man was attacking me.

1        Q    Okay.  You testified Mr. Khalifa picked up some

2   object, right?

3        A    No, a brick.

4        Q    A brick.  Let's, can you describe this brick?

5        A    Yes.  It was concrete.

6             MR. MOTTOLA:  Can you put the lights on?

7        A    Some concrete in, from that construction site.

8        Q    Use your hands.

9        A    (Indicating) a boulder about this big.

10       Q    A boulder?

11       A    A boulder.

12       Q    Your hands are spread apart?

13       A    Mmm-hmm.

14       Q    Approximately 8 to 10 inches.  Is that fair?

15       A    Okay.  Mmm-hmm.

16       Q    A boulder?

17       A    Your is about 15.  I said a boulder.

18       Q    Boulder (indicating)?

19       A    He wrapped it in his shirt.

20       Q    He wrapped it?

21       A    In his shirt.

22       Q    What did he do when he wrapped it?

23       A    He wailed it.

24       Q    Just for the record, just the jury can see, but for

25   the record you are swinging your right arm?

1      A      Right.

2      Q      A circular motion?

3      A      Mmm-hmm.

4      Q      That's in the video, right?

5      A      Yeah.

6      Q      Okay.  You are going to show us where that --

7      A      Yes.

8      Q      Okay.

9             MR. MOTTOLA:  Can I put on People's 2?

10     Q      And I want you to use the clicker, okay, sir.

11     A      I got you.

12     Q      Before we get to this, just he is wailing it the

13     whole time, right?  On Court?

14     A      Bro, bro.  Listen.  Listen.  He picked the thing

15     up, he threatened me with this (indicating).

16     Q      Okay.  Listen.  I just --

17     A      Then I approached him.

18     Q      You were here yesterday, right?

19     A      Yes, I was.

20     Q      You heard all the witnesses yesterday?

21     A      Mmm-hmm.  Did I?

22     Q      You did.

23            And all three of those women, do you know any of

24     those women?

25     A      None.

VdV

1       Q    You don't know any of them, right?

2       A    No, I don't.

3       Q    Okay.  Well --

4                 (Whereupon, a videotape was played.)

5       Q    -- were they, I want to know where you were when

6    you are saying Mr. Khalifa's whirling this brick, this

7    boulder.

8       A    Okay.

9       Q    We are going to get to that.

10           I also want you to point out, sir, where you see

11   him pick up the boulder.

12      A    Right.

13      Q    8 or 10 inch boulder.

14                (Whereupon, the videotape was stopped.)

15      Q    I paused the video here.  It's 13:07:24 seconds.

16      A    Mmm-hmm.

17      Q    Do see yourself in the top?

18      A    No, I don't.

19      Q    You don't see yourself in the top corner by that

20   black vehicle?

21      A    No, I don't.  No, I don't.

22      Q    Okay.  You don't.

23           You let me know when you first see yourself.

24      A    Okay.

25                (Whereupon, a videotape was played.)

Case 1:21-cv-00703-AMD-LB   Document 6-4   Filed 04/15/21   Page 73 of 135 PageID #: 734

1      Q    You are crossing the street right now.  That's not

2  you?

3      A    I don't see it yet.

4      Q    Okay.

5               (Whereupon, the videotape was stopped.)

6      Q    Do you recall crossing Court Street from Joralemon?

7      A    Yes, I do.  I don't see it here yet.

8      Q    That could be you, sir?

9      A    Roll the tape, bro.  This is distorted.

10     Q    Okay.  Distorted?

11     A    Yeah.  Boom.  There I go.  Right there.

12     Q    So --

13     A    There I go.  Right there.

14     Q    Can you point to the jury where?

15     A    Right there (indicating).

16     Q    You are in the middle of the street?

17     A    That's right.

18     Q    Which direction did you come from?

19     A    I came from Joralemon.

20     Q    Right.

21          So you crossed from Joralemon off the, walk into

22  the street, right?

23     A    Right.

24     Q    Okay.  And you passed, you called it by this

25  machine is what?

1      A    It's a pay loader.

2      Q    A pay loader, right?

3      A    Right.

4      Q    You crossed the pay loader.  Did you notice

5  Mr. Khalifa behind you at this point?

6      A    Not at this point.

7      Q    Not at this --

8      A    Boom.  There he go picking up the brick.

9           Back it up.

10     Q    I am going to back it up.

11               (Whereupon, a videotape was played.)

12     Q    You use the red light?

13     A    See him right there.  See him kneeling down right

14  there.

15     Q    Point there.

16     A    There he go, right there.  There he go kneeling

17  down (indicating).

18     Q    Okay.  Perfect.  So this is 13:07 and 32 seconds.

19     A    Mmm-hmm.

20     Q    You are indicating there is a man in the green

21  shirt bending down?

22     A    Bending down right here picking up the brick.

23     Q    Right by the crane?

24     A    Yes.

25     Q    This is when you are saying he picked up this 8 or

1    10 inch boulder?

2         A    And he wraps it in his shirt.  Boom.  Did you see

3    that?

4         Q    I am just asking you to describe --

5         A    I am asking you to describe what he did.  He just

6    seen him stand up, pick the boulder up.  He is approaching

7    me now.

8         Q    Video paused 13:07:41 seconds.

9              Did you see yourself in this video?

10        A    No.  I am behind the truck.

11        Q    You are not pictured right there by the left of the

12   red van?

13        A    Oh, okay, okay, okay.  That's me on the tail end.

14   Okay.

15        Q    Okay.  That's you.

16             Can you please point where Mr. Khalifa is?

17        A    He, I gather he is behind this thing right here.  I

18   don't see him either (indicating).

19        Q    Okay.  And --

20             MS. BURKE:  Judge, can we indicate for the

21        record, please.

22             THE COURT:  Please.

23             MR. MOTTOLA:  The witness indicating he was

24        the person in the middle of the video right by the left

25        of this red van.  And indicated Mr. Khalifa would be

1          the person that appears to be in a green shirt above

2          the orange little mini part of the vehicle in the

3          center of the photo.

4          Q    How far apart are you, approximately?

5          A    I can't tell from the video, but what I can tell is

6     my back is to him.

7          Q    Okay.  But your back is to him at that point?

8          A    Yeah.  Right here my back is to him (indicating).

9          Q    Are you sure?

10         A    Okay.  Okay, okay, okay.  I have turned around.

11         Q    So you have turned around.  Okay.

12              Now up until this point you didn't know he was

13    behind you, right?

14         A    Until I heard him yell.  That's why I turned

15    around.

16         Q    Okay.  He was yelling.  And what was he yelling?

17         A    Nigga.  Stop.  Da, da, da.  And he picked up that

18    brick.

19         Q    He has been yelling this the whole time, right?

20         A    Right.

21         Q    How did you feel at this point?  This guy's

22    following you for X amount of blocks, he is yelling these

23    nasty things at you.

24         A    Mmm-hmm.

25         Q    You were frightened?  Were you also angry?  Is that

1    possible?

2         A    No.  No, I am not angry.

3         Q    You are not angry?

4         A    At all.

5         Q    That a man you never met before is telling you go

6    back to Africa?

7         A    No, I am scared, not angry.

8         Q    You are scared?

9         A    Right.

10        Q    You are so scared.  You actually approach him.  You

11   actually go towards him now?

12        A    No, no.  Actually he is coming towards me wailing

13   the brick.

14        Q    Okay.  Can you please show everyone where he is

15   whirling this brick?  Just show us.

16             (Whereupon, a videotape was played.)

17        A    See him wailing it?  Back it up a little more.

18        Q    The video played, I believe, for about six seconds.

19        A    Okay.  Back it up a little more, you will see him

20   twirling the shirt.

21        Q    I want you to just show us the twirling like you

22   showed the jury.

23        A    Here we go running.

24        Q    Okay.

25        A    No.  You got to back it up.

1      Q   I am backing it up.

2      A   See it right there (indicating).  See him right

3   there, okay.  Run it.

4      Q   Hang on, all right, sir.

5      A   Okay.

6      Q   I am going to run it 13:07:41 seconds.

7      A   Here we go.

8      Q   You agree you are facing Mr. Khalifa?

9      A   I am facing him.

10     Q   Is the knife out of your pocket?

11     A   No.

12     Q   It's not out of your pocket?

13     A   No.

14     Q   Are we going to see you pull it out on the video?

15     A   I don't know.  Do you?

16     Q   When did you pull it out of your pocket?

17     A   When I grabbed for him.

18     Q   So?

19     A   To stop him from swinging the brick.

20     Q   When you grabbed him, it's your testimony that the

21   knife, you then pull it out of your pocket?

