*To be argued by*
DAVID L. GOODWIN
*(15 minutes)*

# New York Supreme Court

### APPELLATE DIVISION — SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against -*

LORENZO MCGRIFF,

*Defendant-Appellant.*

*TO BE HEARD ON
THE ORIGINAL
RECORD*

Kings County
Ind. No. 6248/15

A.D. No. 2017-02694

## BRIEF FOR DEFENDANT-APPELLANT

PAUL SKIP LAISURE
Attorney for
Defendant-
 Appellant
111 John Street, 9th
Floor
New York, NY 10038
(212) 693-0085

DAVID L. GOODWIN
*Of Counsel*
August 21, 2018

## TABLE OF CONTENTS

RULE 5531 STATEMENT ........................................................................ 1

PRELIMINARY STATEMENT.................................................................. 2

QUESTIONS PRESENTED...................................................................... 3

STATEMENT OF FACTS ........................................................................ 5

    Introduction.................................................................................... 5

    The Trial........................................................................................ 7

        Jury Selection and *Batson* Challenge ......................................... 7

        The People's Case .................................................................... 11

        The Defense Case..................................................................... 17

            Appellant's Testimony ........................................................ 17

            Cross-Examination ............................................................. 20

            EMT Testimony ................................................................. 22

            Defense Attempts to Call Nicole McGriff............................. 23

        Summations............................................................................. 24

        Jury Instructions, Deliberations, and Verdict.............................. 27

        Defense Motion to Set Aside Verdict ............................................ 29

        Appellant's Background and Sentencing....................................... 30

ARGUMENT ......................................................................................... 34

i

POINT I

THE PEOPLE FAILED TO DISPROVE APPELLANT'S
JUSTIFICATION DEFENSE BEYOND A REASONABLE
DOUBT, AND THE VERDICT WAS AGAINST THE
WEIGHT OF THE EVIDENCE, WHEN THE PEOPLE'S
OWN VIDEO AND MEDICAL EVIDENCE AND
APPELLANT'S CREDIBLE TESTIMONY SHOWED THAT
KHALIFA, WHO DID NOT TESTIFY—AND WAS BOTH
BEHAVING ERRATICALLY AND UNDER THE
INFLUENCE OF COCAINE AT THE TIME OF THE
INCIDENT—PURSUED APPELLANT AFTER HITTING
HIM, ALL WHILE YELLING THREATS AND SLURS, AND
THAT APPELLANT TRIED TO ESCAPE UNTIL, WINDED,
HE REALIZED KHALIFA HAD PICKED UP A WEAPON
AND WAS THUS FORCED TO PROTECT HIMSELF FROM
PHYSICAL HARM ............................................................... 34

POINT II

THE PROSECUTOR COMMITTED MISCONDUCT
DURING CROSS-EXAMINATION AND SUMMATION BY
VOUCHING FOR HIS WITNESSES WHILE CALLING
APPELLANT A LIAR, SHIFTING THE BURDEN OF
PROOF, MAKING INFLAMMATORY COMMENTS,
TESTIFYING AND MISSTATING RECORD EVIDENCE,
AND IMPLYING THAT APPELLANT WAS A
DANGEROUS AND VENGEFUL PERSON—ALL WHILE
ALSO MISSTATING THE APPLICABLE LAW ................. 44

## POINT III

THE COURT ERRED IN FAILING TO INSTRUCT JURORS THAT AN ACQUITTAL ON THE TOP COUNT BASED UPON A FINDING OF JUSTIFICATION PRECLUDED FURTHER DELIBERATIONS, AND ITS INSTRUCTIONS IMPROPERLY SUGGESTED THAT JURORS WERE REQUIRED TO CONTINUE DELIBERATING AND EMPOWERED TO RENDER A GUILTY VERDICT EVEN IF THEIR ACQUITTAL ON THE TOP COUNT RESULTED FROM A DETERMINATION THAT APPELLANT HAD BEEN JUSTIFIED................................................................53

## POINT IV

THE PROSECUTOR'S TWO-INCIDENTS THEORY TRANSFORMED THE SINGLE COUNT OF ASSAULT INTO TWO SEPARATE COUNTS, CREATING IMPERMISSIBLE DUPLICITY AND RENDERING IT IMPOSSIBLE TO DETERMINE WHETHER THE JURY WAS UNANIMOUS IN ITS VERDICT...............................57

## POINT V

THE COURT ERRED WHEN IT EXCLUDED AS "COLLATERAL" APPELLANT'S WIFE'S TESTIMONY THAT HE CARRIED A WIRE STRIPPER AND NOT A KNIFE, WHEN IT WOULD HAVE CORROBORATED A KEY ELEMENT OF HIS TESTIMONY AND REHABILITATED HIS CREDIBILITY, BOTH OF WHICH DIRECTLY RELATED TO HIS JUSTIFICATION DEFENSE ...........................................................................60

POINT VI

>THE COURT'S STEP-ONE DENIAL OF DEFENSE COUNSEL'S *BATSON* APPLICATION, WHICH ALLEGED THAT THE PROSECUTION DISPROPORTIONATELY STRUCK BLACK JURORS WITH NO APPARENT BASIS FOR MOST OF THE CHALLENGES—THUS MEETING THE DEFENSE'S BURDEN OF SHOWING *PRIMA FACIE* DISCRIMINATION—WAS ERROR ................................... 64

POINT VII

>APPELLANT'S SENTENCE IS EXCESSIVE IN LIGHT OF HIS PERSONAL CIRCUMSTANCES AND MENTAL-HEALTH STRUGGLES, HISTORY AS A PRODUCTIVE CITIZEN, AND STRONG FAMILY TIES—AND THE FACT THAT THE INSTIGATING COMPLAINANT SUFFERED NO SERIOUS INJURY ......................................................... 69

CONCLUSION ...................................................................................... 73

CERTIFICATE OF COMPLIANCE ......................................................... 74

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,                     :

        Respondent,                                              :

        - against -                                              :

LORENZO MCGRIFF,                                          :

        Defendant-Appellant.                             :
------------------------------------------------------------------------x

## RULE 5531 STATEMENT

1.    The indictment number in the court below was 6248/2015.

2.    The full names of the original parties were People of the State of New York against Lorenzo McGriff. The parties have not changed.

3.    This action was commenced in Supreme Court, Kings County.

4.    It was commenced by the filing of an indictment on August 19, 2015.

5.    This appeal is from a judgment convicting appellant, after a jury trial, of second-degree assault.

6.    This appeal is from a judgment of conviction rendered January 20, 2017.

7.    Appellant has been granted permission to appeal as a poor person on the original record. The appendix method is not being used.

1

## PRELIMINARY STATEMENT

Appellant Lorenzo McGriff appeals from a January 20, 2017 judgment of the Supreme Court, Kings County, convicting him, after a jury trial, of second-degree assault (P.L. 120.05[2]), and sentencing him to 7 years in prison, to be followed by 5 years of post-release supervision (Cyrulnik, J., at trial and sentence).

Timely notice of appeal was filed and, on May 5, 2017, this Court granted appellant leave to proceed as a poor person and assigned Lynn W. L. Fahey of Appellate Advocates, since succeeded as Attorney-in-Charge by Paul Skip Laisure, as appellate counsel.

Appellant had no co-defendants at trial. He is currently incarcerated pursuant to the judgment.

2

## QUESTIONS PRESENTED

1. Whether the People failed to disprove appellant's justification defense beyond a reasonable doubt, and the verdict was against the weight of the evidence, when the People's own video and medical evidence and appellant's credible testimony showed that Khalifa, who did not testify—and was both behaving erratically and under the influence of cocaine at the time of the incident—pursued appellant after hitting him, all while yelling threats and slurs, and that appellant tried to escape until, winded, he realized Khalifa had picked up a weapon and was thus forced to protect himself from physical harm?

2. Whether the prosecutor committed misconduct during cross-examination and summation by vouching for his witnesses while calling appellant a liar, shifting the burden of proof, making inflammatory comments, testifying and misstating record evidence, and implying that appellant was a dangerous and vengeful person—all while also misstating the applicable law?

3. Whether the court erred in failing to instruct jurors that an acquittal on the top count based upon a finding of justification precluded further deliberations, and its instructions improperly suggested that jurors were required to continue deliberating and empowered to render a guilty verdict even if their acquittal on the top count resulted from a determination that appellant had been justified?

4. Whether the prosecutor's two-incidents theory transformed the single count of assault into two separate counts, creating impermissible duplicity and rendering it impossible to determine whether the jury was unanimous in its verdict?

5. Whether the court erred when it excluded as "collateral" appellant's wife's testimony that he carried a wire stripper and not a knife, when it would have corroborated a key element of his testimony and rehabilitated his credibility, both of which directly related to his justification defense?

6. Whether the court's step-one denial of defense counsel's *Batson* application, which alleged that the prosecution disproportionately struck black jurors with no apparent basis for most of the challenges—thus meeting the defense's burden of showing *prima facie* discrimination—was error?

7. Whether appellant's sentence is excessive in light of his personal circumstances and mental-health struggles, history as a productive citizen, and strong family ties—and the fact that the instigating complainant suffered no serious injury?

4

## STATEMENT OF FACTS

Introduction

Appellant Lorenzo McGriff, a married, middle-aged man on his lunchtime break from his job as a peer specialist working with the mentally ill, was walking around the block in downtown Brooklyn when Mohammed Khalifa, a stranger, elbowed him in the collarbone. When appellant pushed him away, Khalifa called appellant, an African American, a "fucking nigger" and a "slave," and threatened to "kick [his] ass." Appellant retreated, but Khalifa followed him across the street and down the block. And when appellant, winded from trying to get away, perceived that Khalifa had picked up a brick from a construction site and was swinging it at him, appellant jabbed Khalifa five times with a sharp instrument. Appellant then fled the scene, with Khalifa still in pursuit.

Khalifa was then picked up by EMTs, and proceeded to call them "niggers" and "bitches." Khalifa eventually required sedation to be treated. Hospital records revealed that Khalifa tested positive for cocaine. Khalifa did not testify at trial; appellant, who did testify, raised a justification defense premised on Khalifa's aggressive, abusive, and apparently drug-fueled behavior.

5

During jury selection, the People exercised 9 out of 11 peremptory challenges against black members of the panel. The court denied appellant's objection to these strikes, ruling that he had not made a *prima facie* case of racial motivation.

Both at trial and during summation, the prosecutor called appellant a liar and embellisher, and asked, among other things, why he failed to preserve the weapon Khalifa had menaced him with. The prosecutor also argued at summation that even if appellant was initially justified in using force, he may have "chased" Khalifa, negating his justification defense.

