To be argued by:
Caroline R. Donhauser
(15 minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

          -against-

LORENZO McGRIFF,

                    Defendant-Appellant.

Appellate Division
Docket Number
2017-02694

Kings County
Indictment Number
6248/2015

RESPONDENT'S BRIEF

LEONARD JOBLOVE
VICTOR BARALL
CAROLINE R. DONHAUSER
Assistant District Attorneys
     of Counsel

Telephone: 718-250-2487
Email: DonhausC@BrooklynDA.org

December 7, 2018

**ERIC GONZALEZ**
**DISTRICT ATTORNEY KINGS COUNTY**
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................... iii

PRELIMINARY STATEMENT ........................................... 1

STATEMENT OF FACTS ............................................. 2
    Introduction .............................................. 2
    Jury Selection ............................................ 2
    The Trial ................................................. 6
        The People's Case ..................................... 6
        The Defense Case ..................................... 14
    The Verdict and Sentence ................................ 21

POINT I -
    DEFENDANT'S CLAIM THAT THE PEOPLE FAILED TO DISPROVE
    HIS JUSTIFICATION DEFENSE IS UNPRESERVED AND WITHOUT
    MERIT.  MOREOVER, THE VERDICT WAS NOT AGAINST THE WEIGHT
    OF THE EVIDENCE. ......................................... 23

POINT II -
    DEFENDANT'S CLAIMS REGARDING THE PROSECUTOR'S CROSS-
    EXAMINATION OF DEFENDANT AND HIS SUMMATION ARE MOSTLY
    UNPRESERVED.  FURTHERMORE, THE PROSECUTOR'S CONDUCT WAS
    PROPER, AND ANY ERROR WAS HARMLESS. ..................... 33

        A. Defendant's  Claims  Regarding  the  Prosecutor's
           Cross-Examination of Defendant Are Unpreserved and
           Without Merit. .................................... 33

        B. Defendant's  Claims  Regarding  the  Prosecutor's
           Summation  Remarks  Are  Unpreserved  and  Without
           Merit. ........................................... 38

POINT III -
    DEFENDANT  DID  NOT  PRESERVE  HIS  CLAIM  THAT  THE  COURT
    ERRED  IN  FAILING  TO  INSTRUCT  THE  JURY  TO  CEASE
    DELIBERATIONS  IF  IT  ACQUITTED  DEFENDANT  OF  ATTEMPTED
    FIRST-DEGREE ASSAULT ON JUSTIFICATION GROUNDS, AND IN
    SUBMITTING  A  VERDICT  SHEET  THAT  OMITTED  SUCH  AN
    INSTRUCTION.   REVIEW  IN  THE  INTEREST  OF  JUSTICE  IS
    UNWARRANTED,  BECAUSE  THE  JUSTIFICATION  CHARGE  AS  A
    WHOLE  CONVEYED  THE  CORRECT  LAW  AND  THE  EVIDENCE
    DISPROVING JUSTIFICATION WAS OVERWHELMING. .............. 43

TABLE OF CONTENTS (cont'd)

Page

POINT IV -
DEFENDANT'S CLAIM THAT THE SECOND-DEGREE ASSAULT COUNT
WAS RENDERED DUPLICITOUS BY THE PROSECUTOR'S SUMMATION
IS UNPRESERVED AND WITHOUT MERIT. ....................... 59

POINT V -
DEFENDANT'S CLAIM THAT THE COURT IMPROPERLY PRECLUDED
TESTIMONY OF DEFENDANT'S WIFE IS UNPRESERVED AND
MERITLESS.  IN ANY EVENT, ANY ERROR WAS HARMLESS. ....... 63

POINT VI -
DEFENDANT DID NOT MAKE OUT A PRIMA FACIE CASE OF
DISCRIMINATION BY THE PROSECUTOR IN JURY SELECTION. ..... 68

POINT VII -
THE SENTENCE WAS NOT EXCESSIVE. ......................... 76

CONCLUSION .................................................... 77

PRINTING SPECIFICATIONS STATEMENT ............................. 78

TABLE OF AUTHORITIES

Page(s)

CASES

Batson v. Kentucky,
   476 U.S. 79 (1986) .................................. 69, 73, 75

Brooks v. Lee,
   2016 U.S. Dist. LEXIS 176859, at *29 (S.D.N.Y. Dec.
   19, 2006)(Magistrate's Report), adopted, 2017 U.S.
   Dist. LEXIS 9644 (S.D.N.Y. Jan. 23, 2017) ................... 48

People v. Adamo,
   309 A.D.2d 808 (2d Dep't 2003) ............................. 42

People v. Allen,
   149 A.D.3d 764 (2d Dep't 2017) ............................. 45

People v. Allen,
   24 N.Y.3d 441 (2014) ....................................... 59

People v. Armonte,
   287 A.D.2d 645 (2d Dep't 2001) ............................. 42

People v. Arroyo,
   77 N.Y.2d 947 (1991) ....................................... 66

People v. Aska,
   91 N.Y.2d 979 (1998) ....................................... 64

People v. Barreto,
   70 A.D.3d 574 (1st Dep't 2010) .................. 30, 46, 48, 58

People v. Braithwaite,
   153 A.D.3d 929 (2d Dep't 2017) ..................... 47, 51, 53

People v. Breckenridge,
   162 A.D.3d 425 (1st Dep't 2017) ............................ 47

People v. Brown,
   97 N.Y.2d 500 (2002) ................................... 68, 70

People v. Castro,
   131 A.D.2d 771 (2d Dep't 1987) ........................ 49, 58

People v. Childress
   81 N.Y.2d 263 (1993) ................................... 69, 72

People v. Colasuonno,
  135 A.D.3d 418 (1st Dep't 2016) .............................. 58

People v. Copeland,
  197 A.D.2d 629 (2d Dep't 1993) ............................... 71

People v. Cosby,
  200 A.D.2d 682 683 (2d Dep't 1994) ........................... 27

People v. Creekmmur,
  137 A.D.3d 1052 (2d Dep't 2016) .............................. 37

People v. D'Arton,
  289 A.D.2d 711 (3d Dep't 2001) ............................... 65

People v. Daggett,
  150 A.D.3d 1680 (4th Dep't 2017) ......................... 46, 58

People v. Estevez,
  95 A.D.3d 1232 (2d Dep't 2012) ............................... 64

People v. Feuer,
  11 A.D.3d 633 (2d Dep't 2004) ............................ 45, 49

People v. Fitzgerald,
  120 A.D.3d 506 (2d Dep't 2014) ............................... 46

People v. Flecha,
  60 N.Y.2d 766 (1983) ......................................... 24

People v. Fletcher,
  2018 N.Y. App. Div. LEXIS 7678, 2018 N.Y. Slip Op.
  07747 (2d Dep't Nov. 14, 2018) ........................... 46, 53

People v. Ford,
  66 N.Y.2d 428 (1985) ......................................... 28

People v. Francis,
  155 A.D.3d 1059 (2d Dep't 2017) .............................. 72

People v. Frazier,
  125 A.D.3d 551 (1st Dep't 2015) .............................. 65

People v. Grey,
  282 A.D.2d 544 (2d Dep't 2001) ............................... 30

People v. Gueye,
  81 A.D.3d 974 (2d Dep't 2011) ................................ 46

iv

People v. Hecker,
  15 N.Y.3d 625 (2010) ............................ 68, 69, 71, 72

People v. Henegan,
  150 A.D.2d 606 (2d Dep't 1989) ............................... 30

People v Henry,
  244 A.D.2d 424 (2d Dep't 1997) ............................... 32

People v. Hines,
  39 A.D.3d 968 (3d Dep't 2007) ................................ 60

People v. Holmes,
  12 A.D.3d 532 (2d Dep't 2004) ................................ 46

People v. James,
  99 N.Y.2d 264 (2002) ......................................... 73

People v. Jenkins,
  84 N.Y.2d 1001 (1994) ........................................ 70

People v. Jung,
  22 A.D.3d 506 (2d Dep't 2005) ................................ 44

People v. Kaid,
  43 A.D.3d 1077 (2d Dep't 2007) ........................... 60, 61

People v. Kassebaum,
  95 N.Y.2d 611 (2001) ......................................... 45

People v. Kaval,
  154 A.D.3d 875 (2d Dep't 2017) ............................... 38

People v. Kello,
  96 N.Y.2d 740 (2001) ......................................... 67

People v. King,
  85 A.D.3d 820 (2d Dep't 2011) ................................ 59

People v. LaGuerre,
  29 A.D.3d 820 (2d Dep't 2006) ................................ 45

People v. Lane,
  7 N.Y.3d 888 (2006) .......................................... 64

People v. Lemaire,
  187 A.D.2d 532 (2d Dep't 1992) ............................... 32

People v. Lewis,
    154 A.D.3d 1329 (4th Dep't 2017) .............................. 37

People v. Lowe,
    234 A.D.2d 564 (2d Dep't 1996) ................................ 71

People v. Mothon,
    284 A.D.2d 568 (3d Dep't 2001) ................................ 32

People v. Palmer,
    34 A.D.3d 701 (2d Dep't 2006) ....................... 46, 49, 58

People v. Ramsundar,
    138 A.D.3d 892 (2d Dep't 2016) ................................ 64

People v. Rogers,
    161 A.D.3d 1013 (2d Dep't 2018) ......................... 37, 38

People v. Samuels,
    99 N.Y.2d 20 (2002) .......................................... 47

People v. Santos
    105 A.D.3d 1064 (2d Dep't 2013) ......................... 68, 69

People v. Scharpf,
    60 A.D.3d 1101 (3d Dep't 2009) ............................... 27

People v. Smith,
    173 A.D.2d 416 (1st Dep't 1991) ............................. 40

People v. Snyder,
    100 A.D.3d 1367 (4th Dep't 2012) ............................ 60

People v. Soriano,
    188 A.D.2d 420 (1st Dep't 1992) ............................. 28

People v. Sparks,
    29 N.Y.3d 932 [2017] ..................................... 23, 24

People v. Terk,
    24 A.D.3d 1038 (3d Dep't 2005) ............................... 30

People v. Thompson,
    62 A.D.3d 817 (2d Dep't 2009) ........................... 37, 42

People v. Troche,
    147 A.D.2d 513 (2d Dep't 1989) ..................... 27, 32, 41

People v. Varela,
    164 A.D.2d 924 (2d Dep't 1990) .............................. 30

People v. Velez,
    131 A.D.3d 129 (1st Dep't 2015) ........................ 47, 53

People v. Vidal,
    212 A.D.2d 553 (2d Dep't 1995) .............................. 71

People v. Wahedi,
    301 A.D.2d 541 (2d Dep't 2003) .............................. 23

People v. White,
    66 A.D.3d 585 (1st Dep't 2009) .............................. 48

People v. Willingham,
    253 A.D.2d 533 (2d Dep't 1998) .............................. 70

People v. Wright,
    62 A.D.3d 916 (2d Dep't 2009) .............................. 34

Rivera v. Anilesh,
    8 N.Y.3d 627 (2003) ........................................ 65

In re Y.K.,
    87 N.Y.2d 430 (1996) ....................................... 24

## STATUTES

C.P.L. § 270.25 ......................................... 4, 73

P.L. § 35.15 .............................................. 23

P.L. § 70.04 .............................................. 76

P.L. § 110.00 ........................................... 2, 34

P.L. § 120.05 ........................................... 2, 76

P.L. § 120.10 ............................................. 2

## OTHER AUTHORITIES

C.J.I.2d (NY) Justification (revised January 2018) ............ 44

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                           Respondent,

            -against-

LORENZO MCGRIFF,

                Defendant-Appellant.

Appellate Division
Docket Number
2017-02694

Kings County
Indictment Number
6248/2015

## RESPONDENT'S BRIEF

### PRELIMINARY STATEMENT

Defendant, Lorenzo McGriff, appeals from a January 20, 2017 judgment of the Supreme Court, Kings County, convicting him, after a jury trial, of Assault in the Second Degree (P.L. § 120.05[2]), and sentencing him to seven years' imprisonment and five years' post-release supervision (Cyrulnik, J., at trial and sentence).

Defendant had no codefendants.  He is incarcerated pursuant to the judgment.

STATEMENT OF FACTS

Introduction

On August 11, 2015, at approximately 1:07 p.m., on Court Street, Brooklyn, defendant grabbed Mohammed Khalifa, who had been following defendant and shouting racial epithets, and stabbed Khalifa repeatedly with a sharp instrument that appeared to be a knife. The men tussled, Khalifa briefly broke away and then fell, and defendant stabbed him again and again before running away.

Defendant was charged by Kings County Indictment Number 6248/2015 with, inter alia, Attempted Assault in the First Degree (P.L. §§ 110.00/120.10[1]) and Assault in the Second Degree (P.L. § 120.05[2]).

