*To be argued by*
DAVID L. GOODWIN
*(15 minutes)*

# New York Supreme Court

## APPELLATE DIVISION — SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against -*

LORENZO MCGRIFF,

*Defendant-Appellant.*

*TO BE HEARD ON
THE ORIGINAL
RECORD*

Kings County
Ind. No. 6248/15

A.D. No. 2017-02694

## REPLY BRIEF FOR DEFENDANT-APPELLANT

PAUL SKIP LAISURE
Attorney for
Defendant-
 Appellant
111 John Street, 9th
Floor
New York, NY 10038
(212) 693-0085

DAVID L. GOODWIN
*Of Counsel*
dgoodwin@appad.org
December 20, 2018

## TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................. 1

ARGUMENT ........................................................................................... 2

POINT I

APPELLANT WAS JUSTIFIED IN DEFENDING HIMSELF
FROM AN AGGRESSIVE AND UNHINGED ASSAILANT,
WHOM THE PEOPLE FAILED TO PRODUCE FOR TRIAL
AND WHOSE UNRELENTING PURSUIT OF APPELLANT
CONTINUED EVEN AFTER THE CENTRAL INCIDENT
(RESPONDING TO POINT I). ............................................... 2

POINT II

THE COURT'S FAILURE CHARGE THE JURY THAT
JUSTIFICATION WAS NOT TO BE REASSESED
BETWEEN COUNTS REQUIRES A NEW TRIAL,
ESPECIALLY WHEN THE PEOPLE DID NOT
"OVERWHELMINGLY" DISPROVE APPELLANT'S
JUSTIFICATION DEFENSE (RESPONDING TO POINT
III)..................................................................................... 12

POINT III

THE IMPROPER REFUSAL TO ALLOW APPELLANT'S
WIFE TO TESTIFY IS BOTH PRESERVED AND FAR
FROM HARMLESS (RESPONDING TO POINT V). ......... 17

POINT IV

IN THIS CASE, WHERE THERE WAS NO SERIOUS HARM DONE AND APPELLANT WAS IN NO WAY THE INSTIGATOR OR INITIAL AGGRESSOR, A 7-YEAR SENTENCE FOR SECOND-DEGREE ASSAULT WAS EXCESSIVE AND SHOULD BE REDUCED TO THE MINIMUM (RESPONDING TO POINT VII)......................19

CONCLUSION .........................................................................................21

## TABLE OF AUTHORITIES

Cases

*Alberty v. United States*, 162 U.S. 499 (1896)..........................................8

*People v. Baez*, 118 A.D.2d 507 (1st Dept. 1986) ......................................7

*People v. Braithwaite*, 153 A.D.3d 929 (2d Dept. 2017).........................16

*People v. Castro*, 131 A.D.2d 771 (2d Dept. 1987) ................................15

*People v. Cintron*, 95 N.Y.2d 329 (2000) ..................................................8

*People v. Cosby*, 200 A.D.2d 682 (2d Dept. 1994) ...................................9

*People v. Cunny*, 163 A.D.3d 708 (2d Dept. 2018) ..................................8

*People v. Delamota*, 18 N.Y.3d 107 (2011) ...........................................3, 4

*People v. Feuer*, 11 A.D.3d 633 (2d Dept. 2004).....................................15

*People v. Flecha*, 60 N.Y.2d 766 (1983).....................................................9

*People v. Fletcher*, No. 2017-06994, ___ A.D.3d ___, 2018 WL 5931261

   (2d Dept. Nov. 14, 2018)..................................................... 13, 14, 15, 16

*People v. Minaya*, 6 A.D.3d 728 (2d Dept. 2004) .....................................7

*People v. Scharpf*, 60 A.D.3d 1101 (3d Dept. 2009) .................................9

*People v. Soriano*, 188 A.D.2d 420 (1st Dept. 1992) ................................7

*People v. Troche*, 147 A.D.2d 513 (2d Dept. 1989)...................................9

*State v. Starnes*, 531 S.E.2d 907 (S.C. 2000) ...........................................8

Statutes

C.P.L. § 470.05.......................................................................................19

iii

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

        Respondent,

      - against -

LORENZO MCGRIFF,

        Defendant-Appellant.

