UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                  :

**LORENZO MCGRIFF**,                    :

                 Plaintiff,         :

                                    :    **MEMORANDUM DECISION AND**
                                       **ORDER**
             – against –           :
                                    :    21-CV-703 (AMD)

**SUPERINTENDENT DOC REARDON**,    :

                   Defendant.       :
------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  On August 11, 2015, the petitioner repeatedly stabbed Mohammed Khalifa.  The petitioner was convicted after a jury trial in Brooklyn Supreme Court of assault in the second degree and was sentenced as a predicate violent felon to a determinate prison sentence of seven years.  The Appellate Division, Second Department affirmed the conviction, and the New York Court of Appeals denied the petitioner's application for leave to appeal.

In seeking habeas relief, the petitioner raises the same claims he made in the Second Department: that the prosecutor exercised peremptory challenges of jurors in a discriminatory way, that the verdict was against the weight of evidence, that the prosecutor's cross-examination of the petitioner and summation comments were unfairly prejudicial, that the trial court's charge on the justification defense was flawed, and that his trial counsel was ineffective because she did not object to the charge or the verdict sheet.  In addition, the petitioner claims that the assault

---

[1] The petitioner was released on parole on August 23, 2022.  *See* Incarcerated Lookup, https://nysdoccslookup.doccs.ny.gov/ (last visited June 13, 2025).

charge was "duplicitous," and that the trial judge should have permitted him to call his wife as a witness.  As explained below, the petition is denied.

## BACKGROUND

### I.    Jury Selection and *Batson* Challenge

Jury selection began on December 13, 2016 before the Honorable Miriam Cyrulnik.[2]  On December 14, 2016, after the third and final round of jury selection, defense counsel, citing *Batson v. Kentucky*, 476 U.S. 79 (1986), argued that the prosecution used peremptory challenges to exclude two prospective Black jurors in the first round, three Black jurors in the second round, and five Black jurors in the third round.  (*See* Jury Selection Transcript ("JS Tr.") 282:20–85:21.)

The prosecutor noted that the court had not yet determined whether there was a pattern of discriminatory challenges, but argued that in any event there was no pattern of race-based peremptory challenges; he said that "we don't probably know half the races of people seated" and that five Black jurors had already been selected as jurors.  (*Id.* 285:16–86:3.)[3]  At that point, the prosecutor said that he could discuss the basis for his challenges after the court determined whether there was a pattern of discrimination.  (*Id.* 286:8-9.)  Based on her review of the record, the judge concluded there was no pattern "across the board."  (*Id.* 286:12-15.)

### II.    Trial

#### a.    The Prosecution's Case

The prosecution called five witnesses: three eyewitnesses — Jeanelle Toribio, Kadesha Guy and Ashley Reyes — and Police Officers Caleb Louard and Kevin Haynes.  The prosecution also introduced cell phone and surveillance videos.  (*See* Trial Transcript ("Tr.") 343:14–44:13;

---

[2] The petitioner's motion to suppress out-of-court identification evidence was denied after a hearing.  The petitioner does not challenge that decision.

[3] The prosecutor said that he did not know the race of one woman he challenged, but that one of her answers "disqualified her from being a fair juror here."  (JS Tr. 285:22-24.)

*see also id.* 24:9-25, 27:2-3 (the petitioner's opening statement describing the surveillance video footage).)  The victim's medical records and additional video evidence were admitted pursuant to stipulation.  (*Id.* 150:8-12.)  The evidence established the following facts.

At around 1:10 p.m., Kadesha Guy was driving on Court Street in Brooklyn when she saw the petitioner and Mohammed Khalifah "scuffling" in the middle of the street (*Id.* 34:22–35:13); "one guy looked like he was about the push the other guy."  (*Id.* 40:13-14.)  Guy's friend, who was sitting in the car behind the driver's seat, used Guy's cell phone to record the incident.  (*Id.* 38:17–40:8.)[4]  The video showed that the petitioner approached the much smaller Khalifa and pushed him onto Guy's car.  (*Id.* 40:12-22, 50:13-14.)[5]  According to Jeanelle Toribio, who was walking down Livingston Street towards Court Street, Khalifa approached the petitioner, the petitioner punched Khalifa, and then both men fell into the car.  (*Id.* 5:1–8:23.)  At that point, the petitioner grabbed Khalifa and stabbed him repeatedly with a knife.  (*Id.* 35:18-22, 37:3-4, 40:14-16, 43:12-24.)  The petitioner then ran down the street, and Khalifa ran in the same direction.  (*Id.* 44:14-25.)

Ashley Reyes was further down Court Street when the petitioner, who was holding a knife, chased Khalifa.  (*Id.* 109:14–110:25, 112:2-18, 114:2–15:2.)  When Khalifa fell into a storefront that was under construction, the petitioner stabbed him again, this time in the head and neck.  (*Id.* 9:20-23, 114:9–17:18.)  The petitioner ran south on Court Street.  (*Id.* 118:5-15.)  According to Toribio and Reyes, Khalifa was not holding anything.  (*Id.* 8:4-14, 16:7-16,

---

[4] The recording was admitted into evidence and submitted as Exhibit B to the state's response to the petition for a writ of habeas corpus.  (*See* ECF No. 5 (letter motion for leave to file video trial exhibits via email).)

[5] Guy thought that Khalifa pushed the petitioner back, although the recording is not clear on this point.