22     A   Right.  Pulled it out of my pocket.

23         It's not a knife, it's a wire stripper.

24     Q   Did you tell him you had a knife?

25     A   No.

1       Q    Did you tell him back up, leave me alone?

2       A    Yes.

3       Q    You did.  Okay.

4            Did you say anything else to him?

5       A    No.  I told him get out of here.

6       Q    Okay.  You didn't tell him if you keep walking, we

7    are going to do this?

8       A    No.

9       Q    Right.  We are going to go, nothing like that?

10      A    No.  Never.

11      Q    Okay.  Now tell the jury what is happening here.

12      A    Boom.  Right here see whirling.  See he is whirling

13   it.  (Indicating) that's when I approach him.  He is

14   whirling it at me now.

15      Q    Now, the video's still playing.  I am going to

16   pause the video 13:07:55 seconds.

17           (Whereupon, the videotape was stopped.)

18      Q    Can you see you and Mr. Khalifa at this point?

19      A    No.

20      Q    Not in this video, right?

21      A    No, I can't.

22      Q    Now, you heard testimony yesterday and you saw that

23   other video involving the car, Miss Guy's car?

24      A    Right.

25      Q    Do you recall where Miss Guy's car was at this

VdV

1    point?

2        A    It's probably right past this pay loader.

3        Q    It's -- right now, you're out of view on this

4    video?

5        A    Right.

6        Q    Right.

7             So is it fair to say Miss Guy's cell phone video

8    kind of captures the other side.  Is that accurate?

9        A    Okay.

10       Q    Would you agree?

11       A    I guess.

12       Q    Okay.

13       A    I mean it's a live video.

14       Q    You don't see her car in this photo, do you?

15       A    No, I don't.

16       Q    Is it possible she's behind this pay loader?

17       A    I don't know.

18       Q    Okay.

19            MR. MOTTOLA:  Officer, if I could just have

20        the light for a moment.

21       Q    Okay.  Before we get to that other video, sir.

22       A    Now as you see I am grabbing his arm to stop him

23    from swinging the brick, and this is actually when I pulled

24    the knife out.

25            You can ask that question.

1        Q    Just so it's your testimony, so we are clear, this

2    is not a knife in your right hand (indicating)?

3        A    No, it's a wire shredder.

4        Q    It's a wire shredder?

5        A    Yes.

6        Q    Can you describe this wire shredder in detail to

7    us?

8        A    It's an apparatus this big (indicating).

9        Q    Hang on.  It's about five -- four, five inches?

10   Four inches?

11       A    Yes.  Extends.  It has brackets on the back of it

12   for you to measure wire, you clamp it, you pull it

13   (indicating).

14       Q    Okay.  Does it point in the front?

15       A    Mmm-hmm.

16       Q    Okay.  Or is it more like a needle nose?

17       A    I guess so.

18       Q    Well I am asking you.  We don't have it, right?

19       A    Right.

20       Q    You didn't keep it?

21       A    No.  You saying it's a needle nose.

22       Q    We don't have the instrument, right?

23       A    Right.

24       Q    Because you threw it away, right?

25       A    Okay.

1     Q    Okay.  So we don't know what it is, so you are

2     telling us it's a wire cutter?

3          A    Right.

4          Q    And we have to rely on what you describe it as?

5          A    Right.

6          Q    I am asking you to just tell us, because we have a

7     photo (indicating).

8          A    Right.  I just told you what it is.

9          Q    Okay.  So this is not a knife?

10         A    No.  It's a wire shredder.

11         Q    It's a wire cutter, okay.

12         A    I didn't say cutter, I said shredder, stripper.  It

13    strips wire.

14              MR. MOTTOLA:  Could I have the lights,

15         please, officer.

16         Q    Before I play this video, sir, we are in agreement

17    this video, right, is from once you and Mr. Khalifa are

18    behind that pay loader?

19         A    Okay.

20         Q    Correct?

21         A    I guess.

22              (Whereupon, a videotape was played.)

23         Q    Is Mr. Khalifa backing up in this video?

24         A    No.  He is, see, he is keep coming towards me.  I

25    am trying to ward him off, backing off.  Every time I try to

1    withdraw, he advances.

2         Q    He is coming at you?

3         A    With this brick wrapped in that shirt, yes.

4         Q    Did you see this on video where he was whirling the

5    brick, as you described it?

6         A    Well if he can't because I am holding his hand.  I

7    grabbed him now.

8         Q    Do you see him whirl --

9         A    Do I see?  He can't whirl.  I grabbed his hands,

10   stopped him from swinging it.

11        Q    Your testimony originally --

12        A    Was the same thing.  I grabbed him, stopped him

13   from continuing swinging it, as you can see in the video.

14        Q    Okay.  So, once you grab him now, just make me

15   understand.

16        A    He is struggling to get loose.

17        Q    Okay.  You are six foot one?

18        A    Relevance?

19        Q    Almost 300 pounds?

20        A    Relevance?

21             THE COURT:  Mr. McGriff.

22             THE WITNESS:  Yes.

23             THE COURT:  You are asked a question, sir.

24   If you are asked a question, please answer it.

25        Q    Yes?

1      A    Yes.

2      Q    Okay.  Mr. Khalifa is smaller than you?

3    Significantly smaller than you?

4      A    Uh-huh.

5      Q    Okay.  You have him now?

6      A    But if he was in a rational state he would have

7    took that in consideration at that time.  Thank you.

8      Q    So you grabbed him, right?  You have some point by

9    the arms?

10     A    Right.  I am suppressing his arm from swinging the

11   brick.

12     Q    The only option you are telling everyone is to pull

13   out this knife and stab him how many times, sir?

14     A    Whatever it is you said.

15     Q    Well how many times did you stab him when you are

16   in the middle of the street?

17     A    Like I said, I swung my arm about three, four times

18   at least.

19     Q    Where did you stab Mr. Khalifa?

20     A    I was aiming for the lower extremities to stop him.

21     Q    Right.

22          But you actually hit him in the torso, correct?

23     A    Okay.

24     Q    Well you didn't hit him in the leg?

25     A    Because he was so erratic.  He is moving, trying to

1    get, so I have to contain him so I don't allow him to strike

2    me.

3        Q    So you have this man who is significantly smaller

4    than you, you already have him?

5        A    That's erratic, mind you.  That he is erratic.  He

6    is erratic.  I don't have him.  He is erratic.

7        Q    Fair to say that you grabbed him at some point,

8    right?

9        A    No.  I grabbed his hands to stop him from swinging

10   the brick.

11       Q    Before you stabbed him, sir, do you not have a hold

12   of a body?

13       A    His arm with the brick in it.

14       Q    Okay.  So, you pulled out this knife, you are

15   saying, during the struggle, right?

16       A    Wire shredder.

17       Q    Wire shredder, okay.

18            Could you not have punched him in the face?  Was

19   that not an option for you?

20       A    No.  This man had a brick wrapped in something and

21   he was lunging at me with it.  No, it wasn't an option.

22       Q    We have to take your word he had a brick, right?

23       A    No, you don't.  I just told you where he picked it

24   up.

25       Q    You could see the, a brick in this video?

1      A    Am I lying because I told you he had a brick?

2      Q    That's for them to decide.

3          You can see him kneeling down, correct?

4      A    Right.  I am telling you he picked up a brick.  You

5 have to believe what I am saying, right?  I was the only one

6 there.  So I am telling you that he picked up a brick.

7          What is your point?

8      Q    When he bends down, sir, you are not looking at

9 him, correct?  In that video when he bends down you are

10 face --

11      A    Right.  When I turn around, he has a brick wrapped

12 up in a shirt.

13      Q    Okay.  If the brick is as large as you are saying?

14      A    It's wrapped in, right.  It's a big, about this

15 big, (indicating) he got it wrapped in a shirt.  He is

16 wailing it.  Don't you see that?  You don't see that in the

17 video?  Is that your testimony?

18      Q    Well yes or no.  You see Mr. Khalifa bending down

19 in the video?

20      A    Yes.

21      Q    Okay.  Is it your testimony you can see what he is

22 picking up?