The jury ultimately acquitted appellant of attempted first-degree assault but convicted him of second-degree assault. Although the court was presented evidence that appellant, a family man with a full-time job, suffered from bipolar disorder and previously undiagnosed post-traumatic stress disorder, connected to a debilitating injury he suffered as a child, the court imposed the maximum 7-year sentence.

6

## The Trial

### Jury Selection and *Batson* Challenge

#### Round 1

At the end of the first round of jury selection, the prosecution exercised peremptory challenges against panelists Ashley Dunn and Khandija Barrow, both of whom were black (J. 121, 283).[1] During defense counsel's questioning, Dunn had indicated that she looked for consistency in witnesses and, along with Barrow, answered affirmatively when asked "Would you stick by what you believe in?" (J. 108, 112). Both Dunn and Barrow provided biographical information, such as neighborhood and job, during the court's initial voir dire; neither was questioned by the prosecution (J. 72–73, 88–99).

Eight jurors were seated from the first round, three of whom were identified as black by the prosecution. Among the non-black jurors seated were Sean McGuinness, who had a prior theft conviction; and Morley Bland, who was a crime victim, had served on both a criminal and civil

---

[1] Citations prefixed by "J" refer to jury-selection minutes; "H" to minutes of the post-trial hearing held on January 17, 2017; and "S" to sentencing minutes. Unprefixed citations refer to Volume II of the trial minutes. All cited documents are contained in the Supreme Court file, except for the pre-sentence report ("PSR") which is submitted under separate cover.

7

jury, had volunteered previously for a public defender, and revealed that she experienced unpleasant interactions with people on the street "[a]ll the time" (J. 79, 85–86, 94–95, 106, 121–22, 285).

### Round 2

At the end of the second round, the prosecution struck panelists Gerard Philip, Andrea Solstad, and Pauline Stewart, who were black, and Tara Cascone, who was white (J. 196–98, 200, 283). Solstad, who related a story about subway harassment, earlier had been challenged unsuccessfully by the prosecution for cause (J. 152–53, 167, 181–84, 189–90, 198–99). Outside of providing neighborhood, family, and work biographical details, neither Stewart nor Philip spoke during questioning, except for when Philip answered defense counsel's question about the meaning of the presumption of innocence (J. 135, 144–45, 158–59, 186). Cascone had reported being a recent victim of theft (J. 151).

Two jurors were ultimately seated from this second round. One was black, and both had been engaged by the prosecutor during questioning (J. 169–72, 202, 285–86).

55 - scheduling
       problem w/ children

## Round 3

At the end of the third and final round of jury selection, the prosecution struck panelists Yvonne Best, Melina Grant, and Marlene Laplante—all black—and panelist Glen Mendez, who was identified by the defense as black (J. 275–77, 280, 284–85). A single white panelist, Elyse Barton, was also struck (J. 281, 285). The prosecution initially brought, but later withdrew, a challenge to Shaquan Nelson, another black panelist who was seated as an alternate (J. 280–81).

Of the struck black panelists, Grant had been asked only preliminary biographical questions by the court, while Best had told the prosecutor that she would have "[n]o problem" evaluating the case even if the complainant did not testify, and Laplante described herself as "very emotional" (J. 213–15, 255, 259–60). Panelist Mendez asked the prosecutor why the complainant would not be present, but also agreed to follow the court's instructions about the complainant's absence (J. 258–60).

## Batson Challenge

After the selection of the final alternate, defense counsel made a *Batson* challenge, contending that, out of 11 total peremptory challenges,

9

the prosecution had used 9 to strike black panelists and only 2 to strike white panelists (J. 282–85).[2] Defense counsel observed that neither Barrow nor Dunn, the first-round panelists, had made "any statements during voir dire . . . one way or the other" (J. 283). Of the second-round panelists, Philip and Stewart "said virtually nothing during voir dire," although counsel acknowledged Solstad's discussion about being a crime victim (J. 283). With regard to the third round, defense counsel noted that 4 of the prosecution's 5 strikes had been against black panelists (J. 284–85). When the court observed that panelist Mendez might be Hispanic rather than black, defense counsel disagreed, and the court did not comment further (J. 284). In closing, defense counsel observed no apparent race-neutral reasons for the "pattern" of strikes against black panelists other than Solstad, which led ultimately to a majority-Caucasian jury (J. 285).

In a short response, the prosecutor labeled "presumptive" and "unfair" the allegation of a majority-Caucasian jury, saying that "we don't

---

[2] Defense counsel referred to 10 peremptory challenges, contending that panelist Nelson was deprived of a seat on the main jury, but Nelson was not challenged until the full main jury had already been chosen (J. 207, 278, 280, 284).

10

probably know half the races of people seated" (J. 285–86). He pointed to 5 seated jurors that either were black or that he "believe[d]" were black, as well as at least one of the alternates, and commented that he had "no idea" of panelist Solstad's ethnicity (J. 285–86). The prosecutor nevertheless represented that he would "meet [his] burden" if the court found a pattern (J. 286).

The court summarily denied the *Batson* application, ruling that "across the board I do not find a pattern" (J. 286).

### The People's Case

Shortly after 1:00p.m. on August 11, 2015, security camera footage showed appellant, an African American man, walking along a street in downtown Brooklyn, followed by Mohammed Khalifa (People's Ex. 2 [security footage]). When appellant crossed the street into busy traffic, Khalifa continued to follow him (*Id.* at 1:07:23). Blocked by a construction site from reaching the sidewalk, appellant resumed walking on the street itself (*Id.* at 1:07:30). Upon reaching the same construction site a few moments behind appellant, Khalifa bent over and appeared to pick something up from the ground and wrap it in some clothing, which swung

11

back and forth in his hands as he continued to follow appellant (*Id.* at
10:07:33–40).

A few moments later, appellant turned around and charged
forward, causing Khalifa to back up (*Id.* at 1:07:37–46). The men began
to scuffle and argue. As Khalifa repeatedly approached appellant,
appellant both told and gestured at Khalifa to "get away" from him, and
asked if Khalifa was going to "keep on saying what [Khalifa] was saying"
(Janelle Toribio [eyewitness]: 4–6, 23–24; Kadesha Guy [eyewitness]: 33–
34; Ashley Reyes: 112–13 [eyewitness]).

Although appellant and Khalifa eventually moved out the frame of
the security footage, a cell-phone video taken by Kadesha Guy, a
passenger in a nearby car, captured appellant and Khalifa arguing in the
street, with Khalifa holding something that was swinging back and forth
and appellant alternately retreating and moving forward (People's Ex. 7
[cell-phone footage] at .00–10). Khalifa continued to advance on appellant
(Toribio: 6–7). Appellant then thrusted at Khalifa three times with a
sharp instrument, and someone in the car yelled "he's stabbin' him" (Guy:
35, 39–40, 60; People's Ex. 7 at .12–25). A photograph extracted from the
cell-phone video showed appellant holding Khalifa's arm in his left hand

12

and a short, sharp instrument in his right, while Khalifa held what appeared to be an article of clothing (People's Ex. 8 [cell-phone still]).

The two men were not in the frame of either video for about 20 seconds, at which point appellant reappeared on both recordings, running down the street (People's Ex. 2 at 1:08:31–38; People's Ex. 7 at .38–42).

Two witnesses and a recording of a 911 call were presented at trial to fill that 20-second time gap. According to Janelle Toribio, who was standing about 7 feet away, Khalifa clung to appellant and, after an additional struggle in which they careened into a car, both men entered an empty, under-construction storefront, where they remained for "[m]aybe a minute, not very long" (8–9, 12–14, 24; People's Ex. 4 [street photograph]). When appellant emerged, he pocketed a knife (which Toribio had not previously seen) before running down the street (14–17, 27). Bleeding from the head, Khalifa exited the storefront, screamed "I am still alive," and ran after appellant (14–15, 17, 28).

Ashley Reyes was focusing her attention on a potential client when she became aware of appellant and Khalifa arguing about 8 to 15 feet

13

away from her (109–10, 112–13, 120; People's Ex. 5).[3] They ran towards her and she moved out of the way (112, 114, 116). She testified that appellant, whom she described as "professionally dressed" with a "vest and button up outfit" or a "suit"—although appellant was actually wearing jeans and a beige shirt—was holding a knife and "chasing after" the "yelling" Khalifa, whose head and chest were already injured (112–17, 119–20; People's Ex. 10 [post-arrest photograph]). Unlike Toribio, Reyes testified that appellant attacked Khalifa as Khalifa "fell into" the storefront, which was behind her and occupied, not empty (114, 116–17, 120). Appellant, "in the suit," then "came out and ran away," and Khalifa emerged shortly afterwards; Khalifa, yelling, tried to run in the same direction (117–22).

Neither Reyes nor Toribio saw anything in Khalifa's hands during the encounter, although Toribio was initially uncertain (Toribio: 8, 16, 25, 30; Reyes: 117–18, 120–21). Guy, who was nearer, did not recall seeing Khalifa holding any "objects" or "kinds of weapons," but thought that Khalifa was holding something—however, she was "not sure what it

---

[3] During Reyes's testimony, the court sustained four objections to editorializing comments in her answers (115–16, 118–19, 122).

14

was" (49). Guy also recalled that, as appellant ran away, Khalifa followed him, running in the same direction a few minutes later (41, 44–45, 51).

The People also played a 911 recording for the jury. The caller said a man "chased another guy who stabbed him," and that both men had "just ran down Schermerhorn" (Kevin Haynes [NYPD technician]: 125–29; People's Ex. 11 [911 call]).

Officer Caleb Louard arrived at the scene and was directed by a series of pointing passersby to an intersection about 6 city blocks away. There, he discovered Khalifa, who was walking but laboring and bleeding from "what appeared to be . . . stab wounds" to his head, torso, and arm (Louard: 61–67, 101–06). Khalifa "seemed determined to continue walking" and did not "immediately" heed Louard's direction to stop and get down, but he eventually complied and pointed south (Louard: 67–69).

Louard and another officer discovered appellant one block away, down on the ground behind a parked minivan. Louard testified that he had not ordered appellant to the ground and did not recall hearing another officer do so (Louard: 69–72, 76, 89–90; People's Ex. 9 [arrest footage]). According to Louard, appellant tried to stand and did not "immediately give both of his arms upon request" to be handcuffed, but

15

Louard was unsure about whether he had asked appellant to show his hands (72–73, 91, 95).

Louard searched appellant and did not find a weapon. Appellant, who was 6'1" and about 300 pounds, was uninjured (Louard: 73, 77–78).