Jury Selection

Jury selection began on December 13, 2016, and concluded the following day (JS.15, JS.25, JS.239, JS.287).[1]  A first panel of sixteen prospective jurors then was seated in the jury box (JS.60-62). The panel was questioned by the court, the prosecutor, and defense counsel (JS.62-115).

---

[1] Parenthetical numbers preceded by the letters "JS." refer to the pages of the jury selection proceedings. Parenthetical numbers without any prefix letter refer to pages of the trial transcript covering proceedings on December 15, 16, 19, and 20, 2016. Names within parentheses refer to the witnesses whose testimony is recounted.

Two prospective jurors were challenged for cause (JS.118-21). The prosecutor peremptorily challenged two prospective jurors, Khandija Barrow and Ashley Dunn (JS.61, JS.121), and defense counsel challenged four (JS.121-22). The remaining eight panelists were seated as petit jurors (JS.124-25).

A second panel of sixteen individuals was seated in the box and questioned (JS.128-92).

Six panelists were excused for cause, with the consent of the non-moving party (JS.193-95, JS.199-200).

The prosecutor exercised four peremptory challenges, striking Andrea Solstad, Gerard Philip, Tara Cascone, and Pauline Stewart. Defense counsel also exercised four peremptories, and the two panelists who were not challenged were seated as petit jurors nine and ten (JS.194-202).

A third panel of sixteen was seated and questioned (JS.205-74). The prosecutor challenged Alisa Hidary, the panelist in seat five, for cause and she was excused on consent (JS.206, JS.277).

From the remaining panelists in seats one through eight, the prosecutor peremptorily challenged Glen Mendez, Yvonne Best, and Melina Grant. The defense exercised two peremptories. The two panelists who were not challenged, who occupied seats seven and eight in the jury box, were seated as petit jurors eleven and twelve (JS.275-78).

3

Jury selection continued in order to select two alternates. The individual in seat nine was excused on consent; defense counsel peremptorily challenged those in seats ten and eleven; and the prosecutor struck numbers twelve and thirteen, Shaquan Nelson and Marlene Laplante (JS.278-80; see JS.207, 223). Hence, since the parties had exhausted their two challenges (see C.P.L. § 270.25), the person in seat fourteen was selected as the first alternate (JS.281).

The prosecutor peremptorily challenged seat fifteen, Elyse Barton. She was the last person on the third panel, because seat sixteen, Oventon Callwood, had previously been excused (JS.281, see JS.240-41). The court asked the parties to agree on a second alternate, and they agreed to seat Shaquan Nelson (JS.281-82).

At that point, with the entire petit jury seated, defense counsel made a Batson motion (JS.282). Defense counsel alleged that ten of the prosecutor's twelve peremptories had been exercised against African-Americans: Barrow and Dunn in round one; Philip, Solstad, and Stewart in round two; and Best, Mendez, Grant, Nelson, and Laplante in round three. According to counsel, the only two non-African-American individuals whom the prosecutor challenged were Cascone and Barton (JS.282-85).

Defense counsel cited the following additional circumstances in support of his motion: (1) in round one neither African-American juror whom the prosecutor challenged made any statements

4

that "went one way or the other," and in round two, Philip and Stewart "said virtually nothing"; (2) if the prosecutor had not exercised one of his peremptories against someone else, then third-round juror Nelson (the second alternate) would have been "one of the twelve main jurors"; and (3) with the exception of Solstad, there had been no race-neutral reasons for the removal of the African-American panelists, "to the point we now have a jury that is majority Caucasian" (JS.283-85).

The court disagreed with counsel's assertion that third-round panelist Mendez was African-American, stating: "Mr. Mendez I think is Hispanic." Counsel acknowledged that Mendez's last name suggested that he was Hispanic, but stated, "He appeared to me to be African-American. For the record, he is dark complexion[ed]" (JS.284).

The prosecutor said that it was "presumptive" (i.e., presumptuous) and "unfair" of defense counsel to claim that a majority of the jury was Caucasian (JS.285-86), stating that the race of half of the people seated was unclear (JS.285 ["we don't probably know half the races of people seated"]). The prosecutor then identified as African-Americans three of the jurors selected in the first round (Wilson, Bennett, Brown) and one of the jurors selected in the second round (Payne) (JS.285-86; see JS.124, JS.202). Defense counsel did not identify the members of the petit jury whom he believed to be Caucasian.

5

Additionally, the prosecutor disputed that Solstad, whom he had challenged, was African-American, stating, "I have no idea what she is," and added that, in any event, "the answer that she gave I think disqualified her from being a fair juror" (JS.285).

Finally, the prosecutor stated that, although he did not believe defense counsel had made out "a pattern," he was prepared to "meet [his] burden" if the court found otherwise (JS.286).

Following a pause in the proceedings, the court denied defendant's Batson motion: "I've had an opportunity to review the challenges that have been exercised.  Actually across the board I do not find a pattern" (JS.286).

The Trial

The People's Case

Around 1:00 p.m. on August 11, 2015, JEANELLE TORIBIO was headed to the Department of Education building at 65 Court Street in downtown Brooklyn.  She was on the sidewalk opposite the Education building and about to cross to the other side of Court Street, when she noticed two men arguing in the middle of the street several feet away from her (Toribio: 2-5, 23, 25, 29). There was some construction going on in the street nearby, but

6

nothing was blocking her view of the men, neither of whom she knew (Toribio: 4, 11, 17, 22, 26-27, 29).[2]

One man was tall and wearing a black hat, blue jeans, and a tan shirt; the other was skinny, with long black hair, and wearing a green shirt. She later learned that their names were Lorenzo McGriff and Mohammed Khalifa, respectively (Toribio: 4, 18).[3]

Lorenzo McGriff [defendant] was motioning with both his arms and telling Khalifa to get away from him, but Khalifa kept trying to get closer and would not give defendant any space (Toribio: 5-6, 8, 25-26). Defendant said to Khalifa something along the lines of, "[Y]ou going to keep on saying what you are saying?" or "Oh, you going to say it again?" (Toribio: 6, 24). Toribio did not know what had gone on between the men before they got to Court Street (Toribio: 18).

Defendant got mad and punched Khalifa. Khalifa himself had not taken any physical action against defendant and he had no weapon in his hands (Toribio: 6-7, 8, 16). Khalifa could not hit back, because defendant, the larger man, overpowered him. Khalifa

---

[2] At the end of the People's case, a surveillance video of Court Street on August 11, 2015, which was recovered from the building at 75 Livingston Street, was, by stipulation, admitted into evidence as People's Exhibit Two (150). The video was played for the jury during the defense case (see, infra, at 19). A copy of People's Exhibit Two is being provided to this Court.

[3] Toribio was not asked to identify defendant in court. During her testimony, she referred to defendant as "the man in the tan shirt" or "the man in the black hat" or "Lorenzo McGriff."

grabbed onto defendant and held on.  The men fell against the side of a car stopped in the street (Toribio: 7-9).

That car's occupants were its driver, KADESHA GUY, Guy's sister, and Guy's friend, who was in the back seat behind Guy (Guy: 33-34, 37, 40, 46, 50).  Moments earlier, Guy had been driving on Court Street, towards Atlantic Avenue, when she saw two men-- defendant and a man in a green shirt [Kahlifa]--scuffling in the street in front of her car.  They looked like they were going to fight (Guy: 35-36, 40).  Guy had music on, and she could not hear what the men were saying, although they appeared to be arguing (Guy: 47-49).  Guy's friend, Ashley, said, "Kick his ass," and began filming the encounter between defendant and Khalifa with Guy's cell phone (Guy: 37-38, 39, 40, 58; People's Exhibit Seven [cell phone video]).[4]

Defendant took three or four steps towards Khalifa, while Khalifa, at the same time, backed up.  Defendant paused, and Khalifa took a step towards defendant (Exhibit Seven: 00:00- 00:09).  Khalifa was holding something in his hand (Exhibit Seven: 00:05-00:06).  Guy was not sure what it was; it was not any kind of weapon (Guy: 40, 49, 57).  She did not see Khalifa whirl anything above his head (Guy: 58).

---

[4] A copy of the cell phone video is being submitted to this Court.

8

Defendant charged towards Khalifa (Exhibit Seven: 00:07–00:08) and pushed him (Guy: 40). Khalifa was backing up (Guy: 58). Khalifa pushed defendant (Guy: 50, 57). The scuffling men banged into Guy's car (Guy: 35; Exhibit Seven: 00:10). Then, defendant, with what looked like a knife in his hand, repeatedly stabbed Khalifa in his stomach area (Guy: 35, 43, 50; Exhibit Seven: 00:13–00:15).[5] The men moved out of Guy's range of view as she drove past them (Guy: 50–51).

Meanwhile, Toribio saw the men stumble to the other side of Court Street and fall into an empty storefront that was under construction three doors down from 65 Court Street (Toribio: 9, 12, 14, 27).

Around this time, ASHLEY REYES, was on the sidewalk about three doors down from 65 Court Street, close to the business under construction (Reyes: 109–11).

Reyes was facing the street, conversing with a potential client, when she noticed a commotion coming from two men in the middle of the street down near the Education building. She could

_____

[5] A still-photo from the cell phone video was admitted into evidence as People's Exhibit Eight (41–42). It depicts defendant, holding with one hand an instrument with a four-to-five-inch pointed blade and holding with his other hand Khalifa's arm which Khalifa has brought to his upper chest. Khalifa appears to be clutching to his upper chest both a sweater and a portion of defendant's shirt. A copy of the still-photo is being provided to this Court.

not hear what was being said (Reyes: 109-13, 120). One individual, an African-American man, was "professionally dressed" in a "vest and button up outfit" and was wearing a hat; the other man was Caucasian and wearing a green shirt (Reyes: 113).[6]  Khalifa was yelling at defendant. They were about eight to ten feet away from Reyes, running up the street towards her (Reyes: 112-13, 120).

Defendant, with a knife in his hand, was chasing Khalifa (Reyes: 114, 120). Reyes did not see anything in Khalifa's hands (Reyes: 117-18, 120). When the men were only about five feet from Reyes, Khalifa, with defendant in pursuit, ran towards the store construction site and fell at the open doorway. Defendant stabbed Khalifa three times in the head and chest with the knife (Reyes: 114-17).[7]

Seconds later, defendant, uninjured, ran from the construction site and along Court Street in the direction of the Education building (Toribio: 14, 15, 16-17, 28; Reyes: 116-18,

---

[6] Reyes did not identify defendant in court. During her testimony she referred to defendant as the "African-American gentleman" and to Khalifa as "the man in the green shirt" or "the Caucasian."

[7] The cell phone video, Exhibit Seven, after showing defendant grab Khalifa and stab him near Guy's car, very briefly shows individuals on the Court Street sidewalk, including a person wearing blue who falls to the ground (00:20-00:22). Khalifa was wearing blue shorts in addition to a green shirt (Exhibit Seven: 00:11-00:14; Exhibit Eight [still-photo taken from cell phone video]). On the audio accompanying this portion of the cell phone video, a person can be heard saying, "He's stabbing him" (Exhibit Seven: 00:21-00:22).

121).    Defendant  pocketed  a  knife  (Toribio:  14-15).    Khalifa,

moaning and bleeding from injuries to his chest and head, also

came out of the site (Toribio: 15, 28; Reyes: 115, 117).   Khalifa

yelled, "I'm still alive" (Toribio: 15) and went after defendant

(Toribio: 15, 17, 28; Reyes: 119, 121, 122-23).

Having pulled her car over, Guy saw defendant run along Court

Street and turn right (Guy: 44, 51-52, 55-56; Exhibit Seven: 00:37-

00:42).    A  minute  or  two  later,  Khalifa  came  running  after

defendant, but he stopped at the corner of Livingston and Court

Streets.   Guy's friend called the police (Guy: 44-45, 51-52, 53).

The police received a "911" call.   The female caller stated

that a man had just gotten stabbed by Court and Livingston Streets.

The caller provided clothing descriptions of the stabber and victim

and stated that the victim was chasing the stabber, who, running,

had turned off Court and onto Schermerhorn Street, with the victim

in pursuit (KEVIN HAYNES [police employee with NYPD Communications

Division]: 125-29; People's Exhibit Eleven ["911" audiotape]).

Police Officer CALEB LOUARD and his partner, responding to a

call of an assault in progress, arrived at Court and Livingston

Streets shortly after 1:10 p.m., but there was nobody matching the

description of the victim or perpetrator; however, people were

pointing down Court Street in the direction of Schermerhorn, and

the officers proceeded in that direction (Louard: 59-63, 100-02).