------------------------------------------------------------------------x

## PRELIMINARY STATEMENT

This reply brief addresses some of the arguments raised in the People's opposition brief, which was served by regular mail on December 7, 2018. For those points not addressed within, appellant respectfully relies on his main brief.

1

## ARGUMENT

### POINT I

APPELLANT WAS JUSTIFIED IN DEFENDING HIMSELF FROM AN AGGRESSIVE AND UNHINGED ASSAILANT, WHOM THE PEOPLE FAILED TO PRODUCE FOR TRIAL AND WHOSE UNRELENTING PURSUIT OF APPELLANT CONTINUED EVEN AFTER THE CENTRAL INCIDENT (Responding to Point I).

The evidence at trial showed that appellant was pursued and physically threatened by the erratic and cocaine-influenced complainant, Mohammed Khalifa, thereby justifying his use of force and rendering the second-degree assault verdict as against the weight of the evidence (Appellant's Br. at 34–44). Despite Khalifa's "undisputed" (People's Br. at 25) pursuit of appellant and his undeniably unhinged and aggressive behavior, the People argue that appellant's conduct both during and after the central incident, in tandem with lack of eyewitness testimony about Khalifa's wielding of a weapon, disproved appellant's justification defense (People's Br. at 23–32). But, as they did at trial, the People incorrectly harmonize their eyewitness testimony, ignoring significant inconsistencies in the process, while erroneously employing a heightened justification standard. And to the contrary, where the majority of

2

appellant's testimony was either corroborated or undisputed, the People's case here—bereft of any testimony by the complainant, whom the People failed to produce—did not disprove appellant's justification defense.

The People first argue against a sufficiency claim that appellant does not raise, presenting their initial assessment of the evidence in the light most favorable to them while drawing "every reasonable inference" in their favor (People's Br. at 23, 28). *See People v. Delamota*, 18 N.Y.3d 107, 113 (2011) (sufficiency standard). Appellant raises a weight-of-the-evidence claim, however, not a sufficiency claim (*see* Appellant's Br. at 34–44). A weight claim has no similar bias in favor of the People, and requires the Court to "independently assess all of the proof; substitute its own credibility determinations for those made by the jury in an appropriate case; determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt." *Id.* at 116–17 (weight standard).[1]

---

[1] To the extent that the People argue that the jury's credibility findings should not be "second-guessed on appeal" (People's Br. at 32), *Delamota* makes clear that this Court can and should resolve inconsistencies among record evidence in the course of its weight review, especially when, as here, the jury's verdict

Applying the appropriate weight standard undermines the People's contention that the verdict was in line with the weight of the evidence. First, as set forth in appellant's main brief, the People's three eyewitnesses told three markedly different stories about what happened at the scene between appellant and Khalifa, and crucial parts of the People's argument against justification—such as appellant's alleged "chase" of Khalifa, which the People use to claim that appellant was the aggressor—appeared *only* in Reyes's account. But Reyes admitted to being distracted by a client during the incident; often editorialized on the stand; and was objectively wrong about basic facts, like when she testified that appellant was wearing a suit (*see* Appellant's Br. at 13–14 & n.3, 40). Nevertheless, as they did at trial, the People rely heavily on Reyes's "chase" and her allegations of additional violence after Khalifa ran away (*e.g.*, People's Br. at 10, 29) to defend the verdict, all without acknowledging that neither Toribio nor Guy, who watched the exact same

_____

need not have been based on an implicit credibility finding. *See Delamota*, 18 N.Y.3d at 116–17.

events unfold, mentioned any "chase" or second interaction between the two men (*see* Appellant's Br. at 10, 40).[2]