30:4-10, 117:19–18:1.)  Guy thought that Khalifa was holding something when he was "scuffling" with the petitioner but was "not sure what it was."  (*Id.* 49:9-13.)[6]

Police officers found Khalifa on Dean Street near Boerum Place, bleeding heavily from his wounds.  (*Id.* 65:11–67:20.)  Shortly thereafter, police officers found the petitioner crouching behind a car on Bergen Street between Boerum Place and Court Street.  (*Id.* 70:19–71:5.)  The police did not find the petitioner's weapon.  (*Id.* 77:14-15.)

Khalifa was treated at Methodist hospital for stab wounds, which, according to the medical records, were to his "lateral left chest," "left flank," "right cheek," "right eyebrow," and "left forearm."  (*Id.* 80:1-25, 357:11–58:7.)

### b.    The Defense's Case

The defense called two witnesses: the petitioner and Dominique Boyd, the EMT who treated Khalifa.  (*Id.* 158:14-24, 279:21–280:17.)[7]  The petitioner testified that on August 11, 2012, he was walking on Joralemon Street in Brooklyn Heights when Khalifa, whom he did not know, elbowed him in the collarbone.  (*Id.* 161:22–62:15.)  The petitioner, "startled," shoved Khalifa, who "had this growl on his face like a madmen [*sic*]."  (*Id.* 162:21-25.)  Khalifa followed the petitioner, shouting that the petitioner was "a slave" and a "N****."  (*Id.* 163:1-5.)  The petitioner tried to walk away but Khalifa ran up behind him, "ranting and raving."  (*Id.* 163:15.)  Khalifa continued to follow the petitioner, still shouting racist remarks, as the petitioner walked toward Court Street.  (*Id.* 163:16-25.)

---

[6] In the video, Khalifa does not appear to be holding anything.

[7] The defense also introduced Boyd's report.  (Tr. 286:22-23.)

At one point, Khalifa picked up a brick from a construction site and wrapped it in his shirt.  (*Id.* 164:25–65:6.)[8]  The petitioner ran from Khalifa, but had "no more run … to get away from him."  (*Id.* 182:7-8.)  The petitioner "did not believe … [he] could withdraw from this man in complete safety without him hitting [the petitioner] with that rock."  (*Id.* 182:8-10.)  The petitioner turned to defend himself and pulled out a four inch "wire stripper."  (*Id.* 165:18-22.)  Although at points in his testimony the petitioner referred to the wire stripper as a knife, he said that it "wasn't actually a knife," but a "tool … for shredding wire" (*Id.* 167:4-6); he used it "to prepare, fix headphones," and "[t]hings like that."  (*Id.* 195:16-17.)  Khalifa was "jousting" the petitioner with the brick, so the petitioner struck him with the wire stripper "[a]bout three or four times" (*Id.* 166:16-25), "aiming for the lower extremities so [as] not to cause fatal damage."  (*Id.* 167:2-3.)  Khalifa dropped the brick and fell into the construction site.  (*Id.* 167:2-11.)  The petitioner's "first instinct was to get away from [Khalifa] because of the erratic state he was in" and "[his] only concern was to create distance between [them] because he was definitely posing [an] [imm]inent threat to [the petitioner]."  (*Id.* 188:23–89:1.)

The petitioner ran down Court Street toward his office on Livingston Street.  (*Id.* 167:18.)  Khalifa was still following him and yelling, but he no longer had the brick in his hand.  (*Id.* 167:19–68:3.)  According to the petitioner, Khalifa was no longer "posing [an imm]inent threat," so he "ke[pt] moving" and dropped the wire stripper.  (*Id.* 190:3–91:12.)  A police officer saw the petitioner behind a truck, pulled out his gun, and yelled at him to get on the ground.  (*Id.* 169:1-16.)  The petitioner complied.  (*Id.* 169:14-16.)

---

[8] The petitioner described the object as a "brick," a "boulder," "debris" (*id.* 165:5-19), and a "rock" (*id.* 187:7-23).

An ambulance arrived to take Khalifa to the hospital.  (*Id.* 287:17.)  According to EMT Boyd, Khalifa had to be sedated because he was "very combative, uncooperative, verbally abusive and assaulted [the] crew."  (*Id.* 287:21-22.)  Boyd wrote in her report that Khalifa had "two stab wounds to the left side of his back," "one stab wound to [his] right jaw," and "one stab wound to [his] left forehead above [the] eyebrow."  (*Id.* 287:18-20.)  Khalifa, whose blood tested positive for cocaine, checked out of the hospital the next day against doctors' orders. (*Id.* 330:3-10.)

> i.   *Evidentiary Ruling*

The defense moved to call the petitioner's wife.  (*Id.* 276:19-20.)  Outside the presence of the jury, the prosecution asked for an offer of proof as to what the petitioner's wife would say, because she did not see the stabbing.  (*Id.* 277:10-14.)  Counsel proffered that she would testify that the petitioner regularly carried a wire stripper because one of his hobbies was repairing speakers and other electrical equipment.  (*Id.* 277:15-23.)  According to the defense, this testimony would support the petitioner's testimony that he stabbed Khalifa with a wire stripper, not a knife.  (*Id.* 277:15-23.)  The court denied the application, because whether the petitioner used a knife or a wire stripper was "collateral" and irrelevant.  (*Id.* 278:12-13.)  The court instructed the jury "not to speculate" why the petitioner's wife did not testify.  (*Id.* 278:24–79:4.)