23      A    When I turned around, he was wrapping it in his

24 shirt in the video.

25      Q    Can you see what he is picking up?

1          A    No.   That's why I am telling you what he picking

2     up.

3          Q    Could it have been bottle cap?

4          A    No.   I am telling you because I seen it.

5               MS. BURKE:  Objection, Your Honor.  He is not

6          allowing Mr. McGriff to continue to answer.

7          A    Right.   What are you talking to, trying to tell

8     people something that's not doing, that's what you are

9     doing, you know the evidence.

10              THE COURT:  Overruled.

11         A    You see this man chasing me on the block.  For

12    several blocks he chased me.  Now you going to sit here,

13    tell these people I attacked him.

14         Q    I did not say that.

15         A    Yes.   That's when you first talked to these people,

16    I am going to prove to you Mr. McGriff attacked him.

17              MS. BURKE:  Objection.

18              THE COURT:  Mr. McGriff, Mr. McGriff, I will

19         ask you when you are asked a question to answer it, all

20         right.  Thank you.

21         Q    Okay.  So, as you sit here right now, sir, you are

22    going to tell everyone that you weren't angry on August 11,

23    2015?

24         A    No, I wasn't.

25         Q    You weren't angry when a stranger bumped you --

1     A     No.  I was afraid.

2     Q     You were afraid then, and but you are not angry

3     now?

4     A     I am not angry at all.  I am just having a debate

5     with you.

6     Q     We have to rely on you that this rock is what he

7     picked up, right?

8     A     Hopefully.

9     Q     Right?

10    A     Yes.

11    Q     You are the only person that has come in court,

12    said he picked up a rock, right?

13    A     Okay.

14    Q     You didn't wait on scene after you stabbed him five

15    times, right?

16    A     Because he continued chasing me.

17    Q     The man you stabbed in the head and the body was a

18    threat to you, is that what you are saying?

19    A     Yes.  Extremely.

20    Q     You didn't run?  Everyone on Court Street saw?

21    A     No.

22    Q     That wasn't why you ran away?

23    A     No.

24    Q     You didn't call 911, right?  You had a cell phone?

25    A     A man is chasing me.  I am going to pull out my

1    cell phone, 911.  911 don't answer you like that.

2         Q    You never made a call on your phone when you were

3    walking?

4         A    Not running.

5         Q    It was possible, though?

6         A    Not running.

7         Q    You could have, right?

8         A    Not running.

9         Q    We are going to continue playing this video,

10   Mr. McGriff.

11        A    Yes.  Please do.

12               (Whereupon, a videotape was played.)

13        Q    I paused it again.

14               (Whereupon, the videotape was stopped.)

15        Q    Played for about two seconds.  Stopped at the 14

16   second mark.

17             You threw two, at least two swings with that knife

18   or wire cutter?

19        A    Because he is struggling with me to get free to

20   swing the brick.

21        Q    Now, from, I am going to run the tape.  Right now

22   it's paused 14 seconds --

23        A    I said he was struggling to get free to swing the

24   brick.

25        Q    Sure.  The video's paused 14 seconds.

1           At this point you're already close to Mr. Khalifa,

2     right?

3           A     Right.

4           Q     You have got him in your grip?

5           A     No, I have his arm.  He is struggling with me.  He

6     is not giving him -- not like he is saying no, please.  I am

7     not going to do this to you.  No.  He is getting away,

8     trying to pull away to swing the brick.

9           What is your point?

10          Q     You have him grabbed.  You have his arm grabbed,

11    correct?

12          A     Yeah.

13          Q     Okay.  You stabbed him now at least twice, right?

14          A     Mmm-hmm.  And he is still going.

15          Q     Okay.  He is still going?

16          A     He is still going.

17          Q     The moment you stabbed him the first two times that

18    we have on this video?

19          A     He is still going (indicating).

20          Q     Okay.

21          A     Still in it.

22          Q     Going to let the video play on 14 seconds until you

23    start to run towards Atlantic Avenue, okay?

24          A     Okay.

25          Q     I want to establish how long that was.

VdV

1      A    Okay.

2              (Whereupon, a videotape was played.)

3      A    But you don't know, see what's going on, so what

4   are you saying?  I am telling you what is going on, so what

5   are you saying?

6              (Whereupon, there was a pause in the

7      proceedings.)

8              (Whereupon, the videotape was stopped.)

9      Q    Okay.  So now I have paused the video 38 seconds.

10             We can see you here in the center, sir?

11     A    Right.  Leaving.

12     Q    Leaving.  You are running, right?

13     A    Right.  Um, leaving.

14     Q    Your testimony earlier on direct was that you were

15  briskly walking to get away from Mr. Khalifa?

16     A    No, I didn't say -- I said I was running.

17     Q    No, at first.  When you are coming up Joralemon you

18  cross Court Street, right, you were walking?

19     A    Right.

20     Q    Then you were out of breath because you smoke,

21  something like that?

22     A    Right.  Okay.  It's not out of breath because I

23  smoke.  I was running, and because I smoke, I was out of

24  breath.

25     Q    So now, so you couldn't run from him then is what

1    you are saying?

2         A    Right.  I was exhausted.  I couldn't run anymore.

3         Q    Now you had a 40 second physical battle with this

4    man.  You are saying he is fighting you?

5         A    Right.

6         Q    Right.

7              You are swinging this knife in him four times, five

8    times, right?

9         A    Right.

10        Q    Okay.  You had energy to do that, right?  You

11   couldn't run but you could stab him in the middle of Court

12   Street?

13        A    I could stand there, we can tussle because I cannot

14   run.  I have no more oxygen, mister.

15        Q    You ran in this video?

16        A    No, I couldn't get away from him.  He was still on

17   my trail.  Wasn't, the only difference this time, he didn't

18   have the brick.  There was no more for confrontation.

19        Q    After you stabbed him twice, we have that 25

20   seconds or so elapse.

21             That's not on Miss Guy's video, right?

22        A    What you saying, I came back and did it again?

23        Q    No.

24        A    Right.  What are you saying?

25        Q    You heard from Miss Reyes yesterday.  She came into

1    court and testified.

2        A    Said he was a well-clad man.  Do I have on any suit

3    in that video?

4                MR. MOTTOLA:  Officer.

5        A    Do I have a suit on in this video?  That woman said

6    I was in a suit, well-dressed.  I got on jeans and sneakers.

7        Q    So you are -- some other stabbing happened right

8    next to her?

9        A    No.  No.

10               MS. BURKE:  Objection.

11       A    That lady don't know what was going on.  She said

12   it was a well-dressed man that did it.  I got on jeans and

13   sneakers in there.

14       Q    One second.

15       A    Yeah.  Your witness.

16       Q    One second.

17            This is your arrest photograph, correct?

18       A    Mmm-hmm.

19       Q    Okay.

20       A    Her testimony was a well-dressed man.  Is that a

21   well-dressed man?

22       Q    It's up to the jury.

23            It's fair to say you were well-dressed?

24       A    Jeans and a khaki shirt.

25       Q    Bucket hat.  Nice red --

1       A     She was --

2       Q     She got it wrong?

3       A     She was wrong.  She said a well-dressed man.

4    That's exactly what she said.

5       Q     She also said there was a man in the green shirt.

6       A     Could there have been some prepping by you?

7       Q     Oh, okay.

8       A     Oh, oh, I am sure of it.

9       Q     The woman in the green shirt -- the man in the

10   green shirt, she did tell us that he ran away from you,

11   right?  He was already stabbed.

12             You remember that part?

13      A     No.  Right.  But you never see him running away

14   from me.  She said that, that he ran away.  You never see

15   him running away from me.

16      Q     We don't have a video of that.  That's correct.  We

17   have to rely on what she told us.

18      A     What I said, right, this was happening to me.

19      Q     You didn't say anything actually on direct.

20      A     About what?

21      Q     About crossing the street at all.  That's --

22      A     Why didn't I say that?  This is what happened.

23      Q     Okay.

24      A     Why didn't I say that?

25      Q     Do you recall going into a construction site with

1      Mr. Khalifa?

2          A     No.  I don't recall.

3          Q     You don't recall.

4                You don't recall him, he is coming after you

5      stabbed him the first two times, running?

6          A     No.  No, he never ran.  He never ran.

7          Q     You didn't chase him with that knife?

8          A     No.  He never ran.

9          Q     You didn't stab him three more times, including the

10     head?