Khalifa was taken to the hospital (Louard: 80). Medical records described Khalifa as "combative," "highly uncooperative," "extremely verbally belligerent and threatening," and "severely agitated" (People's Ex. 1 at 3–4, 7 [Medical Records]). They recounted Khalifa standing up on the stretcher and "scream[ing] out religious statements" even as he was bleeding, to the point that he required "sedat[ion]" in order to be treated for his wounds, and was intubated to "protect staff and patient" (*Id.* at 3–8, 10–11). After testing positive for cocaine, Khalifa signed himself out against medical advice while "threaten[ing] bodily harm" to the staff, and had to be escorted out of the hospital by security (*Id.* at 2, 25, 53).

16

The Defense Case

Appellant's Testimony

Appellant was a Brooklyn-born man in his mid-40s, married with two adult sons, who suffered from diabetes and was a heavy smoker (159, 164, 174, 198). Appellant, who agreed he had one prior felony conviction, testified that at the time of the incident, he worked as a forensic peer specialist at an office on Baltic Street in Brooklyn, assisting persons diagnosed with Axis I psychiatric disorders (159–61, 164, 167, 174, 199, 262).

Appellant was in the midst of his daily lunchtime walk around the block when, on busy Joraelmon Street near Brooklyn Law School, he encountered Khalifa (161–63, 201). As the two men passed each other, Khalifa suddenly "lift[ed] his elbow up" and "jammed it . . . in[to] [appellant's] collarbone" (162). "[S]tartled," appellant shoved Khalifa away from him (162, 172, 202).

Khalifa "growl[ed] . . . you fucking nigger" and started to "rant and rave," calling appellant a "slave" and threatening to "kick [his] ass" (162–63). When appellant walked away, Khalifa ran up behind him and shouted, "Motherfucker. Where the fuck you going?" (163).

17

Accustomed to working with people suffering from mental illness, appellant "noticed something was off" about the "drool[ing]" Khalifa and his "erratic" body language (163, 172). Appellant reasoned that "you encountered all kinds of things" on the street, including "sick people," so he resolved to "walk away" from what appeared to be "more than a rational situation," hoping Khalifa would lose interest once appellant created distance (173–74). Appellant crossed the street, at one point running at "top speed" into heavy traffic, in an attempt to lose Khalifa, to attract police attention if necessary, and eventually to return to his office (163–64, 172–75).

But Khalifa continued to follow, "yelling" and "ranting" slurs like "[y]ou nigger" and "[t]ake your black ass back to Africa" (163–64, 172–75, 204). Appellant saw no police he could flag down (188). After turning the corner onto the street captured by the surveillance footage, appellant slowed because, as an overweight smoker, he had to "catch [his] wind" (164, 229).

Turning around, appellant saw that Khalifa had wrapped a brick or rock in a shirt he was carrying, and was leveraging it to swing at appellant (164–65, 182). Believing he was in danger of imminent attack,

18

appellant tried to grab Khalifa's arm, and then jabbed Khalifa with a wire stripper tool, not a knife (165–67, 182–84, 195–96, 219). Appellant tried to aim low, in an attempt to get Khalifa to stop, but Khalifa did not retreat or initially drop the brick (166–67).

The two men "tussle[d]," causing Khalifa to drop the brick and stumble into a nearby construction site, which appellant did not recall entering himself; believing Khalifa was no longer a threat, appellant then dropped the wire stripper and ran away, "adrenaline . . . high," before eventually slowing to a walk (167–68, 184–85, 190). Appellant denied chasing Khalifa during the encounter (232–33).

Appellant identified on the surveillance video where Khalifa picked up the brick and whirled it at him (182–83, 270–71). In the cell-phone video, appellant also identified a "rock in the sweater" dangling from Khalifa's hands, and said that appellant grabbed Khalifa's hands "because [Khalifa] is trying . . . to swing it" (187). Appellant pointed out moments on the cell-phone video where he tried to turn around and walk away (188).

Once away from the scene, appellant intended to take a back route to his office, but realized Khalifa was still yelling and in pursuit, although

19

at enough of a distance that appellant could not hear the words (167–68, 180, 189–90). Appellant did not want to "bring this to [his] job," so he "zigzag[ged]" in an attempt to lose Khalifa and find authorities who could help him (168, 175, 207, 253). Appellant then heard the police behind him, and testified that Officer Louard ordered him to get on the ground, denying that he resisted arrest (168–69, 190–94).

### Cross-Examination

During cross-examination, the prosecutor questioned appellant's story about Khalifa's wielding a brick or rock. Appellant was "the only person that has come in court [and] said [Khalifa] picked up a rock, right?" and the jury would have to "rely on" appellant's testimony and "take [his] word for that" point (226, 238). The prosecutor also asked appellant why he "didn't stay on scene" so that he could have the police "secure the boulder so we have it at trial" (252). The court overruled defense counsel's objection to this question (252).

The prosecutor also repeatedly questioned appellant's testimony that the tool was a wire stripper and not a knife (216, 223), and attempted to get appellant to admit it was a knife (255). Appellant sometimes corrected the prosecutor's inquiries about the "knife" (216, 223), but other

20

times repeated "knife" in his answers (218–19, 262). The prosecutor asked appellant why he had not "kept" it so he "could have show[n] it to the police," and theorized that appellant had disposed of the instrument "[b]ecause it ha[d the complainant's] blood on it" (255). Defense counsel's objection to this last comment was overruled (255–56).

The prosecutor pressed appellant about why he did not take advantage of other purported "options" in the encounter. For instance, the prosecutor asked if "[t]he only option you are telling everyone is to pull out this knife and stab him" (222–23, 248), and inquired about whether appellant had warned Khalifa that appellant "had a knife" (216). The prosecutor twice proposed another "option": punching Khalifa in the face instead (223, 240). The prosecutor also asked appellant on five separate occasions why he did not call 911 (226, 251, 264), or otherwise "wait on the scene" for police to arrive and "have this man arrested" (248).

With regard to appellant's conduct after the encounter, the prosecutor asked why he did not immediately return to his office, suggesting that rather than trying to escape Khalifa, appellant was trying to lose "the police"; appellant answered that there were "no police

21

to dodge" (207). The prosecutor attacked appellant's claim that Khalifa continued to pursue him (207, 230, 257).

Finally, the prosecutor extensively questioned appellant regarding his arrest, in part by asking him to comment on the video recording (257–61). Noting the inconsistencies between appellant's testimony about being ordered to get on the ground and Officer Louard's denial of that, the prosecutor pressed appellant on whether Louard had "lied" in court (257–58).

Only once did the prosecutor impeach appellant over inconsistencies with his grand jury testimony: appellant had told the grand jury he dropped the wire stripper on Boerum Street, but now testified he dropped it one block away on Court Street, at the scene (249–50; People's Ex. 12 [map]).

### EMT Testimony

Dominique Boyd, an EMT who treated Khalifa, testified that Khalifa was "verbally abusive and really aggressive," calling her and her black female partner "niggers and bitches," refusing to let the medical team touch him, "yelling and screaming," "fighting" and "assault[ing]" the team, and refusing to allow his wounds to be dressed (281–87;

22

Defense Ex. A [EMT report]). Khalifa was "swinging his arms around, trying to get us off of him" (288). Another crew was called in order to sedate him so that he could be treated and transported (284, 287; Defense Ex. A).

### Defense Attempts to Call Nicole McGriff

When the defense attempted to call appellant's wife, Nicole McGriff, as a witness, the prosecutor challenged the relevance of her testimony and asked for an offer of proof (276–77). Defense counsel explained that Nicole, appellant's wife of 25 years, would testify that appellant carried around a wire stripper because one of his hobbies was repairing speakers and other equipment, and argued that her testimony was necessary because the prosecutor "has been repeatedly calling [the tool] a knife" (277). The prosecutor responded that this proposed testimony was "collateral," because either a wire stripper or knife could be a "dangerous instrument," and alleged that "several times throughout [appellant's] own testimony he referred to it as a knife"—although the prosecutor also conceded appellant "mostly" said "wire stripper" on direct (278). The court excluded the testimony as collateral and noted an exception at defense counsel's request (278).

23

Summations

In its summation, the defense called justification the "main issue" in the case, emphasizing that Khalifa elbowed appellant purposefully, pursued appellant for several blocks, and continued to behave aggressively and erratically even at the hospital (313).

The People's summation repeated many of the themes from cross-examination. The prosecutor argued that despite appellant's options of "fleeing the situation" and "resolving the dispute in another way," appellant "chose violence" (334). According to the prosecutor, appellant also ignored the "choice of calling 911" or of "securing this boulder or brick" for trial (334); while later conceding appellant "doesn't have to call 911," the prosecutor suggested that it showed that his story was false and that he was not really afraid of Khalifa (350). The prosecutor contended that appellant chased after Khalifa, who was "fleeing" from appellant, "[m]ake no mistake about it" (339).

The prosecutor encouraged the jury to find that the People's witnesses had testified truthfully, while appellant had lied to them on the stand. The People's witnesses had "no bias" and "no motive to lie for either party" (338). By contrast, "everything [appellant] told you . . . was

24

an embellishment in some way" or "a straight up lie" (341), such as appellant's testimony that Khalifa was "going to keep attacking me even though I stabbed him" (349). Appellant's story about Khalifa whirling a brick was "embellished," and appellant was lying about his fear because he "needs [the jury] to believe . . . he had this fear from this tiny man [who] has no weapon," as "[u]nder no view of the evidence was [Khalifa] armed" (338, 342, 360). The inconsistency between appellant's grand jury and trial testimony about where he dropped the weapon was "nonsense" because appellant "knows what he said in the grand jury" and "will say anything to you" (356).

With regard to the missing tool, the prosecutor argued that appellant "didn't have an excuse" for it, asking "Where's the knife? Where's the knife?" and telling the jury that appellant "eventually . . . started calling it a knife on the witness stand" (355). Pointing to the screenshot of the cell-phone video, the prosecutor asked the jury to "[u]se your own eyes . . . [t]hat's not a wire stripper . . . [c]lear as day that's a knife" (355). Defense counsel's objection to this last comment was sustained (355).

25

The prosecutor suggested that appellant was motivated by a pattern of anger and vengeance. Five minutes into cross-examination appellant was already "extremely angry," and thus was likely "ten times angrier" when encountering Khalifa (345). "No one talks to [appellant] like that. Right? All six foot one, 300 pounds of him. He is not used to this" (338). According to the prosecutor, appellant wanted to "teach [Khalifa] a lesson" for "walk[ing] around Brooklyn and call[ing him] those words" (343). "Here is how I solve my problems. It's with my knife" (346). "Why," the prosecutor asked, "couldn't he punch him in the face again and again . . . instead of pulling out the knife?" because "[i]f that [had] happened we wouldn't be here" (346).