Following  directions  from  people  on  the  street,  the  officers

11

eventually reached Dean Street near Boerum Place, where Louard saw Khalifa (Louard: 64-66, 102-06).

Officer Louard repeatedly ordered Khalifa to stop and get on the ground. Khalifa, who was breathing heavily and bleeding profusely from multiple stab wounds, did not immediately comply. He collapsed on his knees as an ambulance arrived (Louard: 67-69, 83-85, 106-07). Louard and other officers proceeded in the direction that Khalifa was pointing (Louard: 68, 87-88).

At Bergen Street, a passerby pointed to a minivan parked on the south side of the street. Officer Louard suspected that someone might be behind it (Louard: 69-70).

Defendant, hunched over and hat in hand, paced back and forth for a few moments behind the minivan (People's Exhibit Nine [video taken from a Bergen Street location, admitted into evidence at 74]: 1:27:12-1:27:22).[8] He started to crouch down on the sidewalk, almost hugging the side of the parked van (Exhibit Nine: 1:27:29-1:27:30).

Drawing his gun, Louard crossed the street, went around the vehicle, and saw defendant down on the ground (Louard: 70-72, 88, 92; Exhibit Nine: 1:27:31). Prior to coming around the van, Officer Louard had not seen defendant and had not ordered him to stop or get on the ground (Louard: 72, 76, 89).

---

[8] The video is being provided to this Court.

12

Defendant attempted to rise, but Louard and his partner pushed him back down and handcuffed him (Louard: 72-73, 93). Other officers arrived and conducted a fruitless search along the Bergen Street sidewalk and under the van (Exhibit Nine: 1:30:10-1:35:40). The officer searched defendant upon his arrest and again at the 84th Precinct stationhouse but did not recover any knife (Louard: 77).

Defendant, who gave his height as six feet one inch and weight as 295 pounds, was uninjured (Louard: 73, 78).[9]

Khalifa's hospital medical records noted his height as 70 inches and weight as 160 pounds (People's Exhibit One at 9).[10] He had suffered five stab wounds: a three-by-four-centimeter wound to his cheek, a three-centimeter wound to his forehead, a one-centimeter wound to his arm, a two-centimeter wound to his lateral left chest, and a two-centimeter wound to his lateral left flank (Exhibit One at 4, 11, 12). Khalifa was combative, uncooperative, and verbally aggressive in the emergency room, and had to be sedated (Exhibit One at 3, 5, 7). His urine tested positive for cocaine (Exhibit One at 25).

_____

[9] A photograph of defendant taken at the precinct was admitted into evidence as People's Exhibit Ten (Louard: 78-79).

[10] After the prosecution witnesses had all testified, certified medical records of Khalifa were, by stipulation, admitted into evidence as People's Exhibit One (150).

13

The Defense Case

Defendant, LORENZO McGRIFF, 47 years old at the time of trial and previously convicted of a felony, testified on his own behalf (McGriff: 158-59, 267).

On August 11, 2015, at about 12:45 p.m., defendant left his desk at a non-profit agency on Baltic Street, where he worked as a forensic peer specialist/counselor helping those with mental illnesses, and began his daily lunchbreak walk up Court Street (McGriff: 159-61).

When he turned onto Joralemon Street, crowded with pedestrians, a person, whom he later learned to be Mohammed Khalifa, walked past him. As Khalifa did so, he lifted his elbow, and, with a backward thrusting motion, jammed it into defendant's collarbone (McGriff: 161-62, 202). Defendant testified that he was startled and shoved Khalifa, who, with a "growl on his face like a madman," said, "You fucking nigger" (McGriff: 162). Defendant testified that, due to his experience with people with mental illnesses, he noticed that something "was off" about Khalifa, who defendant characterized as "ranting and raving" (McGriff: 163). Defendant continued walking down Joralemon towards Boerum Place. Khalifa ran up behind him, stating, "You're a slave," and "Nigga, I kick your ass," and "Motherfucker, where the fuck you going?" (McGriff: 163, 203).

14

Defendant told Khalifa to "get out of here," and, in order to avoid Khalifa, he crossed Joralemon Street to the Borough Hall side (McGriff: 163, 203). At this point, defendant had no real concern for his safety, but wanted to get away from Khalifa, because Khalifa had "messed with [his] lunch break," which was a problem because he was a diabetic and had not eaten. Defendant was also anxious about work and returning to his office about a half mile away (McGriff: 164, 173-74).

According to defendant, Khalifa ran across the street after him, still yelling, "[y]ou nigger," "[y]ou slave," and, "Take your black ass to Africa" (McGriff: 163, 174).

Defendant quickened his pace, headed back to Court Street, dashed across Joralemon Street as a bus was approaching, and, left Khalifa, blocked by the bus, on the other side of Joralemon. Defendant testified that he started running, figuring he could blend into the foot traffic (McGriff: 164, 175-76).

On Court Street, defendant, a heavy smoker, got winded, slowed down, and stopped to catch his breath (McGriff: 164, 178, 180). Defendant claimed that he heard Khalifa coming up behind him, yelling, "you nigga," and that as he turned around, Khalifa reached down and picked up an object from "a pile of rocks" on the ground next to a construction site in the street (McGriff: 164, 178, 180-81, 214, 224). At trial, defendant variously described the object as "some debris," "a rock," "a boulder," and "a brick" (McGriff:

15

165, 178, 181, 208, 212-13).  He estimated that it was eight to ten inches long (McGriff: 208).  Defendant testified both that he had seen and that he had not seen Khalifa pick up the brick or rock (McGriff: 224-25, 234, 269).

Defendant claimed that Khalifa wrapped the brick or rock in a shirt or sweater and began swinging, whirling or "wailing" the wrapped rock (McGriff: 164, 182, 187, 213, 215, 224, 269). Defendant testified that at that point he felt threatened and afraid.  He believed he had to "stand [his] ground" (McGriff: 165, 183, 226).  He denied that he was angry (McGriff: 215, 225).

He confronted Khalifa, telling him to "get out of here" (McGriff: 166, 186, 188).  According to defendant, Khalifa rapidly approached him and then backed up, allegedly to get leverage to swing the brick.  Khalifa persisted in threatening defendant with the brick, and defendant, feeling in "total danger," tried to seize Khalifa's hands to stop Khalifa from swinging the brick (McGriff: 165-66, 182-83, 216).

Defendant grabbed Khalifa's arm and hands, and the men allegedly engaged in a "full-fledged tussle."  Defendant claimed that the smaller man continued struggling to get loose (McGriff: 183-84, 221, 223, 236).  Defendant had a wire-stripper, about four inches long, in his pocket, which he said he used when fixing headphones (McGriff: 165, 167, 195-96, 216).  He took it out and prodded or struck Khalifa two, three or four times with the

16

instrument (McGriff: 166-67, 216, 218-19, 262). Defendant claimed that he aimed at Khalifa's lower extremities so as not to cause fatal damage (McGriff: 167, 222). Defendant insisted that the instrument was not a knife (McGriff: 167, 216, 219-20, 223, 255), although during his testimony at trial, he himself also referred to the instrument as a "knife" (McGriff: 218, 250). Defendant rejected the idea that he could have punched Khalifa to stop him, because Khalifa was "erratic" and was lunging at him with the brick (McGriff: 223).

The men tussled (McGriff: 184, 230, 235, 238, 242). Khalifa continued to struggle, and, as Khalifa was backing up and pulling away, defendant stabbed him two more times, for a total of five times (McGriff: 244-45, 248, 263). Khalifa fell off his feet, down to the ground (McGriff: 167, 185, 243-44, 246-47, 263). Defendant denied that Khalifa ever ran from defendant (McGriff: 233, 244).

Once Khalifa fell and released the alleged brick, defendant turned around and ran down Court Street (McGriff: 167). Defendant admitted that, while Khalifa had five stab wounds, he himself was uninjured (McGriff: 238, 263). Defendant did not wait at the scene and, although he had his cell phone, he did not call "911," allegedly because he was in distress and "had a psychotic man chasing" him (McGriff: 205, 251, 264). He claimed that he walked

17

towards a police car parked at the corner, but there was no officer in it (McGriff: 263).

At trial, defendant admitted that he did not keep the knife and he testified that, having seen that Khalifa had dropped the brick or rock, he dropped his "instrument" on Court Street (McGriff: 166, 191, 249, 264). After conceding at trial that he had testified in the Grand Jury that he had dropped the wire cutter on Boerum Place, he asserted that he had simply released the instrument either on Court or Boerum; he denied that he had dropped it on purpose (McGriff: 250-51, 255).

Defendant thought he had "lost" Khalifa, but then saw Khalifa coming after him, bleeding and yelling. Defendant kept moving, zigzagging, but Khalifa continued to follow him (McGriff: 167-68, 251-53, 256). When defendant reached Clinton Street, he could have continued straight onward to his Baltic Street office; however, defendant instead turned on Atlantic Avenue, and headed towards Boerum Place, away from his office (McGriff: 190, 207, 254; People's Exhibit 12 [map of area which defendant marked with his route]: 205-06). He eventually turned on Boerum and then on Bergen Street, heading back towards Court (McGriff: 190, 254; People's Exhibit 12).

When defendant reached Boerum and Bergen, and turned onto Bergen, he heard police radios behind him (McGriff: 168, 190).

18

Defendant claimed that he could also hear Khalifa yelling from around the corner (McGriff: 193).

Defendant testified that, at that point, while he was standing on the Bergen Street sidewalk, he saw Officer Louard, across the street, pull out a gun and yell at him to "freeze" and "get on the floor." Defendant claimed that was when he started to get down on the ground behind the van (McGriff: 190-94, 258-60). He insisted that he was crouched behind the minivan, not because he was hiding, but because Louard had told him to get down (McGriff: 260-61).

Once defendant was on the ground, the police handcuffed defendant and drove him to the precinct (McGriff: 169, 192).

While defendant was on the stand at trial, defense counsel and the prosecutor played for the jury, People's Exhibit Two, the video surveillance footage recovered from 75 Livingston Street.[11]

Defendant, wearing a tan shirt and black hat, can first be seen on the video (top right of center of the frame) walking on the sidewalk on the far side of Court Street in the direction of Livingston Street (13:07:16-13:07:20). He can then be seen crossing the street in the midst of moving traffic and, now much

---

[11] The video CD admitted into evidence contains footage from all twelve cameras that conducted surveillance for the building at 75 Livingston Street. However, only surveillance camera 12 recorded what was occurring outside on Court Street; other cameras video-recorded what was occurring inside the building and outside the building on Livingston Street. Only the surveillance video from camera 12 was played for the jury.

19

closer to the sidewalk of the near side of Court Street, walking past some street construction, including a payloader, and continuing in the street with the flow of traffic (13:07:20-13:07:34). Khalifa, in a green shirt, appears on the screen near the street construction site and can be seen bending down near some dirt and then standing up (13:07:32-13:07:33); during this time, defendant's back is turned, and he is facing away from Khalifa as he continues to walk in the street away from the construction site (13:07:32-13:07:37).

Khalifa walks about a car-length behind defendant, in the same direction. He is holding some floppy dark material in his right hand, which appears to be swinging (13:07:34-13:07:38). A large truck briefly blocks the camera's view of defendant (13:07:37-13:07:40). Defendant reappears, now walking against the flow of traffic and towards Khalifa, who has stopped (13:07:41-13:07:43). Defendant quickly closes the distance between them, and Khalifa begins to back up (13:07:43-13:07:45). Defendant draws back his arm and fist, as if readying to punch Khalifa (13:07:46). Khalifa continues to rapidly back up with defendant striding quickly forward, both men moving farther and farther away from the surveillance camera and eventually becoming blocked from view by the payloader (13:07:47-13:07:52). Less than one minute later, defendant can again be seen on the video, running down Court Street

with the flow of traffic, until he quickly disappears from view (13:08:35-13:08:38).

DOMINIQUE BOYD, an emergency medical technician ("EMT") employed by the Fire Department, testified that on August 11, 2015, she and her partner, a black female, responded to the corner of Livingston and Court Streets; however, when they arrived, there was no patient to treat. They continued to ride around and eventually found the patient [Mohammed Khalifa] (Boyd: 280-84).

Khalifa was very aggressive and verbally abusive. He did not want the EMTs to touch him, and swung his arms, pushed them off, and screamed at them, calling them "niggers and bitches." They had to call in another EMT crew to sedate Khalifa and transport him to Methodist Hospital (Boyd: 284-85, 288).

Boyd read into the record the EMT report [Defense Exhibit A], which mentioned, in part, that the patient was "very combative, uncooperative, verbally abusive and assaulted crew" (Boyd: 287-88). Boyd noted that she had worked as an EMT for six years and dealt with thousands of patients. She affirmed that she would have difficulty with a patient "all the time" (Boyd: 288-89).