The People also gloss over inconsistencies regarding the fundamental issue of whether Khalifa was holding something in his hands during the incident, even though all of the video and photographic evidence makes clear that he *was* holding something that dangled from his grip and swung back and forth (Appellant's Br. at 38–39). For instance, the People point out that "all three eyewitnesses . . . testified that they did not see Khalifa armed with any weapon" (People's Br. at 28), and insist an eight-to-ten-inch rock or brick would show up on the videos or have been seen by the eyewitnesses (People's Br. at 31, 55). But Toribio and Reyes testified not just that Khalifa was not holding a weapon, but that he was not holding anything *at all* (Appellant's Br. at 38). They were wrong, as the visual evidence shows that Khalifa was holding something that swung in his grip, although none of the video

---

[2] The People suggest that the cellphone video corroborates Reyes's chase testimony because it "very briefly" shows a person wearing blue—suggested to be Khalifa, who was wearing blue shorts—falling "to the ground" at the 20-second mark (People's Br. at 10 n.7). Because the video is extremely grainy, pixelated, and low-quality, whatever is happening at that timestamp is at best unclear, and certainly does not corroborate Reyes's "chase" story or show additional interaction after Khalifa was on the ground.

exhibits is of high enough quality to reveal greater detail. The People therefore cannot selectively rely on Toribio's and Reyes's recollection that Khalifa was not holding a weapon when the objective visual evidence contradicts their testimony that he held nothing in his hand.

The People further insinuate that appellant, who maintained that Khalifa picked up a brick or piece of debris and wrapped it in his sweater, testified inconsistently about whether he saw Khalifa actually pick up the weapon, as appellant's back was indisputably to Khalifa at the time (People's Br. at 15–16, 26). However, aside from moments where appellant described the action on the surveillance video (180–81, 214, 224–25), appellant did not directly testify that he saw Khalifa pick up the object, as opposed to Khalifa with the object already in his hands (164, 269). Thus, his testimony is not inconsistent on this point—and there is no dispute the appellant consistently stated he saw Khalifa armed.

Outside of these attempts by the People to harmonize the facts of record in their favor, the People principally err, as they did at trial, by arguing in favor of an unreasonably high standard for justification. First, the People heavily rely on 20-20 hindsight and appear to fault appellant for emerging unscathed; they repeatedly emphasize that appellant was

6

uninjured in the encounter, and they blame him for "clos[ing] the
distance" with Khalifa in the first place (People's Br. at 10, 20, 25–26,
36). This hindsight argument overlooks that appellant had just been
pursued for several city blocks by a man screaming racial slurs, who had
threatened to "kick [appellant's] ass" while keeping up his pursuit even
across busy intersections.[3] The People's suggestion that appellant was
required to wait until the unrelenting Khalifa actually caught up and
caused injury before fighting back is without legal basis, because
justification requires only an *imminent* threat, not actual harm. *See*
*People v. Minaya*, 6 A.D.3d 728, 730 (2d Dept. 2004). Notably, in faulting
appellant for initially closing the distance with Khalifa by charging and
threatening to hit him (but not actually throwing a punch), the People

---

[3] Relying on *People v. Soriano*, 188 A.D.2d 420 (1st Dept. 1992), the People
argue that this threat could not provide a basis for a subsequent use of force
by appellant because mere "verbal provocation could not justify defendant's
use of physical force" (People's Br. at 28). The case *Soriano* itself cites for that
point of law, however, distinguishes between mere "insulting language" and
threats "to use . . . physical force." *People v. Baez*, 118 A.D.2d 507, 508 (1st
Dept. 1986).

Khalifa's conduct, even before picking up the brick, amounted to far more than
"insulting language." Khalifa elbowed appellant outside of Brooklyn Law
School, used abusive language, explicitly threatened the use of force against
appellant (a credible threat given what had happened so far), and continued to
act in a menacing manner by following appellant down and across several city
blocks, all *before* picking up the brick from the construction site.