## III.   Jury Charge

As part of her final charge, Judge Cyrulnik instructed the jury on the defense of justification, "also known as self-defense."  (*Id.* 384:4–87:5.)  Judge Cyrulnik explained that the prosecution was "required to prove beyond a reasonable doubt that the defendant was not justified," and that "[t]he defendant…[was] not required to prove that he was justified." (*Id.* 384:9-12.)  She also read the statutory definition of justification: "[A] person may use physical force upon another individual when and to the extent that he reasonably believes it to be

necessary to defend himself from what he reasonably believes to be the use or imminent use of physical force by such person." (*Id.* 384:15-20.) She explained that in order to be justified in using force, "the defendant must have actually believed that Mohammed Khalifa was using or was about to use physical force against him, and that the defendant's own use of physical force was necessary to defend himself," and that "a reasonable person in the defendant's position, knowing what the defendant knew and being in the same circumstances, would have had those same beliefs. It does not matter that the defendant was or may have been mistaken in his belief, provided that such belief was both honestly held and reasonable." (*Id.* 385:2-13).

In addition, Judge Cyrulnik told the jury that "[t]he People are required to prove beyond a reasonable doubt that the defendant was not justified. It is therefore an element of each of the two counts that the defendant was not justified. As a result, if you find that the People have failed to prove beyond a reasonable doubt that the defendant was not justified, then you must find him not guilty under counts one and two." (*Id.* 386:23–87:5.)[9] During deliberations, the jury asked Judge Cyrulnik to repeat these instructions, which she did. (*Id.* 421:20-24, 428:8–430:25).

## IV.   Verdict and Sentence

On December 20, 2016, the jury acquitted the petitioner of attempted assault in the first degree, N.Y. Penal Law § 265.03, and convicted him of second-degree assault, N.Y. Penal Law § 160.15. (*Id.* 438:24–39:8.)[10]

On January 17, 2017, the petitioner's counsel made an oral motion to set aside the verdict pursuant to C.P.L. § 330.30. (Post-Trial Motion Hearing Transcript ("Hr'g Tr.") 3:1–6:10.) She

---

[9] The judge also gave the jury a missing witness charge as to Khalifa, over the prosecutor's objection. (*Id.* 302:20–03:5.)

[10] The jurors did not specify the basis for acquittal on the first-degree attempted assault charge.

argued that "the jury was mistaken on the facts and on the law," that the "complaining witness" did not appear and that the eyewitnesses had not seen what led up to the stabbing.  (*Id.* 3:22–4:9.) According to counsel, the jury was "mistaken when not using the justification defense for Mr. McGriff."  (*Id.* 5:11-13.)  Counsel argued that the jury "appear[ed]" to apply the justification defense to the "attempted assault in the first degree, but did not apply it to the assault in the second degree" and said that "[t]he same defense holds true for the same actions in the second degree."  (*Id.* 5:12-16.)  The prosecutor responded that there was no way to know why the jury acquitted the petitioner of attempted assault in the first degree, but pointed out that, as he argued in summation, there were two separate stabbings: the first in front of Ms. Guy's car, and the second near the construction site.  (*Id.* 5:21–6:6.)  The trial court denied the motion.  (*Id.* 6:12-13.)

On January 20, 2017, the court sentenced the petitioner as a second violent felony offender to a determinate prison term of seven years, followed by a five-year term of post-release supervision.  (Sentencing Transcript ("S. Tr.") 2:11–8:16.)

## PROCEDURAL HISTORY

### I.    Direct Appeal

The petitioner appealed his conviction to the Appellate Division, Second Department, and made the following claims: (1) the prosecution exercised peremptory challenges to exclude Black jurors in violation of *Batson v. Kentucky*; (2) the prosecutor's cross-examination and summation comments were unfairly prejudicial, and rendered the second degree assault charge "duplicitous;" (3) the trial judge should have allowed the petitioner to call his wife as a witness; (4) the trial judge should have instructed the jurors to stop deliberating once they acquitted the petitioner of attempted first degree assault; (5) trial counsel was ineffective because he did not object to the court's instruction or the contents of the verdict sheet; (6) the verdict was against

the weight of the evidence; and (7) the petitioner's sentence was excessive.  (*See* ECF No. 6-7 at 3–5.)

The Second Department unanimously affirmed the conviction.  *People v. McGriff*, 175 A.D.3d 1432 (2d Dep't 2019).  The court found that the "jury's verdict rejecting the defendant's justification defense and finding him guilty was not against the weight of the evidence." *Id.* at 1432–33 (citations omitted).  The court declined to reach the petitioner's challenge to the jury instruction on justification "in the exercise of [its] interest of justice jurisdiction" and because the claim "was not preserved" for review.  *Id.* at 1433 (citations omitted).  The court also rejected the *Batson* challenge because the petitioner "failed to make a prima facie showing that the prosecution exercised its peremptory challenges in a discriminatory manner." *Id*. (citations omitted).  The court rejected the ineffective assistance claim because "the record reveals that his trial counsel provided meaningful representation." *Id.* (citations omitted).  The court concluded that the sentence was not excessive. *Id.*  Finally, the court held that the petitioner's "remaining contentions are without merit." *Id.*

The New York Court of Appeals denied the petitioner's application for leave to appeal on November 29, 2019.  *People v. McGriff*, 34 N.Y.3d 1018 (2019).