11         A     Listen to me.  He didn't run.  What you see is him

12     backing up, getting --

13                     THE WITNESS:  May I stand up, Your Honor?

14                     (Whereupon, there was a pause in the

15               proceedings.)

16                     THE COURT:  I beg your pardon.  You want to

17               stand up?

18                     THE WITNESS:  Yes.

19                     THE COURT:  You may.

20         A     He wasn't running.

21                     THE COURT:  Just stand up here.

22         A     Okay.  He wasn't running, he was backing up to get

23     leverage, and that's why I am approaching him because --

24     listen to me --

25                     MS. BURKE:  Judge, I would ask the record be

1    completed.

2       A    Do you see the scar --

3            THE COURT:  Just a --

4       A    You see the scar on my head?

5            THE COURT:  Mr. McGriff, go ahead.

6       Q    I am just going to ask you, Mr. McGriff, re-enact

7    what you just did so I can make a record.

8       A    Right.

9       Q    What are you showing us?

10      A    When I turned around and saw him with the rock, I

11   started moving towards him to close the space between us

12   because he went like this (indicating), whatever he is

13   yelling.

14      Q    Just stay there for one second.

15           You are standing up, you are indicating that the

16   witness, or that Mr. Khalifa was coming at you, you pushed

17   him with a hand.  He was whirling with his right hand?

18      A    No.  No.  Back it up.  You got it wrong.

19           What do you mean pushed at him with a hand?  We not

20   that close.  I am telling you when he bent down, picked up

21   the rock, I turned around, you know, like this.  Picture all

22   this slow motion.  When I turned around, this man is coming

23   (indicating).  My idea was to close the space between us

24   because (indicating) he can lunge at me with this thing.

25      Q    Right.

1          A    And this is why once I stopped running you could

2     see me on tape slow down before he coming, because I am out

3     of oxygen.  I slowed down.

4               Now when I hear this man yelling the obscenities, I

5     turned around, there is no -- I don't have the zeal to

6     continue running without getting hurt.

7          Q    Okay.

8          A    That was my objective, to avoid him hurting me.

9          Q    Right.

10              MR. MOTTOLA:  I don't see even -- do you want

11         me to make a record?

12         Q    You were up, Mr. McGriff.

13              THE COURT:  Showing backing up motion.

14         Q    You don't have the energy to run?  You couldn't

15    run?

16         A    Right.  I am walking to suppress him from swinging

17    the brick he picked up, wrapped in a shirt.

18         Q    You have him grabbed?

19         A    And accost me with it.

20         Q    Okay.  You have him grabbed?

21         A    Yes.

22         Q    You now stab him twice, right?

23         A    And he's still tussling.

24         Q    Okay.  Is he still twirling the brick.  That's what

25    you were saying, the boulder?

VdV

1          A    He can't.  I got his hands.

2          Q    He can't, right?

3          A    Because I got his hands.  If I let this hand go,

4     pow.  He gonna slap me upside the head to --

5               MR. MOTTOLA:  Objection to that.

6               THE COURT:  Sustained.

7          A    Why?  This is the truth.

8          Q    Why --

9          A    You, because I did not let it happen.  You are

10    telling me I should have.

11         Q    Did you have a single scratch on when you were

12    arrested?

13         A    Why?  Because I didn't let him.  He attacked me.

14    And because I didn't let him injure me.

15              Like I told you, ladies and gentlemen --

16         Q    He attacked you?

17         A    When I was 15 years old --

18         Q    Sir --

19              THE COURT:  Mr. McGriff.

20         A    -- a man walked up on the back, I turned my back on

21    him.

22              THE COURT:  Mr. McGriff.

23         A    You see the scar?  He slapped me with a baseball

24    bat.

25              THE COURT:  Mr. McGriff, you answer the

MCGRIFF - CROSS EXAMINATION - MOTTOLA

237

1          question, that's what you will do.  Your lawyers will

2          have an opportunity to ask you --

3                    THE WITNESS:  Yeah.

4                    THE COURT:  They will have an opportunity to

5          ask other questions on redirect.

6          Q    You have him grabbed.  You've stabbed him twice?

7          A    And he still coming.

8          Q    Did you cross Court Street back towards

9     Mr. Khalifa's direction?

10         A    No.

11         Q    Never?

12         A    Everything happened in one single motion.  Was no

13    pause, come back.  No.  No.  There was none of that.

14         Q    You are fighting.  You are stabbing Mr. Khalifa,

15    correct?

16         A    Because he won't stop.

17         Q    Is it yes or no?  You are stabbing him?

18         A    No.

19         Q    Because he --

20         A    I am trying to suppress him.

21         Q    By stabbing him, correct?

22         A    No.  By stopping him from swinging the brick.

23         Q    How did he get those five stab wounds?

24         A    Because he was trying to hit me with a brick.

25         Q    He got them from you?

1    A    He got them because he was trying to hit me with a

2    brick.

3    Q    We have to take your word for that, sir.

4    A    No, you don't.  You see it in the video.

5    Q    Okay.  At some point you cross back towards

6    Miss Reyes' direction, right?

7    A    Once I left him, I was gone.  That was it.  There

8    was no stop, come back.

9    Q    Did you or did you not --

10   A    No.  There was no stop, come back.

11   Q    Okay.

12   A    There was none of that.

13   Q    I am not asking you that.

14        Did you ever go into the construction site that, or

15   the building that was under construction?

16   A    No, I didn't go into the conduction site.

17   Q    Mr. Khalifa, did he fall into the construction

18   site?

19   A    She was, that they say fighting -- I was in a

20   scuffle.

21   Q    Right.

22   A    I was in a scuffle.

23   Q    You suffered no injuries in the scuffle.  The other

24   man has five stab wounds, correct?

25   A    Okay.  Right.

MCGRIFF - CROSS EXAMINATION - MOTTOLA

239

Q    I am asking you.  Is that accurate?

A    No.  No.  Listen to me.

Q    Sir.

A    You keep relying on this, how big you are.

     Don't you think a rational man would have taken

into consideration that before picking up a brick, chasing

me two blocks, chasing me from Joralemon and Boerum to Court

and Livingston.  Would a rational man do that?

Q    Would a rational --

A    Looking at a big man like?

Q    Sir, can I ask you a question?

A    A rational man would say, you know what, I'ma hit

this man with a brick.

              MR. MOTTOLA:  Objection to this.

              THE COURT:  Sustained.

A    Oh, man.

              THE COURT:  Sustained.

A    I am run him down in the street.

              THE COURT:  Mr. McGriff, have a seat, please.

A    Listen.  No rational man would that.  This the one

that's a fugitive.

Q    A rational man would stab another man five times.

That's your testimony?

A    No.  A rational man defend himself from a man

trying to attack him.

                         VdV

MCGRIFF - CROSS EXAMINATION - MOTTOLA

240

1      Q    Could you not have punched Mr. Khalifa in the face?

2      A    I did.  How was --

3      Q    I am asking you --

4      A    No.

5      Q    Is it possible?

6      A    No.

7      Q    It wasn't possible?

8      A    He attacked me with a weapon.

9      Q    You stabbed him twice, he breaks away from you,

10     right?

11     A    No.

12     Q    He doesn't break away?

13     A    Run your tape.  Run your tape.

14     Q    Is --

15     A    Run your tape.  Stop talking that he ran away.

16     Everything was in one shift motion.  There was no break

17     down, come back and re-group.  No.  There is none of that.

18     Q    I will play the tape, sir.

19     A    Play it.

20     Q    I will.  Now pause that.  One second.

21              (Whereupon, there was a pause in the

22     proceedings.)

23              MR. MOTTOLA:  Officer, sorry, the light.

24     A    Yeah.

25              (Whereupon, a videotape was played.)

VdV

1    A    Now would you like me to explain this to you?

2    Q    Hang on.

3    A    Okay.

4         MR. MOTTOLA:  For the record, the tape's

5    running in its entirety.  People's 4 I believe -- 7.

6         (Whereupon, the videotape was stopped.)

7         MR. MOTTOLA:  All right.  You can hit the

8    lights again, officer, please.

9    Q    Okay.  For 38 seconds the tape ran, right?  From

10   when you first approaching Mr. Khalifa to when you

11   ultimately grab him, stab him at least twice --

12   A    Because he is threatening to swing this thing at

13   me.