The prosecutor told the jury that they should view appellant's conduct after the encounter with skepticism. Appellant's decision to leave the scene was "even more damning behavior," because Khalifa was "down, prone" and appellant was "twice his size" (348–49). That appellant walked "against the vehicular traffic" was "extremely suspicious" because "[h]e is going against the traffic to dodge the police" (352). Similarly, his path to where he was apprehended showed appellant "trying to stay off the main road" (352). As he had during cross-examination, the prosecutor

26

challenged at length appellant's version of the events surrounding his

arrest, asking the jury, "What's Officer Louard's motive to lie . . . ?" (353).

The prosecutor concluded by exhorting the jury to convict:

> [E]ven if you believe that Mr. Khalifa had any kind
> of object or the defendant thought he had this
> object, once he . . . breaks away and is running
> and fleeing towards that construction site, okay,
> the fight is over. . . . He now can no longer use that
> knife. He can retreat in complete safety for
> himself. The man is done. He is stabbed and
> fleeing. He didn't do that. Because that's not what
> this defendant does. He was going to teach Mr.
> Khalifa a lesson for those nasty things he said to
> him. . . . He is on trial because of the choices he
> made that day. The choices of escalating a
> situation where he could have punched a man, to
> the situation where he pulled out a knife. He
> stabbed him again and again and again. It was not
> self-defense. It was assault (358–60).

Jury Instructions, Deliberations, and Verdict

Two counts were submitted to the jury: attempted first-degree

assault and substantive second-degree assault, both premised on the use

of a "dangerous instrument" (Indictment at 2). The People had earlier

dismissed a substantive first-degree assault count, conceding that they

could not make out a case for the infliction of serious physical injury (J.

21).

27

The court gave a missing-witness instruction regarding Khalifa's absence from the trial (378). The court further instructed that the jury "must accept the principles of law as I define them," and that they were not "required to accept the arguments . . . made during summations," but did not tell the jury to disregard statements of the law made by the parties (366, 368).

The court charged the jury on the defense of "physical force" justification, explaining, in pertinent part, that appellant's use of force would be justified "when and to the extent that he reasonably believe[d] it to be necessary to defend himself from what he reasonably believe[d] to be the use or imminent use of physical force" by Khalifa, and did not require appellant to "wait until he [wa]s struck and wounded" (384, 386–87). The People did not ask for, and the court did not give, any instruction on the use of deadly force.

In explaining how justification applied across the counts, the court instructed that it was "an element of each" and then stated:

> [I]f you find that the People have failed to prove beyond a reasonable doubt that [appellant] was not justified, then you must find him not guilty under counts one and two (387, 431 [recharge]).

28

The court omitted C.J.I. language directing the jury to acquit a defendant of "that count and of the remaining count(s) to which that same definition of justification applies." In charging each count, the court included justification as an additional element, but after articulating the elements of the attempted first-degree assault count, the court segued by stating: "The second count *you will consider* is assault in the second degree" (389–90) (emphasis added). The verdict sheet did not mention justification, containing only a listing of both counts with boxes to check for "guilty" or "not guilty."

Over the course of its deliberation, which extended into the afternoon of the next day, the jury asked to be reinstructed on the charges, including "justification as it applies to both charges" (402–38; Court Exs. 1–6). The jury then acquitted appellant of attempted first-degree assault but convicted him of second-degree assault (438–39).

Defense Motion to Set Aside Verdict

Defense counsel moved to set aside the jury's verdict, arguing that appellant should have prevailed on his justification defense (H. 4–5). Responding, the prosecutor said that "[a] large part" of the People's summation was that "this incident was really two separate incidents and

after the initial blows were struck and [Khalifa] fled from [appellant], [appellant] pursued him" (H. 3–6). The court declined to set aside the verdict (H. 6).

## Appellant's Background and Sentencing

In addition to the Probation pre-sentencing report and a short memorandum by the People, the court considered a pre-sentencing memorandum ("PSM") prepared by a Harvard-educated trauma specialist on behalf of appellant. Based on interviews with appellant, appellant's family, prior case workers/managers, and defense counsel, it set forth appellant's family background, mental-health struggles, and history of trauma, urging a lenient approach to sentencing.

Born in Brooklyn in 1969, appellant was raised in a turbulent household marked by his parents' unstable relationship (PSM 2). At age 15, appellant was hit in the head with a baseball bat, and fell into a four-month coma; his injuries were severe enough and prospects for recovery so dim that he was nearly taken off life support (*Id.*). While he nevertheless recovered, he was temporarily paralyzed, and his injury caused him to drop out of school in the tenth grade (*Id.*)

Although appellant supported himself with messenger jobs and similar work, the injury, coma, and resultant trauma "changed" him, leading to complex trauma symptoms such as "sudden emotional or physical reactions," "feeling on guard," flashbacks, and "feeling powerless" (*Id.* at 2–4). These trauma symptoms were suggestive of PTSD, with which he had never been previously diagnosed—and which, if left untreated (as here), often leads to increased likelihood of encounters with the criminal justice system (*Id.* at 2). Appellant also suffered from symptoms of depression (*Id.* at 4).

In 1989, appellant was convicted of misdemeanor assault, and in 1992, appellant was convicted of felony manslaughter (*Id.* at 3; PSR 3). He spent 17 years in prison for the felony offense, during which he remained married to his wife, with whom he has a son; appellant has another son from a previous relationship (Defense Memo. at 3). While in prison, appellant was formally diagnosed with Bipolar Disorder, for which he was medicated (*Id.*) Appellant obtained his GED while in prison (PSR 4).

In 2009, appellant was released on parole, during which he presented no problems and obtained an early release (PSM at 4). He

31

received extensive counseling and therapy, and completed the one-year "Howie the Harp" peer-training program,[4] with his social worker calling appellant "one of [her] best clients" and "a very good peer counselor" who "is the type that always tries to stay away from trouble" (*Id.*).

In 2012, appellant became a peer counselor at the Mental Health Association of New York, managing daily operations, co-leading groups, and working with 23 clients (*Id.* at 4–5). He was promoted in 2014, and eventually moved to a new position as a Peer Advocate at Baltic Street AEH (*Id.* at 4–5). Appellant had no subsequent contacts with the criminal justice system from his release from parole until the encounter with Khalifa (*Id.* at 4).

The defense memorandum described appellant's strong family ties, noting that he was a "thoughtful and considerate individual who has a propensity to care about others who suffer from mental and physical health problems" (*Id.* at 5). His family "remain supportive of him and will continue [to] encourage him despite his circumstances" (*Id*

---

[4] The program "trains individuals with a lived experience in the mental health system for direct service, supervisor, and management roles within Human Services."    http://www.communityaccess.org/our-work/educationajobreadiness/howie-the-harp.

The People submitted their own sentencing memorandum which primarily relied upon appellant's criminal history and the instant offense conduct—such as appellant's "pursu[it]" of the fleeing Khalifa— to argue in favor of the maximum sentence (*see* People's Mem. at 1–2).

At sentencing, defense counsel reiterated many of the points from the defense memorandum, and emphasized that appellant had been out on bail through trial and had complied with the requirements of his release (S. 2–6). Counsel pointed out that during his earlier incarceration, appellant bettered himself extensively to prepare to reenter society, completing his GED and many certificate programs while in prison and maintaining employment—focusing on persons with mental illness and contacts with the criminal justice system—once released (S. 2–4). Counsel also emphasized the unusual circumstances of the encounter, noting that appellant continued to assert that he was justified in defending himself from the absent Khalifa, and asked the court to impose the lowest possible sentence (S. 4–5).

Speaking on his own behalf, appellant said:

> I have been a productive citizen. I am a taxpaying citizen . . . . [Khalifa was] lying. He has not come into this courtroom and told one bit of truth, and I have been telling the truth. (S. 8)

33

In response, the People stated that appellant was a "danger to society" and not rehabilitated (S. 6–7).

Without comment, the court sentenced appellant as a second felony offender to the statutory maximum sentence of 7 years in prison and 5 years of post-release supervision (S. 8; H. 9).

## ARGUMENT

## POINT I

THE PEOPLE FAILED TO DISPROVE APPELLANT'S JUSTIFICATION DEFENSE BEYOND A REASONABLE DOUBT, AND THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE, WHEN THE PEOPLE'S OWN VIDEO AND MEDICAL EVIDENCE AND APPELLANT'S CREDIBLE TESTIMONY SHOWED THAT KHALIFA, WHO DID NOT TESTIFY—AND WAS BOTH BEHAVING ERRATICALLY AND UNDER THE INFLUENCE OF COCAINE AT THE TIME OF THE INCIDENT—PURSUED APPELLANT AFTER HITTING HIM, ALL WHILE YELLING THREATS AND SLURS, AND THAT APPELLANT TRIED TO ESCAPE UNTIL, WINDED, HE REALIZED KHALIFA HAD PICKED UP A WEAPON AND WAS THUS FORCED TO PROTECT HIMSELF FROM PHYSICAL HARM.

Appellant, a peer counselor in Brooklyn, was in the middle of his usual lunchtime walk around the block when he was assaulted without provocation by the complainant, Mohammed Khalifa—a violent and disturbed man under the influence of cocaine. In broad daylight, Khalifa followed appellant, threatening to "kick [his] ass" and calling appellant a "nigger" and "slave." Surveillance footage captured Khalifa picking up something from a construction site just moments before appellant, winded and concerned that Khalifa was about to attack him with a brick wrapped in a shirt, confronted Khalifa in self-defense. Once appellant thought that Khalifa no longer posed a threat, he escaped, with Khalifa in continued pursuit and screaming, "I am still alive!"

The People's video evidence showed, among other things, Khalifa following appellant and appearing to hold something weighted in his hands. The medical evidence conveyed Khalifa's cocaine intoxication and combative, irrational, and racially charged behavior. Together, this evidence overwhelmingly supported appellant's testimony and, by extension, his justification defense.

Significantly, the People failed to produce their undeniably disturbed and unhinged complainant for trial. Instead, the People seized

35

minor inconsistencies to argue that appellant's actions against the aggressive Khalifa were unreasonable. But the People fell far short of their burden, and many of their arguments were legally irrelevant under the justification instruction actually given to the jury. Thus, the People failed to disprove justification beyond a reasonable doubt, and the verdict was therefore against the weight of the credible evidence. U.S. Const., Amends. V, XIV; N.Y. Const., Art. I, § 6; *Jackson v. Virginia*, 443 U.S. 307, 315 (1979); *People v. Danielson*, 9 N.Y.3d 342, 349–50 (2007).