## The Verdict and Sentence

On December 20, 2016, the jury found defendant not guilty of Attempted Assault in the First Degree, but guilty of Assault in the Second Degree (439-41).

21

On January 20, 2017, the court sentenced defendant, who had previously been adjudicated a second violent felony offender, to the maximum term of seven years' imprisonment and five years' post-release supervision (Sentencing Minutes at 2, 8).

POINT I

DEFENDANT'S CLAIM THAT THE PEOPLE FAILED TO
DISPROVE   HIS   JUSTIFICATION   DEFENSE   IS
UNPRESERVED AND WITHOUT MERIT.   MOREOVER, THE
VERDICT   WAS   NOT   AGAINST   THE   WEIGHT   OF   THE
EVIDENCE.

Defendant did not move for a trial order of dismissal (151-55, 290-93) on the ground that he raises on appeal.  Because prior to verdict he never raised below the specific claim that the People had failed to disprove his justification defense, defendant failed to preserve his claim for appellate review.  See People v. Wahedi, 301 A.D.2d 541, 541 (2d Dep't 2003).

In any event, viewing the evidence in the light most favorable to the People (see People v. Sparks, 29 N.Y.3d 932, 934 [2017]), there was legally sufficient evidence to prove that defendant intentionally caused Khalifa physical injury by stabbing him with a dangerous instrument and using a degree of force beyond that which defendant could have reasonably believed was necessary to defend himself.  Moreover, the verdict was not against the weight of the evidence.

A person may use physical force upon another when and to the extent he reasonably believes such force to be necessary to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person.  P.L. § 35.15(1).  The degree of force that may be used in self-defense

23

depends upon the degree of force reasonably believed necessary to repel either the attack or the reasonably perceived threat of attack.   In re Y.K., 87 N.Y.2d 430, 433 (1996).   To disprove a justification defense, the People must establish beyond a reasonable doubt either that the defendant did not believe that the physical force he used was necessary (the subjective element), or that a reasonable person in the same situation as the defendant would not have perceived that such force was necessary (the objective element). See Sparks, 29 N.Y.3d at 934 n.2; see also In re Y.K., 87 N.Y.2d at 434 ("It is not enough that the defendant believed that the use of force was necessary under the circumstances; his reactions must be those of a reasonable person similarly confronted").

The People carried their burden in this case.

First, the evidence proved that defendant did not have the requisite subjective belief that, in order to prevent Khalifa from causing him physical injury, he had to stab Khalifa repeatedly, including after Khalifa had fallen to the ground.

In evaluating whether a defendant had the requisite subjective belief, courts have considered whether a defendant's statements and actions before and after the incident, as well as during it, were consistent with acting in self-defense. See, e.g., People v. Flecha, 60 N.Y.2d 766, 767 (1983) (statements of

intention before incident and "furtive conduct" afterwards tend to disprove justification).

Based on the testimony of the prosecution witnesses and the surveillance video of Court Street (Exhibit Two), cell phone video (Exhibit Seven), still-photograph (Exhibit Eight), and Bergen Street surveillance video (Exhibit Nine), the jury could have concluded that defendant stabbed Khalifa out of anger and exasperation and not because he felt physically threatened.

It was undisputed that Khalifa followed defendant, a stranger, for several blocks, yelling racial slurs. Although defendant claimed that he had been afraid of Khalifa, none of the prosecution witnesses suggested that defendant had in any way appeared frightened of the smaller man. The surveillance video shows that when the men were walking in the street, with Khalifa behind defendant, and defendant turned, it was defendant who then strode towards Khalifa, closing the distance between them. Indeed, Toribio testified that when the men were facing each other, defendant said to Khalifa, "[Y]ou going to keep on saying what you are saying?" and further testified that defendant "got mad" and punched Khalifa. The jury could have reasonably concluded that defendant, angered by Khalifa's persistent, public racial hectoring and his refusal to desist from pursuing defendant even after defendant had confronted him, lashed out in fury, not in self-defense.

The surveillance video showed that when Khalifa bent down and, according to defendant, picked up a "brick" or "boulder" and stood back up and wrapped it in his sweater, defendant's back was turned, as defendant was still walking away from Khalifa. This footage established that defendant could not have seen Khalifa allegedly arm himself with the large, heavy object that defendant claimed he had believed Khalifa was going to use against him. Thus, contrary to defendant's trial testimony, defendant at the time of the incident could not have known that Khalifa had any kind of object that could cause defendant any real harm.

The surveillance video further shows that after the two men had stopped in the street, defendant charged towards Khalifa, the person allegedly menacing him, rather than calling the police on his cell phone or seeking help from a pedestrian or from one of the construction workers. Defendant's actions appeared to be those of a fed-up and infuriated, not fearful, individual.

The cell phone video, which captures how defendant had grabbed Khalifa and then stabbed him while the shorter, thinner man struggled, also undermined defendant's assertion that he was in fear of Khalifa and had to repeatedly stab Khalifa in order to protect himself from imminent harm.

Additionally, Reyes testified that Khalifa had tried to flee from defendant and that after Khalifa had fallen at the open doorway of the storefront construction site, defendant had stabbed

Khalifa three times.  This continuing attack on a fallen man again appeared driven by rage, not fear.

Furthermore, defendant's actions after he had finished assaulting Khalifa supported the conclusion that defendant knew he had acted criminally and not in self-defense.

According to all the prosecution witnesses and to the surveillance and cell phone videos, defendant immediately ran from the scene without calling "911" or asking any bystander for help. Although Toribio saw defendant put a knife in his pocket, no knife or tool was recovered from him when he was arrested.  Defendant had deliberately discarded the stabbing instrument after he left Court Street--not dropped it at the scene almost unconsciously, as defendant claimed in his testimony.  Moreover, the Bergen Street video shows defendant, in a crouched position, moving back and forth behind a van.  He appeared to be hiding from the police.

Thus, defendant's post-stabbing conduct provided strong circumstantial evidence of consciousness of guilt.  See People v. Troche, 147 A.D.2d 513, 514 (2d Dep't 1989)(justification defense inconsistent with defendant's flight from scene and disposal of his knife and victim's alleged knife); People v. Scharpf, 60 A.D.3d 1101, 1103 (3d Dep't 2009)(in case where defendant raised justification defense, leaving scene of incident to avoid detection by police evinced consciousness of guilt); see also People v. Cosby, 200 A.D.2d 682 683 (2d Dep't 1994).

27

In short, this mountain of evidence, when viewed in the light most favorable to the People and drawing every reasonable inference in their favor (People v. Ford, 66 N.Y.2d 428, 437 [1985]), established that defendant lacked the subjective belief that it was necessary for him to repeatedly stab Khalifa to protect himself from imminent physical harm.

Regardless of whether the People disproved defendant's alleged subjective belief that his use of force was necessary to protect himself, the People proved that any such belief was not objectively reasonable.

First, Khalifa's torrent of insults and his alleged boast, "I kick your ass" (McGriff: 163), did not provide a sufficient basis for defendant's use of force against Khalifa.   See People v. Soriano, 188 A.D.2d 420 (1st Dep't 1992) (verbal provocation could not justify defendant's use of physical force).   Even Khalifa's pursuit of defendant did not provide a basis for using physical force against Khalifa.   Indeed, defendant himself confirmed that these aspects of Khalifa's conduct did not place him in fear of physical harm (McGriff: 173-74).

In addition, given that all three eyewitnesses (Toribio, Guy, and Reyes) testified that they did not see Khalifa armed with any weapon, and that neither the surveillance video nor cell phone video shows Khalifa holding an eight-to-ten-inch brick or boulder, the jury could have concluded that it was objectively unreasonable

28

for defendant to have believed that Khalifa was armed with such a large, potentially dangerous object. Further, it was objectively unreasonable for defendant to believe that Khalifa was about to harm him with some object from the construction site, because--as is clear from the surveillance video--when defendant turned to face Khalifa, Khalifa stopped moving towards defendant. The distance between the men was too great for Khalifa to strike defendant. It was defendant who closed that distance.

Even if the jury had concluded that Khalifa had picked up some construction debris and wrapped it in a sweater, and that it was reasonable for defendant to believe that Khalifa was threatening him with this object, the evidence established that it was not reasonable for defendant to believe that he had to stab Khalifa to repel the potential attack. Even if defendant had initially been justified in using some kind of physical force against Khalifa to repel an assault, such as grabbing, shoving, or even punching Khalifa, he was not justified in stabbing Khalifa the many times that he did, especially once Khalifa was on the ground and apparently no longer able to use any wrapped object as a weapon.

The additional stab wounds that defendant inflicted while Khalifa was on the ground, three by Reyes's account and apparently including the two wounds to Khalifa's head, clearly exceeded the type of force that a person might have reasonably believed

29

necessary for self-defense. See People v. Barreto, 70 A.D.3d 574, 575 (1st Dep't 2010)(even if defendant's initial force was justified, his slashing of victim's neck was not, because by then, victim was unarmed and situation was under control); People v. Terk, 24 A.D.3d 1038, 1039 (3d Dep't 2005)(where victim suffered a broken jaw and lacerated spleen, even if jury credited defendant's statement that victim started altercation by striking him in the back of the head, jury could have nonetheless reasonably concluded that defendant either need not have resorted to physical force to repel the attack or responded disproportionately to the threat perceived); People v. Grey, 282 A.D.2d 544, 545 (2d Dep't 2001)(justification disproved; jury could have concluded that victim was unarmed and that defendant continued stabbing him even when he was lying helplessly on the floor); People v. Henegan, 150 A.D.2d 606, 607 (2d Dep't 1989)(defendant could not have reasonably believed that victim was about to use deadly physical force because victim had been disarmed before stabbing occurred); see also People v. Varela, 164 A.D.2d 924, 925 (2d Dep't 1990).

In addition, the jury's verdict finding defendant guilty of second-degree assault and rejecting his justification defense was not against the weight of the evidence.

Here, the jurors had ample opportunity to scrutinize various videos, as well as the still-photograph from the cell phone video, and decide for themselves whether all this visual evidence

corroborated the most important aspects of the prosecution witnesses' or defendant's testimony.

Citing to the surveillance and cell phone videos, defendant argues that the People's witnesses' testimony that Khalifa had no weapon was wrong. But, while the surveillance video shows Khalifa bending down and straightening up, it is not clear what, if anything, he has picked up from the ground, or that anything is in his sweater. In the videos, the sweater appears to swing from his hand, but it is not clear that there is anything in it, or if there is, what size it is. Defendant claimed that the rock or brick was eight to ten inches long--a brick or boulder that size would presumably have been visible on the videos. It is not.

The videos also do not show Khalifa "whirling" or "wailing" the sweater, as defendant testified, and none of the eyewitnesses saw Khalifa engage in such a distinctive gesture.

The jurors also had ample opportunity to decide whether the Bergen Street video showed defendant hiding from the police or complying with police orders. They could have reasonably concluded that defendant, asserting the latter, had lied on the stand. And, unlike this Court, the jury had the opportunity to assess first-hand defendant's demeanor as he testified and decide whether he was being truthful or evasive and combative in his answers.

Thus, to the extent that defendant's testimony contradicted that of the People's witnesses, it presented an issue of

31

credibility which was reasonably resolved by the jury in favor of the prosecution, and that conclusion should not be second-guessed on appeal.

Accordingly, because the evidence fully supported the jury's verdict rejecting defendant's justification defense and finding defendant guilty of second-degree assault, the judgment of conviction should be affirmed.  See People v Henry, 244 A.D.2d 424, 425 (2d Dep't 1997)(where victim and two other prosecution witnesses testified that defendant attacked victim with a racquet and broken bottle and defendant testified that his actions were justified because victim had tried to hit him with a piece of wood embedded with nails, guilty verdict was not against the weight of the evidence despite defendant's claim that the prosecution witnesses were incredible); see also People v. Mothon, 284 A.D.2d 568, 570 (3d Dep't 2001); People v. Lemaire, 187 A.D.2d 532, 533 (2d Dep't 1992); Troche, 147 A.D.2d at 514.

POINT II

DEFENDANT'S CLAIMS REGARDING THE PROSECUTOR'S
CROSS-EXAMINATION    OF    DEFENDANT    AND    HIS
SUMMATION       ARE       MOSTLY       UNPRESERVED.
FURTHERMORE,    THE    PROSECUTOR'S    CONDUCT    WAS
PROPER, AND ANY ERROR WAS HARMLESS.

Defendant's claims that the prosecutor engaged in various forms of misconduct with regard to both his cross-examination of defendant and his summation are unpreserved for appellate review. Moreover, the prosecutor's conduct was, on the whole, proper, and any isolated instances of improper questions or remarks were harmless in light of the overwhelming evidence of defendant's guilt.