7

have ironically asserted that appellant's attempt to scare Khalifa away *in lieu of violence* was invalid. Again, the justification defense did not require appellant to continuously and passively run away until Khalifa eventually wore appellant out and caught up to him. *Cf. State v. Starnes*, 531 S.E.2d 907, 913 (S.C. 2000) (observing that "the accused doesn't have to wait until his assailant gets the drop on him" (internal quotations and citations omitted)).

In arguing that they disproved justification, the People also rely heavily on what they deem appellant's alleged consciousness of guilt (*e.g.*, People's Br. at 27), although there was no request for a consciousness of guilt instruction at trial (*see* 293). But this kind of evidence has "limited probative value," *People v. Cintron*, 95 N.Y.2d 329, 332 (2000), being "consistently viewed as weak because the connection between the conduct and a guilty mind often is tenuous," *People v. Cunny*, 163 A.D.3d 708, 711 (2d Dept. 2018). *See also Alberty v. United States*, 162 U.S. 499, 511 (1896) ("[I]t is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties."). This is especially so in justification cases, where a person may be understandably uncertain whether his use

8

of force will be protected by law. In any event, as set forth in appellant's main brief, the record makes plain that appellant "ran from the scene" *pursued* by Khalifa (Appellant's Br. at 40), and appellant's arrest at Bergen Street was (contrary to the People's emphasis on it both now and at trial) quick and without resistance beyond appellant's briefly trying to rise to his feet. Further, in light of the speed with which the situation escalated, it is hardly appropriate to blame appellant for failing to call 911 while running from an erratic Khalifa. The consciousness of guilt cases cited by the People (*see* People's Br. at 27) are distinguishable in any event, as they involved facts actually demonstrative of a guilty mind. *See People v. Flecha*, 60 N.Y.2d 766, 768 (1983) ("furtive conduct" in tandem with instructing neighbor not to call police and prior justification-less statements about the crime showed consciousness of guilt); *People v. Scharpf*, 60 A.D.3d 1101, 1102 (3d Dept. 2009) (actively deceiving police); *People v. Cosby*, 200 A.D.2d 682, 682–83 (2d Dept. 1994) (elaborately disposing of body, cleaning up scene, abandoning car in a vacant lot, repeated lies to family about incident); *People v. Troche*, 147 A.D.2d 513, 514 (2d Dept. 1989) (getting rid of all weapons and providing false alibi showed consciousness of guilt).

Finally, the People again use a circular and conclusory proportionality argument about the actual use of force, one that does not align with the justification charge or proof at trial. They insist that stabbing Khalifa was a disproportionate response to the threat Khalifa actually presented, because appellant could have punched him or used some other, lesser force (*e.g.*, People's Br. at 28–29). The People conceded before trial, however, that they could not prove that Khalifa suffered a serious physical injury in the altercation (J. 21). Nor could they, given that Khalifa was clearly fit enough to be a physical threat to the people trying to treat him—requiring sedation to stop his standing up on a stretcher, screaming, and hurling racial abuse—and signed himself out of the hospital the next day, all while continuing to threaten bodily harm to hospital staff (Appellant's Br. at 16; People's Ex. 1 at 53). Far from being inherently disproportionate force, appellant's improvised defense with a tool that he carried did not cause serious injury, and the People *never* tried to prove otherwise below and instead dismissed that charge at the start of trial.

\* \* \*

Appellant was pursued on his lunchtime walk by an unhinged and violent man spewing alarming racial slurs—a man who had, while under the influence of cocaine, decided to pick a random, senseless fight with a passerby. That passerby, appellant, used a wire stripper in self-defense after being threatened and pursued for several blocks, and only after witnessing Khalifa wielding a brick wrapped in a sweater—as confirmed by the street surveillance footage, which shows Khalifa picking something up from a construction site as he pursues appellant. Appellant caused no significant injury to Khalifa while successfully avoiding injury to himself. The People's argument that appellant should have acted differently, and their reliance on inconsistent eyewitness testimony to chip away at the margins of his story, ignores that the law of justification is in appellant's favor and renders his preemptive conduct, when confronted by an unstable and violent man, lawful on the evidence presented at trial. For the above reasons, and the reasons set forth in appellant's main brief, the Court should find that the verdict of guilty on second-degree assault was against the weight of the evidence, reverse appellant's conviction, and dismiss the indictment.