## II.    Federal Habeas Petition

The petitioner filed this petition on February 3, 2021 (ECF No. 1) and makes the same claims he made to the Second Department, excepting the excessive sentence claim.  (*Id.*)

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits federal courts' authority to grant state prisoners' habeas corpus petitions.  A federal court can entertain only those applications claiming violations "of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A petitioner can seek federal habeas corpus relief only after he exhausts his state court remedies and gives the state court a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

Even when issues are properly before a federal court, AEDPA's standards are "difficult to meet" because the Act provides a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted). Accordingly, a federal court may not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This bar applies to substantive and procedural state law grounds alike. *Id.* at 729–30.

As for claims that have been "adjudicated on the merits in State court proceedings," a federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C. § 2254(d)). Federal court review "is limited to the record that was before the state court that adjudicated the claim on the merits," and "[t]he petitioner carries the burden of proof." *Id.* at 180–81.

When a state court "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment. . . a federal habeas court must defer in the manner prescribed by 28 U.S.C. §

2254(d)(1) to the state court's decision on the federal claim — even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (citation omitted). For example, a state court ruling simply that a claim is "without merit" constitutes an adjudication on the merits of that claim. *Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006) (citing *Fama v. Comm'r of Corr. Services*, 235 F.3d 804, 810–11 (2d Cir. 2000)). In such a case, "the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." *Sellan*, 261 F.3d at 311–12.

For the purposes of federal habeas review, "clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412–13. The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## DISCUSSION

The petitioner challenges the state court's rejection of his *Batson* claim and the trial court's instructions to the jury on justification. He also claims that the prosecutor's cross

examination and summation comments were unfairly prejudicial, and that his comments rendered the second-degree assault charge duplicative.  He says that his trial lawyer was ineffective, that the trial judge should have allowed his wife to testify, and that the verdict was against the weight of evidence.  (ECF No. 1 at 2, 13.)

## I.   Justification Instruction

New York law provides that a person may "use physical force upon another person when . . . he . . . reasonably believes such to be necessary to defend himself . . . from what he . . . reasonably believes to be the use or imminent use of unlawful physical force by such other person."  N.Y. Penal Law § 35.15(1).  The defense of justification is not available, however, if the person "was the initial aggressor," used force beyond what was necessary to stop the threat or had the opportunity to, but did not, retreat.  *Id.* § 35.15(1)(b), (2)(a).

Judge Cyrulnik charged the jury on the law of justification.  She read the statutory definition, and explained that the petitioner was "not required to prove that he was justified;" rather the prosecution had "to prove beyond a reasonable doubt that he was not justified." (Tr. 384:9-12.)  The trial court instructed the jury that they must consider the justification defense "with respect to counts one and two."  (*Id.* 384:5.)  The petitioner's lawyer did not object to any aspect of the court's charge.

Although he made no such request to the trial court, the petitioner argues that the trial court should have also charged the jurors that they should cease deliberations if they found that the prosecution had not disproved justification beyond a reasonable doubt.  (ECF No. 1-2 at 31– 51.)  The Second Department rejected this claim as "unpreserved for appellate review," because the petitioner did not object to the jury charge.  *People v. Gutierrez*, 172 A.D.3d 1094, 1094– 1095 (2019) (citations omitted); *see also* C.P.L. §470.05(2) (to preserve a claim for appeal, a party must register an objection at the trial, when the court has an opportunity to remedy any

error); *People v. O'Hara*, 96 N.Y.2d 378, 383 (2001) ("[D]uring the jury charge conference, defendant did not object to the specific language of the charge . . . [t]hus, those issues are unpreserved."). The Appellate Division's determination that the petitioner did not preserve the claim is an independent and adequate state ground that precludes habeas review in this Court. *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011). Nor does the petitioner demonstrate cause for the default, actual prejudice or that failure to consider the claims will result in a fundamental miscarriage of justice.

In any event, there is no merit to the petitioner's claim. To succeed on a state court jury instruction claim, a habeas petitioner must establish that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973).

The petitioner has not made that showing. As an initial matter, justification was not the only ground on which the jury could have acquitted the petitioner of first-degree attempted assault, and there is no suggestion in the record that the jury concluded that the petitioner was justified. Moreover, Judge Cyrulnik was clear that the defense of justification applied to both assault counts. And the evidence, which included eyewitness testimony and video, established that the petitioner was not justified. He grabbed the unarmed victim and stabbed him at least three times, chased him, and continued stabbing him even after he fell down. Nor was the court required to include justification language on the verdict sheet. *See Moreno v. Kirkpatrick*, No. 06-CV-2136, 2010 WL 1223121, at *13 (E.D.N.Y. Mar. 23, 2010) ("Under New York Criminal Procedure Law, courts are not required to submit defenses on the verdict sheet." (citing N.Y. C.P.L. § 310.20(2))).

## II.    Ineffective Assistance of Counsel

Because there was no error in the court's charge, or on the verdict sheet, trial counsel was not ineffective for failing to object.  Indeed, the Second Department concluded that "the record reveals that his trial counsel provided meaningful representation."  *McGriff*, 175 A.D.3d at 1433 (citing *People v. Benevento*, 91 N.Y.2d 708, 712 (1998)).