14   Q    I am giving the time line.

15        Then you run 38 seconds or so?

16   A    Watch.  I am not keeping time.

17   Q    What happened during those 38 seconds?

18   A    I am not keeping time.

19   Q    I am just pointing to the video.

20        At 14 seconds you and him go off camera.  You are

21   not back on this camera until 38 second?  Fair?

22   A    Right.

23   Q    Okay.  So there is 24 seconds in between?

24   A    That we are not in the camera, right?

25   Q    Right.

1    A    I am tussling with him.

2    Q    Right.

3              THE WITNESS:  Your Honor, may I?  May I?

4              THE COURT:  You want to?

5              THE WITNESS:  Stand up.

6              THE COURT:  Of course.

7    A    Those 24 seconds that we not in the camera he's

8    steady.  You see him.  I am trying to grab his hands because

9    he, (indicating) what am I supposed to do?

10             THE COURT:  Have a seat.

11   A    What am I supposed to do?

12   Q    Just for the record, you were whirling your right

13   hand again.  That's when Mr. Khalifa --

14             THE COURT:  Backing up.

15   Q    -- backing up?

16   A    He is trying to pull from him.

17   Q    After he's stabbed twice, at least you are saying

18   still trying --

19   A    Yes, trying to swing --

20   Q    Do you have him by the arm?

21   A    At one point he breaks away, because my idea is to

22   get him off of his feet.

23   Q    Okay.  What point he breaks away?

24   A    Pull his arm away.  This is where the eminent

25   threat comes in.  I have to get him off his feet because he

MCGRIFF - CROSS EXAMINATION - MOTTOLA

243

1    is relentless.  He is going to strike me with this.

2                 MR. MOTTOLA:  Objection.

3         A    He is going --

4                 THE COURT:  Sustained.

5         A    What do you mean objection?  Do you not see this

6    man pursuing me from Boerum and Joralemon?  Do you not see

7    me running?  Do you not see me running?

8                 THE COURT:  Mr. McGriff, I am going to --

9                 THE WITNESS:  Your Honor.

10                THE COURT:  Mr. McGriff, I am giving you a

11           lot of leeway.  I am directing you, please, to answer

12           the question.

13                THE WITNESS:  All right.  Okay.  But, Your

14           Honor, I can't answer question that.  He is designing,

15           make it look like something other than what it --

16                THE COURT:  Mr. McGriff, it's for the jury to

17           determine what is or isn't from all the evidence.

18                I am going to direct --

19                THE WITNESS:  Right.

20                THE COURT:  Mr. McGriff, please.  I am going

21           to ask you again to answer the questions.  Your lawyers

22           will have an opportunity to address anything on

23           redirect.

24                THE WITNESS:  Okay.

25        Q    All right.  Let's go back to when he breaks away

244

1    from you.

2         A    No.

3         Q    You said he did?

4         A    No.

5         Q    Okay.  He didn't -- does he ever get away from you?

6    He never pulls away from you?

7         A    Didn't I just answer that question?

8         Q    You said no, you said yes.  I want to know can you

9    be clear for us?

10        A    No.

11        Q    He never gets away from you?  He never runs away

12   from you?  That's your testimony?

13             (Whereupon, there was a pause in the

14        proceedings.)

15        A    For the fifth time, no.

16        Q    Okay.  So how do you get him to his feet?  When do

17   you decide the fight is over?

18        A    When he's off his feet.

19        Q    How many --

20        A    And the brick is out his hands, he has no more

21   injuries applied to him at that time.  I turn and leave.

22        Q    How many times did you stab him at this point?

23        A    They said it was five.

24        Q    How many did you stab him?

25        A    I told you I swung my arm I recall three or four

1     times.  They said it was five.  But once he was off of his

2     feet there was, the eminent danger was gone.

3          Q     Okay.  So look.  Stop me when I am wrong.

4                You have this man that you are saying attacked you,

5     right?  You are the victim?

6          A     Right.

7          Q     Okay.  He is this crazy person?

8          A     Right.

9          Q     Okay.  You have him.  Right?

10         A     No, I don't have him.  He is pursuing me.

11         Q     At some point you grab his arm?

12         A     Okay.  Right.

13         Q     You stab him twice, right?

14         A     Mmm-hmm.

15         Q     You stab him a couple more times?

16         A     Right.

17         Q     He goes to the ground?

18         A     No.  No.  See, you got it wrong.  Stop you when you

19    are wrong.

20         Q     Okay.

21         A     I grab his arm.

22         Q     Right.

23         A     He struggling, pulling.  (Indicating) as you see on

24    the video, I hit him, boom, but he is struggling.  We go out

25    of the video.  He is, I mean like do, do, do (indicating).

1    Pulling, struggling.  Struggling with me as opposed to

2    moving along.  So then I hit him again.  But he doesn't

3    respond to it.  He's still erratic.

4        Q    So you are saying he is pulling away from you

5    because he is trying to hit you, right?

6        A    Right.  He is trying to get leverage.

7        Q    Is it possible he is pulling away from you because

8    you have a knife?

9        A    No.

10        Q    Oh, that's not possible?

11        A    No.  He is doing this.  He is doing this

12    (indicating).

13        Q    You have stabbed him twice?

14            MS. BURKE:  For the record, Your Honor.

15        A    He is still doing it.

16            MR. MOTTOLA:  I will make the record.

17        A    He is still doing this.  This is what I am trying

18    to tell -- he is injured, he is still doing this.

19        Q    Okay.  You were standing up.  You were, you had,

20    you were backing up indicating what Mr. Khalifa was doing.

21    I am unclear.

22        A    Yes.

23        Q    He was backing up trying to --

24        A    No.  He was trying to get leverage to swing the

25    weapon he had (indicating).  That's what he was doing.

VdV

MCGRIFF - CROSS EXAMINATION - MOTTOLA

247

1    Q    That's what you think he was doing, right?

2    A    No.  I was there.  That's what he was doing.

3    Q    Right.

4         Well he never swung the brick at you?

5    A    Because I didn't allow him to.

6    Q    How do you know he was trying to --

7    A    He broke his hand away from me.  He was making the

8    gesture.  That's what it means (indicating).  Unless, I mean

9    unless you an idiot, you can't tell what somebody else going

10   to do.

11              THE COURT:  Mr. McGriff.

12   Q    You stabbed him twice from you, he was pulling

13   away?  It's not possible?

14   A    Not at all.  Were you there?  No.  I am telling you

15   what the environment was there.

16   Q    It's possible?

17   A    No, it's not possible.

18   Q    Now let's talk about what you do after he is down

19   and --

20   A    Off his feet, no longer has the brick.

21   Q    Right.

22   A    That's when you see him turn and leave.

23   Q    I want to go back to my point.

24        So you are the victim, right?  In this whole story

25   the person, victim?

1      A     Yes.

2      Q     You stab this man down on the ground, five knife

3   wounds, at least one to the head, one to the arm, right, two

4   or three to the torso and the back.  This man is down.

5            Right?

6      A     Mmm-hmm.

7      Q     Okay.  You don't have any injuries, right, sir?

8            (Whereupon, there was a pause in the

9   proceedings.)

10     A     This man is making a mockery of this.

11     Q     I am asking you if you had injuries.  I am not

12   making a mockery.

13     A     No.

14     Q     Okay.  So Mr. Khalifa's down, significantly smaller

15   than you, right?  We have already established that you agree

16   he is down and he had this weapon, okay.

17           Why did you not wait on the scene, sir, have this

18   man arrested?  You are the victim.

19     A     Because he keep getting up.

20     Q     He doesn't have the weapon anymore.

21     A     Right now I am leaving.

22     Q     Yeah.  Okay.  Now you are leaving?

23     A     Right now I am leaving.  He is no longer a threat

24   now.  I am leaving.  Okay.

25     Q     The man with five knife wounds?

1      A    The psychotic man.  The crazy man.

2      Q    He is the --

3      A    Oh.

4           MS. BURKE:  Objection, Your Honor.

5      A    Yeah.  The crazy man.

6           THE COURT:  Sustained.

7           MS. BURKE:  Objection.  Move to strike.

8           THE COURT:  Sustained.  Strike the comment

9      and the answer.