A justification defense becomes an extra element that the People must disprove beyond a reasonable doubt. P.L. §§ 25.00(1), 35.00; *Matter of Y.K.*, 87 N.Y.2d 430, 433 (1996). Physical force against another is justified when a person "reasonably believes such to be necessary to defend himself" against "the use or imminent use of unlawful physical force by such other person." P.L. § 35.15(1). A mistaken belief, if honestly held, suffices so long as it is reasonable. *People v. Sparks*, 29 N.Y.3d 932, 934 n.2 (2017); C.J.I. § 35.15(1).

Appellant, who worked as a peer counselor with people suffering from mental illness, testified that he was in the midst of his daily lunch walk when Khalifa, unprovoked, elbowed him in the collarbone as they

36

were passing on the street, called appellant a "nigger" and "slave," and threatened to "kick [his] ass"—and became more agitated as appellant tried to retreat (162–63). This encounter established that Khalifa was the initial aggressor, capable of violence and spoiling for a fight. Right from the first, Khalifa both physically attacked appellant and threatened him, while using charged racial slurs.

Not only did the People not dispute the initial encounter, their evidence *supported* appellant's testimony. Khalifa's medical records, introduced by the People, showed he was high on cocaine during the entire encounter and, at the hospital, behaved in such an alarmingly irrational and abusive manner that he could not be treated without sedation. He also called the EMT team "nigger bitches" (287; People's Ex. 1 [Medical Records] at 2, 3–7, 25, 53; Defense Ex. A [EMT Report]). In other words, Khalifa was *precisely* who appellant said he was.

Continuing, appellant testified that he attempted to retreat and lose Khalifa, but that Khalifa persisted in following him across the street and around the corner, even cutting into busy traffic (163–64, 172–75, 204). This testimony was amply corroborated by People's Exhibit 2, the surveillance footage, which shows Khalifa following appellant both down

37

and *across* a busy street, turning to follow him despite ample opportunities to go the other direction (People's Ex. 2 at 1:07:23–30).

Appellant testified that the encounter escalated when, winded, he turned around and realized Khalifa had picked up something from the nearby construction site, had wrapped it in some clothing, and was menacing him with it (164–65, 183). And again, the People's evidence corroborates appellant's testimony. The surveillance footage shows Khalifa bending over and picking something up before wrapping it in the clothing he was carrying; it then "pendulums" back and forth as he continues to walk (People's Ex. 2 at 10:07:33–40). The other visual evidence, such as the cell-phone video and still image, both show Khalifa holding clothing that sags in his grip (People's Ex. 7 [cell-phone video] at .00–10; People's Ex. 8 [cell-phone still image]).

Here, the People *did* challenge appellant's story by eliciting statements that Khalifa did not have a weapon, but the eyewitness testimony relied upon simply cannot be squared with the visual evidence to the contrary. Both Toribio and Reyes testified that Khalifa held nothing in his hands (Toribio: 8, 16, 25, 30; Reyes: 117–18, 120–21), which is flatly contradicted by the cell-phone and surveillance-camera

38

evidence. Guy, who was closer, testified more accurately, remembering that Khalifa was holding something but "not sure what it was" (49). The People's witnesses were simply wrong, and the visual evidence is consistent with appellant's explanation that Khalifa wrapped a brick or debris in an article of clothing that he held.[5]

Appellant testified that, in the scuffle that followed, he jabbed Khalifa a few times with a wire stripper, trying to aim low, and ran away once he thought Khalifa could no longer harm him (165–67, 182–85, 190, 195–96, 219). The cell-phone video and still image supported appellant's testimony, and the audiovisual evidence as a whole showed that the entire scuffle lasted less than 20 seconds. Moreover, nothing in Guy's or Toribio's recounting disputed appellant's testimony or the clear timeline established by the videos. While both witnesses thought that appellant used a "knife," they were far enough away so that the difference between tools might not have been clear, and Toribio in particular testified to the chaotic and confusing struggle between the two men.

---

[5] Even assuming there was no brick, appellant had already been physically attacked, threatened, and pursued by the cocaine-fueled Khalifa. Thus, appellant's belief that some kind of physical assault was imminent, and his use of physical force in self-defense, would still have been reasonable.

39

While the People extensively relied on Reyes's suggestion that appellant "chased" Khalifa during the scuffle, none of the other witnesses recounted anything similar. Indeed, the 911 caller said that *Khalifa* chased *appellant* (People's Ex. 11). Moreover, Reyes was facing away from the scene, admitted that she was not paying close attention, was wrong about several other details of the encounter—such as her insistence that appellant was wearing a suit—and frequently editorialized during her time on the stand (112–14, 118, 120, 122). In short, to the extent that the fleeting mention of a "chase" was even legally significant, it was not credibly supported by the broader record.

Finally, appellant testified that Khalifa continued to pursue him as appellant zigzagged to avoid leading the deranged man back to his office (167–68, 180, 189–90, 207, 253). Yet again, the People's evidence supports appellant. Officer Louard testified that both men were found near each other, about 6 or 7 blocks away from the scene (61–72, 101–06; People's Ex. 12 [map]). Far from trying to dodge police, appellant testified that he hoped to encounter them on the route back—which included Atlantic Avenue—who would notice that Khalifa kept chasing him and render aid (175). And all of the People's eyewitnesses agreed that Khalifa

40

took off in the same general direction as appellant, although they varied on the specifics.

Bearing in mind that it was the People's burden to disprove appellant's justification defense beyond a reasonable doubt, the People managed instead only minor ambiguity about irrelevant particulars. Here, Khalifa, whom the People failed to produce for trial, was the violent and deranged man appellant described, and was also under the influence of cocaine. From the moment he encountered appellant, Khalifa was both physically aggressive and actively threatening—more than enough to render him the aggressor under the law, especially given that appellant was overweight and otherwise in poor health (174). *Cf. People v. Valentin*, 29 N.Y.3d 57, 61 (2017) ("initial aggressor" picked up a mop handle and followed the defendant). The People could not seriously dispute that Khalifa was filmed picking something up from the construction site, or that he had created a threatening, hostile, and intimidating environment even before picking up the brick.

Further, to the extent that appellant "chased" Khalifa—and the evidence overwhelmingly shows he did not—a brief pursuit does not defeat justification. The relevant inquiry is not whether Khalifa was

41

retreating, but whether appellant reasonable believed that he still posed a threat. *See People v. Bennett*, 279 A.D.2d 585 (2d Dept. 2001). The People did not convincingly argue that, in the heat of the moment, and in light of Khalifa's post-encounter conduct, such a belief would have been unreasonable.

Given the extensive evidence showing the reasonableness of appellant's behavior in the face of a dangerous and disturbed man, the People advanced a variety of legally dubious arguments that likely confused the jury's analysis of justification.

For one, the People repeatedly suggested that appellant had some responsibility to "flee" or to take advantage of other more-peaceable options (216, 223). This is simply not so. A "physical force" justification defense has no requirement of a duty to retreat. Only *deadly force* justification requires retreat, but that charge was neither requested nor given. *See* P.L. § 35.15(1)–(2); C.J.I. 35.15(2). Because the People are bound to disprove the charge actually given, *People v. Singh*, 128 A.D.3d 860, 862 (2d Dept. 2015), appellant's failure to "choose" retreat could not defeat his defense.

42

For another, and relatedly, the People suggested that appellant's use of force was excessive. Given the facts presented at trial, the winded and overweight appellant would have been justified in using *deadly* force when confronted with a clearly deranged individual menacing him with a brick. But again, only physical-force justification was charged here.

In the face so much evidence that appellant was justified in his actions, the jury's guilty verdict could therefore be explained by the prosecutor's misleading suggestions that appellant had a duty to retreat or to otherwise prove that the use of the wire stripper was proportionate to the perceived threat. This is especially so in tandem with the prosecutor's repeated suggestions, amounting to misconduct, that appellant had a duty to preserve Khalifa's weapon and that appellant was generally a dangerous and vengeful man. *See* Point II.

In sum, appellant's consistent testimony was largely corroborated by the People's case—and his conduct, in the face of a dangerous and disturbed individual who had physically and verbally threatened him and pursued him with a heavy object, was entirely reasonable. Justification requires only that appellant act "reasonably" in the moment, and does not demand perfection through the distorting effects

43

of hindsight. The People failed to prove beyond a reasonable doubt that

appellant's use of physical force was unjustified, and as the verdict is

against the weight of the credible evidence, this Court should reverse

appellant's conviction and dismiss the indictment.

## POINT II

> THE PROSECUTOR COMMITTED MIS-
> CONDUCT DURING CROSS-EXAMINATION
> AND SUMMATION BY VOUCHING FOR HIS
> WITNESSES WHILE CALLING APPELLANT A
> LIAR, SHIFTING THE BURDEN OF PROOF,
> MAKING INFLAMMATORY COMMENTS,
> TESTIFYING AND MISSTATING RECORD
> EVIDENCE, AND IMPLYING THAT
> APPELLANT WAS A DANGEROUS AND
> VENGEFUL PERSON—ALL WHILE ALSO
> MISSTATING THE APPLICABLE LAW.

Through a combative cross-examination and a heated summation,

the prosecutor did more than just argue that appellant's justification

defense was not worthy of belief. The prosecutor shifted the burden of

proof to appellant, pressed him to testify that certain prosecution

witnesses were lying, acted as an unsworn witness, vouched for the

prosecution's witnesses while denigrating appellant, and—in

summation—described appellant as having a violent and vengeful

44

character. Throughout, the prosecutor's comments also gave the jury an erroneous view of the relevant law, which was not cured by the jury charge. This misconduct denied appellant a fair trial and deprived him of due process. *See* U.S. Const., Amends. V, XIV; N.Y. Const., Art. 1, § 6; *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

First, the prosecutor repeatedly shifted the burden of proof to appellant by suggesting, among other things, that appellant had the responsibility to preserve evidence, to remain at the scene, or to otherwise explain why he had not "warned" Khalifa or made a more peaceable choice. For instance, the prosecutor suggested that it was appellant's burden to produce witnesses to corroborate his story about the brick, by asking him why he was "the only person that has come in court" to testify about it (226, 252, 255, 264–65, 341), and that appellant had the duty to call 911 or to otherwise warn Khalifa about the wire stripper (216–17, 350). "Given the choice of calling 911 . . . he didn't do so," the prosecutor said, and "[t]hat's why [appellant] is in this chair" (334). The prosecutor also suggested that it was appellant's responsibility to "wait on the scene" for police to arrive and "have this man arrested" (248), and to justify why appellant emerged from the fracas uninjured

45

(236). These comments served to shift the burden to appellant to provide affirmative proof of justification and lack of intent, and also impermissibly referred to his pre-arrest silence. *See People v. Acquista*, 41 A.D.3d 491, 492 (2d Dept. 2007) (improper comments regarding failure to "contact the police immediately" and "produce physical evidence in support of his claim that the victim was armed"); *People v. Torres*, 223 A.D.2d 741, 742 (2d Dept. 1996) (improper to argue appellant has obligation to come forward with exculpatory evidence).