A.    Defendant's Claims Regarding the Prosecutor's Cross-Examination of Defendant Are Unpreserved and Without Merit.

Defendant claims that the prosecutor, with cross-examination questions of defendant, shifted the burden of proof, improperly suggested that defendant was an angry person, misstated the law pertaining to justification, and improperly asked defendant to characterize Officer Louard as having lied (Brief for Defendant-Appellant [hereinafter "Def.Brief"] at 44, 45, 49, 47). Defendant failed to raise any objection whatsoever to most of the allegedly improper questions that he now cites on appeal (see 215, 216-17, 223, 226, 257). Although defendant did raise a general objection

33

to a few of the prosecutor's questions that he now points to as examples of burden shifting (252, 255, 264-65), these objections were insufficient to preserve his claims, either because he did not specify the ground for his objections or because, when some of his objections were sustained by the court, defendant did not ask for any further curative instructions (264-65). See People v. Wright, 62 A.D.3d 916, 917 (2d Dep't 2009). Hence, none of defendant's claims regarding the prosecutor's cross-examination of defendant are preserved for appellate review.

Moreover, the prosecutor properly, albeit vigorously, cross-examined defendant.

Because the indictment charged Attempted Assault in the First Degree, the People had to prove that defendant had not merely intended to cause physical injury to Khalifa, but that he had intended to cause serious physical injury. See P.L. §§ 110.00/120.10(1). Further, because defendant raised a justification defense, the People had the burden of proving, first, that defendant, when he repeatedly stabbed Khalifa, did not do so because defendant in fact believed such an assault, including the extent of the assault, was necessary to defend himself against an attack by Khalifa, and second that, even if defendant subjectively believed his conduct was necessary to defend himself, such belief was not objectively reasonable under the circumstances.

34

Defendant's claims that the prosecutor, by his cross-examination questions, engaged in burden shifting and promoted an incorrect statement of the law, are meritless.

The actions that defendant took before and after stabbing Khalifa, and the reasons why he decided to take those actions, were probative of his intent to cause serious physical injury and to both the subjective and objective elements of the justification defense, and the prosecutor did not burden-shift by asking defendant about his decisions. For example, defendant's decision not to warn Khalifa that he had a dangerous instrument was arguably relevant to whether defendant really acted out of fear or whether he acted out of anger when he started stabbing Khalifa. Therefore, the prosecutor's question in this regard (216-17) was proper. The prosecutor's question about how defendant felt when Khalifa had followed him for blocks, yelling "nasty things," whether angry in addition to frightened (214), was relevant to defendant's subjective state of mind before stabbing Khalifa. Defendant's assertion that he had not been angry "[a]t all" (McGriff: 215) might well have struck the jurors as incredible and led them to question the entirety of defendant's testimony.

Similarly, defendant's decision to flee from Court Street immediately after stabbing Khalifa, not to call "911" or otherwise seek assistance for Khalifa, and not to retain the stabbing instrument, could all be considered as evidence of consciousness

35

of guilt.   Accordingly, the prosecutor's questions probing these issues (248, 252) were proper.

Indeed, defense counsel had asked defendant on direct why he had not called the police or called for help on the street (188-89)--obviously, realizing that defendant's answers to these questions were relevant.

The fact that defendant, who was considerably larger than Khalifa, was entirely uninjured in their encounter supported the conclusion that it was unnecessary for defendant to stab Khalifa five times.   The prosecutor was entitled to elicit from defendant an admission about his lack of injury (236), because this evidence helped establish that the extent of the force used by defendant was neither subjectively, nor objectively, necessary for self-defense under the circumstances.

Likewise, contrary to defendant's claim (Def.Brief at 49), the prosecutor did not "misstate" the law pertaining to justification by asking defendant if, to repel Khalifa, he could have punched him in the face instead of stabbing him.   While defendant replied that such conduct had not been "an option" (223), it was entirely legitimate for the jury to consider whether defendant's using a dangerous instrument had been an excessive response.   And, indeed, defense counsel had previously asked defendant, "Did you think of any other ways you could protect yourself?" (189).

The prosecutor did not err in asking defendant whether Officer Louard had lied when the officer testified that he had not seen defendant prior to coming around the van (257-58). Defendant himself had created the credibility contest by offering testimony on direct examination that directly contradicted Officer Louard's. See People v. Lewis, 154 A.D.3d 1329, 1330 (4th Dep't 2017)(proper for prosecutor to ask defendant whether prosecution witnesses were liars when defendant's own testimony left open no alternative suggestion except that People's witnesses lied). Here, defendant was only too ready to explain why the jury should agree with defendant that Louard had lied and should accept that defendant was telling the truth with regard to his actions behind the minivan on Bergen Street. See People v. Rogers, 161 A.D.3d 1013, 1014 (2d Dep't 2018)(defendant failed to preserve his claim of burden-shifting; in any event, prosecutor's cross-examination questions asking defendant to comment on accuracy of prosecution witnesses' testimony were not improper).

In any event, even if any of these questions were improper, none was so flagrant as to deprive defendant of a fair trial, especially in light of the overwhelming evidence of defendant's guilt (see, infra, at 55-57). See People v. Creekmmur, 137 A.D.3d 1052, 1053 (2d Dep't 2016); People v. Thompson, 62 A.D.3d 817, 818 (2d Dep't 2009).

B.  Defendant's Claims Regarding the Prosecutor's Summation
    Remarks Are Unpreserved and Without Merit.

Defendant's claims that certain of the prosecutor's remarks
on summation were improper and deprived him of a fair trial are
unpreserved since defendant failed to raise any objection to the
remarks that he now challenges on appeal or raised only a general
objection.  See People v. Kaval, 154 A.D.3d 875, 876 (2d Dep't
2017).  Furthermore, the challenged remarks were either fair
response to defense counsel's summation, or fair comment on the
evidence and the reasonable inferences to be drawn therefrom, or
harmless.  See Rogers, 161 A.D.3d at 1014.

The prosecutor properly argued that defendant assaulted
Khalifa out of anger, not fear, and that defendant's conduct, even
after the confrontation ended, supported that conclusion.

Notably, on summation, defense counsel dwelt at length on the
despicable character of the victim, stating that Khalifa had said
"racist" things (316, 320), and repeatedly calling Khalifa a
"racist" (327, 330-31).  Counsel repeatedly tried to lecture the
jury about the word, "nigger" (314, 316).  She also reviewed at
length Khalifa's conduct after his encounter with defendant and
his horrible behavior towards medical staff (321-22, 328-31).
After noting that the judge would instruct on justification,
counsel urged the jury, "But use your everyday common sense when
tackling this question" (313) (emphasis added).  She insinuated

38

that defendant might have been entitled to use force merely because
Khalifa had taunted him: "Did Mr. Khalifa get what he called for?
In plain language, did his mouth write a check that his body
couldn't cash?" (313).  Counsel declared, "And I am telling you
[defendant] was justified in answering the call that Mr. Khalifa
put out there" (322).

 Counsel summed up:

> [V]iolent, racist, uncooperative, aggressive,
> argumentative, irrational, racist.
>
> That's the man that Mr. Khalifa is.  That's the man
> that the People are trying to say that [defendant] is
> not justified in defending himself against. . . .  He
> absolutely was justified in doing so.

(331).

While defense counsel thus sought to persuade the jurors to
loathe and condemn the victim, the prosecutor sought to turn this
strategy to the People's advantage by arguing that defendant's
assertion that he had not been angry was simply not credible (341).
The prosecutor properly urged the jury to consider defendant's
failure to be forthright about being mad at Khalifa when evaluating
the rest of his testimony (345).

Defense counsel also questioned on summation the credibility
of the prosecution witnesses and insinuated that they had
deliberately lied.  Counsel stated, "You clearly saw on the video
that [Khalifa] bent over, picked up the rock and put it in that
shirt that's in his hand" (326) (emphasis added).  Counsel wondered

why the prosecution witnesses would not "admit" they had seen "this item" in Khalifa's hand (326).

Defense counsel repeatedly averred that Khalifa had a brick. While playing the surveillance video for the jury, counsel asserted: "[T]here's Mr. Khalifa, he just bent down and picked up a brick. He's wrapping it in his shirt . . ." (323). Concerning the cell phone video, she stated, "[Y]ou see that there's the brick swinging in his hand" (325). Counsel further stated, "And what he had in his hands was a brick in a shirt (indicating) that he was whirling and coming after [defendant] with" (327).

The prosecutor correctly noted that the defense had no burden in the case, but also correctly noted that given that defendant had decided to testify, the credibility of his testimony should be scrutinized just like that of the People's witnesses (340). Contrary to defendant's claim on appeal, the prosecutor did not improperly vouch for the credibility of the prosecution witnesses or improperly denigrate defendant's testimony. Rather, he contrasted their lack of motive to lie with defendant's interest in the outcome of the case (340). Additionally, the prosecutor properly drew the jury's attention to defendant's truculent demeanor while testifying (345). See People v. Smith, 173 A.D.2d 416, 417 (1st Dep't 1991) (prosecutor's comments regarding witnesses' demeanor, interest and attitude in testifying were not improper).

40

Moreover, the prosecutor did not misstate the law or improperly burden-shift, as defendant now contends. Referring repeatedly to the videos in evidence--which the prosecutor invited the jurors to scrutinize for themselves--and the testimony of the three eyewitnesses, the prosecutor cogently argued that defendant's testimony about Khalifa threatening him with a brick was simply not borne out by the evidence. Further, the prosecutor, drawing reasonable inferences from the evidence, properly argued that defendant's actions after the stabbing were all deliberate and evinced a consciousness of guilt. See Troche, 147 A.D.2d at 514-15 (prosecutor did not shift burden of proof on justification by his summation remarks pertaining to incredibility of defendant's testimony).

Defendant also complains (Def.Brief at 48) that the prosecutor erred in urging the jurors to "use your own eyes" in looking at the still-photograph from the cell phone video and stating, "Clear as day that's a knife" (355). This remark was fair comment on the evidence and fair response to defense counsel, who had baldly proclaimed, "It's not a knife" (312).

Accordingly, the prosecutor's summation was proper. In any event, any error was harmless. The court, both before the summations and in its final charge, instructed the jurors that they were the sole factfinders and that the parties' summations were not evidence (305-07, 366-69, 372). These instructions would

41

have dispelled any prejudicial impact of any of the prosecutor's remarks.   See People v. Armonte, 287 A.D.2d 645, 646 (2d Dep't 2001).

Finally, if any of the prosecutor's questions on cross-examination of defendant or any summation comments were improper, the errors were harmless in light of the overwhelming evidence of defendant's guilt (see, infra, at 55-57).  There is no significant probability that the verdict would have been different but for any of the alleged errors, and, accordingly, the judgment of conviction should be affirmed.   See Thompson, 62 A.D.3d at 818; People v. Adamo, 309 A.D.2d 808, 809 (2d Dep't 2003).

POINT III

DEFENDANT DID NOT PRESERVE HIS CLAIM THAT THE
COURT ERRED IN FAILING TO INSTRUCT THE JURY TO
CEASE DELIBERATIONS IF IT ACQUITTED DEFENDANT
OF ATTEMPTED FIRST-DEGREE ASSAULT ON
JUSTIFICATION GROUNDS, AND IN SUBMITTING A
VERDICT SHEET THAT OMITTED SUCH AN
INSTRUCTION. REVIEW IN THE INTEREST OF
JUSTICE IS UNWARRANTED, BECAUSE THE
JUSTIFICATION CHARGE AS A WHOLE CONVEYED THE
CORRECT LAW AND THE EVIDENCE DISPROVING
JUSTIFICATION WAS OVERWHELMING.

On appeal, defendant claims for the first time that the trial
court erred by failing to issue specific instructions that the
jury should cease deliberations if it acquitted defendant of
attempted first-degree assault (count one) on justification
grounds, and by submitting a verdict sheet that also omitted this
specific cease-deliberations language (Def.Brief at 53-55).
Defendant failed to preserve this claim for appellate review.
Moreover, this Court should not reach the issue in the interest of
justice, because: (1) the court's charge, considered as a whole,
properly and unambiguously instructed the jury on justification,
so that the jury would not have deliberated on count two if it had
acquitted defendant on count one based on justification, and (2)
there was overwhelming evidence disproving defendant's
justification defense.

To preserve a claim regarding a justification charge for
appellate review, a defendant must object to the charge as given

43

or propose an alternative or supplemental charge. See People v. Jung, 22 A.D.3d 506 (2d Dep't 2005). Defendant's claim regarding the court's final charge and the language of the verdict sheet is unpreserved and waived.