11

## POINT II

THE COURT'S FAILURE TO CHARGE THE
JURY THAT JUSTIFICATION WAS NOT TO BE
REASSESED BETWEEN COUNTS REQUIRES A
NEW TRIAL, ESPECIALLY WHEN THE
PEOPLE DID NOT "OVERWHELMINGLY"
DISPROVE APPELLANT'S JUSTIFICATION
DEFENSE (Responding to Point III).

At trial, the jury acquitted appellant of attempted first-degree
assault, but found him guilty of second-degree assault. In his main brief,
appellant argued that the court's charge and verdict sheet suggested that
the jury should reconsider justification in determining appellant's guilt
on count 2, rather than stopping deliberations and issuing a straight
verdict of acquittal if they found his conduct justified on count 1
(Appellant's Br. at 53–56). This error was exacerbated by the People's
summation argument that the jury could read two separate "incidents"
into the single course of allegedly assaultive conduct, as the jury could
then have understood that it was to consider justification as to each
incident within a single count (Appellant's Br. at 57–60).

In their response brief, the People argue, in part, that any error
would be of no moment because "it can be said with near certainty that
the jury did not acquit [appellant] on count one . . . and then re-deliberate

12

on the issue of justification" (People's Br. at 53). According to the People, the jury's split verdict has only one possible explanation: the jury did not think appellant was justified, but also did not think he intended to cause serious physical injury (People's Br. at 54).

By claiming that the jury's verdict is open to only one possible interpretation, the People are attempting to distinguish *People v. Fletcher*, No. 2017-06994, ___ A.D.3d ___, 2018 WL 5931261 (2d Dept. Nov. 14, 2018), an on-point decision that strongly supports appellant's argument in favor of a new trial in this case. *Fletcher*, which was decided after appellant's main brief was filed, is an interest-of-justice review of a justification claim arising out of an acquittal of first-degree assault and a conviction of second-degree assault arising out of a single incident. *Fletcher* held that justification instructions lacking a stop-deliberating charge, in tandem with a similarly lacking verdict sheet, "may have led the jurors to conclude that deliberation on each assault count . . . required reconsideration of the justification defense, even if [the jury] had already acquitted the defendant of assault in the first degree based on justification." *Id.* at *1. Because the *Fletcher* Court could not "say with any certainty and there is no way of knowing whether the acquittal on

13

assault in the first degree was based on a finding of justification," appellant was granted a new trial. *Id.*

The reasoning of *Fletcher* applies with equal force to this case. As in *Fletcher*, the jury verdict here acquitted on a higher degree of assault, but convicted on a lesser degree of assault, in charges arising out of a single incident. Much like in *Fletcher*, there is a *possible* explanation for the jury's split that does not require an inconsistent verdict on justification: the jury could have found that appellant had the *mens rea* for second-degree assault but lacked the intent to cause serious physical injury required for first-degree assault.

But as in *Fletcher*, the above is not the only explanation for the jury's verdict, and the People's claim otherwise ignores the influence of their two-incidents theory of assault on the verdict, in which the People urged the jury to split appellant's conduct into "initial" and "post-chase" acts (*see* Appellant's Br. at 57–60). This jury could have first considered the initial portion of the encounter captured on video, decided that appellant was justified, and acquitted on count 1 without also reaching the issue of appellant's intent. The jury could then have credited Reyes's testimony about the off-camera portion of the incident, deciding

14

appellant was not justified as to that portion while also concluding that any inflicted injury was minor and not the product of an intent to cause serious physical injury.