The petitioner cannot demonstrate that the Appellate Division's decision was "contrary to, or involved an unreasonable application of the federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"  28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 100 (2011), a standard that is meant to be exacting; the petitioner must demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 102–03.  The federal court must grant the state court "deference and latitude that are not in operation when the case involves a review under the *Strickland* standard itself."  *Id.* at 101.

As noted above, counsel was not ineffective because there was no error.  Indeed, counsel persuaded the jury to acquit the petitioner of the most serious charge.  Accordingly, the Second Department's finding that the petitioner's trial counsel was not ineffective was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

14

## III.    Against the Weight of the Evidence[11]

The petitioner argues that the verdict was against the weight of the evidence.  (ECF No. 1-2 at 52–62.)  In rejecting this claim, the Second Department found that "the jury's verdict rejecting the defendant's justification defense and finding him guilty was not against the weight of evidence."  *McGriff*, 175 A.D.3d at 1432–33.

"[T]he law is clear that a 'weight of the evidence' claim is based on state law.'"  *Rubin v. Lamanna*, No. 18-CV-1924, 2019 WL 3557693, at *15 (E.D.N.Y. Aug. 5, 2019); *see also Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles.").  "The Court cannot consider a purely state law claim on federal habeas review."  *Lamanna*, 2019 WL 3557693 at *15 (citation omitted).  Moreover, it is the jury's exclusive province to determine the weight and credibility of evidence, and a habeas court must defer to those assessments.  *See Douglas v. Portuondo*, 232 F. Supp. 106, 115–16 (S.D.N.Y. 2002) (citations omitted).  Habeas review is thus not available, and the petitioner's weight of the evidence claim is dismissed.

## IV.    The Prosecution's Summation and Cross-Examination of the Petitioner

The petitioner also renews his complaints about the prosecutor's cross-examination and summation, which he claims deprived him of a fair trial.  According to the petitioner, "[t]he prosecutor shifted the burden of proof to petitioner, pressed him to testify that certain

---

[11] The petitioner is not challenging the legal sufficiency of the evidence.  As he clarified on appeal in state court, he was making "a weight-of-the-evidence claim … not a sufficiency claim."  (ECF No. 6-9 at 7.)  A petitioner may not raise "a federal claim for the first time in an application for discretionary review to a state's highest court."  *St. Helen v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004).  "Nonetheless, even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it has become procedurally barred under state law."  *Id.*

prosecution witnesses were lying, acted as an unsworn witness, vouched for the prosecution's witnesses while denigrating petitioner, and in summation[] described the petitioner as having a violent and vengeful character." (ECF No 1-2 at 63.) The Second Department included this claim in the "remaining contentions" that were "without merit." *McGriff*, 175 A.D.3d at 1433.

AEDPA deference applies to the Second Department's decision on the merits of the petitioner's claim. *See* 28 U.S.C. § 2254(d); *Renico v. Lett*, 559 U.S. 766, 773 (2010) (explaining that AEDPA "demands that state-court [adjudications on the merits] be given the benefit of the doubt"). This Court cannot disturb the Second Department's finding unless the petitioner can show that it "involved an unreasonable application of[ ] clearly established Federal law." 28 U.S.C. § 2254(d)(1). The petitioner cannot meet this high burden.

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone . . . in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11 (1985). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted). "In order to reach the level of a constitutional violation, a prosecutor's remarks must 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "Whether a prosecutor's improper remarks result in a denial of due process depends upon whether the remarks caused 'substantial prejudice' to the defendant." *United States v. Tutino*, 883 F.2d 1125, 1136 (2d Cir. 1989) (citation omitted). To determine whether "substantial prejudice" exists, the court "must assess how prejudicial the prosecutor's conduct was, what measures, if any, the trial court used to cure the prejudice, and whether conviction was certain absent the prejudicial conduct." *Gonzalez*, 934 F.2d at 424.

The petitioner claims that the prosecutor "repeatedly shifted the burden of proof" during cross-examination "by suggesting, among other things, that petitioner had the responsibility to preserve evidence, to remain at the scene, or to otherwise explain why he had not 'warned' Khalifa or made a more peaceable choice."  (ECF No. 1-2 at 64.)  The petitioner challenges the following questions: (1) whether the petitioner was "the only person that has come in court, [and] said [Khalifa] picked up a rock" (Tr. 226:11-12); (2) that the petitioner "didn't stay on scene to talk to the police to make a report to secure the boulder so it would be available for trial" (*id.* 252:6-7); (3) whether the petitioner "could have kept [the wire cutter]" and "showed it to the police" (*id.* 255:8-9); (4) whether the petitioner "t[old] [Khalifa] that [he] had a knife" (*id.* 216:24); (5) whether the petitioner called 911 (*id.* 264:7); (6) "[w]hy [the petitioner] did not wait on the scene" and "have [Khalifa] arrested" (*id.* 248:17-18); and (7) whether the petitioner "ha[d] a single scratch on [him] when [he] [was] arrested" (*id.* 236:11-12).

The prosecutor's "questions were a permissible attempt to attack the credibility of [the] [p]etitioner's claim of self-defense." *Cruz v. Walcott*, No. 22-CV-6046, 2024 WL 1908880, at *10 (W.D.N.Y. May 1, 2024).   Moreover, defense counsel objected to only one of these questions — whether the petitioner stayed to speak to the police in order to secure the "boulder" — and the court overruled the objection. *See People v. Overlee*, 236 A.D.2d 133, 142 (1st Dep't 1997) ("[T]ellingly, defendant's failure to object to any of the questions is perhaps the best indication of the absence of any real prejudice.").