10     Q    What did you do with this knife or this --

11     A    I told you I dropped it.

12     Q    Where?

13     A    Right there on Court.

14     Q    Miss Toribio, you were --

15     A    She said I put it in my pocket.

16     Q    Right.

17          You remember testifying in the grand jury?

18     A    Mmm-hmm.

19     Q    About a year ago?

20     A    Okay.

21     Q    Right.

22          And I asked you questions then?

23     A    Mmm-hmm.

24     Q    Right.

25          You were under oath just like you are now?

1    A    Right.

2    Q    You promised to tell the truth?

3    A    Right.

4    Q    Right?  Okay.

5         So I asked you --

6              THE COURT:  Page and line.

7              MR. MOTTOLA:  Sorry.  Page 57.

8    Q    I am going to direct your attention to -- I am

9    going to read those questions.  I am going to ask you if you

10   remember me asking you this and you giving these answers,

11   okay?

12             THE COURT:  Give defense counsel the page and

13        line number, please.

14   A    Let's get to the point.  You are sitting here

15   playing.

16             MR. MOTTOLA:  Page 57, lines six through ten.

17   Q    Sir, I asked you, sir.

18             "QUESTION:  Okay.  You testified that you

19        threw the wire cutter somewhere, right?

20   A    Yeah.  I threw it on the ground.

21   Q    Hang on.

22             "QUESTION:  Do you know where?

23             "ANSWER:  On Boerum.  I dropped it on Boerum.

24   Q    Do you remember saying that?

25   A    Boerum, Court.  I know that I dropped the knife.

1      Q    Yeah.  Sure.

2      A    That's the important thing, I dropped it.

3      Q    Well Boerum is a long way from Court, sir, isn't

4    it?

5      A    This man chase me nine blocks but you still trying

6    to stab at something else.

7      Q    Were you telling the truth in the grand jury or

8    were you telling the truth today?

9            MS. BURKE:  Objection, Your Honor.

10     A    What you talking about?  I dropped the knife.

11   That's the point.

12           MS. BURKE:  Objection, Your Honor.

13           THE COURT:  Sustained.

14     Q    You dropped the knife, right?

15     A    Yes.  That's the point.

16     Q    Did you put this in your pocket, run to Boerum

17   before you dropped it?          .

18     A    No.  I dropped it.

19     Q    Did you stay on the scene to call 911?

20     A    I had a psychotic man chasing me.

21     Q    A psychotic man who was stabbed five times?

22     A    Chasing me.

23           MS. BURKE:  Objection, Your Honor.

24     A    Chasing me.

25           THE COURT:  Overruled.

VdV

MCGRIFF - CROSS EXAMINATION - MOTTOLA

252

1    A    That he continued chasing me.

2         Didn't your first witness say that?

3    Q    The jury can --

4    A    Thank you.

5    Q    The jury will decide.

6         You didn't stay on scene to talk to the police to

7    make a report to secure the boulder so we have it for trial?

8              MS. BURKE:  Objection.

9              THE COURT:  Overruled.

10   A    The man was still attacking me.

11   Q    Sir.

12   A    He was still psychotic and outrageous.

13   Q    The man you stabbed, he is down?

14   A    No, he is up.  He's got stabbed.  He's back up,

15   chasing me once I leave.

16        What's the point you trying to make?  You trying to

17   make it seem like I attacked him.  Isn't that right?  Is

18   that your case?  That I attacked him?  Is that what you

19   trying to convince the people of, that I attacked him?

20             MR. MOTTOLA:  Objection.

21             THE COURT:  Sustained.

22   A    I am sure.

23             THE COURT:  Mr. McGriff.

24   Q    Okay.  So now let's get to your escape from Court

25   Street, okay?

VdV

1          MS. BURKE:  Objection, Your Honor.

2     A    Yeah, escape.

3          THE COURT:  Sustained.

4     Q    So, you start running, right?

5          The video shows you at least running at least

6     towards Schermerhorn Street, right?  You told us you took

7     this route here, okay.  So you are going down Court Street,

8     right?  Towards Livingston Street?

9     A    Mmm-hmm.

10    Q    Towards Livingston.

11         You go up Livingston towards Clinton, right?

12    A    Mmm-hmm.

13    Q    You then go down Clinton one block, two blocks,

14    three blocks, you hit Atlantic?

15    A    Mmm-hmm.

16    Q    Right.

17         Now you could have just kept going straight down

18    Livingston to get to your job?

19    A    I don't want him to bring this to my job.

20    Q    Right.

21         Not because you are --

22    A    No.  You asked a question, I answered it.  Don't

23    try to throw in nothing else.

24    Q    Not because --

25    A    Not it's not, it's because what I said.

1       Q    It's because you are --

2       A    It's because of what I said.

3       Q    Can I finish the question?

4       A    No.  It's because of what I said.

5            THE COURT:  Mr. McGriff.

6            THE WITNESS:  Tell me trying to fix up the

7       questions.  He asked a question, I answered it.

8            THE COURT:  Mr. McGriff, sir, please let the

9       assistant ask the question.

10           THE WITNESS:  And I answer it.

11           THE COURT:  Mr. McGriff, please let him ask

12      the question.  There is an issue your lawyer believes

13      the question is inappropriate, they will object.

14      Otherwise you must answer the questions.

15      Q    So --

16           THE WITNESS:  But excuse me.  Excuse me.

17      Should I answer the question the way he want me to

18      answer them, or should I answer them the way they were?

19           THE COURT:  Please continue.

20      A    Thank you.

21      Q    You hit Atlantic Avenue, correct?  You then go two

22      full avenues, right?  You go past Clinton, past Court, you

23      actually end up, is that Boerum?

24      A    Boerum.

25      Q    Okay.  Then you turn down Boerum.  That's when you

 1    drop this knife or wire cutter, right?

 2         A    Boerum, Court. Yeah. I dropped it. I dropped it.

 3         Q    On purpose, right? This wasn't an accident?

 4         A    I just released it. I just released it.

 5         Q    Because it was a knife, sir, right? It wasn't a --

 6         A    No. It was a wire cutter.

 7         Q    It was a wire cutter.

 8              You could have kept it, right? You could have

 9    showed it to the police?

10         A    No.

11         Q    But you didn't. You threw it somewhere in

12    Brooklyn, we don't know where, Court or Boerum?

13         A    I dropped it. I didn't throw it anywhere. I

14    dropped it.

15         Q    Intentionally?

16         A    I just release it out of my hands.

17         Q    Because you didn't want it when the police behind

18    you, right? You didn't want to have it on you, near you

19    anywhere?

20         A    No. That's not the reason.

21         Q    Why did you drop it then?

22         A    Because I didn't want it anymore.

23         Q    Because it has Mr. Khalifa's blood on it, right,

24    from all the stabbing you did with it, right?

25              MS. BURKE: Objection, Your Honor.

VdV

1              THE COURT:  Overruled.

2        A    For him chasing me with a brick.

3        Q    Sure.

4        A    Because I don't allow him to attack me, because I

5   don't allow him to hurt me.

6              Shouldn't a rational man think, yo, this is a big

7   dude.  I am not going to do this to him.  He is running.

8   Why am I chasing him?  Why am I chasing him?

9        Q    You go south on Boerum, right?

10       A    Mind you, all the while he is telling you --

11             THE COURT:  Mr. McGriff.

12       A    -- he is chasing me --

13             THE COURT:  Mr. McGriff.

14       A    A man with five stab wounds.

15             THE COURT:  You are being asked a question.

16       Q    He is following you, sir?

17       A    Chasing.  Chasing.  Five wounds.

18       Q    You were in court yesterday?

19       A    Yes.

20       Q    You heard all the testimony from the witness?

21       A    All three different version.  All different --

22       Q    Do you remember him, he walked after you?

23       A    No.  But I am running.  How is he -- is he walking?

24       Q    He's the one who is stabbed?

25       A    He is right behind me, though.

1   Q   You are the one trying avoid the police?

2   A   No.  I am trying to avoid him.

3   Q   He is the one with the five stab wounds bleeding on

4   the streets of Brooklyn?

5           MS. BURKE:  Objection, Your Honor.

6           THE COURT:  Overruled.

7   A   Because he no longer has the brick.  I have to

8   disarm him with -- yes.  Exactly, sir.

9   Q   So now you get to Boerum Street, right?

10  A   And the police approach me.

11  Q   Right.

12          Now you finally gave up this --

13          MS. BURKE:  Objection.

14  Q   -- this fight?

15          THE COURT:  Sustained.

16  Q   So now Officer Louard from the 84th Precinct, you

17  don't know him, right?  The arresting offer.  You didn't

18  know him before that day, right?