Second, the prosecutor vouched for the People's witnesses while calling appellant a liar. *See People v. Collins*, 12 A.D.3d 33, 37 (1st Dept. 2004) (misconduct to call defendant a liar while vouching for People's witnesses). Referring to Guy, Reyes, and Toribio, the prosecutor said all had testified under oath and remarked, "I submit that they told you exactly what they saw. They have no bias here . . . no motive to lie" (335, 338). The prosecutor's improper vouching shifted the burden to appellant, suggesting that it was his obligation to present the jury with a reason to disbelieve the various witnesses. *See People v. Griffin*, 125 A.D.3d 1509, 1510 (4th Dept. 2015) ("motive to lie" constituted improper burden shifting); *People v. Anderson*, 83 A.D.3d 854, 856 (2d Dept. 2011)

46

(misconduct for prosecutor to vouch for credibility of witnesses on summation); *People v. Williams*, 112 A.D.2d 177, 179 (2d Dept. 1985) (misconduct to premise acquittal on proof of witness's motive to lie). Appellant's testimony, by contrast, was "nonsense" because "[h]e will say anything to you"; should not be believed because "[n]one of that happened" and the only person saying to the contrary is "the interested [appellant]"; and "everything" he said was "an embellishment" or "a straight up lie" (341, 356–57). These exhortations were plainly improper. *See People v. Morales*, 108 A.D.3d 574, 575 (2d Dept. 2013) (misconduct when prosecutor expressed belief that defendant was lying); *People v. Brown*, 26 A.D.3d 392, 393 (2d Dept. 2006) (misconduct to call appellant's "story" a "load of garbage" and imply he lied on the stand, while People's witnesses were "credible" and "accurate").

Relatedly, the prosecutor also engaged in misconduct, both innately and through additional burden shifting, by pressing appellant to say that Officer Louard "lied" about the arrest (257–58). The prosecutor then repeated this characterization on summation, asking the jury, "What's Officer Louard's motive to lie . . . ?" (353). But it is "improper for a prosecutor to force a defendant on cross-examination to characterize the

47

prosecution witnesses as liars." *People v. Lewis*, 154 A.D.3d 1329, 1330 (4th Dept. 2017); *People v. Santiago*, 78 A.D.2d 666, 666 (2d Dept. 1980) (misconduct to ask defendant if police witness was lying).

The prosecutor also testified to the jury. Without record support, the prosecutor told the jury that appellant "came up with the idea" to throw away the wire stripper "because people are following me" (356). The prosecutor assured the jury that, during the scuffle, Khalifa was "fleeing" from appellant, "[m]ake no mistake about it" (339), and that the instrument seen in the cell-phone still picture was "a knife," "clear as day" (355). With regard to the path appellant took following the incident, the prosecutor speculated that appellant was evading police (352). In each of these instances, the prosecutor was inappropriately acting as an unsworn witness. *See People v. Moulton*, No. 2015–07386, ___ A.D.3d ___, 2018 WL 3371389 (2d Dept. 2018) (reversing in the interest of justice when prosecutor became unsworn witness).

Perhaps most troubling was the prosecutor's repeated suggestion that appellant was generally a violent, dangerous, and vengeful man. The prosecutor told the jury that appellant, "[a]ll six foot one, 300 pounds of him," was "not used to this" kind of disrespect (338), and was instead an

48

"angry" (215, 345) person inflicting pain on "tiny" Khalifa (342)—to
"teach" Khalifa a "lesson," because appellant was the kind of person who
"solve[d] [his] problems" with his "knife" (343, 346, 359). In his closing
pitch to the jury, the prosecutor returned to this theme: appellant did not
back down because "that's not what this defendant does," and he "chased"
Khalifa to "finish the job" (359). The prosecutor's improper comments
served to "convey to the jury, by insinuation, suggestion or speculation,
the impression that the defendant is guilty of other crimes not in issue at
the trial" or was otherwise of bad character. *People v. Ashwal*, 39 N.Y.2d
105, 110 (1976); *see also People v. Moss*, 215 A.D.2d 594, 594–95 (2d Dept.
1995) (depiction of appellant as a "violent person" part of cumulative
misconduct requiring a retrial).

Finally, the prosecutor misstated the law pertaining to appellant's
justification defense by claiming that appellant had a duty to retreat, and
that "punching" would have been acceptable while using an instrument
was not (223, 334, 346, 360). "It is improper for the prosecutor to misstate
the law on summation." *People v. Butler*, 185 A.D.2d 141, 144 (1st Dept.
1992). First, the prosecutor's assertion that "we wouldn't be here" if
appellant had punched Khalifa (346) is both erroneous, in the sense that

it could still at a minimum be charged as third-degree assault, P.L. § 120.00(1), and misleading, in that the prosecutor's arguments against justification would apply equally had appellant punched Khalifa. Second, appellant had no duty to retreat under the charged physical-force justification, but the jury would not have been aware that a lack of such duty is one of the key differences between physical-force and deadly-force justification.

Both individually and cumulatively, the prosecutor's improper comments, in tandem with a sarcastic and inflammatory tone, deprived appellant of due process and a fair trial. *See People v. Miller*, 149 A.D.2d 439, 440 (2d Dept. 1989) ("argumentative and sarcastic tone" compounded misconduct).

This pervasive misconduct cannot be deemed harmless. *Chapman v. California*, 386 U.S. 18, 23 (1967); *People v. Crimmins*, 36 N.Y.2d 230, 242 (1975). As set forth in Point I, the People failed to present Khalifa for trial and did not even attempt to challenge appellant's testimony that Khalifa was repeatedly and violently menacing appellant. And by vouching for witnesses, denigrating appellant, and otherwise straying outside of the boundaries of the factual record, the prosecutor encouraged

50

the jury to disbelieve appellant's otherwise logical and credible recollection of the events and to disregard the many instances where the evidence corroborated his testimony—such as the video and medical evidence showing Khalifa's pursuit of appellant, or the EMT who confirmed Khalifa's irrational, racist, and violent behavior.

Moreover, the prosecutor's incorrect statement of *legal* principles was particularly damaging where the People assailed appellant for failing to take actions that were of no legal consequence to justification. The jury was not told to disregard the legal arguments of counsel, and the instructions given could not "cure" the prosecutor's misstatements because they did not affirmatively inform the jury that those disputed elements, particularly the duty to retreat and the difference between a punch and stab, were irrelevant. The prosecutor therefore usurped the court's function of instructing the jury on the law. *See People v. Pinkney*, 48 A.D.3d 707, 709 (2d Dept. 2008); *cf. People v. Giuca*, 58 A.D.3d 750, 751 (2d. Dept. 2009) (error harmless because court "repeatedly advised" it would instruct jurors on the law).

Defense counsel objected to several of the prosecutor's comments, such as the attempt to shift the burden to appellant regarding the

51

production of Khalifa's weapon for trial (252) and the similar need to keep the wire stripper (255), preserving them for the Court's review. To the extent that the arguments above rest on points not preserved in the trial court, this Court should reach them in the interest of justice, as it has not hesitated to do in the past. *See, e.g., People v. Rowley*, 127 A.D.3d 884, 885 (2d Dept. 2015) (finding, in the interest of justice, that cumulative misconduct during cross and summation deprived defendant of fair trial); *People v. Mehmood*, 112 A.D.3d 850, 852–53 (2d Dept. 2013) (same on summation). Alternatively, because there is no apparent reason why defense counsel would not object and request curative instructions or a mistrial, the Court should find that counsel was constitutionally ineffective for failing to do so. U.S. Const. Amend. VI; N.Y. Const., Art. I, § 6; *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *People v. Baldi*, 54 N.Y.2d 137, 147 (1981).

For the above reasons, the Court should vacate appellant's conviction and grant a new trial.

52

## POINT III

*unpresented.*

THE COURT ERRED IN FAILING TO INSTRUCT JURORS THAT AN ACQUITTAL ON THE TOP COUNT BASED UPON A FINDING OF JUSTIFICATION PRECLUDED FURTHER DELIBERATIONS, AND ITS INSTRUCTIONS IMPROPERLY SUGGESTED THAT JURORS WERE REQUIRED TO CONTINUE DELI-BERATING AND EMPOWERED TO RENDER A GUILTY VERDICT EVEN IF THEIR ACQUITTAL ON THE TOP COUNT RESULTED FROM A DETERMINATION THAT APPELLANT HAD BEEN JUSTIFIED.

The court's instructions, considered as a whole and in conjunction with the verdict sheet, failed to adequately convey to jurors that an acquittal on the top count based upon a finding of justification precluded further deliberations and required a not guilty verdict as to all counts. Because there is no way to know whether the verdict convicting appellant of second-degree assault occurred after a justification-based acquittal on the attempted first-degree assault charge, this Court should vacate appellant's conviction and grant him a new trial. U.S. Const., Amend. XIV; N.Y. Const., Art. 1, § 6.

Because a meritorious justification defense renders the use of force "entirely lawful," *People v. Castro*, 131 A.D.2d 771, 773 (2d Dept. 1987),

53

a not-guilty verdict premised on justification requires acquittal on any count for which the same theory of justification is an element. Thus, and as set forth in the C.J.I pattern instructions, a court is supposed to inform the jury that a finding of justification on an initial count requires acquittal not only on "that count" but also on "the remaining count(s) to which that same definition of justification applies." C.J.I. § 35.15(1).

Here, the court altered the crucial C.J.I. language, telling the jury that "if you find that the People have failed to prove beyond a reasonable doubt that [appellant] was not justified, then you must find him not guilty under counts one and two" (387, 341). This failed to convey to the jury that the *same* theory of justification applied to both counts, and if the jury found that the People had failed to meet their burden on count 1, they should *stop* deliberating and render a verdict of acquittal on count 2. In fact, this omission alone constitutes reversible error. *See People v. Feuer*, 11 A.D.3d 633, 634–35 (2d Dept. 2004) ("[T]his Court has repeatedly held that . . . failing to instruct the jurors that if they found the defendant not guilty of a greater charge on the basis of justification, they were not to consider any lesser counts, is of such nature and degree so as to constitute reversible error")

54

The remaining instructions exacerbated this error. Although the court described justification as an element of each count, it failed to inform the jury that a finding of justification should end the matter. To the contrary, immediately after describing count 1, the court told the jury: "The second count you *will consider* is assault in the second degree" (390 [emphasis added]). By including lack of justification as an element of each crime, therefore, the court implied that these continued deliberations required reconsideration of the justification defense. *See People v. Velez*, 131 A.D.3d 129, 133–34 (1st Dept. 2015) (justification as element "may have led the jurors to conclude that deliberation on each crime required reconsideration of the justification defense" even with acquittal on top count).