At the pre-charge conference on December 19, 2016, the court noted that it had reviewed the specific requests of the parties and that the "defense had requested justification, which is in there" (293). There is no indication in the record that defense counsel submitted to the court any particular text for the justification charge, and presumably, defense counsel assumed that the court would rely on the Model Criminal Jury Instructions, which at the time did not include any language directing the jury that, if it found that the People had failed to prove defendant was not justified with regard to the first count, to also find defendant not guilty on all remaining counts to which justification applied. That language--the language that defendant now claims should have been part of the final charge (Def.Brief at 54)--was added only in January 2018. See C.J.I.2d (NY) Justification (revised January 2018), at 4-5 and n.1 and n.11). Because the court charged the jury exactly as defense counsel likely expected and wished, defendant raised no objection whatsoever to the court's final charge (399) or when the court re-charged the jury, in response to its note, on justification and the elements of the charged crimes (427-36, Court Exhibit Five).

Additionally, defense counsel consented to the language on the verdict sheet by initialing the front of the verdict sheet provided to the jury (see Verdict Sheet in court file) and by raising no objection to the court's instructions pertaining to the verdict sheet (394-95).

Thus, defendant failed to preserve any claim regarding the justification charge and waived any objection to the verdict sheet by consenting to it. See People v. Kassebaum, 95 N.Y.2d 611, 621-22 (2001)(defendant waived claim regarding language on verdict sheet "by explicitly consenting at trial to the use of the verdict sheet procedure"); People v. LaGuerre, 29 A.D.3d 820, 823 (2d Dep't 2006)(defendant failed to preserve claims with respect to verdict sheet and court's jury charge by failing to object); see also People v. Allen, 149 A.D.3d 764, 765 (2d Dep't 2017).

This Court should not exercise its interest of justice jurisdiction to reach defendant's claim. See People v. Feuer, 11 A.D.3d 633, 634 (2d Dep't 2004)(exercise of interest of justice jurisdiction is not warranted "unless on the whole case there is a reasonable basis for the fear that injustice has been done") (emphasis added, citation omitted). No injustice was done in this case.

Not only was there overwhelming evidence disproving the justification defense, but also the justification charge, when viewed as a whole, effectively conveyed to the jury that if it

45

found defendant not guilty of attempted first-degree assault based upon a defense of justification, it also had to automatically find him not guilty on second-degree assault. See People v. Fitzgerald, 120 A.D.3d 506, 507 (2d Dep't 2014)(declining to review in the interest of justice defendant's unpreserved justification charge claim); People v. Gueye, 81 A.D.3d 974 (2d Dep't 2011)(same); People v. Holmes, 12 A.D.3d 532 (2d Dep't 2004) (same); see also People v. Daggett, 150 A.D.3d 1680, 1682 (4th Dep't 2017) (declining to exercise interest-of-justice review of defendant's claim that trial court erred in omitting a cease-deliberations instruction if jury found defendant not guilty by reason of justification on the top count, and noting the overwhelming evidence disproving the justification defense); People v. Barreto, 70 A.D.3d 574, 575 (1st Dep't 2010) (declining interest-of-justice review of justification charge, because "charge, viewed as a whole, sufficiently conveyed the principle that if the People did not disprove the defense of justification beyond a reasonable doubt, defendant was entitled to an acquittal as to all counts); People v. Palmer, 34 A.D.3d 701, 703-04 (2d Dep't 2006)(where overwhelming evidence disproved justification and court charged justification as a specific element of each submitted charge, declining to reach in the interest of justice unpreserved claim regarding court's failure to include "cease deliberations" language). But see, e.g., People v. Fletcher, 2018 N.Y. App. Div. LEXIS 7678, at *2-*3, 2018

N.Y. Slip Op. 07747, at 2 (2d Dep't Nov. 14, 2018)(reviewing in interest of justice charge claim regarding omission of cease-deliberation instruction in connection with justification defense); People v. Breckenridge, 162 A.D.3d 425 (1st Dep't 2017) (same); People v. Velez, 131 A.D.3d 129, 133-34 (1st Dep't 2015) (same); but see also People v. Braithwaite, 153 A.D.3d 929, 930 (2d Dep't 2017)(reaching in interest of justice unpreserved claim that verdict sheet and attendant instructions regarding justification defense did not effectively convey that jury should cease deliberations if it found defendant not guilty of greater charge based on justification).

The court's instructions correctly stated the applicable legal standard and enabled the jury to render a reliable verdict. A jury charge is correct so long as "'the jury, hearing the whole charge, would gather from its language the correct rules which should be applied.'" People v. Samuels, 99 N.Y.2d 20, 25 (2002) (citation omitted).

Here, the court, prior to even discussing the elements of each charge (attempted first-degree assault and second-degree assault), instructed (and later, in response to the jury note, re-instructed) the jury on the defense of justification, clearly noting that the defense applied to both charges: "So, with respect to counts one and two, the defendant has raised the defense of justification, also known as self-defense" (383, 428). The court

47

then explained the defense of justification as it applied to the instant case and the People's burden of disproving the defense beyond a reasonable doubt (384-87, 429-31).  The court concluded by unequivocally stating that if the jury found that the People had failed to prove beyond a reasonable doubt that defendant was not justified, the jury had to find ("you must find") defendant "not guilty under counts one and two" (387, 431).

Thus, by using stark, unambiguous language in its instruction and by issuing the instruction at the outset, before any discussion of the specific submitted charges, the court ensured that the jury knew that any finding of justification compelled a not-guilty verdict regarding not just count one, but also, automatically, count two.  See Barreto, 70 A.D.3d at 575 ("the justification charge, viewed as a whole, sufficiently conveyed the principle that if the People did not disprove the defense of justification beyond a reasonable doubt, defendant was entitled to an acquittal as to all counts" [citing Palmer, 34 A.D.3d at 703]); People v. White, 66 A.D.3d 585, 586 (1st Dep't 2009) (same [citing Palmer]); Brooks v. Lee, 2016 U.S. Dist. LEXIS 176859, at *29 (S.D.N.Y. Dec. 19, 2006)(Magistrate's Report)(where trial court clarified that the jurors were "required to find Petitioner not guilty of all charges against him unless they were convinced beyond a reasonable doubt that Petitioner was not acting in self-defense," trial court's instructions "achieved the result mandated by Feuer"

[recommending denial of habeas relief in People v. Brooks, 71 A.D.3d 1043 (2d Dep't 2010)]), adopted, 2017 U.S. Dist. LEXIS 9644 (S.D.N.Y. Jan. 23, 2017); cf. People v. Castro, 131 A.D.2d 771, 773-74 (2d Dep't 1987)(reversal was required, where court failed to instruct jury "at the outset" that "in the event it reached a verdict of not guilty by reason of justification as to any of the offenses submitted to it, it should simply render a verdict of acquittal and cease deliberations, without regard to any remaining lesser included offenses").

Moreover, the court properly included the absence of justification as a specific element of each submitted charge, thereby serving the rationale of this Court's Feuer holding. In Feuer, 11 A.D.3d at 634, this Court held that it was error for the trial court not to instruct the jurors that, if they acquitted the defendant of a greater charge based on justification, they were not to consider any lesser counts. In a later case, this Court explained that the rationale for this requirement was that without such an instruction, there was no way of knowing whether the acquittal on the top count was based on a finding of justification so as to have required acquittal on the lesser-included offense, as well. See Palmer, 34 A.D.3d at 703. This Court noted that this rationale was also served by requiring that absence of justification be a specific element of each of the submitted charges. Id. That is precisely what the court did in the instant

49

case--i.e., instructed (and later, re-instructed) the jury with regard to each submitted charge, Attempted Assault in the First Degree and Assault in the Second Degree, that the People had to prove each element beyond a reasonable doubt and that the third element of each crime was that defendant was not justified (389-91, 431-36).

Defendant claims that the court's alleged error in failing to use specific cease-deliberations language was then "exacerbated" by the court's statement--"The second count you will consider is assault in the second degree" (390)--which the court made after it had finished explaining the elements of count one and begun explaining count two (Def.Brief at 55).  Defendant now emphasizes the words "will consider" and argues that the phrase would have led the jurors to conclude that they should reconsider justification for count two even if they had found defendant not guilty of count one based on justification.  The claim is meritless.

First, while defendant in his brief underscores the words "will consider," there is no reason to believe that the court itself placed any particular emphasis on "will"; it simply used an unremarkable turn of phrase.  Second, when the court, in response to the jury's note, Court Exhibit Five, re-instructed the jury on justification and the two submitted charges (428-36), the court did not repeat the phrase, "will consider."  Rather, after it had

finished going through the elements of the first count, the court simply stated, "The second count is assault in the second degree" (434). Thus, there is no reason to believe that the jury would have either specifically recalled the words, "will consider," or have attached any particular significance to them. What would have instead impressed itself on the jurors' minds was the court's correct, clear, re-iterated instruction that, "[I]f you find that the People have failed to prove beyond a reasonable doubt that the defendant was not justified then you must find the defendant not guilty under counts one and two" (387, 431) (emphasis added).

Nor should this Court reverse in the interest of justice based on defendant's unpreserved and waived argument that the lack of cease-deliberation language on the verdict sheet confused the jury (Def.Brief at 55). First, the language on the verdict sheet, which both parties had agreed upon, was minimal: the mere listing of the name of each offense, preceded by the count number ("1." and "2.") and followed by boxes under columns headed "Not Guilty" and "Guilty." Nothing on the verdict sheet suggested to the jurors that they should re-deliberate about the justification defense regarding count two if they found defendant "not guilty" of count one based on justification. Cf. Braithwaite, 153 A.D.3d at 930 (2d Dep't 2017)(reversing in light of language on verdict sheet and accompanying oral instructions that mandated that jury must "go on" and "deliberate" on lesser-included offenses, without

51

explaining that deliberations should cease if jury found defendant
not guilty based upon People's failure to disprove justification)
(emphasis added).

    While it is true that in February 2016 (several months prior
to defendant's trial) a C.J.I. Model Verdict Sheet for
Justification that included cease-deliberations language was
promulgated (see Def.Brief at 55), defense counsel below, having
specifically approved the verdict sheet, obviously and reasonably
thought that such additional verbiage on the sheet in this case
was unnecessary, given the straightforward nature of the jurors'
task in weighing the proof, or lack thereof, of justification.

    The court's instructions regarding the verdict sheet in no
way suggested that the jurors should ignore the court's previous
plain and precise command that if they found that the People had
failed to prove beyond that defendant was not justified they had
to find defendant not guilty under counts one and two.  The court
stated:

        The verdict sheet lists each count that's being
    submitted for your consideration. . . .  Please use the
    form to record your verdict with an X or a checkmark in
    the appropriate place for each count that you are
    required to consider in accordance with my instructions.

(394-95) (emphasis added).   Thus, the jury knew that, "in
accordance with" the court's prior instructions on justification,
it should place an X or checkmark under "Not Guilty" for both

52

counts if it found that the People failed to prove that defendant was not justified.

There was simply nothing in the instruction accompanying the verdict sheet that could be interpreted as directing the jury to continue deliberating with regard to count two if it had already concluded, regarding count one, that defendant had been justified in attempting to inflict serious physical injury on Khalifa. Cf. Braithwaite, 153 A.D.3d at 930 (discussed, supra, at 51-52); Velez, 131 A.D.3d at 132 (both verdict sheet and court's attendant instructions told jury it "must consider" the lesser counts, but neither mentioned defense of justification).

Finally, review in the interest of justice is unwarranted because, under the facts of this case, it can be said with near certainty that the jury did not acquit defendant of count one on justification grounds and then re-deliberate on the issue of justification. Cf. Fletcher, 2018 N.Y. App. Div. LEXIS 7678, at *3, 2018 N.Y. Slip Op. 07747, at 2 (reversing second-degree assault conviction in interest of justice; holding that trial court erred in omitting cease-deliberation instruction from justification charge and on verdict sheet, and stating that this Court could "not say with any certainty"--and there was "no way of knowing"-- whether acquittal on first-degree assault was based on a finding of justification).

With regard to count one, attempted first-degree assault, there were two issues in dispute--whether defendant intended to cause serious physical injury to Khalifa and whether his conduct was justified. On summation, before addressing justification, defense counsel did discuss the first issue, arguing that defendant's actions were not the result of any deliberate intention to cause serious physical injury, as evidenced by the circumstances that defendant did not have a knife, the entire encounter was very quick, and Khalifa was not seriously wounded (308-13).

By contrast, the only disputed issue in this case with regards to the second count, second-degree assault, was justification. Defense counsel did not argue that defendant had not intentionally stabbed Khalifa, that Khalifa had not suffered physical injury, or that the implement defendant had used was not a dangerous instrument. As defense counsel put it: "Was he justified? That's the issue. That's the crux of this case" (331).