In an attempt to further downplay the trial court's error, the People point out that the pattern C.J.I. justification instructions were amended after appellant's trial concluded, and that the instructions in place at the time were less clear on applying a single justification charge across multiple counts (People's Br. at 44). But their argument does not distinguish *Fletcher*, which *also* reviewed a trial and judgment entered prior to the adoption of this more-specific C.J.I. language, and which nevertheless held that a new trial was warranted because the charge and verdict sheet failed to convey to the jury that they should stop deliberating if they found appellant's actions justified. *See Fletcher*, 2018 WL 5931261, at *1 (reviewing a May 2017 judgment). Specifically, the *Fletcher* Court relied on both *People v. Feuer*, 11 A.D.3d 633 (2d Dept. 2004), and *People v. Castro*, 131 A.D.2d 771 (2d Dept. 1987)—decided long before appellant's trial and cited in his main brief on appeal (*see* Appellant's Br. at 53–54)—as well as *People v. Braithwaite*, 153 A.D.3d

15

929 (2d Dept. 2017), which was decided after appellant's trial and the one at issue in *Fletcher*.

In sum, as it did in *Fletcher*, this Court should review the justification-charge issue via its interest of justice jurisdiction, and conclude that the flawed charge and unclear verdict sheet, muddied further by the People's two-incidents theory, created legitimate ambiguity as to whether the jury incorrectly reassessed justification when it acquitted on attempted first-degree assault but convicted on the lesser charge of second-degree assault. As explained in Point I above and in the coordinate point in appellant's main brief, the evidence against justification was far from overwhelming, so the jury's verdict was thus ambiguous on the record. For these reasons, and the reasons set forth in appellant's main brief, the Court should vacate appellant's conviction and order a new trial.

16

## POINT III

### THE IMPROPER REFUSAL TO ALLOW APPELLANT'S WIFE TO TESTIFY IS BOTH PRESERVED AND FAR FROM HARMLESS (Responding to Point V).

The trial court's failure to allow appellant's wife to testify, which was based on the court's mistaken assessment of her testimony as "collateral," deprived the jury of a witness who would corroborate appellant's testimony that he carried a wire stripper, not a knife, and thus rehabilitate his credibility after the prosecutor's aggressive cross-examination. The court's error violated appellant's constitutional rights to present a defense, to due process, and to a fair trial (Appellant's Br. at 60–64).

The People respond that this issue is unpreserved and without merit (People's Br. at 62–67). As to preservation, the People argue that defense counsel was required to further explain the proposed testimony's relevance after the court had heard argument from the People and had rendered its ruling (People's Br. at 62). To the contrary, the preservation rule requires only that a party seek a ruling and make his or her position known, and "a party who without success has either expressly or

17

impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule . . . regardless of whether any actual protest thereto was registered." C.P.L. § 470.05(2). Here, after the prosecutor demanded an offer of proof, defense counsel responded that Ms. McGriff "knows the instrument that was used in this incident" and indicated that the testimony was necessary because the prosecutor had, on cross-examination, repeatedly insisted that appellant had actually used a knife (276–77). The knife accusation was used during cross-examination, and later in summation, to accuse appellant of lying and to undermine his credibility. Defense counsel therefore did exactly what was required under § 470.05(2). To the extent that the People insist that counsel's failure to cite the constitutional basis of the claim at trial also renders this issue partly unpreserved (*see* People's Br. at 63–64), the erroneous exclusion of Ms. McGriff's testimony would require reversal even under review for nonconstitutional trial error (*see* Appellant's Br. at 63).

By barring Ms. McGriff from testifying, the court erroneously deprived the jury of hearing testimony that was directly relevant to appellant's habit and credibility. This error cannot be considered

harmless when the jury's assessment of the credibility of appellant's account was the pivotal consideration in determining justification, and a new trial is therefore required.

## POINT IV

> IN THIS CASE, WHERE THERE WAS NO
> SERIOUS HARM DONE AND APPELLANT WAS
> IN NO WAY THE INSTIGATOR OR INITIAL
> AGGRESSOR, A 7-YEAR SENTENCE FOR
> SECOND-DEGREE ASSAULT WAS EXCESSIVE
> AND SHOULD BE REDUCED TO THE
> MINIMUM (RESPONDING TO POINT VII).