The petitioner challenges the following summation comments: that the eyewitnesses testified "under oath" and "told you exactly what they saw. They have no basis here … no motive to lie" (Tr. 335:16-19); that the petitioner "embellished" his "story" that Khalifa picked up a brick (*id.* 338:10); that "everything [the petitioner] told you up there, was an embellishment

in some way.  Some of it was a straight up lie" (*id.* 341:8-10); that the petitioner's testimony that

he was fearful was "[n]onsense;" that "[h]e will say anything to you;" that the petitioner was an

"interested witness;" that he was the "[o]nly one person" who told the jury that Khalifa whirled a

brick "over the head like a sling" (*id.* 356:20–57:1); and that one of the police officers had no

motive to lie.  (*Id.* 354:12).  The petitioner also challenges the prosecutor's statement that he did

not call 911.  (*Id.* 335:2-3, 350:11-14.)[12]

These comments were largely responsive to defense counsel's summation arguments.

(*See id.* 324:7-8 ("He saw him with the brick in his hand and he felt his life was in danger."); *id.*

326:4-13 ("[T]he testimony by all three of the People's witnesses … not one of them said that

they saw anything in Mr. Khalifa's hands.  You clearly see he had something in his hands

…Why would all of [*sic*] three of the witnesses not admit that they saw this item?  I don't

know."); *id.* 327:2-6 ("All three of the prosecution witnesses said they heard yelling, but not one

of them said we heard those words.  Why is that?  But the one witness we called who is not an

interested party clearly heard those words.").)  *See also Mejia v. Superintendent, Elmira Corr.*

*Facility*, 702 F. Supp. 3d 83, 96 (E.D.N.Y. 2023) ("[A] prosecutor gains more leeway to

comment on a witness's credibility after defense counsel attacks it."); *Duren v. Lamanna*, No.

18-CV-7218, 2020 WL 509179, at *16 (E.D.N.Y. Jan. 30, 2020) ("Where a prosecutor's

statement is responsive to comments made by defense counsel, the prejudicial effect of such

objectionable statements is diminished.").

Moreover, the trial court instructed the jury that "it is for you and you alone to determine

the facts from the evidence that you find to be truthful and accurate" and that "what the lawyers

say is simply argument that's being submitted for your consideration."  (Tr. 305:19-24.)  *See*

---

[12] The petitioner also cites page 341 of the trial transcript but does not identify the comments to which he is objecting.

*Mejia*, 702 F. Supp. 3d at 96 ("[E]ven when improper vouching occurs, the trial court may cure it by instructing the jury that summations are not evidence and that the jury is the sole judge of the facts."). "[T]hat [the prosecutor] called [the petitioner] a liar in summation does not amount to misconduct warranting habeas relief." *Smith v. Walsh*, No. 00-CV-5672, 2003 WL 22670885, at *5 (E.D.N.Y. Oct. 20, 2003); *see also id.* ("Criminal trials often involve irreconcilable testimony, and an argument that a defendant—or any other witness, for that matter—lied under oath is not something courts should be squeamish about."); *Portes v. Capra*, 420 F. Supp. 3d 49, 58 (E.D.N.Y. 2018) ("The prosecution's characterization of the defense theory of self-defense as 'absurd' likewise was not improper such that it could be said to constitute prosecutorial misconduct.").

The petitioner contends that "the prosecutor also testified to the jury" during his summation. (ECF No. 1-2 at 66.) He challenges the following remarks: (1) "[s]omewhere along that crazy path [the petitioner] took, I submit that he came up with the idea I don't want this knife because people are following me" (Tr. 356:10-12); (2) "Khalifa was fleeing. He was fleeing. Make no mistake about it." (*Id.* 339:16-17); and (3) "You have eyes. Use your own eyes, everyone. You can look at that as long as you want. That's not a wire stripper, that is a knife. Clear as day that's a knife." (*Id.* 355:17-19.)

These remarks were fair comment on the evidence, and like the comments above, responsive to defense counsel's arguments. "[T]he prosecution is permitted to rebut arguments raised during a defendant's summation, even to the extent of permitting the prosecutor to inject his view of the facts to counter the defense counsel's view of the facts." *Duren*, 2020 WL 509179, at *16 (internal quotation marks and citation omitted). As for the comment to which counsel objected — that the petitioner used a knife, not a wire stripper, to stab Khalifa — the

trial judge sustained the objection. (Tr. 355). "[G]iven that defense counsel's objection to the remark was sustained, I cannot conclude that this error infected the whole trial with prejudice." *Schicchi v. Ercole*, No. 06-CV-3273, 2007 WL 837109, at *9 (E.D.N.Y. Mar. 18, 2007).

Finally, the petitioner argues that the prosecutor repeatedly suggested that the petitioner "was generally a violent, dangerous, and vengeful man." (ECF No. 1-2 at 67.) The petitioner challenges the following remarks: (1) "No one talks to Mr. McGriff like that. Right? All six foot one 300 pounds of [the petitioner]. He is not used to this" (Tr. 338:25–339:2); (2) the petitioner was "angry" even though "[h]e won't tell us that he was angry" (*id*. 345:7-19); (3) the petitioner "needs you to believe that he . . . had this fear from this tiny man" (*id*. 342:1-3); (4) the petitioner was trying to teach Khalifa a "lesson" (*id*. 343:9-10, 359:7-8); (5) the petitioner "solve[s] [his] problems" with [his] knife" (*id*. 346:9-10); and (6) the petitioner did not "retreat" "[b]ecause that's not what this [petitioner does]" and the petitioner "followed [Khalifa] and he chased him down." (*Id*. 359:4-9.)