19  A   No.

20  Q   You didn't know he was going to respond to your

21  location, right?

22  A   Mmm-hmm.

23  Q   Now you are telling everyone he came into court

24  yesterday, that he lied, too?

25  A   Yes.  Exactly.

MCGRIFF - CROSS EXAMINATION - MOTTOLA

258

1    Q    He lied when he said he didn't see you?

2    A    That's right.

3         I am getting ready to point out to you.  Roll the

4    tape.

5    Q    I am going to play the tape for everybody.  You

6    are --

7    A    Show you exactly where he was when he told me to

8    get on the ground.

9              (Whereupon, a videotape was played.)

10             (Whereupon, the videotape was stopped.)

11         MR. MOTTOLA:  This is People's 9 in evidence.

12    Q    Mr. McGriff, I am going to stop the photo -- the

13    video right now.  This is 1:27:19 seconds.

14    A    Now if you roll it again you will see his feet come

15    into the frame.  He walks around the back of it.

16    Q    We are going to get there.

17    A    Okay.

18    Q    Right now you are behind this white van, right?

19    A    Right.

20    Q    Is it fair to say that you are crouched a little

21    bit?

22    A    Because I hear him yelling.  He is yelling at me.

23    Q    Right.

24         It's not because you are trying to hide from the

25    officer, right?

VdV

1    A    No.   The officer is yelling at this point.

2    Q    It's your testimony at this point --

3    A    He was yelling at me from across the street.   He

4    said he didn't see me 'til he got on this side.   No, that's

5    not true.   He yelling at me across the street to get on the

6    ground.

7    Q    Now I will play the tape again.

8         (Whereupon, a videotape was played.)

9    Q    We were going to pause it when we see Officer

10   Louard's feet, okay?

11   A    Okay.   Boom.   Right there.

12        (Whereupon, the videotape was stopped.)

13   A    He is yelling long before he get into the street.

14   Q    Okay.

15   A    And this is why he coming along the other side

16   yelling.

17        Did you see the part where his feet was on the

18   other side of the car?   Did you see that?

19   Q    The video is paused 1:27:28 seconds.

20   A    Mmm-hmm.

21   Q    At this point can you indicate where you see

22   Officer Louard's feet?

23   A    You just went by it.   They right here (indicating).

24   Q    Right.   Hang on.

25   A    In between here.   Right there.

VdV

MCGRIFF - CROSS EXAMINATION - MOTTOLA

260

1      Q    The top left corner of the video, the frame next on

2  the passenger's side with the white van?

3      A    Right.  He already told me to get on the ground,

4  that's why I am getting on the ground.

5      Q    That's what you are saying.

6      A    Am I lying?

7      Q    I am asking you, that's what you are saying, he

8  told you get on the ground?

9      A    Right.

10     Q    That's not what he said?

11     A    Right.  That's what I am saying.

12     Q    You are on the ground.  It's your testimony you are

13  on the ground not because you were hiding, but because you

14  were ordered on the ground?

15     A    Right.  By the officer.

16     Q    You are not trying to avoid the officer, nothing

17  like that?

18     A    No.

19     Q    Now you are on the ground, sir.

20          I am running the tape again.

21     A    Yes.

22              (Whereupon, a videotape was played.)

23     A    Him and all his crew coming around the corner.  I

24  am on the ground, as he ordered from across the street.

25              (Whereupon, the videotape was stopped.)

VdV

1          Q    Now, sir, I played the video.  Now pausing at

2    1:27:34.

3          A    Mmm-hmm.

4          Q    Are you not trying to stand up right now at this

5    point in the video?

6          A    No.  Actually, actually, bro, my knees are bad.

7    Stretching out my knee.  I didn't stand up erect.

8          Q    You weren't hiding from the officer?

9          A    No.

10         Q    You weren't ordered down on the ground?

11         A    Right.

12         Q    At this very moment when they come around and see

13   you, your knee starts to hurt?

14         A    No.  No.  No.  No.  Not knees start to hurt.  My

15   knee is on the ground.

16         Q    Well you were prone before that, right?  You were

17   lower now in this frame.  You are standing.  Is that fair?

18         A    No, I am not standing.

19         Q    You are attempting to stand?

20         A    Might have -- lifting my leg up, not standing up

21   erect, up.

22         Q    Because you are stretching your legs.  You have bad

23   legs?

24         A    No.  I am trying to stretch my leg from pressing on

25   the ground so I can lay down properly for them without

1    injuring myself.

2        Q    Okay.  I just want to be very clear.  I just have a

3    couple more questions for you.

4        A    Mmm-hmm.

5            MR. MOTTOLA:  You could put the light on,

6        officer.

7        Q    So, you have previously been convicted of a felony,

8    right, sir?

9        A    Yes.

10        Q    Okay.  Now I want to, just so we have your story

11   straight here, you are on Court Street.  We saw the videos

12   in evidence, right?  Mr. Khalifa, he is coming at you, you

13   turn around, right?

14        A    Mmm-hmm.

15        Q    Then you start to approach him.  You are saying the

16   knife's not out?

17        A    No, it's not out.

18        Q    At some point you grab him, right?  You grab his

19   arm?

20        A    Mmm-hmm.

21        Q    You stab him once?

22        A    Mmm-hmm.

23        Q    You stab him again?

24        A    Mmm-hmm.

25        Q    Right in the stomach or the torso?

1       A    I would say if that's what the report says I --

2       Q    You then go off camera, go over Kadesha Guy's

3   video, we don't see you anymore?

4       A    All right.

5       Q    There's 20 something seconds that passes on this

6   tape.  Is that accurate?

7       A    Okay.

8       Q    You are saying during that time period you stabbed

9   him again and again and again because you had to disarm him?

10      A    To stop him from swinging the brick.

11      Q    Then he goes down to the ground?

12      A    Right.

13      Q    You have suffered no injuries?

14      A    Right.

15      Q    At that point you decide I am not going to wait

16   here?

17      A    No, I am not.

18      Q    Right.

19           You are not going to wait.  Right?

20           You are not going to tell the police that he came

21   at you, right?  Or that you were a victim?

22      A    Actually there was a police car on the corner and I

23   walked towards it.

24      Q    Okay.

25      A    There is no police in there.

1   Q   You didn't call 911?

2   A   No, I didn't.

3   Q   You didn't --

4   A   I am in distress right now, actually.  That's the

5   real reason.  You dig what I am saying?  My mind is running.

6   A man just attacked me, you know, so, that's basically --

7   Q   You didn't call 911?

8   A   Right.

9   Q   Right.

10      You didn't keep the knife?

11  A   Right.

12  Q   Right.

13      Do you remember where you put it?  Did you put it

14  in your pocket?

15  A   Did I answer this question several times already?

16          MS. BURKE:  Objection.

17  A   Why you ask me that question again?

18          MS. BURKE:  Objection.

19  A   Because you trying to fool the people.

20          THE COURT:  Sustained.

21          Mr. McGriff, again, the objection is

22      sustained.

23  Q   Okay.  You didn't call 911?

24          MS. BURKE:  Objection, Your Honor.

25  Q   You didn't keep the knife?

VdV

1            MS. BURKE:  Objection, Your Honor.

2      Q    You didn't stay on scene?

3            THE COURT:  Sustained.

4            MS. BURKE:  Objection, Your Honor.

5            THE COURT:  Sustained.

6            By the way, I can hear you better when you

7      stand.

8            MR. MOTTOLA:  Nothing further, sir.

9            MS. BURKE:  Redirect.

10           THE COURT:  Redirect, sure.

11           MS. BURKE:  One moment, Your Honor.

12           (Whereupon, there was a pause in the

13     proceedings.)

14     REDIRECT EXAMINATION

15     BY MS. BURKE:

16     Q    Mr. McGriff, you had mentioned, you were pointing

17     to your head on cross examination.

18           Can you explain to the jury why you were pointing

19     to your head?

20           MR. MOTTOLA:  Objection.

21           THE COURT:  Sustained.

22           MS. BURKE:  May we approach, Your Honor?

23           THE COURT:  Yes.

24           (Whereupon, there was a discussion held at

25     the bench off the record.)