The verdict form, which did not mention justification at all, failed to clarify for the jury that reassessment of justification for each count was prohibited. Significantly, the C.J.I.-approved Model Verdict Sheet for justification cases contains printed instructions telling jurors that an acquittal due to justification compels both a cessation of deliberations and a not guilty verdict on lesser counts. *See* C.J.I.2d Model Verdict Sheet – Justification.

55

In a series of recent reversals, the First Department has reaffirmed the importance of proper justification instructions. *See, e.g., People v. Breckenridge*, 162 A.D.3d 425 (1st Dept. 2018); *People v. Marcucci*, 158 A.D.3d 434 (1st Dept. 2018); *Velez*, 131 A.D.3d at 132–134. In so doing, the First Department has noted the confusion created when, as here, a trial court not only fails to give a stop-deliberations charge, but also indicates that jurors should consider lesser counts in the alternative or irrespective of the disposition of others. *See Velez*, 131 A.D.3d at 132–134 (conviction reversed after court failed to give a stop-deliberations instruction and directed jurors to consider one lesser count in the alternative and another lesser count regardless of other verdicts).

This Court should reach the issue in the interest of justice given the compelling evidence supporting appellant's justification defense and the impossibility of determining whether the court's errors led the jury to reach an improper verdict. *See Breckenridge*, 162 A.D.3d 425 (reversing in the interest of justice). This Court should vacate appellant's conviction and grant him a new trial. Alternatively, a new trial is warranted by defense counsel's failure to object to the improper charge and verdict sheet. *Strickland*, 466 U.S. at 687–88; *Baldi*, 54 N.Y.2d at 147.

POINT IV

THE PROSECUTOR'S TWO-INCIDENTS
THEORY TRANSFORMED THE SINGLE
COUNT OF ASSAULT INTO TWO SEPARATE
COUNTS, CREATING IMPERMISSIBLE
DUPLICITY AND RENDERING IT IMPOSSIBLE
TO DETERMINE WHETHER THE JURY WAS
UNANIMOUS IN ITS VERDICT.

The prosecutor's theory of the case asked the jury to treat the single

assault charge as two separate counts—based on when Khalifa allegedly

"fled"—and to reconsider justification for each. In an error similar to the

one committed by the court in Point III, above, this violated the well-

established prohibition against duplicitous counts. Because it is therefore

impossible to tell if the jury was unanimous in its verdict, appellant was

deprived of his rights to due process and a fair trial. U.S. Const., Amends.

V, XIV; N.Y. Const., Art. 1, § 6.

Each count of an indictment "may charge one offense only." C.P.L.

§ 200.30(1). The prohibition on duplicitous counts "furthers not only the

functions of notice to a defendant and of assurance against double

jeopardy, but also ensures the reliability of the unanimous verdict."

*People v. Keindl*, 68 N.Y.2d 410, 418 (1986). A facially valid count can

become duplicitous if the "evidence presented at trial makes plain that

57

multiple criminal acts occurred during the relevant time period, rendering it nearly impossible to determine the particular act upon which the jury reached its verdict." *Singh*, 128 A.D.3d at 861 (internal citation and alterations omitted).

Here, the indictment charged a single count of assault, and a single charge of attempted assault based on a different intended outcome, arising out of Khalifa's confrontation with appellant. Doing so was appropriate, because a single assault charge ordinarily covers an uninterrupted course of conduct, not each separate attack. *See People v. Alonzo*, 16 N.Y.3d 267, 269–70 (2011); *People v. Kaid*, 43 A.D.3d 1077, 1080 (2d Dept. 2007).

The prosecutor seized on Reyes's stray comment about a "chase" to split the single incident in two, and to ask the jury to reconsider the use of force for each even though no charge to that effect was requested or given. The prosecutor's argument was that the initial encounter, in which appellant stabbed Khalifa, was interrupted by Khalifa's flight, and appellant's decision to "finish the job" marked a second, discrete incident of assault for which the jury needed to reassess justification—*even if* the

58

jury believed appellant was justified as to the first part of the encounter (358–59).

The prosecutor's theory created a duplicitous assault count, allowing the jury to treat the single confrontation as two separate incidents. It is thus impossible to tell whether the jury's verdict was unanimous. Some of the jury could have thought appellant was not justified at all, while the rest of the jury could have thought appellant was justified as to the "initial" encounter but not the subsequent confrontation after Khalifa's alleged flight.

Although the court did partly charge that justification equaled a not-guilty verdict, *but see* Point III above, the court never told the jury to disregard the prosecutor's erroneous statement of the law, which the jury could easily have reconciled with the court's instruction: if you find appellant's justified for *both* purported uses of force, he is not guilty. And unlike cases like *People v. Kaid* where the prosecution's theory simply offered the jury alternative means (not requiring unanimity), the theory here asked the jury to decide on what were now two different justification elements. *See Kaid*, 43 A.D.3d at 1082–83 (no duplicity when theory split means rather than elements).

In sum, the count of conviction was rendered duplicitous by the prosecutor's split trial theory. This Court should vacate appellant's conviction in the interest of justice and grant him a new trial. Alternatively, a new trial is warranted by defense counsel's failure to object to the duplicitous charge. *Strickland*, 466 U.S. at 687–88; *Baldi*, 54 N.Y.2d at 147.

## POINT V

> THE COURT ERRED WHEN IT EXCLUDED AS "COLLATERAL" APPELLANT'S WIFE'S TESTIMONY THAT HE CARRIED A WIRE STRIPPER AND NOT A KNIFE, WHEN IT WOULD HAVE CORROBORATED A KEY ELEMENT OF HIS TESTIMONY AND REHABILITATED HIS CREDIBILITY, BOTH OF WHICH DIRECTLY RELATED TO HIS JUSTIFICATION DEFENSE.

Both in their case-in-chief and during appellant's cross-examination, the People advanced the theory that appellant had stabbed Khalifa with a knife, a weapon, rather than with a wire stripper, a tool. In short, the People argued that appellant was lying when he denied using a knife. As part of the defense case, counsel sought to rehabilitate appellant and corroborate his testimony by calling his wife, Nicole

McGriff, to speak about appellant's repair hobby and his habit of carrying around a wire stripper, but the trial court erroneously barred her testimony as collateral. This incorrect exclusion deprived appellant of his constitutional rights to present a defense, to due process, and to a fair trial. U.S. Const., Amends. VI, XIV; N.Y. Const., Art. 1, § 6; *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *see also* C.P.L. § 60.15(1).

As defense counsel set forth, Nicole's testimony was being offered to corroborate appellant's story and, if necessary, to rehabilitate his credibility. The People's case in chief had included extensive testimony about the alleged "knife" (Toribio: 14–15; Guy: 43; Reyes: 114–15, 117) and People's Exhibit 8 showed appellant with a sharp instrument in his hand. When appellant testified that it was actually a wire stripper (165, 167), the prosecutor attempted to undermine this testimony on cross-examination, aggressively and sometimes sarcastically questioning appellant's truthfulness (219–20, 223, 255), and stating that the jury would "have to rely on" appellant's testimony because of lack of corroborating evidence (220). The knife was one of the key points on which the prosecution attempted to impeach appellant's credibility; in fact, in summation, the prosecutor not only emphasized the identity of

61

the knife but seized on those few moments during cross where appellant said "knife" instead of "wire stripper" (355).

Nicole's testimony would have provided the corroboration alluded to as lacking by the prosecution. Her testimony about her husband's habit of carrying a wire stripper for the purpose of his repair hobby would have been directly relevant to both the intent and justification elements of the charged offenses. Also, while there is nothing inherently illegal about carrying a knife, common sense suggests that a jury would perceive the dispute differently if appellant were deploying a hobbyist's tool in a frantic attempt to defend himself.

Furthermore, the jury's assessment of appellant's truthfulness is central to the justification defense, and appellant testified that he used a wire stripper, not a knife—a fact clearly not "collateral" in the People's view, especially as the People argued on summation that it undermined his credibility. Because appellant's credibility was *the* central question in assessing his justification defense, it simply could not be collateral. *People v. Bradley*, 99 A.D.3d 934, 937 (2d Dept. 2012) (court should not exclude as collateral matters directly relevant to what the jury must decide); *see also People v. D'Arton*, 289 A.D.2d 711, 712 (3d Dept. 2001)

62

(admitting habit evidence, through spouse's testimony, that a person tended to carry cash).

The court's failure to allow Nicole to testify clearly harmed the defense. *Chapman*, 386 U.S. at 23; *Crimmins*, 36 N.Y.2d at 242. It allowed the prosecutor to suggest, both directly and implicitly, that appellant was engaged in an unsupported fabrication—that he would "say anything" to the jury to appear sympathetic, and that the failure to produce the tool at trial amounted to deception (356). Moreover, despite arguing that Nicole's testimony was "collateral" during the colloquy with the court, the prosecution eagerly returned to attacking appellant's credibility regarding the tool in closing: "If it was really this wire stripper, right, that he wants you to believe, wouldn't he have kept it?" (355). With credibility and corroboration directly bearing on the elements of justification and intent, the exclusion of this witness cannot be harmless. *See People v. Thomas*, 140 A.D.2d 562, 564 (2d Dept. 1988) (reversing where court refused to allow defense witness to corroborate another defense witness's testimony); *People v. Forbes*, 87 A.D.2d 829, 829 (2d Dept. 1982) (same, where witness erroneously excluded on ground that her testimony would be collateral).

This issue was preserved when defense counsel proposed calling Nicole and, in response to the People's demand, explained the scope of her testimony regarding appellant's hobbies and the need to correct the prosecutor's implication that appellant was lying and had used a knife (277–78).[6] For the reasons set forth above, this Court should vacate appellant's conviction on the law and remand for a new trial.

## POINT VI

> THE COURT'S STEP-ONE DENIAL OF DEFENSE COUNSEL'S *BATSON* APPLICATION, WHICH ALLEGED THAT THE PROSECUTION DISPROPORTIONATELY STRUCK BLACK JURORS WITH NO APPARENT BASIS FOR MOST OF THE CHALLENGES—THUS MEETING THE DEFENSE'S BURDEN OF SHOWING *PRIMA FACIE* DISCRIMINATION—WAS ERROR.