Thus, because justification was the only element of the second count that was in controversy, the jurors, if they had found defendant not guilty of attempted first-degree assault based on a finding of justification, necessarily would have acquitted defendant of second-degree assault.

Moreover, whether or not the jurors found for defendant on justification hinged on their finding defendant's version of this

single, ongoing event credible and finding the People's proof not credible.   The evidence overwhelmingly disproved justification.

The justification defense depended on the resolution of three key issues, and if the jury disbelieved defendant's testimony with regard to any one of them, it would have concluded that defendant was not justified in using physical force against Khalifa.

First, the jury had to decide whether Khalifa was armed with a large, heavy object when he faced defendant in the street. Defendant insisted Khalifa had picked up an eight-to-ten-inch brick or boulder and had held it wrapped in a sweater.   All three of the prosecution's eyewitnesses stated that Khalifa did not have a weapon, and neither the surveillance video nor the cell phone video shows such an object either being picked up by Khalifa or being wrapped by Khalifa in his sweater.

Second, even assuming the jury believed that Khalifa had a large brick wrapped in his sweater, the jury still had to decide whether Khalifa threatened its imminent use to hurt defendant. Defendant insisted that Khalifa had whirled or "wailed" the wrapped brick while facing him in the street, threatening to hit defendant with it.   None of the prosecution witnesses saw Khalifa engage in such a distinctive motion, nor does either the surveillance video or the cell phone video capture Khalifa whirling a large, heavy object in a sweater.   Moreover, both as the prosecution witnesses

testified and the videos show, defendant, far from fearfully shrinking away from Khalifa, moved towards him.

Third, even assuming the jury concluded that Khalifa had whirled the brick and threatened to hit defendant with it, the jury still had to decide whether defendant had had the subjective belief that it was necessary for him to stab Khalifa five times, including after Khalifa had fallen to the ground, in order to protect himself, and, if he had that belief, whether it was reasonable.  Defendant insisted that he was not angry at all when he stabbed Khalifa, despite all of Khalifa's racially-charged taunting; he stabbed Khalifa multiple times only because he was afraid and wanted to protect himself.  He further testified that the instrument that he had used was a wire-stripper not a knife. He denied that he ran from the scene or hid from the police to evade capture, or that he had deliberately discarded his instrument to avoid being found with it.

The jury had ample evidence from which to conclude that defendant was untruthful on all these important points.  Toribio testified that she heard defendant say something like, "Oh you going to say it again?" before punching Khalifa, and she described defendant as "mad."  All three witnesses said they saw defendant with a knife.  From the cell phone video's still-photo the jurors would likely have concluded that defendant had held a knife, not a wire-stripper.  Further, the surveillance video and the cell

56

phone video both depict defendant appearing angry, not fearful.
The size discrepancy between the two men would have been obvious
to the jurors, who would have then questioned defendant's
insistence that he had to stab Khalifa repeatedly to neutralize
the alleged physical threat against him.

Additionally, Reyes's testimony that defendant pursued
Khalifa until he fell in the storefront doorway and that defendant
then stabbed Khalifa again and again, comported with the cell phone
video, which showed defendant initially stabbing Khalifa in the
stomach but not the head, and then also showed a person wearing
blue falling on the sidewalk and someone in Guy's car saying, "He's
stabbing him."  The additional stab wounds to Khalifa's head and
body clearly happened after defendant had initially thrust his
pointed instrument into Khalifa's stomach area.

Finally, the Bergen Street video showed defendant crouching
behind a van, and the only possible conclusion was that he was
hiding.  Defendant's actions of fleeing the scene and discarding
the stabbing instrument also indicated a consciousness of guilt.
Defendant's weak explanations for all his post-stabbing conduct
would have only further reinforced the jurors' conclusion that
they could not credit any of defendant's testimony.

Because the evidence overwhelmingly established that
defendant was not justified and there is a clear reason why jurors
acquitted defendant of count one--their reasonable doubt about

whether defendant intended to cause serious physical injury, rather than physical injury--there is simply no reason to believe that, contrary to the court's explicit instructions, the jurors resolved the justification issue in defendant's favor on count one, without also automatically resolving it in defendant's favor on count two. Cf. People v. Colasuonno, 135 A.D.3d 418, 419-20 (1st Dep't 2016) (two separate altercations allowed for possibility that jury could have found one altercation justified and other altercation unjustified); Castro, 131 A.D.2d at 773 (court knew jury's verdict of not guilty on top count was based on justification, but court nevertheless sent jury back to deliberate on lesser-included offense, and jury reached contradictory finding concerning justification).

Accordingly, this Court should decline to review defendant's claim in the interest of justice and should affirm the judgment of conviction. See Palmer, 34 A.D.3d at 703-04; Daggett, 150 A.D.3d at 1682.[12]

---

[12] Defendant's claim that counsel was ineffective for failing to object to both the justification charge and the verdict sheet (see Def.Brief at 56), should also be rejected. Counsel vigorously defended defendant and provided the effective assistance to which he was entitled. Because any alleged charge or verdict sheet error was harmless, "[r]egardless of whether counsel should have asked the court to charge the jury in accordance with defendant's present claim, defendant has not established that he was prejudiced." Barreto, 70 A.D.3d at 575; see also Daggett, 150 A.D.3d at 1682.

58

POINT IV

DEFENDANT'S CLAIM THAT THE SECOND-DEGREE
ASSAULT COUNT WAS RENDERED DUPLICITOUS BY THE
PROSECUTOR'S SUMMATION IS UNPRESERVED AND
WITHOUT MERIT.

Issues of non-facial duplicity must be preserved for appellate review. People v. Allen, 24 N.Y.3d 441, 449-50 (2014). Defendant now complains that the prosecutor's summation rendered the second-degree assault count duplicitous, but defendant raised no such claim below. Accordingly, the claim is unpreserved for this Court's review. See People v. King, 85 A.D.3d 820, 820-21 (2d Dep't 2011). In any event, the claim is entirely devoid of merit.

As defendant concedes (Def.Brief at 58), the indictment properly charged a single count each of attempted first-degree assault and second-degree assault based on different intended outcomes arising out of defendant's confrontation with Khalifa. The trial testimony fully supported the conclusion that there had been one continuous assault. Defendant took less than one minute to stab Khalifa five times. There was no real abeyance during defendant's attack, which was triggered by a single incident of anger at Khalifa. Although Khalifa may have very briefly broken free from defendant's grip and managed to run or stumble a few paces away from him before falling, defendant, within seconds, had caught up to Khalifa and was again stabbing him.

It was entirely appropriate for the jury to have been charged with a single count of attempted first-degree assault and a single count of second-degree assault, because the trial evidence established that defendant engaged in an unbroken course of conduct during a single transaction, conduct which the jury could either find criminal or non-criminal depending on its conclusion about defendant's justification defense. See People v. Snyder, 100 A.D.3d 1367 (4th Dep't 2012)(rejecting duplicity claim; defendant's multitude of punches and kicks delivered over short time frame, without apparent abeyance and triggered by single incidence of anger, constituted single assault); see also People v. Kaid, 43 A.D.3d 1077, 1079-80 (2d Dep't 2007); People v. Hines, 39 A.D.3d 968, 969 (3d Dep't 2007). Evidence that defendant, after starting to stab Khalifa in the street, inflicted some additional stab wounds at the storefront doorway after Khalifa had tried to escape from him, did not make each charged count duplicitous. See id. (fact that assault moved from inside apartment to outside when victim attempted to escape did not render count duplicitous).

Moreover, and contrary to defendant's unpreserved argument (Def.Brief at 58-59), the prosecutor's summation comments (the prosecutor's alleged "erroneous statement of the law") did not somehow make each count duplicitous. First, the jury received its instructions on the law from the court, not the prosecutor. The instructions were proper, and the trial evidence described a single

60

criminal transaction.  Defendant cites no case for the proposition that a prosecutor's summation comments may render a count duplicitous.

Second, the prosecutor appropriately argued on summation that the jury should reject the justification defense because, when the entirety of defendant's confrontation with Khalifa was considered, it was clear that the amount of physical force used by defendant exceeded the extent necessary to repel any perceived threat of attack by Khalifa (see, supra, at 29-30, 55-57).  Some of the jurors may have concluded that from the moment defendant first stabbed Khalifa, defendant was unjustified.  Other jurors may have concluded that defendant might have been justified in stabbing Khalifa once or twice but was not justified in inflicting all five wounds, including ones to Khalifa's head while Khalifa was on the ground.  Either way, the jurors were unanimous that defendant committed the charged second-degree assault, consisting of the infliction of five stab wounds with a dangerous instrument causing physical injury to Khalifa, and that defendant was not justified in using this degree of force.

Thus, there was no chance in this case that individual jurors might have convicted defendant of second-degree assault based on different offenses.  See Kaid, 43 A.D.3d at 1079 (explaining that prohibiting duplicitous counts prevents the possibility that

individual jurors might convict defendant of a count on the basis of different offenses).

Accordingly, defendant's claim should be rejected.

POINT V

DEFENDANT'S CLAIM THAT THE COURT IMPROPERLY
PRECLUDED TESTIMONY OF DEFENDANT'S WIFE IS
UNPRESERVED AND MERITLESS.  IN ANY EVENT, ANY
ERROR WAS HARMLESS.

The day after defendant had completed his testimony, defense
counsel sought to call his wife, Nicole McGriff, to testify.
Defense counsel stated that Nicole had been defendant's wife for
25 years, knew his hobbies, knew that he repaired wires and
speakers, and knew that "the instrument that was used in this
incident" was "a wire stripper," contrary to the prosecutor's
"repeatedly calling it a knife."  The prosecutor argued that
whether the instrument was a knife or wire-stripper was
"collateral"; either object was a "dangerous instrument."  The
court stated that the proposed evidence was collateral, and added,
"I don't see how that's relevant," repeating the phrase for
emphasis.  Instead of explaining to the court why the proffered
proof would be relevant, defense counsel merely stated, "Note my
exception" (277-788).

Now, for the first time, defendant argues that his wife's
testimony about defendant's "habit" of carrying a wire-stripper
would have corroborated his own testimony and thereby bolstered
his credibility, which was a central issue in the case (Def.Brief
at 61-62).  Defendant, however, never provided that explanation to
the court below, and also never claimed that preclusion would

63

violate his constitutional rights.    Therefore, his current claim

of error is unpreserved.    See People v. Estevez, 95 A.D.3d 1232,

1233 (2d Dep't 2012)(because specific arguments made by defendant

on appeal were not made below, his claim that court deprived him

of a fair trial and right to present a defense was unpreserved);

see also, People v. Lane, 7 N.Y.3d 888, 889 (2006); People v.

Ramsundar, 138 A.D.3d 892, 893 (2d Dep't 2016).

In any event, the trial court properly exercised its

discretion in precluding Mrs. McGriff's testimony.    See People v.

Aska, 91 N.Y.2d 979, 981 (1998)(court has broad discretion in

making evidentiary rulings and may preclude proffered evidence

that it determines is collateral or not relevant).

While Mrs. McGriff may have been able to testify that her

husband used a wire-stripper for his hobby of repairing headphones,

she was not with her husband at the time of the crime and could

not have testified about what instrument defendant possessed when

he stabbed Khalifa.    Although counsel asserted that Mrs. McGriff

"knows the instrument that was used in this incident and can attest

to what it was" (277), counsel failed to explain why Mrs. McGriff

would "know" that on the day and time of the crime defendant had

a wire-stripper in his pocket.    For example, counsel did not assert

that Mrs. McGriff had seen her husband put a wire-stripper in his

pocket that morning, or that he always carried around a wire-

stripper, such that his carrying of a wire-stripper qualified as

64

habit evidence.  Cf. People v. D'Arton, 289 A.D.2d 711 (3d Dep't 2001)(testimony of deceased's wife that husband "at all times" carried $500-1,000 in cash in his pockets was admissible as habit evidence to prove he acted in accordance with that habit on occasion at issue).  See generally Rivera v. Anilesh, 8 N.Y.3d 627 (2003).

It was undisputed that defendant pulled from his pocket a sharp, pointed instrument and that he used that instrument to repeatedly stab Khalifa.  Given this concession, the fact that defendant's wife could corroborate his testimony that he had a hobby of repairing headphones and that he used a wire-stripper for such hobby, was simply not sufficiently material to mandate the admission of her testimony.  It would have been improper for counsel to have asked Mrs. McGriff to speculate, based only on the knowledge of her husband's hobby, about whether she thought defendant had possessed a wire-stripper and not a knife when he stabbed Khalifa.