Appellant, a family man, maintained steady employment and stayed out of trouble for 6 years following release from prison after his prior encounter with the criminal justice system. He did precisely what the criminal justice system hopes all people do upon release: they find and keep employment, provide for their families, and lead law-abiding lives. Working as a mental-health peer counselor, appellant was on his lunchtime walk when he was confronted, elbowed, harassed, physically threatened, and followed by an unhinged man spewing racist invective— a man who was not produced by the People at trial and whose subsequent racist and violent conduct towards the EMT and hospital teams aligns

19

precisely with appellant's account. The complainant, Khalifa, was not seriously harmed, and while the People challenged certain aspects of appellant's story, they did not dispute that the encounter arose after Khalifa, completely unhinged and aggressive, targeted appellant, a stranger, for abuse, yelling racial slurs and threatening violence. Even if this Court agrees with the People that appellant's actions fell on the wrong side of justification, these actions were not so egregious, either in the moment or with the benefit of hindsight, to warrant the maximum 7-year sentence—especially given the jury's partial verdict of acquittal on the more serious count.

Thus, for the reasons set forth above and in appellant's main brief (Appellant's Br. at 69–72), this Court should therefore reduce appellant's sentence to the 5-year minimum to address the undeniably startling and difficult situation in which appellant found himself, and to take into account appellant's proven ability to be a productive member of society who gives back to the community.

## CONCLUSION

FOR THE REASONS SET FORTH ABOVE AND
IN APPELLANT'S MAIN BRIEF, THIS COURT
SHOULD         REVERSE         APPELLANT'S
CONVICTION      AND      DISMISS      THE
INDICTMENT      (POINT      I);      VACATE
APPELLANT'S CONVICTION AND ORDER A
NEW TRIAL (POINTS II–V); OR REMAND FOR
FURTHER        CONSIDERATION        OF
APPELLANT'S *BATSON* CHALLENGE (POINT
VI). ALTERNATIVELY, THE COURT SHOULD
REDUCE     APPELLANT'S     SENTENCE     AS
EXCESSIVE (POINT VII).

Respectfully submitted,

Paul Skip Laisure
Attorney for Defendant-
Appellant
Appellate Advocates
111 John St., 9th Floor
New York, NY 10038

DAVID L. GOODWIN
Of Counsel
December 20, 2018

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,             :
                                                 : PRINTING
            Respondent,                          : SPECIFICATIONS
                                                 : STATEMENT
      - against -                                : PURSUANT TO
                                                 : 22 N.Y.C.R.R.
LORENZO MCGRIFF,                                 : § 1250.8(b)(6), (j)
                                                 :
            Defendant-Appellant.                 :
------------------------------------------------------------------------x

      DAVID L. GOODWIN, an attorney admitted to practice before the
Courts of this State, certifies, pursuant to 22 N.Y.C.R.R. § 1250.8(b)(6)
and (j) that this brief was prepared on a computer using a proportionally
spaced serifed typeface, as follows:

      Name of typeface: Century Schoolbook

      Point size: 14 (13 in footnotes)

      Line spacing: Double (single in headings, blockquotes, and
      footnotes)

      The total number of words in the brief, inclusive of point headings
and footnotes, and exclusive of pages containing the table of contents,
table of authorities, proof of service, and this specifications statement, is
4,015.

Dated:      December 20, 2018
            New York, NY


                                          David L. Goodwin

## AFFIRMATION OF SERVICE

STATE OF NEW YORK     )
                         )    ss.:
COUNTY OF NEW YORK     )

David L. Goodwin, an attorney duly admitted to the practice of law in this State, does hereby affirm and show:

That on December 20, 2018, the within Reply Brief for Defendant-Appellant was served upon Mr. Lorenzo McGriff, 17-A-0545, Marcy Correctional Facility, P.O. Box 3600, Marcy, NY 13403, by causing a true copy of the same, in a post-paid, properly addressed wrapper, to be deposited in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York.

Dated: New York, NY
      December 20, 2018

David L. Goodwin