The prosecutor's comments about the petitioner's height were not improper, as trial counsel made a similar remark during her summation. (*See id*. 314:20–315:1 ("MS. BURKE: . . . Because who in this day and age would have called somebody on the street [n*****] and say that to him? Especially a man [the petitioner's] size. He is six foot one, on the plus side of 275 pounds.").) Nor do the comments that the petitioner was angry and vengeful entitle the petitioner to habeas relief; courts have found that far more inflammatory comments do not warrant habeas relief. *See Darden*, 477 U.S. at 180–181 (denying habeas relief where the prosecutor referred to the petitioner as an "animal," among other offensive comments); *Jackson*, 763 F.3d at 149 ("[T]he prosecutor's characterization of Jackson in her opening statement as

'twisted' and 'sadistic' was no more inflammatory than the statements made by the prosecutor in *Darden*, which the Court found did not warrant habeas relief.").

The Second Department's rejection of the petitioner's prosecutorial misconduct claims was not contrary to or an unreasonable application of federal law.  None of the prosecutor's questions or remarks could have had "a substantial or injurious effect or influence on the jury's verdict," because the prosecution presented "compelling evidence" that allowed the jury to conclude that the petitioner was guilty beyond a reasonable doubt.  *Bentley v. Scully*, 41 F.3d 818, 825 (2d Cir. 1994); *see also United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) ("Often, the existence of substantial prejudice turns upon the strength of the government's case: if proof is strong, then the prejudicial effect of the comments tends to be deemed insubstantial."); *McManus v. Vann*, No. 18-CV-3800, 2019 WL 3767538, at *9–16 (E.D.N.Y. Aug. 9, 2019) (declining to overturn a conviction even assuming that the prosecutor mentioned matters not in evidence, vouched for her witness, attempted to shift the burden of proof and mischaracterized the evidence, because "the evidence of petitioner's guilt was so overwhelming that the outcome would have been the same absent the alleged prejudicial conduct").

Accordingly, habeas relief is not available on this ground.

## V.  Duplicitous Count

The petitioner claims, as he did on appeal, that the prosecutor made the assault charge "duplicitous."  Citing New York Criminal Procedure Law 200.30(1), which provides that "[e]ach count of an indictment may charge one offense only," the petitioner objects to the following remarks:

> When you stab someone five times, twice to the front and the back, twice to the forearm, twice to the head, what else could you be doing?  You are trying to seriously hurt them.

Just because I submit Mr. Khalifa got lucky and the defendant got lucky he didn't actually cause a serious physical injury, doesn't mean that wasn't his intent. His actions proved to you that's exactly what it was.

So, the big thing here, right? Is justification. Well let's say you are sitting there, you are saying, Mr. Mottola, I don't know. I don't know. I don't know. What if, what if we can't see it? The witnesses just missed this, this brick. Something was in that shirt, that hoodie and I don't know. I don't know. Maybe, you know, maybe he was within his right to stab him. Stab him once, stab him twice.

Go back to Ashley's testimony. She's right there. Once even if you believe that Mr. Khalifa had any kind of object or the defendant thought he had this object, once he is stabbed twice, breaks away and is running and fleeing towards that construction site, okay, the fight is over. The fight is over. He now can no longer use that knife. He can retreat in complete safety for himself. The man is done. He is stabbed and fleeing.

He didn't do that. Because that's not what this defendant does. He was going to teach Mr. Khalifa a lesson for those nasty things he said to him. He followed him and he chased him down. He went to finish the job. He stabs him three more times. And the law doesn't permit that. That's not self-defense.

(Tr. 358:5–359:11.)  The Second Department did not address this claim specifically but included it in the "remaining contentions" it found were "without merit."  *McGriff*, 175 A.D.3d 1432 at 1433.

Even if the petitioner were correct, a claim of duplicitous charges is not cognizable on habeas review.  "[T]he mere presence of duplicitous charges cannot provide a basis for habeas relief."  *Santilus v. Heath*, No. 11-CV-5703, 2014 WL 5343817, at *2 (E.D.N.Y. Oct. 20, 2014).  "Such state law requirements cannot be considered by federal courts on habeas review."  *Watson v. DHS/ICE*, No. 15-CV-4173, 2019 WL 1473083, at *10 (E.D.N.Y. Mar. 31, 2019) (quoting *Jones v. Lee*, No. 10-CV-7915, 2013 WL 3514436, at *7 (S.D.N.Y. July 12, 2013)) (citing 28 U.S.C. § 2254(a)).

## VI.    Preclusion of Collateral Testimony

After the petitioner's lawyer announced that she was calling the petitioner's wife as part of the defense case, the prosecutor asked, out of the jury's presence, for an offer of proof.  (Tr. 277:7-14.)  Counsel said that the witness would testify that the petitioner carried a "wire stripper" because he repaired things as a hobby.  (*Id.* 277:15-22.)  The prosecutor argued that the testimony was collateral and irrelevant.  (*Id.* 278:1-2.)  The court agreed, and instructed the jury not to speculate about why the witness did not testify.  (*Id.* 277:11-13.)  The petitioner challenges this ruling, as he did on appeal.  The Appellate Division included this claim in the "remaining contentions" that were "without merit."  *McGriff*, 175 A.D.3d 1432 at 1433.