1    Q    Mr. McGriff, you were demonstrating to the jury how

2  Mr. Khalifa was backing up from you when you were near the

3  back, you called it the backhoe or the --

4              MR. MOTTOLA:  Pay loader.

5              THE COURT:  Pay loader.

6    Q    The pay loader.  Near the pay loader.

7         You recall that testimony?

8    A    Yes.

9    Q    Why is it that you did not want him to get close to

10  you at that time?

11   A    Like I originally said to you, right...

12             (Whereupon, there was a pause in the

13  proceedings.)

14   Q    You need a moment, Mr. McGriff?

15             MR. MOTTOLA:  Your Honor, I object to this

16  line of questioning.  Objection.

17             THE COURT:  Overruled.

18             (Whereupon, there was a pause in the

19  proceedings.)

20   A    Excuse me.  Like I was saying, you know, when I

21  turned around and I see this man.

22             (Whereupon, there was a pause in the

23  proceedings.)

24   A    Listen to me.  When I was 15 years old --

25             MR. MOTTOLA:  Objection.

VdV

1          THE COURT:  Sustained.

2          MS. BURKE:  Your Honor, I believe this is --

3     A    A man walked up to me and hit me with a baseball

4    bat.

5          MR. MOTTOLA:  Objection.

6          THE COURT:  Sustained.  Sustained.

7          The jury is to disregard it.

8     A    You kidding me?  Here is another man walking up on

9    me, wailing for what?  I didn't provoke you.  I didn't chase

10   you.

11    Q    Mr. McGriff.

12    A    I withdrew from him.  Now I am here, sitting here

13   trying to explain why this man -- it's not explanation why

14   he got hurt, it's why was he chasing me with a brick.

15          THE COURT:  Counsel.

16    Q    Mr. McGriff.

17          (Whereupon, there was a pause in the

18    proceedings.)

19    Q    Mr. McGriff.

20    A    Yes.

21    Q    Can you explain to the jury why you wanted to

22   prevent Mr. Khalifa from getting close to you?

23    A    Because I suffered a serious head injury.

24          MR. MOTTOLA:  Objection.

25          THE COURT:  Sustained.

1        A     When I was young.

2              THE COURT:  Sustained.

3              MR. MOTTOLA:  Objection.

4              THE COURT:  Sustained.

5        Q     What were you afraid he would do?

6        A     Strike me in the head with that brick he had

7   wrapped in his shirt.

8              MS. BURKE:  One moment, Your Honor.

9              (Whereupon, there was a pause in the

10  proceedings.)

11             MS. BURKE:  Judge, can I have Number 2 in

12  evidence, please?  Thank you.

13       Q     Mr. McGriff, I am going to cue up the first video

14  that you testified to earlier, which seems to be the longer

15  video of all of them.  Video on Court Street.

16             (Whereupon, a videotape was played.)

17       Q     I am going to try to get us to 13:07.

18             (Whereupon, there was a pause in the

19  proceedings.)

20             MS. BURKE:  One moment, Your Honor.  More

21  like 30 seconds.

22             (Whereupon, there was a pause in the

23  proceedings.)

24             MS. BURKE:  Officer, can you hit the lights,

25  please.

1    Q    All right.  Mr. McGriff, I am going to stop this at

2    13:07 and 18 seconds.

3              (Whereupon, the videotape was stopped.)

4    Q    Bring your attention to the screen.  I am not

5    going -- I don't want you to focus on you in the video, I

6    want you to focus on Mr. Khalifa.

7              When you stated that he --

8              (Whereupon, a videotape was played.)

9    Q    -- picked up a brick about 8 to 10 inches wide and

10   put it in his shirt.  During viewing this video.

11   A    Boom.  Right there (indicating).  That's him

12   picking up, bending.  See him standing up erect with the

13   brick?  That's where he picked up the brick at.  He is

14   steady, coming to follow me.

15             Now initially when he picked up the brick I didn't

16   know he was doing that until he started yelling

17   (indicating).  Now, when I turn back around he is coming

18   forward with the brick.  See, I am walking away.  He done

19   picked up the brick.  It's not until he start getting my, he

20   is coming at me, then I turn around he is wailing the brick.

21   Q    At this point --

22             (Whereupon, the videotape was stopped.)

23   Q    -- did you see where Mr. Khalifa is and where he

24   has this --

25   A    Well you can't see what because he is behind this

1    cement mixer, but he has the brick in his hands.  He has the

2    shirt, he is swinging it.  He is whirling it.  You

3    understand what I am saying?

4         Now like I said, told you, I had no more energy to

5    keep my back to him and retreat safely because he was

6    closing in rapidly.

7              (Whereupon, a videotape was played.)

8         Q    As you're walking back towards him can you point

9    out to the jury what Mr. Khalifa is doing with this brick?

10        A    He's whirling it in his hand.  He is whirling it

11   back, you know, in an attempt to thrust it at me now.

12        Q    Pointing with the pointer, can you show the jury --

13        A    Right here is where I am stopping him from swinging

14   the brick.

15             (Whereupon, the videotape was stopped.)

16        A    (Indicating) he is whirling it.

17        Q    Going to back it up a couple seconds.

18        A    My objective is to get this brick out of his hand.

19        Q    At 13:07:44 seconds.

20             Can you indicate to the jury where his arm is with

21   the brick in it?

22        A    Right (indicating), right now he is raising his

23   arm.  I am reaching to grab his arm.  As you could see right

24   there, I am extending my arm to grab his arm.

25        Q    As --

271

1    A    Though he is backing up, he's looking to get

2    leverage to swing the rock.

3    Q    At 13:07:45 seconds.

4         Can you indicate to the jury where his arm is with

5    this brick?

6    A    He is still in his motion to swing it, swing it,

7    but I am trying to get, to get the brick out of his hand.

8              (Whereupon, a videotape was played.)

9    A    Or at least prevent him from swinging it.  And

10   right there (indicating) where we clash.

11   Q    Indicating at 13:07:47 seconds.

12        So from the time you turned around --

13             (Whereupon, the videotape was stopped.)

14   Q    -- until the time you encountered him by this piece

15   of equipment, would you agree that approximately eight

16   seconds had passed?

17   A    Possibly.

18   Q    During that eight seconds, can you tell the jury

19   how you were feeling?

20             MS. BURKE:  Lights, please.

21             (Whereupon, there was a pause in the

22        proceedings.)

23   A    Listen, the man was trying to hurt me.  I just

24   didn't want him to hurt me.  That's it.

25             MS. BURKE:  Nothing further, Your Honor.

1      MR. MOTTOLA:  I have no redirect.

2      THE COURT:  Thank you, Mr. McGriff.  You may

3  step down.

4      (Whereupon, the witness was excused from the

5  stand.)

6      MS. BURKE:  Your Honor, there is another

7  witness that we have subpoenaed, the EMS worker who did

8  not respond to our subpoena, so we're asking for time

9  to secure that witness.

10      THE COURT:  Let's do this outside the

11  presence of the jury, please.  All right.

12      Come on up.

13      (Whereupon, there was a discussion held at

14  the bench off the record.)

15      THE COURT:  All right, ladies and gentlemen,

16  that's going to conclude our proceedings for the day.

17  As I told you, we will be working a half a day today.

18  I am going to send you on your way.

19      Please don't discuss amongst yourselves or

20  with anyone else.  Again, no independent research about

21  anything at all connected with the case.  No visiting

22  the location, the scene, anything having to do with the

23  case.

24      Continue with your holiday shopping if you

25  haven't finished it yet.  Get some rest.  Stay warm.

VdV

1          I will see you at 9:30 on Monday morning we

2     will continue with proceedings in this case.  Have a

3     wonderful weekend.  Thank you for your attention.

4               JUROR:  Thank you.

5               COURT OFFICER:  Follow me.

6               (Whereupon, the jury left the courtroom.)

7               THE COURT:  Okay.  See you 9:30 sharp Monday

8     morning.  Thank you.

9               By the way, be prepared for a pre-charge

10     conference right after we finished, and summations.

11               MR. MOTTOLA:  Sure.

12

13     *      *      *      *      *      *      *      *
       **(Whereupon, the proceedings were adjourned to
       December 19, 2016.)**

14     *      *      *      *      *      *      *      *

15          It is hereby certified that the foregoing is a true
       and accurate transcript of the proceedings.

16

17          _Vanessa del Valle_
              **VANESSA DEL VALLE**

18          Senior Court Reporter

19

20

21

22

23

24

25

VdV