The prosecution used 9 of 11 peremptory challenges to strike black panelists. When the defense challenged this extremely high and apparently arbitrary deployment of strikes, the prosecutor's only

---

[6] If the Court deems any aspect of the issue unpreserved, it is respectfully requested that the Court reach it in the interest of justice or, alternatively, rule that trial counsel was ineffective for failing to appropriately object. *Strickland*, 466 U.S. at 687–88; *Baldi*, 54 N.Y.2d at 147.

response was that the seated jury was purportedly not "majority" white. On this record, the defense's challenge more than made out a *prima facie* case of racially based peremptory challenges, and the trial court's summary decision to the contrary was error. U.S. Const. Amend., XIV; N.Y. Const., Art. 1 §§ 6, 11; *Batson v. Kentucky*, 476 U.S. 79, 98 (1986).

The use of peremptory challenges to purposefully exclude persons of a particular race violates the federal and state constitutions, as well as New York Civil Rights Law § 13. *People v. Bridgeforth*, 28 N.Y.3d 567, 571–72 (2016). The three-step *Batson* assesses whether the prosecution has exercised peremptory challenges on the basis of race: 1) a *prima facie* showing of race-based strikes, 2) opposing party's articulation of a race-neutral rationale, and 3) determination of whether the proffered reason was pretextual. *Id.* at 571 (citing *Batson*, 476 U.S. at 96–98)).

This case implicates the first of *Batson*'s three steps: a *prima facie* case. The *prima facie* burden is not onerous, as "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). Relevant factors include numerical arguments, whether seated panelists shared

65

similar characteristics or answers with the excluded panelists, and whether the defendant shares a group identity with the excluded jurors. *People v. Hecker*, 15 N.Y.3d 625, 651–53 (2010).

Here, defense counsel's challenge combined numerical information with qualitative assessments of those struck. Defense counsel argued that 9 of 11 peremptories used by the prosecution served to eliminate black prospective jurors (J. 285). *See People v. Bolling*, 79 N.Y.2d 317, 325 (1992) ("disproportionate" exclusion of four out of five black panelists deemed a significant part of a *prima facie* showing); *People v. Vega*, 198 A.D.2d 56, 56 (1st Dept. 1993) (*prima facie* showing when challenging all but one white person on a panel). The number of strikes provided an ample statistical baseline, distinguishing this fact pattern from cases where the number of black jurors and the number of strikes were too small to be statistically significant. *See People v. Sweeper*, 71 A.D.3d 439, 440 (1st Dept.) (step one not met when defense admitted that small pool of jurors obscured pattern), *aff'd*, 15 N.Y.3d 925 (2010).

Counsel did not rely on a numbers argument alone, turning to the fact that the prosecutor struck at least 4 of the panelists for no apparent reason, as those panelists had said "virtually nothing" (J. 283). Defense

counsel contrasted this to panelist Solstad, who had discussed her status as a crime victim (J. 283).

Outside of Solstad, the challenged black panelists from the first two rounds—Barrow, Dunn, Philip, and Stewart—gave minor biographical details and answered innocuous questions about "consistency," but were otherwise silent (J. 72–73, 88–99, 108, 112). The third-round challenges, meanwhile, included panelists like Grant who had answered only biographical questions, and those like Best who answered questions in a manner favorable to the prosecution (J. 213–15, 259–60). Far from providing grist for the prosecution, those removed were largely the people who said nothing at all. And yet the prosecution agreed to seat, among others, a person with a prior theft conviction and a person who had worked for a public defender and experienced unpleasant street harassment—neither of whom was black (J. 79, 86, 94–95, 106, 111, 121).

Ignoring defense counsel's qualitative arguments, the prosecutor responded to the numeracy argument by pointing to black jurors whom he had allowed to be seated. However, "[t]he mere inclusion of some members of defendant's ethnic group will not defeat an otherwise meritorious [*Batson*] motion," *Bolling*, 79 N.Y.2d at 324, because the law

67

forbids "the exclusion of even a single juror on racial grounds," *People v. Mitchell*, 80 N.Y.2d 519, 530 (1992). It thus matters little that the prosecution did not strike *all* of the black members of the panel. Moreover, as appellant is a black man, removing black people from the jury directly affects the "cognizable group" of which he is a part. *See People v. Childress*, 81 N.Y.2d 263, 267 (1993).

In short, the disproportionate number of challenges to black panelists, combined with the lack of any obvious on-the-record reasons for challenging them, more than met appellant's step-one burden. The trial court's summary ruling that there was no "pattern" was thus incorrect and without any clear grounding in the record. *Cf. Hecker*, 15 N.Y.3d at 657 (observing on subsequent *Batson* steps that a trial court should create a "meaningful record" for appellate review).

Appellant's *Batson* claim was preserved via a timely challenge and the court's ruling (285–86).[7] Because the full *Batson* inquiry was

---

[7] This *Batson* argument expands on the same argument presented by defense counsel at jury selection. But to the extent that the Court deems any aspect of the issue unpreserved and necessary for a disposition favorable to appellant, it is respectfully requested that the Court reach it in the interest of justice or, alternatively, rule that trial counsel was ineffective. *Strickland*, 466 U.S. at 687–88; *Baldi*, 54 N.Y.2d at 147.

pretermitted by the trial court's incorrect ruling, this Court should remit the matter so that the second and third *Batson* prongs can be addressed. *See People v. Jones*, 63 A.D.3d 758, 758–59 (2d Dept. 2009) (remanding for consideration of steps two and three).

POINT VII

> APPELLANT'S SENTENCE IS EXCESSIVE IN LIGHT OF HIS PERSONAL CIRCUMSTANCES AND MENTAL-HEALTH STRUGGLES, HISTORY AS A PRODUCTIVE CITIZEN, AND STRONG FAMILY TIES—AND THE FACT THAT THE INSTIGATING COMPLAINANT SUFFERED NO SERIOUS INJURY.

Appellant, a man in his 40s who worked as a peer counselor for people suffering from mental illness, is serving the maximum sentence allowed based on a dispute in which he was not the aggressor and did not cause serious injury. In light of appellant's background, strong family ties, history of mental illness, and demonstrated attempts to better himself and be a productive citizen, the imposed sentence is excessive. The Court should reduce it in the interest of justice.

Appellant's early years were marked by adversity and tragedy. When appellant was 15, he was hit in the head with a baseball bat,

69

rendering him comatose for four months and wheelchair-bound for a year; as a result of his injury, he dropped out of high school, working as a messenger and in other various jobs (PSM 2). The defense's trauma assessment revealed that this incident likely led to undiagnosed and untreated, Complex PTSD, with symptoms such as easy startling, hypervigilance, and "sudden emotional or physical reaction[s] when reminded of . . . traumatic events (*Id.* at 4–5).

Then, after a minor misdemeanor conviction, appellant was convicted of felony manslaughter in his early 20s, receiving a lengthy sentence (*Id.* at 3; PSR 3). Appellant used his time in prison to better himself, remaining married to his wife and obtaining his GED in 1998 (PSM 3; PSR 4). In prison, appellant learned that he had bipolar disorder, which had not previously been diagnosed, and pursued therapy and medication to manage his emotions and symptoms (PSM 3–4).

Appellant's success after his 2009 parole and reintegration into society is a story of rehabilitation against daunting odds. Informed by his background, he became a peer counselor for persons struggling with mental health issues, eventually obtaining a promotion to Peer Specialist while impressing favorable upon his social worker (PSM 5). Prior to

70

sentencing, he resided with his wife, with whom he had a strong relationship, and he also has adult sons (PSM 5).

Until the incident forming the basis of this prosecution, appellant had gone more than half a decade outside of prison without any incident, staying completely out of trouble. During the trial itself, he faithfully attended each day and, released on bail, fulfilled his obligations without any reported problem.

It is significant that, even under the People's view of the case, it was the complainant who initially and relentlessly threatened appellant, following him through the streets of Brooklyn while calling him a "nigger" and "slave." It was only after appellant thought himself cornered and at risk that the confrontation escalated. Even then, it is clear that appellant successfully avoided causing any serious injury—and the jury's verdict of acquittal on the attempt count suggested that it believed appellant did not intend to cause any such injury.

On these facts, and given appellant's background and obvious dedication to bettering himself while out of prison, 7 years is an excessive prison sentence. Appellant was approached and attacked by a man who the prosecution did not present at trial, was clearly aggressive (as

71

indicated by appellant, the EMT, and the medical records), was mentally unstable, and was under the influence of cocaine. Appellant used force only when he believed it necessary to do so. Appellant did not cause serious harm, and this confrontation interrupted what was otherwise a productive and encouraging adjustment to life outside of prison. Moreover, appellant has done well on supervision in the past. In light of appellant's background and ample future potential, this Court should, in the interest of justice, reduce appellant's sentence to the minimum 5-year term authorized by statute. *See* P.L. 70.04(3)(c).

## CONCLUSION

FOR THE REASONS SET FORTH ABOVE, THIS
COURT SHOULD REVERSE APPELLANT'S
CONVICTION AND DISMISS THE
INDICTMENT (POINT I); VACATE
APPELLANT'S CONVICTION AND ORDER A
NEW TRIAL (POINTS II–V); OR REMAND FOR
FURTHER CONSIDERATION OF
APPELLANT'S *BATSON* CHALLENGE (POINT
VI). ALTERNATIVELY, THE COURT SHOULD
REDUCE APPELLANT'S SENTENCE AS
EXCESSIVE (POINT VII).

Respectfully submitted,

Paul Skip Laisure
Attorney for Defendant-
Appellant
Appellate Advocates
111 John St., 9th Floor
New York, NY 10038

DAVID L. GOODWIN
Of Counsel
August 21, 2018

73

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,           :
                                               :
                  Respondent,                  :
                                               :          CERTIFICATION
                                               :          PURSUANT TO
            - against -                        :          22 N.Y.C.R.R.
                                               :          § 670.10-c(f)
LORENZO MCGRIFF,                               :
                                               :
                  Defendant-Appellant.         :
-------------------------------------------------------------------------x

    DAVID L. GOODWIN, an attorney admitted to practice before the
Courts of this State, certifies, pursuant to 22 N.Y.C.R.R. § 670.10-c(f),
that this brief was prepared on a computer. A proportionally spaced
serifed typeface was used, as follows:

    Name of typeface: Century Schoolbook

    Point size: 14 (13 in footnotes)

    Line spacing: Double (single in headings, blockquotes, and
footnotes)

    The total number of words in the brief, inclusive of point headings
and footnotes, and exclusive of pages containing the table of contents,
proof of service, and this certificate of compliance, is 13991.

Dated:    August 21, 2018
           New York, NY

                             David L. Goodwin