Thus, in light of defendant's offer of proof, the court did not abuse its discretion in precluding Mrs. McGriff's testimony. See People v. Frazier, 125 A.D.3d 551 (1st Dep't 2015) (court properly exercised its discretion to preclude defendant from calling his mother to testify, as she was not present for the incident and any probative value of the proposed testimony was outweighed by the risk of confusing or misleading the jury or

65

inviting improper speculation); see also People v. Arroyo, 77 N.Y.2d 947, 948 (1991) (trial court's preclusion of defendant's mother's testimony was not reversible error because defendant's offer of proof was insufficient to alert court that mother's testimony was relevant because it would corroborate details of defendant's account).

In any event, even assuming that the court should have permitted Mrs. McGriff to testify that defendant used a wire-stripper for his hobby and that she somehow knew the instrument that he had used in the assault was a wire-stripper, any error was harmless.

Bearing in mind that as a wife of 25 years, Mrs. McGriff might very well say anything to protect her beloved, the jury would naturally have viewed defendant's wife's testimony with some skepticism. Additionally, given that Mrs. McGriff was not at the crime scene, it is not clear how she could have said with any certainty that defendant had used a wire-stripper and not a knife against Khalifa. Moreover, the still-photograph showing defendant holding a pointed instrument was in evidence, and the jury could decide for itself what object was depicted and whether to believe the three eyewitnesses who all testified that defendant had a knife.

Finally, whether defendant had a knife or a wire-stripper, was not the crux of the case. Ultimately, it did not make a

difference, because overwhelming evidence established that defendant used whatever sharp, pointed instrument he pulled from his pocket to stab Khalifa. Even if the jurors had credited defendant's testimony that he had used a wire-stripper (just like the jurors might well have credited defendant's testimony that Khalifa had pursued him, shouting racial slurs), the jurors still would have found defendant's conduct to be a disproportionate and unjustified use of force in response to any threat that Khalifa might have posed (see, supra, at 29-30, 55-57).

Accordingly, even if the trial court erred in precluding Mrs. McGriff's testimony, this Court should affirm the judgment because there is no significant probability that such error affected the verdict. See People v. Kello, 96 N.Y.2d 740, 743-44 (2001)(unpreserved confrontation clause claim subject to non-constitutional standard for harmless error analysis).

67

POINT VI

DEFENDANT DID NOT MAKE OUT A PRIMA FACIE CASE
OF DISCRIMINATION BY THE PROSECUTOR IN JURY
SELECTION.

Although defendant attempts to dress up his Batson motion as based on something more than just the number of peremptory challenges the prosecutor exercised against African-Americans, the other circumstances cited by defense counsel below in reality added nothing to his numbers-based claim.  The Court of Appeals has repeatedly stated that "purely numerical or statistical arguments are 'rarely conclusive in the absence of other facts and circumstances' to give rise to an inference of discrimination." People v. Hecker, 15 N.Y.3d 625, 651 (2010), quoting People v. Brown, 97 N.Y.2d 500, 507 (2002).  Here, the numbers cited by defense counsel, which were disputed below, were insufficient to make out a prima facie case.  Moreover, it would not have been difficult for the court below to have discerned from the record the reasons why the prosecutor exercised a number of his challenges, and those reasons substantially weakened defendant's numerical argument.  Hence, the trial court properly denied the defendant's motion.  See, e.g., People v. Santos 105 A.D.3d 1064 (2d Dep't 2013).

*

To establish a prima facie showing of discrimination, the defendant bears the burden of establishing that there exist facts and other relevant circumstances that would support an inference of impermissible discrimination. See Batson v. Kentucky, 476 U.S. 79, 96 (1986); Hecker, 15 N.Y.3d at 650-51; People v. Childress 81 N.Y.2d 263, 266 (1993).

There are "no fixed rules for determining what evidence will give rise to an inference sufficient to establish a prima facie case." Id. at 266. However, as noted above, "purely numerical or statistical arguments" are generally insufficient to make out a prima facie case. Hecker, 15 N.Y.3d at 651; see also Santos, 105 A.D.3d at 1065.

Among the facts and circumstances that may support a claim of a prima facie case are: the type of questions asked or statements made by the prosecution during the voir dire; a showing that members of the cognizable group were peremptorily challenged while individuals of other groups with the same relevant characteristics were not; a showing that members of the cognizable group were challenged although their backgrounds or experience suggested that they would likely be favorably disposed toward the prosecution; and the fact that the defendant and the challenged juror are from the same cognizable group. See Hecker, 15 N.Y.3d at 651-52.

In this case, defense counsel maintained that the prosecutor exercised ten of his twelve peremptory challenges against African-

69

American prospective jurors.   But the court rejected defense
counsel's claim that Mendez, one of those ten jurors, was in fact
African-American.   Additionally, the prosecutor disputed that
Solstad was African-American, and, in any event, defense counsel
acknowledged that the prosecutor had a race-neutral reason for
challenging her (JS.285 ["[F]or almost all of the African Americans
for whom the People challenged, the one outliner [sic] I think
being Andrea Solstad, I don't believe there are race neutral
reasons that they were removed"] [emphasis added]).   Furthermore,
although the prosecutor initially challenged Shaquan Nelson, he
ultimately withdrew his challenge, and Nelson was seated as the
second alternate.   Thus, excluding these three prospective jurors
from the equation, as they should be, the fraction of allegedly
discriminatory peremptory challenges drops from 10 of 12 to 7 of
12.

     These numbers were insufficient to make out a prima facie
case.   See, e.g., Brown, 97 N.Y.2d at 508 ("People's removal of
seven African-Americans through the exercise of eight peremptory
challenges was inadequate, without more, to require the trial court
to find a prima facie showing of discrimination"); People v.
Jenkins, 84 N.Y.2d 1001, 1003 (1994)(finding no prima facie case,
where defendant relied only on the number of African-American
jurors challenged by prosecutor; prosecutor struck six black
jurors over three rounds of jury selection); People v. Willingham,

70

253 A.D.2d 533 (2d Dep't 1998)(finding no prima facie case, where defense counsel stated only that prosecutor had challenged eight black venirepersons and had "no good reason" for his challenges); People v. Lowe, 234 A.D.2d 564, 565 (2d Dep't 1996)(finding no prima facie case, where "defendant noted only that the prosecutor had exercised seven peremptory challenges against black venirepersons"); People v. Vidal, 212 A.D.2d 553 (2d Dep't 1995)(finding no prima facie case, where defense counsel noted only bare fact that prosecutor exercised five of his eight peremptory challenges against black venirepersons"); People v. Copeland, 197 A.D.2d 629 (2d Dep't 1993)(finding no prima facie case based upon "perfunctory statement that 10 excluded prospective jurors were black").

Indeed, as the Court of Appeals has noted:

> In cases where we have sustained a prima facie showing of purposeful discrimination absent a 100% exclusion rate of a cognizable group, the moving party has placed other factors on the record to meet the step one burden.

Hecker, 15 N.Y.3d at 653-54.

Here, defendant below did not maintain that any of the African-American panelists whom the prosecutor struck articulated pro-prosecution positions; or that the prosecutor struck African-Americans while not striking similarly-situated panelists of other races; or that the prosecutor asked questions or made statements evincing bias.

71

Moreover, the non-numerical arguments defense counsel did make below do not add up to anything. First, defense counsel observed that four of the individuals whom the prosecutor struck did not have much to say during the voir dire (JS.283). But to say that a panelist revealed very little about herself or himself is entirely different from arguing that the panelist said something that would suggest a pro-prosecution predilection. In the latter instance, the observation advances the argument for a prima facie case (see Childress, 81 N.Y.2d at 267); in the former, it does not, because a panelist's inscrutability is a perfectly acceptable reason for striking her or him. See Hecker, 15 N.Y.3d at 657-58 (an attorney's explanation--that she challenged a prospective juror in essence because she had not been able to learn anything about her during voir dire--was a race-neutral explanation that a trial court could credit); People v. Francis, 155 A.D.3d 1059 (2d Dep't 2017) (same).

Second, defense counsel argued below that if the prosecutor had not struck other prospective jurors who preceded Nelson, then Nelson would have been on the main jury, rather than merely an alternate (JS.284). But that observation, even if correct, did not in any way impugn the race-neutrality of the prosecutor's strikes of the African-American panelists who preceded Nelson or his strike of Nelson. Finally, defense counsel asserted that the majority of the jury was Caucasian (JS.285)--a disputed claim--

72

but even if correct, that assertion was merely another way of saying that the prosecutor had struck African-Americans, and not an argument impugning the neutrality of the strikes.[13]

There are additional reasons why this Court should uphold the determination of the trial court that defendant had not made out a prima facie case. First, the prosecutor showed no hesitation to provide reasons for his challenges, should the court ask him to do so, stating, "[I]f the Court finds there is a pattern, I can, I will meet my burden" (JS.286). Second, four African-Americans were selected for the main jury of twelve, and the prosecutor, who used only ten of his fifteen allotted challenges (see C.P.L. § 270.25[2][b]), could have challenged more of them if his intent had been to eliminate or minimize their representation on the jury.

Third, the record makes clear why the prosecutor challenged some of the panelists covered by defendant's Batson motion; accordingly, the prosecutor's credible, race-neutral reasons for challenging those panelists would have been apparent to the trial court. For example, the prosecutor challenged Solstad for cause, because she had stated that it would be difficult to convict if she did not hear from the victim. When his for-cause challenge

---

[13]In his brief, defendant makes additional claims about why the prosecutor's challenges evinced a discriminatory intent (see Defendant's Brief at 67). But these claims, made for the first time in this Court, are unpreserved. See People v. James, 99 N.Y.2d 264, 270 (2002).

73

was denied, he challenged Solstad peremptorily (JS.198-99).
Mendez, whom the prosecutor challenged peremptorily, also had
stated that it would be a problem for him if the victim did not
testify (JS.257-58, JS.260, JS.269). The issue of whether the
prospective jurors would need to hear the victim's testimony was
obviously of great concern to the prosecutor; much of his voir
dire was devoted to this very issue (JS.92-93, JS.160-69, JS.257-
62). Furthermore, he had successfully challenged for cause another
juror, Mercene, on this basis (JS.193), and this was also almost
certainly the basis for his successful for-cause challenge of yet
another juror, Hidary (see JS.260-62, JS.277), and for his
peremptory challenge of a white juror, Barton (see JS.261-62).
Therefore, even assuming that Solstad and Mendez were African-
American (but see 69-70, supra), the court below would very likely
have understood why the prosecutor challenged them and have
commensurately discounted defendant's motion.

Additionally, third-round panelist Laplante revealed, among
other problems she had, that she was a "very emotional person" who
"can't make a decision" (JS.255-56), and second-round juror
panelist Stewart stated that she had been on a jury in a criminal
case in Brooklyn, and had been one of two holdouts, with the result
that there had been a mistrial (JS.158-59). It is not difficult
to understand that a prosecutor would be reluctant to select
individuals whose indecision or obstinacy might necessitate a

retrial.    Consequently,  this  Court  should  reject  defendant's

<u>Batson</u> claim.

## POINT VII

## THE SENTENCE WAS NOT EXCESSIVE.

The court properly exercised its discretion in sentencing defendant to seven years' imprisonment and five years' post-release supervision.   Defendant was convicted of second-degree assault, a class D violent felony offense.   See P.L. § 120.05(2). As a second violent felony offender (the result of his prior first-degree manslaughter conviction), he faced a minimum of five years' to a maximum of seven years' imprisonment.   See P.L. § 70.04(3)(c).

The court reviewed the People's pre-sentence letter and the report prepared by defense counsel and counsel's mitigation specialist and listened to the statements of the parties prior to sentencing (Sentencing Minutes at 2-7, 8).[14]   It also had the opportunity to hear firsthand from defendant when he testified at trial and to evaluate his credibility and demeanor.   Presumably considering all this information, the court reasonably concluded that a maximum sentence was appropriate.   That sentence should not be disturbed.

---

[14] Appellate counsel, quoting defendant at sentencing, incorrectly attributes defendant's statements about someone "lying" as concerning Khalifa (Def.Brief at 33); defendant was complaining about the prosecutor.

76

CONCLUSION

THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated:      Brooklyn, New York
            December 7, 2018

                              Respectfully submitted,


                              ERIC GONZALEZ
                              District Attorney
                              Kings County


LEONARD JOBLOVE
VICTOR BARALL
CAROLINE R. DONHAUSER
Assistant District Attorneys
      of Counsel

PRINTING SPECIFICATIONS STATEMENT

Certificate of Compliance
Pursuant to 22 NYCRR § 1250.8(j)

This brief was prepared on a computer.  A monospaced typeface was used, as follows:

Name of typeface:  Courier New
Point size:  12
Line spacing:  Double

According to the word count of the word processing system used to prepare the brief, the total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of authorities, proof of service, certificate of compliance, or any authorized addendum containing decisions, statutes, rules, regulations, etc., is 16,123.

Caroline R. Donhauser
Assistant District Attorney