A petitioner seeking habeas relief because of an evidentiary error must show that the exclusion of evidence was so prejudicial that the "conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  A petitioner seeking habeas relief based on an error of state evidentiary law must show that: (1) the state court's evidentiary ruling was an error of "constitutional magnitude," that is, it was both (a) an error under New York state law and (b) an error that denied him the "constitutional right to a fundamentally fair trial;" and (2) "the constitutional error was not harmless."  *Perez v. Phillips*, 210 F. App'x 55, 57 (2d Cir. 2006) (internal citations omitted); *see also Freeman v. Kadien*, 684 F.3d 30, 35 (2d Cir. 2012) (federal habeas corpus relief does not lie for errors of state law, but "[a] federal habeas court may, of course, review an error of state evidentiary law to assess whether the error deprived the petitioner of his due process right to a 'fundamentally fair trial.'" (quoting *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004))).  To satisfy the second prong, the erroneously admitted evidence must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 73 (2d Cir. 2011)

(citation omitted); *see also Lyons v. Girdich*, No. 02-CV-3117, 2003 WL 22956991, at *10 (E.D.N.Y. Oct. 15, 2003) ("Errors of state law that rise to the level of a constitutional violation may be corrected by a habeas court, but even an error of constitutional dimensions will merit habeas corpus relief only if it had a 'substantial and injurious effect or influence in determining the jury's verdict.'" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993))).

Since there was no dispute that the petitioner stabbed Khalifa with a weapon that even he sometimes described as a knife, the Appellate Division's conclusion that the petitioner's claim was meritless was not contrary to or an unreasonable application of clearly established federal law.

## VII.    *Batson* Challenge

The petitioner argues that the trial court should have granted his claim under *Batson* that the prosecution exercised peremptory challenges to exclude Black jurors in violation of *Batson*. (ECF No. 1-2 at 84–88.)  The Second Department upheld the trial court's "determination that the defendant failed to make a prima facie showing that the prosecution exercised its peremptory challenges in a discriminatory manner." *McGriff*, 175 A.D.3d at 1433.  This ruling is entitled to AEDPA deference.

In *Batson v. Kentucky*, the Supreme Court established a three-part test for evaluating whether a peremptory challenge is based on an impermissible discriminatory motive.

(1) The party objecting to the exercise of the peremptory challenge must make a prima facie showing that the proponent of the peremptory challenge did so with an intent to discriminate.  *Batson,* 476 U.S. at 93–97.

(2) If the objecting party makes a prima facie showing, the burden shifts to the non-objecting party to articulate a race-neutral explanation for challenging the potential juror.  *Id.*

(3) If the non-objecting party articulates a race-neutral explanation, the burden shifts back to the objecting party to show purposeful discrimination, that is, the race-neutral

explanation was a pretext for discrimination.  *Id.* at 96–98; *see also Hernandez v. New York*, 500 U.S. 352, 358–59 (1991).

Here, the trial court found at step one that there was no pattern and denied the petitioner's *Batson* challenge.  (Tr. 286:12-15.)  The petitioner argues that the Second Department's decision affirming the trial court's determination was an unreasonable application of clearly established federal constitutional law.  (ECF No. 1-2 at 84–88.)

Notwithstanding the petitioner's claims to the contrary, the record is "incomplete on critical information that could confirm (or not) a pattern of discrimination."  *DeVorce v. Philips*, 603 F. App'x 45, 47 (2d Cir. 2015).  A petitioner "cannot establish that the state court unreasonably concluded that the pattern was not sufficiently suspicious unless the petitioner can adduce a record of the baseline factual circumstances attending the *Batson* challenge."  *Sorto v. Herbert*, 497 F.3d 163, 171 (2d Cir. 2007).  The petitioner cites the following: (1) "the prosecutor struck at least 4 of the panelist[s] for no apparent reason, as those panelist[s] had said virtually nothing;" (2) during the first two rounds, the prosecutor struck four panelists who "gave minor biographical details and answered innocuous questions about consistency, but were otherwise silent;" and (3) "[t]he third-round challenges . . . included panelists like Grant who had answered questions in a manner favorable to the prosecution."  (ECF No. 1-2 at 86 (internal quotation marks omitted).)  But the record is missing "critical information;" there is no evidence, for example, of the racial "composition of the venire."  *DeVorce*, 603 F. App'x at 47; *see also Sorto*, 497 F.3d at 171–72.  Nor does the record show "the race of every prospective juror, as would be required for an accurate count."  *DeVorce*, 603 F. App'x at 47 n.3.  Indeed, the Court, trial counsel, and prosecutor disagreed about the race of various seated and prospective jurors.  (JS Tr. 284:4–286:17.)

Under these circumstances, the Second Department's decision on the *Batson* issue was not an unreasonable determination of facts or an unreasonable application of Supreme Court precedent.

## CONCLUSION

For these reasons, the petition is denied in its entirety. The case is dismissed. A certificate of appealability will not be issued because the petitioner has not made a substantial showing of a denial of a constitutional right. *See* 28 U.S.C. § 2553(c).


**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge


Dated: Brooklyn, New York
      June 16, 2025